UNITED STATES BANKRUPTCY COURT      <u>FOR PUBLICATION</u>
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re:                                  Chapter 11

RESIDENTIAL CAPITAL, LLC            Case No. 12-12020 (MG)

           Debtors.               Jointly Administered
-----------------------------------------------------------------x
ROWENA DRENNEN, individually and as
Representative of the KESSLER         Adv. No. 15-01025 (SHL)
SETTLEMENT CLASS, *et al.*,

           Plaintiffs,

       v.

CERTAIN UNDERWRITERS AT
LLOYD'S OF LONDON, *et al.*,

           Defendants.
-----------------------------------------------------------------x

<u>**MEMORANDUM OF DECISION**</u>

**A P P E A R A N C E S :**

**WALTERS, BENDER STROHBEHN &**
**VAUGHAN, P.C.**
*Co-Lead Counsel for the Kessler Class* and
*Counsel for the Mitchell Class*
2500 City Center Square
1100 Main
Kansas City, Missouri 64105
By:    R. Frederick Walters, Esq.
        Karen W. Renwick, Esq.
        David M. Skeens, Esq.
        Garrett M. Hodes, Esq.
        Michael B. Sichter, Esq.

**CARLSON LYNCH SWEET &**
**KILPELA, LLP**
*Co-Lead Counsel for the Kessler Class*
1133 Penn Avenue, 5th Floor
Pittsburgh, Pennsylvania 15222

By:     R. Bruce Carlson, Esq.
        Edwin J. Kilpela, Jr., Esq.

**POLSINELLI**
*Counsel for Kessler and Mitchell Classes*
900 Third Avenue, 21st Floor
New York, New York 10022
By:    Jason A. Nagi, Esq.
       Daniel J. Flanigan, Esq.

**PERKINS COIE, LLP**
*Counsel for ResCap Liquidating Trust*
700 13th St. NW, Suite 600
Washington, DC 20005
By:    Selena J. Linde, Esq.
       Vivek Chopra, Esq.
       Alexis Danneman, Esq.

**CLYDE & CO US LLP**
*Counsel for Defendant ACE Bermuda Insurance Ltd.*
405 Lexington Avenue, 16th Floor
New York, New York 10174
By:    Paul R. Koepff, Esq.

**O'MELVENY & MYERS LLP**
*Counsel for Defendant ACE Bermuda Insurance Ltd.*
7 Times Square
New York, New York 10036
By:    Tancred Schiavoni, Esq.
       Michael Neumeister, Esq.

**D'AMATO & LYNCH, LLP**
*Counsel for Defendant American International*
*Reinsurance Company, Ltd.*
Two World Financial Center
225 Liberty Street
New York, New York 10281
By:    David Kuffler, Esq.
       Maryann Taylor, Esq.

**TROUTMAN SANDERS LLP**
*Counsel for Defendant Chubb Atlantic Indemnity Ltd.*
401 9th Street, NW
Suite 1000
Washington, DC 20004
By:    Jonathan A. Constine, Esq.

Mitchel H. Perkiel, Esq.
Lee W. Stremba, Esq.

**SKARZYNSKI BLACK LLC**
*Counsel for Defendant XL Insurance Bermuda Ltd.*
One Battery Park Plaza
32nd Floor
New York, New York 10004
By:   James Sandnes, Esq.
        Michael Chester, Esq.

**FORAN GLENNON PALANDECH PONZI & RUDLOFF**
*Counsel for Certain Insurers under GM*
*Combine Specialty Insurance Company Program*
222 North LaSalle Street
Suite 1400
Chicago, IL 60601
By:   Susan N.K. Gummow, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are numerous motions in the above-captioned insurance coverage

dispute.  Four defendants filed a variety of motions seeking to dismiss the case for, among other

things, lack of personal or subject matter jurisdiction, and to send the dispute to arbitration.[1]

These four defendants, which will be collectively referred to as the "Bermuda Insurers," are ACE

Bermuda, AIRCO,[2] Chubb Atlantic, and XLIB.  The Bermuda Insurers have requested that the

---

[1]       These motions include: (1) ACE Bermuda Insurance Ltd.'s ("ACE Bermuda") motion to dismiss the
adversary proceeding and to compel arbitration [ECF No. 148]; (2) American International Reinsurance Company,
Ltd.'s ("AIRCO") motion to compel or stay in favor of arbitration [ECF No. 158-3]; (3) Chubb Atlantic Indemnity
Ltd.'s ("Chubb Atlantic") motion to dismiss the amended complaint, or in the alternative for a stay pending
arbitration [ECF No. 170]; (4) XL Insurance Bermuda Ltd.'s ("XLIB") motion for a stay pending arbitration, for
*Barton* leave (if and only to the extent necessary) and for an interim stay (the "XLIB Arbitration Motion") [ECF No.
77] (collectively referred to as the "Arbitration Motions"); (5) ACE Bermuda, AIRCO, Chubb Atlantic, and XLIB's
motions to dismiss for lack of personal jurisdiction and improper service [ECF Nos. 153, 162, 170, 168]; and (6)
ACE Bermuda and XLIB's motions to dismiss for lack of subject matter jurisdiction [ECF Nos. 151, 168].

[2]       AIRCO is the successor-in-interest to the excess liability insurance policy issued by Starr Excess Liability
Insurance International Limited to General Motors Corporation ("GM") for the period December 15, 2000 to
December 15, 2003.  *See* Decl. of Maryann Taylor in Support of Motion to Compel or Stay in Favor of Arbitration
("Taylor Decl.") ¶ 2 [ECF No. 158-1].

Court consider their Arbitration Motions first, arguing that they will moot their other motions.[3]

In addition to opposing the motions of the Bermuda Insurers, the plaintiffs filed a motion to

strike the majority of these motions for failure to post security under New York Insurance Law §

1213(c)(1) (the "Bond Motion") [ECF No. 177].[4]   The plaintiffs also filed what is styled as a

cross-motion under Section 1142(b) of the Bankruptcy Code that seeks an order to consummate

the bankruptcy plan (the "Section 1142 Motion") [ECF No. 187].   In this Section 1142 Motion,

the plaintiffs seek an order enjoining the defendants from raising certain defenses to insurance

coverage, like anti-assignment and reasonableness, which the plaintiffs contend are inconsistent

with the terms of the confirmed Chapter 11 plan.   *See* Section 1142 Motion at 9.   For the reasons

set forth below, the Bermuda Insurers' Arbitration Motions are granted but the arbitration

proceedings are stayed while the plaintiffs pursue their claims against other defendants on other

related insurance policies.   The Court denies the plaintiffs' Bond Motion, concluding that no

security was required before the filing of the Bermuda Insurers' motions.[5]   All other motions are

denied as moot.[6]

---

[3]      Counsel for ACE Bermuda informed the Court that in light of the Second Circuit's decision in *Katz v. Cellco P'ship*, 794 F.3d 341 (2d Cir. 2015), the Bermuda Insurers are seeking a stay of the litigation as against them, as opposed to dismissal of the adversary proceeding, while the arbitration goes forward.   *See* Transcript of Hearing Held on December 10, 2015 ("Hr'g Tr.") at 15:15–21 [ECF No. 273].

[4]      Unless otherwise specified, references to the Case Management/Electronic Case Filing ("ECF") docket are to this adversary proceeding.

[5]      The Bond Motion was also filed against two defendants that are not Bermuda Insurers: Swiss Re International S.E. ("SRI") and Steadfast Insurance Company ("Steadfast").   *See* [ECF No. 177].   Both SRI and Steadfast had filed motions to dismiss Count V of the amended complaint [ECF Nos. 139, 157].   Subsequently, all of these parties entered into a stipulation whereby the plaintiffs were granted leave to file a second amended adversary complaint that deleted Count V of the amended complaint, thereby rendering SRI and Steadfast's motions to dismiss moot.   *See* So-Ordered Stipulation to File Second Amended Adversary Complaint ¶¶ 2, 4 [ECF No. 205].

[6]      Because the Court will grant the Arbitration Motions, it does not need to reach the merits of the motions to dismiss for lack of personal or subject matter jurisdiction or the Section 1142 Motion.

## BACKGROUND

The plaintiffs in this action include the representatives of two class actions (the "*Kessler* Class," and the "*Mitchell* Class," and together, the "Class Plaintiffs"), and the ResCap Liquidating Trust (the "Liquidating Trust," and together with the Class Plaintiffs, the "Plaintiffs"). The Liquidating Trust is the successor to Residential Funding Company, LLC ("RFC"), one of the debtors, and was created pursuant to the Chapter 11 liquidation plan (the "Plan") in the Residential Capital LLC bankruptcy case.[7] The Liquidating Trust was created to implement the terms of the plan by collecting assets and making distributions to creditors. *See* Plan, Art. VI.B [Case No. 12-12020, ECF No. 6065-1].

Before filing for bankruptcy in 2012, RFC was a company specializing in "the purchase and resale of mortgage loans." *See In re Residential Capital, LLC*, 2015 WL 9302834, at *1 (S.D.N.Y. Dec. 21, 2015). "The Class Plaintiffs are individuals who obtained mortgage loans, which RFC later acquired on the secondary market." *Id.* The Class Plaintiffs brought several lawsuits against RFC before the bankruptcy in connection with its acquisition of the mortgage loans. *See id.* RFC filed for Chapter 11 on May 14, 2012. *Id.* The Class Plaintiffs subsequently filed proofs of claim in the bankruptcy. *Id.* The parties ultimately settled the *Kessler* Class and *Mitchell* Class lawsuits as part of a global settlement and the Plan. *See id.*

Under the settlement, the *Kessler* Class received a $300 million allowed claim and the *Mitchell* Class received a $14.5 million allowed claim. *See id.* The Plan assigned RFC's rights under certain insurance policies (the "GM Policies") to the Class Plaintiffs for recovery of their allowed claims. *See id.*; Plan, Art. IV.G; *see also* Order, dated December 17, 2013 [Case No.

---

[7]    The Residential Capital LLC bankruptcy case is pending before Judge Martin Glenn of this Court, while this adversary proceeding was transferred to Judge Lane. *See* Notice of Case Reassignment dated March 30, 2015 [ECF No. 87].

12-12020, ECF No. 6133] (providing the same assignment of rights to *Mitchell* Class as afforded

the *Kessler* Class in the Plan).  Pursuant to the *Kessler* settlement agreement and the Plan, the

Class Plaintiffs' recovery is limited to the GM Policies and distributions from a Borrower Claims

Trust.  *See* Plan, Art. IV.G.1.[8]  The *Kessler* settlement agreement sets forth the conditions for the

Class Plaintiffs' ability to recover against the GM Policies:

> The sole source of recovery of the Kessler Settlement Class shall be distributions from
> the Borrower Claims Trust and Insurance Rights under the [GM] Policies and not from
> any other assets or property of the Settling Defendants, Released Persons or any other
> Debtor . . . .
>     . . . .
> The Kessler Settlement Class and the Liquidating Trust take on all risk of recovery or
> lack thereof (including non-collectability), on the Insurance Rights. The assignment of
> the Insurance Rights under the Policies is without recourse or warranty with respect to
> actual recovery on such assigned rights. The lack of recovery on the Insurance Rights by
> the Kessler Settlement Class or the Liquidating Trust, as applicable, shall not create any
> rights of recovery against any Debtor, Released Person or Settling Defendant. To avoid
> any doubt, there shall be no claims upon the Debtors, Released Persons, or Settling
> Defendants based upon the failure to recover insurance proceeds or other Insurance
> Rights or the recovery of only a limited amount of insurance proceeds or other Insurance
> Rights, even in such instances where the Debtor, Released Person, or Settling
> Defendants' own past conduct is what precludes or limits the recovery or such instance
> where the assignments embodied in this Agreement are found to be invalid for any
> reason.

Amended Kessler Settlement Agreement, Exh. A § 5(a), (f) [Case No. 12-12020, ECF No.

4793]; *see also* Plan, Art. IV.G; Order, dated December 17, 2013 ¶ 9.  These same conditions

also apply to the *Mitchell* Class.  *See* Order, dated December 17, 2013; Debtors' Motion

Pursuant to Section 362 of the Bankruptcy Code and Bankruptcy Rule 9019 (A) Granting

Claimants Limited Relief from Automatic Stay and (B) Approving the Debtors' Entry into the

Settlement Agreement [Case No. 12-12020, ECF No. 5700]; *see also* Compl. ¶¶ 147–48.  Other

rights of RFC under the GM policies were assigned to the Liquidating Trust, such as the right to

---

[8]    This Borrower Claims Trust was created under the Plan to direct the processing, liquidating and payment of
allowed borrower claims.  *See* Plan, Art. IV.F.2.

recover defense costs and pre-bankruptcy settlements.  *See In re Residential Capital*, 2015 WL

9302834, at *1; *see also* Plan, Art. IV.G.2.

The Plan includes an "insurance neutrality" provision making clear that the settlement

does not modify the rights of the insurers under the GM Policies.  The provision states:

> Except as set forth below in VII.K.2.(e), nothing contained in this Plan, in the
> Disclosure Statement, in the Liquidating Trust Agreement, or in the Borrower
> Claims Trust Agreement (including addendums, exhibits, schedules, or
> supplements to the Plan, Disclosure Statement,  Liquidating Trust Agreement, or
> Borrower Claims Trust Agreement, and including any provision that purports to
> be preemptory or supervening), *shall in any way operate to, or have the effect of,
> impairing, altering, supplementing, changing, expanding, decreasing, or
> modifying the rights under the GM Policies of any of those insurers that issued
> the GM Policies* (the "GM Insurers").

Plan, Art. VII.K.2.(b) (emphasis added).  The Plan further provides that, except as related to

defenses regarding the assignment of rights, "for all issues of insurance coverage or otherwise,

the provisions, terms, and conditions of the GM Policies, as construed under applicable non-

bankruptcy law, shall control."  *Id.*  Under the Plan, however, "any defense [by the GM Insurers]

to coverage that is based on the assertion that the transfer of the insurance rights in this Plan are

invalid, unenforceable or otherwise breach the terms of the GM Policies" was waived.  *Id.* at Art.

VII.K.2.(e).  All other defenses were unaffected by the Plan.  *See id.*  The Plan defines "GM

Insurers" as "those insurers that issued the GM Policies," which includes the Bermuda Insurers.

*Id.* at Art. VII.K.2.(b).  Under the Plan, the bankruptcy court retained exclusive jurisdiction "over

all matters arising out of, or related to, the Chapter 11 Cases and the Plan . . . other than with

respect to the GM Policies and the GM Insurers, to hear and determine matters relating to

insurance claims and settlements regarding insurance . . . ."  *Id.* at Art. XII(f).

The defendants in this action, including the Bermuda Insurers (the "Defendants"), are

insurance companies that issued the GM Policies to GM.  The GM Policies covered GM's

subsidiaries, including RFC. *See In re Residential Capital*, 2015 WL 9302834, at *1; *see also* Second Amended Complaint ("Compl.") ¶ 4 [ECF No. 206]. GM purchased a $400 million "tower" of professional liability coverage, with primary and excess policies providing the following coverage: Combined Directors and Officers Liability and Company Liability, Errors and Omissions Liability, Pension Trust Liability, and Mortgagees Errors and Omissions Insurance Policy. *See* Compl. ¶¶ 38, 40. The Bermuda Insurers sold GM a $100 million layer of insurance in excess of the first two layers of coverage totaling $200 million. *See e.g.,* XLIB Insurance Policy at 9–10, 13, attached as Exh. A to Decl. of James Sandnes in Support of XLIB Arbitration Motion ("Sandnes Decl.") [ECF No. 79-1]; *see also* Compl. ¶ 43.[9] Thus, the GM Policies sold by the Bermuda Insurers are the third excess layer of coverage (the "Third Excess Policies"). The third excess layer was sold on a quota-share basis, meaning that a given percentage of each dollar of covered loss is paid by the Bermuda Insurers, with four equal shares of 25%. *See* XLIB Insurance Policy at 9–10, 13; ACE Bermuda Insurance Policy at 2–3; Starr Excess International Policy at 2–3; Chubb Atlantic Insurance Policy at 2–3. The Bermuda Insurers are all Bermuda corporations with their principal place of business in Bermuda. *See* Affirm. of Allison Towlson in Support of Motion to Dismiss for Lack of Personal Jurisdiction and Improper Service ("Towlson Affirm.") ¶ 4 [ECF No. 154]; Decl. of Aine Madden ("Madden Decl.") ¶ 2 [ECF No. 166]; Aff. of Alexander Rosati in Support of Motion to Dismiss for Lack of Personal Jurisdiction and Improper Service ("Rosati Aff.") ¶ 4 [ECF No. 160]; Decl. of Kevin Topple in Support of XLIB's Motion to Dismiss ("Topple Decl.") ¶ 4 [ECF No. 171].

---

[9]    *See also* ACE Bermuda Excess Insurance Policy at 2–3, attached as Exh. A to Affirm. of Paul R. Koepff in Support of ACE Bermuda's Motion to Compel Arbitration ("Koepff Affirm.") [ECF No. 149-1]; Starr Excess International Policy at 2–3, attached as Exh. A to Taylor Decl. [ECF No. 158-2]; Chubb Atlantic Excess Insurance Policy at 2–3, attached as Exh. A to Madden Decl. [ECF No. 166-1].

In assessing its liability insurance options, GM was advised by AON (Bermuda) Ltd.

("AON"), an insurance broker.  *See* Towlson Affirm. ¶ 11; Madden Decl. ¶¶ 10–11; Rosati Aff. ¶

14.  The Bermuda Insurers issued and delivered the GM Policies in Bermuda to AON and

received the premium for the policies from AON on behalf of GM.  *See* Towlson Affirm. ¶ 11;

Madden Decl. ¶¶ 10–12, 14; Rosati Aff. ¶¶ 14–16; Topple Decl. ¶¶ 21–24.  Each Bermuda

Insurer policy included a clause providing for arbitration in the event of a dispute.  The

arbitration clauses are very similar.  They generally provide: "*Any dispute, controversy or claim

arising out of or relating to* this Policy or the breach, termination or invalidity thereof shall be

finally and fully determined in London, England under the provisions of the Arbitration Acts of

1996 . . . ."  XLIB Insurance Policy ¶ IV.H (emphasis added).[10]

In this adversary proceeding, the Plaintiffs assert claims for declaratory relief and breach

of contract against the Defendants.  *See* Compl. ¶¶ 212, 219, 226, 233, 260, 269, 279, 288, 304,

312.  The Defendants provided either primary, first excess, second excess, third excess, or fourth

excess coverage to GM and include the Bermuda Insurers and eight other insurers.  *See id.* ¶¶

25–38, 40–44.  The Plaintiffs allege that RFC spent millions of dollars to defend and settle its

liability in relation to class action lawsuits commenced against RFC before the bankruptcy.  *See

id.* ¶¶ 2–3.  The Plaintiffs allege that the GM Policies cover the liability that RFC faced in these

---

[10]     There are no material differences in the other three policies.  The ACE Bermuda policy provides: "Any
dispute, controversy or claim arising out of or relating to this policy or the breach, termination or invalidity thereof
shall be finally and fully determined in London, England under the provisions of the Arbitration Acts of 1950, 1975,
1979 and 1996 . . . ." ACE Bermuda Excess Insurance Policy ¶ IV.H.  AIRCO is the successor-in-interest to the
Starr Excess International policy, which states: "Any and all disputes arising under or relating to this Policy,
including its formation and validity, and whether between the Insurer and the Insured or any person or entity
deriving rights through or asserting rights on behalf of the Insured, shall be finally and fully determined in Hamilton,
Bermuda under the provisions of The Bermuda International Conciliation and Arbitration Act of 1993 . . . ."  Starr
Excess International Policy ¶ VIII.  Finally, the Chubb Atlantic policy provides: "Any and all disputes,
controversies, claims or differences between the parties which arise from or relate to this policy . . . shall be solely
and exclusively determined and resolved by final and binding arbitration held in Bermuda . . . ."  Chubb Atlantic
Excess Insurance Policy at 5; *see also id.* at 4 (providing that all dispute resolution shall be by binding arbitration).

class action lawsuits but the Defendants have failed to pay the majority of the defense costs incurred by RFC or for RFC's liability stemming from the suits. *See id.* ¶ 4. The Plaintiffs, therefore, allege that the Defendants have breached the GM Policies and seek *inter alia* a declaration that the Defendants are obligated under the policies to provide coverage in connection with the class action claims and damages resulting from the alleged breach of contract. *See id.* ¶¶ 15–18. The Liquidating Trust specifically asserts a right to reimbursement from the Defendants for approximately $41 million in defense costs and pre-bankruptcy settlements paid to the Class Plaintiffs. *See In re Residential Capital*, 2015 WL 9302834, at *1; Compl. ¶¶ 126, 131, 148, 152, 224, 225, 226, 231, 233, 277, 278, 279, 286, 287, 288, 304, 310, 311, 312; *see also* Bond Motion at 5. The Class Plaintiffs contend that their claims are covered under the GM Policies and that the Defendants owe them over $314 million. *See In re Residential Capital*, 2015 WL 9302834, at *1; Compl. ¶¶ 16–18.

In April 2015, eight of the twelve defendants in this adversary proceeding filed a motion to withdraw the case from bankruptcy court to district court, arguing that the lawsuit involved non-core state law breach of contract claims. *See* Motion to Withdraw the Reference at 1 [ECF No. 105].[11] The District Court for the Southern District of New York (the "District Court") denied the motion to withdraw the reference. *In re Residential Capital,* 2015 WL 9302834, at *1, 4–5. It found that, although the matter is non-core, the factors established by the Second Circuit in *Orion Pictures Corp. v. Showtime Networks, Inc.* (*In re Orion Pictures Corp.*), 4 F.3d 1095 (2d Cir. 1993), weighed in favor of denying the motion, particularly the concerns for efficiency and delay. *In re Residential Capital,* 2015 WL 9302834, at *4–5 (stating that to withdraw the reference would "cause undue delay to the parties and would waste judicial

---

[11]    The Bermuda Insurers did not join in filing the motion to withdraw the reference. *See* Motion to Withdraw the Reference at 1.

resources."). The District Court concluded that the lawsuit is non-core because the contracts at issue existed before the bankruptcy. *Id.* at 3. It further found the Plaintiffs' arguments that their claims were nevertheless "inextricably linked to the [RFC] bankruptcy" were insufficient to render the action core. *Id.* at *3. Ultimately, "[g]iven the pre-petition nature of the GM policies, the absence of a pay-first provision, and the existence of a confirmed Chapter 11 plan," the District Court concluded the action is non-core. *Id.* at *4.

## **DISCUSSION**

As a threshold matter, the Court must determine the order in which to address the various motions that have been filed. The Bermuda Insurers urge the Court to first decide their Arbitration Motions. The Plaintiffs disagree and request that the Court first address the issue of personal jurisdiction and then the issues raised in the Bond Motion. A "federal court has leeway to choose among threshold grounds for denying audience to a case on the merits." *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (quotations and internal citations omitted); *cf. id.* at 432 (stating a court "may dispose of an action by a *forum non conveniens* dismissal, bypassing questions of subject-matter and personal jurisdiction, when considerations of convenience, fairness, and judicial economy so warrant."). Given the circumstances here, the Court concludes that it is appropriate to address the Arbitration Motions as the threshold matter because resolution of those motions will moot in large part the remaining motions. *See Ramasamy v. Essar Glob. Ltd.*, 825 F. Supp. 2d 466, 467 n.1 (S.D.N.Y. 2011) (holding it was within the court's discretion to first address the defendant's motion to stay or dismiss in favor of arbitration, which made it unnecessary to reach the defendant's motion to dismiss for lack of personal jurisdiction or for failure to state a claim).

### A.  The Arbitration Motions

The Federal Arbitration Act "establishes a 'federal policy favoring arbitration agreements,' and mandates the enforcement of contractual arbitration provisions." *MBNA Am. Bank, N.A. v. Hill*, 436 F.3d 104, 107 (2d Cir. 2006) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)); *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011).  "[W]ritten agreements to arbitrate 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *MBNA Am. Bank*, 436 F.3d at 107–08 (quoting 9 U.S.C. § 2).  Consistent with this policy, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Brownstone Inv. Grp., LLC v. Levey*, 514 F. Supp. 2d 536, 549 (S.D.N.Y. 2007) (internal quotations and citation omitted).  "It is well-settled that even statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the [Arbitration Act]." *Cibro Petroleum Prods., Inc. v. City of Albany* (*In re Winimo Realty Corp.*), 270 B.R. 108, 117 (S.D.N.Y. 2001) (internal quotations and citation omitted).  The Supreme Court has held that the Arbitration Act requires courts to "compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel" even when doing so would create "separate proceedings in different forums." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217 (1985); *see also Nilsen v. Prudential-Bache Sec.*, 761 F. Supp. 279, 284 (S.D.N.Y. 1991) ("When some claims before the court are arbitrable and others are not, a court has no discretion to hear the arbitrable claims, notwithstanding that those claims are based on facts common to the non-arbitrable claims.").

Yet, "[l]ike any statutory directive, the Arbitration Act's mandate may be overridden by a contrary congressional command." *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987); *see also Bethlehem Steel Corp. v. Moran Towing Corp.* (*In re Bethlehem Steel Corp.*), 390 B.R. 784, 793 (Bankr. S.D.N.Y. 2008). The party opposing arbitration bears the burden of proving that "Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue." *McMahon*, 482 U.S. at 227. Such congressional intent can be discerned from either the "[statute's] text or legislative history or from an inherent conflict between arbitration and the statute's underlying purposes." *Id.* (internal quotations and citations omitted).

Disputes that involve both the Bankruptcy Code and the Arbitration Act "often present conflicts of near polar extremes." *MBNA Am. Bank*, 436 F.3d at 108 (internal quotations and citation omitted). "The Second Circuit has recognized that a Bankruptcy Court has discretion to decline to compel arbitration when a conflict exists 'between the Bankruptcy Code, which favors centralization of disputes concerning a debtor's estate, and the Arbitration Act, which advocates a decentralized approach to dispute resolution.'" *In re Winimo*, 270 B.R. at 118 (quoting *Crysen/Montenay Energy Co. v. Shell Oil Co.* (*In re Crysen/Montenay Energy Co.*), 226 F.3d 160, 165 (2d Cir. 2000)). "In the bankruptcy setting, congressional intent to permit a bankruptcy court to enjoin arbitration is sufficiently clear to override even international arbitration agreements." *U.S. Lines, Inc. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n* (*In re U.S. Lines, Inc.*), 197 F.3d 631, 639 (2d Cir. 1999); *but see Bethlehem Steel*, 390 B.R. at 795 (noting a court generally has less discretion to deny motions to arbitrate in the context of international agreements as compared to domestic agreements). Nevertheless, "the presumption in favor of arbitration generally will trump the lesser interest of bankruptcy courts in adjudicating non-core

13

proceedings . . . . [B]ankruptcy courts generally must stay non-core proceedings in favor of arbitration." *In re Crysen/Montenay Energy Co.*, 226 F.3d at 166. In assessing whether it has discretion to refuse arbitration, the bankruptcy court applies a four-part test: "(1) did the parties agree to arbitrate; (2) does the dispute fall within their arbitration clause; (3) if federal statutory claims are raised, did Congress intend those claims to be arbitrable; and (4) if the court concludes that some but not all of the claims are arbitrable, should it stay the non-arbitrable claims pending the conclusion of the arbitration?" *Cardali v. Gentile* (*In re Cardali*), 2010 WL 4791801, at *5 (Bankr. S.D.N.Y. Nov. 18, 2010) (citing *Kittay v. Landegger* (*In re Hagerstown Fiber P'ship*), 277 B.R. 181, 198 (Bankr. S.D.N.Y. 2002)); *cf. Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir. 1987) (noting court asked to stay proceedings pending arbitration "has essentially four tasks"). Addressing each of these four criteria, the Court concludes that this dispute must go to arbitration.[12]

### 1. Whether the Parties Agreed to Arbitrate

Whether the parties have agreed to arbitrate, "*i.e.*, the 'question of arbitrability,' is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *Nicosia v. Amazon.com, Inc.*, -- F.3d --, 2016 WL 4473225, at *4 (2d Cir. Aug. 25, 2016) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)). When determining whether the parties agreed to arbitrate, courts apply state law contract principles. *See id.* (citing *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 27 (2d Cir. 2002); *see also First Options of*

---

[12]    Some courts have formulated the standard for a motion to compel arbitration in the bankruptcy context as a two-prong inquiry. *See In re Winimo*, 270 B.R. at 118. Under the two-prong inquiry, the bankruptcy court considers whether the proceeding at issue is core or non-core. *See id.*; *MBNA Am. Bank*, 436 F.3d at 108. If the proceeding is non-core, the bankruptcy court generally does not have discretion to refuse to compel arbitration. *See MBNA Am. Bank*, 436 F.3d at 108. If the bankruptcy court does have discretion to refuse to compel arbitration, under the second prong the question is "whether any underlying purpose of the Bankruptcy Code would be adversely affected by enforcing [the] arbitration clause." *In re Winimo*, 270 B.R. at 118 (quoting *U.S. Lines*, 197 F.3d at 640). The elements of the two-part test are essentially the same as the four-part test and the result here would be the same under the two-part test.

14

*Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (stating "[w]hen deciding whether the parties

agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state-law

principles that govern the formation of contracts").  "Under New York law, an arbitration clause

is generally held to apply to the assignee of a contract." *Variblend Dual Dispensing Sys., LLC v.

Seidel GmbH & Co., KG*, 970 F. Supp. 2d 157, 166 (S.D.N.Y. 2013).

The parties agreed to arbitrate here.  The applicable agreements between GM and the

Bermuda Insurers each contain a broad provision to send disputes about the policies to

arbitration.  *See, e.g.,* XLIB Insurance Policy ¶ IV.H; ACE Bermuda Excess Insurance Policy ¶

IV.H; Starr Excess International Policy ¶ VIII; Chubb Atlantic Excess Insurance Policy at 4; *see

also Bethlehem Steel*, 390 B.R. at 789 (finding first prong satisfied where it was undisputed that

the debtor entered into separate arbitration agreements with each defendant).  As "an assignee or

other party whose rights are premised on a contract," the Plaintiffs here are "bound by the

remedial provisions bargained for between the original parties to the contract." *Banque de Paris

et des Pays-Bas v. Amoco Oil Co.*, 573 F. Supp. 1464, 1469 (S.D.N.Y. 1983); *see also Variblend*,

970 F. Supp. 2d at 166–68 (holding under New York law, assignee was bound by arbitration

clause).  The Class Plaintiffs were assigned those rights to the GM Policies under the terms of

the settlement agreements.  *See* Amended Kessler Settlement Agreement § 5(b) [Case No. 12-

12020, ECF No. 4793]; Order, dated December 17, 2013 [Case No. 12-12020, ECF No. 6133];

*see also* Plan, Art. IV.G.2.  Likewise, the Liquidating Trust was assigned other rights to the GM

Policies under the Plan.  *See* Plan, Art. IV.G.2.  Moreover, these arbitration provisions cover the

Plaintiffs' dispute, which seeks relief based on the insured's rights under the GM Policies.

The Plaintiffs do not dispute that this prong is met, and, indeed, their motion papers do

not address this prong at all.  Rather, they state that the only inquiries relevant for the purposes of

the Arbitration Motions are the scope of the arbitration clauses and whether Congress intended

the Plaintiffs' claims to be arbitrable.  *See* Pls.' Opp'n to Arbitration Motions at 14–15 [ECF No.

186].  The Court turns now to these issues.

## 2.  Scope of the Arbitration Clauses

Turning to the second prong, courts look to the language of the relevant agreement to

assess the scope of an arbitration clause.  In determining whether the arbitration clause covers the

dispute at issue, courts consider whether the arbitration clause is "narrow" or "broad" in light of

the allegations of the complaint.  *See Togut v. RBC Dain Correspondent Servs.* (*In re S.W. Bach

& Co.*), 425 B.R. 78, 88 (Bankr. S.D.N.Y. 2010); *see also Hagerstown*, 277 B.R. at 198.  In

accordance with the policy favoring arbitration, "doubts as to whether a claim falls within the

scope of [an arbitration] agreement should be resolved in favor of arbitrability."  *Hartford

Accident & Indem. Co. v. Swiss Reinsurance Am. Corp.*, 246 F.3d 219, 226 (2d Cir. 2001) (citing

*Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25).

"A clause submitting for arbitration 'any and all differences and disputes of whatsoever

nature arising out of this [agreement]' is considered a broad arbitration clause."  *In re Cardali*,

2010 WL 4791801, at *6 (quoting *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 167 (2d

Cir. 2004)).  Similarly, a clause referring to arbitration "any controversy or claim between [the

parties] arising out of or relating to" an agreement has also been held broad.  *Id.* (citing *In re

S.W. Bach*, 425 B.R. at 88).  "If a court concludes that a clause is a broad one, then it will order

arbitration . . . ."  *Bethlehem Steel*, 390 B.R. at 790 (citation omitted).  "[T]he existence of a

broad agreement to arbitrate creates a presumption of arbitrability which is only overcome if 'it

may be said with positive assurance that the arbitration clause is not susceptible of an

interpretation that [it] covers the asserted dispute.'"  *WorldCrisa Corp. v. Armstrong*, 129 F.3d

71, 74 (2d Cir. 1997) (citation omitted); *see also Hagerstown*, 277 B.R. at 198 ("If the clause is

broad, arbitrability will be presumed.").

The Plaintiffs argue that their claims fall outside the scope of the arbitration clauses in the

Third Excess Policies because those clauses do not explicitly cover "disputes concerning this

Court's prior orders approving the *Kessler* settlement or this Court's confirmation of the Plan."

Pls.' Opp'n to Arbitration Motions at 15.  In the Plaintiffs' view, this dispute is outside the scope

of the arbitration clauses because the Bermuda Insurers seek to "collaterally attack the

underlying basis for coverage established by this Court's prior orders, including the adjudication

of the *Kessler* claim as an allowed claim, the related determinations of reasonableness, the order

of assignment under the insurance policies, the alteration of certain rights under the policies." *Id.*

at 15–16.

But the Court disagrees.  The arbitration language in these policies is exceedingly broad.

For example, the arbitration clause in the XLIB policy states: "*Any dispute, controversy or claim

arising out of or relating to* this Policy or the breach, termination or invalidity thereof shall be

finally and fully determined in London, England under the provisions of the Arbitration Acts of

1996 . . . ."  XLIB Insurance Policy ¶ IV.H (emphasis added).  The other Bermuda Insurers'

policies contain similar provisions that refer to arbitration disputes that "arising under or relating

to" the policies.  *See* Starr Excess International Policy ¶ VIII; Chubb Atlantic Excess Insurance

Policy at 4 (referring to arbitration disputes that "arise from or relate to" the policy); ACE

Bermuda Excess Insurance Policy ¶ IV.H (referring to arbitration disputes "arising out of or

relating to" the policy).  The case law uniformly recognizes such language as a broad arbitration

clause.  *See Hagerstown*, 277 B.R. at 204–05 (stating a "paradigmatic broad [arbitration] clause

extends" to disputes "relating to or in connection with the contract") (internal quotations and

citation omitted); *JLM Indus.*, 387 F.3d at 172 (finding arbitration clause that provides "[a]ny and all differences and disputes of whatsoever nature arising out of this Charter" to be broad and citing Second Circuit cases that found similar provisions were broad).

This conclusion is confirmed by the allegations in the Complaint. In the Complaint, the Plaintiffs seek broad monetary and declaratory relief, alleging breach of contract claims and requesting a judgment declaring coverage under the respective insurance policies. *See* Compl. ¶¶ 212, 218, 219, 226, 232, 233, 260, 268, 269, 279, 287, 288, 304, 311, 312 (alleging claims made against RFC by the Class Plaintiffs fall within coverage under the GM Policies and seeking damages and declaratory judgment to that effect, and alleging the Liquidating Trust is entitled to relief for Defendants' failure to pay defense costs relating to certain actions and claims). As the Plaintiffs' allegations in the Complaint clearly arise out of and relate to the respective insurance policies, these disputes are covered by the arbitration clauses. The Plaintiffs cannot escape the broad scope of arbitration by re-characterizing the allegations in the Complaint in a light most favorable to their position. *See Hagerstown*, 277 B.R. at 198 (courts consider the scope of an arbitration clause "in light of the allegations of complaint, not the legal theories espoused.").

### 3. Core v. Non-core

The Plaintiffs' reliance on the bankruptcy court's prior orders and potential conflicts with the Plan really relate to the third prong of this inquiry, which asks whether Congress intended any federal statutory claims here to be arbitrable. *See In re Cardali*, 2010 WL 4791801, at *7; *see Hagerstown*, 277 B.R. at 198 ("If an arbitrable dispute involves a federal statutory right, the court must next decide if Congress intended to except the dispute from arbitration."). In determining whether a federal statutory claim is arbitrable, the principal inquiry is whether the claims asserted are core or non-core in the bankruptcy. *See In re Cardali*, 2010 WL 4791801, at

*7.  To determine whether claims arising under a contract are core, courts consider "(1) whether

the contract is antecedent to the reorganization petition; and (2) the degree to which the

proceeding is independent of the reorganization."  *In re U.S. Lines*, 197 F.3d at 637.  The inquiry

under the second factor hinges on "the nature of the proceeding."  *Id.* (quoting *S.G. Phillips*

*Constructors, Inc. v. City of Burlington* (*In re S.G. Phillips Constructors, Inc.*), 45 F.3d 702, 707

(2d Cir. 1995)).  A proceeding can be core by virtue of its nature if either: "(1) the type of

proceeding is unique to or uniquely affected by the bankruptcy proceedings, or (2) the

proceedings directly affect a core bankruptcy function."  *Id.*

    In addressing this question, the Court is mindful that the issue has already been examined

by the District Court.  *See In re Residential Capital*, 2015 WL 9302834, at *3–4.  In denying the

non-Bermuda Insurer Defendants' motion to withdraw the reference, the District Court found the

Plaintiffs' claims to be non-core.  *Id.* at *4–5.[13]  The District Court noted that the Third Excess

Policies were entered into pre-petition between GM and the respective Defendants and,

therefore, were antecedent to the bankruptcy.  *See id.* at *3.  The Plaintiffs had argued to the

District Court that their action was core because "(1) their participation in the claims allowance

process tied their rights to the bankruptcy proceeding; (2) resolution of their claims requires

interpretation and enforcement of the Plan; and (3) any recovery under the GM Policies will

affect the assets available for distribution to RFC's creditors."  *Id.*  The District Court found

these arguments insufficient to render the matter core, stating "[p]articipation in the bankruptcy

process does not, by itself, transform a contract suit into an action that 'derive[s] directly from

---

[13]      The District Court denied the withdrawal motion finding that the *Orion* factors, particularly concerns about
efficiency and delay, weighed heavily in favor of keeping the matter in the bankruptcy court.  *In re Residential
Capital*, 2015 WL 9302834, at *4–5.  But the District Court's denial of the withdrawal motion did not alter its
conclusion about the non-core nature of this lawsuit.

the Bankruptcy Code and can be brought only in the context of a bankruptcy case." *Id.* (quoting

*MBNA Am. Bank*, 436 F.3d at 109).

　　None of the Plaintiffs' arguments here provide a basis to reach a different conclusion than

the District Court.  The Plaintiffs concede that the Liquidating Trust's relationship to the insurers

and coverage claims are pre-petition but argue nonetheless that the Class Plaintiffs' claims "are

exclusively post-petition."  Pls.' Opp'n to Arbitration Motions at 24.  But while the Class

Plaintiffs were assigned the rights to recover under the GM Policies post-petition, the GM

Policies themselves were entered into pre-petition and the rights under them remain unchanged.

*See In re Residential Capital*, 2015 WL 9302834, at *3 ("The GM Policies existed more than a

decade before RFC's bankruptcy . . . . Confirmation of the Chapter 11 Plan does not change

these facts.").  The Court can see no reason why the timing of the alleged breach here would

somehow transform this otherwise non-core matter into a core one.

　　The Plaintiffs also maintain that their action is core because it is uniquely affected by the

bankruptcy proceedings and directly affects core bankruptcy functions.  *See* Pl.'s Opp'n to

Arbitration Motions at 17–19.  The Plaintiffs point to the action's effect on the liquidation and

preservation of the Debtors' assets, recovery of other borrower creditors, and the bankruptcy

court's administrative function of asset allocation.  *See id.* at 19–21.  They also argue that this

case requires interpretation and enforcement of the bankruptcy court's prior orders.  *See id.* at

21–22.  But as the District Court noted, "[p]articipation in the bankruptcy process does not, by

itself, transform a contract suit into an action that 'derive[s] directly from the Bankruptcy Code

and can be brought only in the context of a bankruptcy case." *In re Residential Capital*, 2015

WL 9302834, at *3 (quoting *MBNA Am. Bank*, 436 F.3d at 109).  Furthermore, under the Plan,

the Plaintiffs' recovery is only against the GM Policies and the Borrower's Claims Trust, and

this lawsuit does not affect the asset allocation to other creditors under the Plan. *See* Plan, Art. IV.G. (stating the "sole source of recovery of the Allowed Kessler Claim shall be distributions from the Borrower Claims Trust and the GM Insurance Rights, and not from any other assets or property." and furthermore, "[f]or the avoidance of doubt, the (i) rights of the Kessler Settlement Class in and to the GM Insurance Rights and proceeds thereof, and (ii) the rights of any other creditor who has received from the Debtors an assignment of GM Insurance rights prior to the Effective Date, shall not be transferred to the Liquidating Trust and shall not constitute Available Assets.").

Relying on *In re U.S. Lines, Inc.*, 197 F.3d 631 (2d Cir. 1999), the Plaintiffs nonetheless press their argument that this dispute is core by arguing that any recovery under the Third Excess Policies will "significantly impact the assets available for distribution to creditors[.]" *See* Pls.' Opp'n to Arbitration Motions at 19.  In *U.S. Lines*, the Second Circuit held that notwithstanding that the plaintiff's claims were based upon pre-petition contracts, the insurance coverage dispute was core because the contracts would impact core bankruptcy functions. *See U.S. Lines*, 197 F.3d at 638–39.  The core bankruptcy functions relevant in *U.S. Lines* included, "[f]ixing the order of priority of creditor claims against a debtor," "plac[ing] the property of the bankrupt . . . under the control of the court, for equal distribution among the creditors," and the administration of estate assets. *Id.* at 637 (internal quotations and citations omitted).  However, *U.S. Lines* is distinguishable.  The insurance policies at issue in *U.S. Lines* contained a "pay-first" provision, meaning "the insurers' liability [wa]s not triggered until the insured [debtor first] pa[id] the claim of the personal injury victim." *Id.* at 635.  Thus, the debtor could not seek indemnification from the insurer until after it paid the claim, which would require using money of the estate. *See id.* at

638–39.  Additionally, the court found that the insurance proceeds "represent[ed] the only potential source of cash available" to certain creditors.  *Id.* at 638.

No such pay-first provision exists here.  No estate funds must be expended before suing these defendant insurance companies.  Indeed, the Plan carefully placed the Plaintiffs' rights against these insurance companies in its own silo.  These policies are not available to other creditors as a source of recovery nor will any recovery on the Plaintiffs' claims affect other distributions under the Plan.  As the Plan has already gone into effect, the structure of distributions is already established and does not "hinge on the outcome of [the] Plaintiffs' suit[.]" *In re Residential Capital*, 2015 WL 9302834, at *4.[14]  The Plaintiffs argue that, practically speaking, the Bermuda Insurers' have "pay-first" policies in the form of the arbitration clauses because the Plaintiffs must pay the costs of arbitration before it is determined if they win or lose. *See* Hr'g Tr. at 101:21–24, 102:2–11.  But the Plaintiffs' costs are not the same as the costs imposed upon the estate in *U.S. Lines*.  Indeed, the Plaintiffs were unable to provide any case law to support their analogy.  *See id.* at 102:12–23.  The most the Plaintiffs could offer was *Hicks v. Homeq Servicing Corp. (In re Hicks)*, 285 B.R. 317 (Bankr. W.D. Okla. 2002), in which the court was concerned about provisions that could require the debtor to pay the costs of the arbitration if she did not prevail.  *See* Hr'g Tr. at 102:21–25; *Hicks*, 285 B.R. at 323.  But like

---

[14]    The Plaintiffs argue that any recovery under the Third Excess Policies will significantly affect asset distribution under the Plan because such a recovery will trigger the "Return Amount" provision in the Plan and result in additional distributions to certain beneficiaries of the Borrower Claims Trust.  *See* Pls.' Opp'n to Arbitration Motions at 20.  To the extent the Class Plaintiffs recover anything under the GM Policies, they may have to return under this provision a percentage of any prior distributions they received from the Borrower Claims Trust. *See* Plan, Art. IV.F.6.; Decl. of Peter Kravitz ¶ 6 [ECF No. 186-1].  But the Plaintiffs similarly argued before the District Court that the matter is core because "any recovery will affect the assets available for distribution to RFC's creditors[,]" and "any recovery on their claims will 'collaterally affect the recovery of other borrower-creditors.'" *In re Residential Capital*, 2015 WL 9302834, at *4.  The District Court concluded that, "[w]hile this may be true, the collateral consequences of state law actions do not necessarily make those actions core" and furthermore, "[t]he potential consequences of this suit do not warrant departure from the general principle that 'traditional contract actions arising under state law' are non-core."  *Id.* (citation omitted).  Once again, the Court finds nothing in the Plaintiffs' argument here that would change the result reached by the District Court.

*U.S. Lines*, *Hicks* is distinguishable.  *Hicks* involved a single Chapter 13 debtor in a "precarious financial situation" where the arbitration agreement involved a cost structure that could shift costs to the debtor as the non-prevailing party and that "would have a significant impact on the estate and its creditors."  *Id.* at 319, 323.  These facts are not present here.

The Court instead finds this case to be more akin to *MBNA American Bank, N.A. v. Hill*, 436 F.3d 104 (2d Cir. 2006).  In *MBNA*, the Second Circuit concluded that the debtor's claim was a core proceeding, but nevertheless it held that the bankruptcy proceeding should be stayed pending arbitration.  *Id.* at 109–11.  The Second Circuit found that arbitration would not seriously jeopardize the objectives of the Bankruptcy Code because: (1) the debtor's estate was fully administered and her debts were already discharged; (2) the debtor's claim was brought as a putative class action, which demonstrated "the claim [wa]s not integral to her individual bankruptcy proceeding"; and (3) the bankruptcy court was not "uniquely able to interpret and enforce" the provisions of the automatic stay.  *Id.* at 109–10.  Like in *MBNA American Bank*, arbitration of the Plaintiffs' claims here will not jeopardize core bankruptcy functions because the Plan has been confirmed, any recoveries will not significantly impact available assets, and the Court is not "uniquely able to interpret and enforce" the provisions of the Third Excess Policies.  *See id.* at 109; *see also Residential Funding Co. v. Greenpoint Mortg. Funding, Inc.* (*In re Residential Capital, LLC*), 519 B.R. 593, 601 (S.D.N.Y. 2014).  Further, the Bermuda Insurers have stated that they "do not and will not contest through the arbitration proceeding the assignment of the GM Policies to the Plaintiffs, the Court's certification of the *Kessler* Class and the allowed *Kessler* and *Mitchell* Claims, or the Court's prior determination that the settlement satisfied Bankruptcy Rule 7023 or 9019."  Joint Memorandum of Law in Reply to Pls.' Opp'n

and in Support of Bermuda Insurers' Arbitration Motions ("Joint Reply to Arbitration Motions")

at 19–20 [ECF No. 225]; *see also* Hr'g Tr. at 20:18–24.

### 4. Non-Arbitrable Claims and the Court's Authority to Stay the Arbitration Proceedings

Turning to the fourth prong, the Bermuda Insurers assert that all the Plaintiffs' claims fall

within the purview of the arbitration clauses. *See* AIRCO's Arbitration Motion at 10; XLIB

Arbitration Motion at 11 (stating "[b]ecause there are no non-arbitrable claims in the

Complaint," it will address only the first three prongs of the test). The Plaintiffs do not

distinguish among the counts raised in their Complaint as being arbitrable or not. Indeed there is

nothing in the Complaint that appears to be non-arbitrable given that it is essentially a request for

insurance coverage under the policies which are subject to arbitration. Thus, there is no need to

address whether to stay any non-arbitrable claims.

Nevertheless, the Plaintiffs rely on the "inextricably intertwined" nature of their claims

and the bankruptcy court's prior orders to argue that any arbitration should be stayed until the

Plaintiffs' claims are adjudicated by this Court as against other Defendants who provided the

primary, first excess, and second excess layers of insurance coverage implicated before the

Bermuda Insurers' policies. *See* Pls.' Opp'n to Arbitration Motions at 35–36; Hr'g Tr. at

106:22–107:2.

Once a bankruptcy court determines that a claim is non-core, it generally must refer the

claim to arbitration. *See In re S.W. Bach*, 425 B.R. at 89. But the Court has authority to stay an

arbitration where appropriate. Section 105 of the Bankruptcy Code authorizes the court to "issue

any order, process, or judgment that is necessary or appropriate to carry out the provisions of this

title." 11 U.S.C. § 105(a). This includes "enjoining proceedings in other forums against non-

debtors." *In re S.W. Bach*, 425 B.R. at 98; *see also Allstate Ins. Co. v. Elzanaty*, 929 F. Supp. 2d

199, 220 (E.D.N.Y. 2013) (concluding district court had authority, under the circumstances, to

stay pending arbitrations and enjoin future private arbitrations, pending litigation where "[i]t

would severely threaten any judgment of [the c]ourt to have pending arbitrations or future

arbitrations result in inconsistent rulings with regard to [pending litigation]").  A "bankruptcy

court may enjoin proceedings in other courts when it is satisfied that such a proceeding would

defeat or impair its jurisdiction with respect to a case before it."  *In re S.W. Bach*, 425 B.R. at 99

(quoting *McHale v. Alvarez* (*In re 1031 Tax Grp., LLC*), 397 B.R. 670, 684 (Bankr. S.D.N.Y.

2008)).

In determining whether to issue a Section 105 injunction staying an action against a non-

debtor, a court should consider, "among other relevant factors, whether the suits would (i)

threaten the debtor's insurance coverage, (ii) increase the debtor's indemnification liability, (iii)

result in inconsistent judgments, (iv) expose the debtor to risks of collateral estoppel or *res

judicata*, and (v) burden and distract the debtor's management by diverting its manpower from

reorganization to defending litigation."  *Alvarez*, 397 B.R. at 684 (citing *Goldin v. Primavera

Familienstiftung, Tag Assocs., Ltd.* (*In re Granite Partners, L.P.*), 194 B.R. 318, 337 (Bankr.

S.D.N.Y. 1996)).  In *In re S.W. Bach*, the bankruptcy court applied the factors considered in

*Alvarez* to determine whether it should stay the arbitration of claims brought by the trustee

against a non-debtor broker-dealer for (1) aiding and abetting breach of fiduciary duty by a

defendant and (2) restitution and unjust enrichment, until the court adjudicated a Section 548

fraudulent conveyance claim.  *See In re S.W. Bach*, 425 B.R. at 100.  The court found that factors

(iii) and (iv), inconsistent judgments and exposing the debtor to risks of collateral estoppel and

*res judicata* weighed in favor of staying the arbitration.  *See id.*  Furthermore, the court found

that failing to stay the arbitration would impair its exclusive jurisdiction over the bankruptcy and

25

"could thwart the [d]ebtor's bankruptcy" by removing the fraudulent conveyance claim from its

purview.  *Id.*  So while the court granted the non-debtor's motion to compel arbitration, it stayed

such arbitration pending the outcome of the court's adjudication of the fraudulent conveyance

claim.  *See id.* at 104.

The Court concludes that it is wise to follow the same course here.  As in *S.W. Bach*, the

most relevant factors to consider here are the possibility of inconsistent judgments and the risk of

collateral estoppel and *res judicata*.  Collateral estoppel on a particular issue is permissible if

"(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated

and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the

issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on

the merits."  *Bear, Stearns & Co., Inc. v. 1109580 Ontario, Inc.*, 409 F.3d 87, 91 (2d Cir. 2005)

(quoting *Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 91 (2d Cir. 1997)).  Collateral

estoppel "can be predicated on arbitration proceedings."  *Boguslavsky v. Kaplan*, 159 F.3d 715,

720 (2d Cir. 1998).  "An arbitration decision may effect collateral estoppel in a later litigation . .

. if the proponent can show with clarity and certainty that the same issues were resolved."  *Bear,*

*Stearns & Co.*, 409 F.3d at 91 (2d Cir. 2005) (quotations and citation omitted).

There are four different insurance policies at issue, one from each of the Bermuda

Insurers.  Two require arbitration in Bermuda, while two require arbitration in London.  *See* ACE

Bermuda Excess Insurance Policy ¶ IV.H; Starr Excess International Policy ¶ VIII; Chubb

Atlantic Excess Insurance Policy at 3; XLIB Insurance Policy ¶ IV.H.  The Bermuda Insurers

contend that collateral estoppel is not an issue because the arbitrations are confidential and the

terms of the non-Bermuda Insurer policies are different than the terms under the Bermuda

Insurers' policies.  *See* Hr'g Tr. at 16:21–17:17, 19:1–8.  But the Court disagrees.  Regardless of

these facts, there is no mechanism to prevent inconsistent judgments (a) among the arbitration panels, or (b) between the arbitration panels and a decision rendered in this Court on coverage for the underlying policies. Thus, it is possible that arbitration of coverage issues under the Third Excess Policies could have a collateral estoppel effect on the pending litigation of the underlying primary policy and first and second layers of excess insurance. The possibility of inconsistent judgments and exposing the Plaintiffs to the risks of collateral estoppel or *res judicata* weigh in favor of staying the arbitration proceedings. *See Elzanaty*, 929 F. Supp. 2d at 220 (stating the court "believes that a stay is the most appropriate solution here in order to avoid the large volume of arbitrations and inconsistent judgments" that could possibly result from compelling arbitration).

This is particularly true as to determinations on certain defenses contained in the policies—such as reasonableness—that may arguably be inconsistent with prior orders of the bankruptcy court in this case. For example, the Bermuda Insurers argue that as a result of the insurance neutrality provision, the Plan "does not bar or affect any defenses of Defendants 'based on reasonableness' or that were previously 'adjudicated by the Bankruptcy Court,' and such defenses are not affected by principles of *res judicata* or issue or claim preclusion." Bermuda Insurers' Joint Memorandum of Law in Opp'n to Section 1142 Motion at 14 [ECF No. 223]. The Plaintiffs argue that the Plan is not entirely insurance neutral because it invalidates the anti-assignment provisions in the GM Policies. *See* Settlement Classes' Joint Reply to Defs.' Opp'n to Section 1142 Motion at 9 [ECF No. 234]. The Bermuda Insurers also intend to contest the reasonableness of the settlement for insurance purposes only, distinguishing it from the reasonableness standard used in approving settlements under Federal Bankruptcy Rule of Procedure 9019. *See* Joint Reply to Arbitration Motions at 15; *see also* Hr'g Tr. at 21:1–23,

27

24:16–22.  At this time, the potential overlap or relationship between these two issues is not

clear.  The Court does not know, therefore, whether a determination regarding reasonableness for

insurance purposes might conflict with any prior decisions on reasonableness in the bankruptcy

case.  Under the Plan, moreover, the Court retained jurisdiction, albeit not exclusive jurisdiction,

with respect to the GM Policies and the GM Insurers, "to hear and determine matters relating to

insurance claims and settlements regarding insurance[.]"  Plan, Art. XII(f).  Staying the

arbitration proceedings pending the resolution by this Court of the underlying insurance policies

appropriately preserves that jurisdiction.  *Cf. In re S.W. Bach*, 425 B.R. at 104 (granting motion

to compel arbitration but staying arbitration of those counts that would interfere with the court's

"exclusive jurisdiction over deciding the amount of the fraudulent conveyance claim").

        Additional concerns such as cost and efficiency also weigh in favor of staying the

arbitration proceedings.  The Bermuda Insurers are the third excess insurers.  *See*, *e.g.*, XLIB

Excess Policy at II.A (providing, "with respect to each type of coverage afforded by this Policy,

liability for any covered Loss in each Limit Period shall attach to [XLIB] only after the insurers

of the Underlying Policies, the Named Insured and/or the Insured Persons shall have paid . . . the

full amount of the Underlying Limit for such Limit Period.  [XLIB] shall then be liable to pay

under such type of coverage only covered Loss in excess of such Underlying Limit up to its

Aggregate Limit of Liability.");  *see also* Pls.' Opp'n to Arbitration Motions at 38–39; Hr'g Tr. at

67:5–21 (Plaintiffs' counsel explaining the excess polices are known as "following form

policies," and thus the same issues arise under each).  Depending on the outcome of litigation on

the other levels of coverage, it is not clear whether there will be a need to litigate the third excess

level of coverage provided by the Bermuda Insurers.[15]

---

[15]        The Bermuda Insurers contend that the parties could agree to an appropriate sequence in which to pursue
these arbitrations and that, depending on the outcome of one arbitration, the other Bermuda Insurers may decide not

The Second Circuit's decision in *Anderson v. Beland* (*In re American Express Financial Advisors Securities Litigation*), 672 F.3d 113 (2d Cir. 2011), cited by the Bermuda Insurers, does not compel a different result.  *See* Joint Reply to Arbitration Motions at 25; Hr'g Tr. at 44:17–25. In *American Express*, the Second Circuit considered "whether federal courts have the power to stay arbitration under the [Arbitration Act] (or any other authority) in an appropriate case[.]"  *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d at 139 (citation omitted).  The court concluded that "a district court may properly enjoin arbitration proceedings that are not covered by a valid and binding arbitration agreement."  *Id.* at 142.  However, the court narrowed its holding by noting that federal courts have the authority to "issue 'all writs necessary or appropriate in aid of their respective jurisdictions.'"  *Id.* at 141 n.20 (quoting *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1099 (11th Cir. 2004)) (citing cases enjoining arbitration proceedings); *see Elzanaty*, 929 F. Supp. 2d at 219–21 (discussing *American Express* and its effect on a court's ability to enjoin arbitration proceedings, and noting the *American Express* court was "careful to narrow the applicability of its holding.").[16]

Based on the foregoing, the Court finds it appropriate to impose a stay until after the issues as to coverage under the primary, first excess, and second excess layers of coverage are decided.  However, the stay is without prejudice to any party's right to seek to lift the stay for

---

to pursue arbitration.  *See* Hr'g Tr. at 123:6–21.  But there is no evidence that such an agreement has or will be reached.  Furthermore, there seems little reason to rush forward with arbitration as to the Bermuda Insurers given the possibility that the dispute may never need to be resolved.

[16]    As a procedural matter, XLIB approached the arbitration issue slightly differently than the other Bermuda Insurers.  Specifically, XLIB requested a stay of the lawsuit pending arbitration and for relief, if necessary, under the *Barton* doctrine, which refers to the United States Supreme Court case, *Barton v. Barbour*, 104 U.S. 126 (1881). *See* XLIB Arbitration Motion at 2.  The *Barton* doctrine requires a party that seeks to sue a bankruptcy trustee to first obtain leave of the appointing court.  *See Lebovits v. Scheffel* (*In re Lehal Realty Assocs.*), 101 F.3d 272, 276 (2d Cir. 1996).  Given the Court's ruling, it does not reach a decision as to whether relief from the *Barton* doctrine is necessary.  For the avoidance of doubt, however, the Court's conclusion about the appropriateness of arbitration applies equally to XLIB.

good cause based on additional developments in this case or other appropriate considerations that might bear on the rights of the parties.[17]

## B.  The Bond Motion

The Plaintiffs argue that the Bermuda Insurers' Arbitration Motions cannot be granted because the Bermuda Insurers did not first post a bond as security required by New York Insurance Law § 1213.  *See* Bond Motion at 1–2.[18]  The Plaintiffs contend that Section 1213(c) applies because the Bermuda Insurers performed one or more enumerated acts under the statute that trigger the requirement to file a bond before filing these kinds of motions.  *Id.* at 7–13; *see also* Plaintiffs' Omnibus Reply in Support of the Bond Motion ("Bond Motion Reply") at 4–5, 5 n.4 [ECF No. 232].  But the Court disagrees.

"The purpose of [Section 1213] is to subject certain insurers to the jurisdiction of the courts of [New York] in suits by or on behalf of insureds or beneficiaries under certain insurance contracts."  N.Y. Ins. L. § 1213(a).  The statute is concerned with "residents of [New York] hold[ing] policies of insurance issued or delivered in this state by insurers while not authorized to do business in this state," thus requiring residents to resort to distant forums to assert their legal rights.  *Id.*  To cure this problem, the statute provides that certain acts by such foreign or

---

[17]    The Court notes that at the December 15, 2015 hearing, the parties discussed whether it would be appropriate for the Court to enter an order compelling arbitration that would condition such arbitration on the parties' agreement not to raise certain issues, including for example, challenges based on the anti-assignment provisions in the policies.  *See* Hr'g Tr. at 36:5–19, 57:17–58:2, 76:20–77:4.  But no agreement was reached as to the issue.

[18]    The Plaintiffs contend that the bond requirement also applies to the Bermuda Insurers' motions to dismiss for lack of subject matter jurisdiction but not the motions alleging lack of personal jurisdiction or insufficient service of process.  *See* Bond Motion at 1–2, 2 n.1.  The Plaintiffs concede that these later two defenses fall under a statutory exemption to the bond requirement.  *See id.*; N.Y. Ins. L. § 1213(c)(3).  In any event, the Bermuda Insurers' motions as to service of process have been withdrawn.  *See* Stipulation Regarding Withdrawal of Motions to Dismiss for Insufficient or Improper Service of Process [ECF No. 269].  In addition, the Plaintiffs have withdrawn the Bond Motion as to two Defendants—SRI and Steadfast—who are not Bermuda Insurers.  *See* Notice of Withdrawal [ECF No. 180].

unauthorized insurers will automatically trigger appointment of the New York Superintendent as

a proper party for service. *Id.* § 1213(b)(1). The case law recognizes that Section 1213 provides

a basis for personal jurisdiction over insurance companies based on certain enumerated

insurance-related activities, including "the issuance or delivery of contracts of insurance to

residents of this state or to corporations authorized to do business therein, . . . the solicitation of

applications for such contracts, . . . the collection of premiums, membership fees, assessments or

other considerations for such contracts, or . . . any other transaction of business." N.Y. Ins. L. §

1213(b)(1); *see Blau v. Allianz Life Ins. of N. Am.*, 124 F. Supp. 3d 161, 172, 175–78 (E.D.N.Y.

2015) (analyzing the four enumerated acts in the context of personal jurisdiction analysis);

*Danaher Corp. v. Travelers Indem. Co.*, 2014 WL 7008938, at *3–5 (S.D.N.Y. Dec. 12, 2014).[19]

Separate from these provisions, subsection (c) imposes a "bond requirement" on

unauthorized foreign or alien insurers requiring them to "deposit with the clerk of the court in

which the proceeding is pending, cash or securities or file with such clerk a bond with good and

sufficient sureties" prior to filing "*any* pleading in *any* proceeding against it." N.Y. Ins. L. §

1213(c)(1)(A) (emphasis added). The term "unauthorized foreign or alien insurer" refers to an

insurer that is not authorized or licensed to do business in New York. *See id.* §§ 1213(a),

107(a)(5), (10); *see also Blau*, 124 F. Supp. 3d at 172. Complying with the bond requirement of

Section 1213(c) "is essentially a condition precedent to filing an answer." *John Hancock Prop.*

*& Cas. Ins. Co. v. Universale Reinsurance Co.*, 147 F.R.D. 40, 50 (S.D.N.Y. 1993); *see also*

*Associated Aviation Underwriters*, 2003 WL 1888731, at *2 (stating Section 1213(c) "requires

---

[19] The Plaintiffs have stated they are not relying on Section 1213 as a statutory basis for personal jurisdiction. *See* Hr'g Tr. at 146:11–14. Not surprisingly though, many of the cases cited by the parties discuss the jurisdictional import of Section 1213. *See, e.g.*, *Armada Supply Inc. v. Wright*, 858 F.2d 842, 848–49 (2d Cir. 1988); *Associated Aviation Underwriters v. Arab Ins. Grp. (B.S.C.)*, 2003 WL 1888731, at *2–6 (S.D.N.Y. Apr. 16, 2003).

all unauthorized alien insurers to file a security sufficient to secure payment of any final

judgment before filing any pleadings").

There are some exceptions to the bond requirement. *See John Hancock Prop. & Cas.*

*Ins.*, 147 F.R.D. at 50; *see also Nw. Nat'l Ins. v. Kansa Gen. Ins.*, 1992 WL 367085, at *3 n.7

(S.D.N.Y. Nov. 25, 1992).  As an alternative to posting the required security, for example, an

unauthorized foreign or alien insurer may procure a license to do business in New York.  *See*

N.Y. Ins. L. § 1213(c)(1)(B).  In addition, a foreign insurer is not required to post a bond prior to

filing a motion to set aside service on the ground that the insurer did not commit "any act

enumerated in paragraph one of subsection (b) of [Section 1213]."  *Id.* § 1213(c)(3); *see also*

*Levin v. Intercontinental Cas. Ins. Co.*, 95 N.Y.2d 523, 527 (2000) (stating Section 1213(c)(3)

excuses a foreign insurer from the bond requirement "when it files a 'motion' to set aside service

on the ground that the carrier, or the person upon whom service is made pursuant to section

1213(b)(3), did not commit the acts in [New York] that form the predicate for the court's

jurisdiction.").

As a preliminary matter, the Court addresses the Bermuda Insurers' argument that

Section 1213's bond requirement does not apply because their motions do not qualify as a

"pleading" under the statute.  *See* Bermuda Insurers' Memorandum of Law in Opp'n to Bond

Motion ("Opp'n to Bond Motion") at 20–24 [ECF No. 193].  But the Court rejects the Bermuda

Insurers' narrow reading of the term "pleading" under the statute.  Granted, there are some cases

that apply a more restrictive definition of pleadings under Section 1213.  *See Allstate Ins. Co. v.*

*Administratia Asigurarilor de Stat*, 948 F. Supp. 285, 295 (S.D.N.Y. 1996) (limiting "pleading"

in Section 1213 to those identified in Federal Rule of Civil Procedure 7 and N.Y. C.P.L.R.

3011).  But more cases construe Section 1213 to require that foreign insurers post security before

32

filing *any* pleading. *See, e.g.*, *Signal Mut. Indem. Ass'n v. Rice Mohawk U.S. Constr., Co.*, 1997 WL 148813, at *1 (S.D.N.Y. Mar. 28, 1997); *Marsh & McLennan Cos. v. GIO Ins.*, 2013 WL 4007555, at *5 (S.D.N.Y. Aug. 6, 2013); *John Hancock Prop. & Cas. Ins.*, 147 F.R.D. at 50; *see also British Int'l Ins. v. Seguros La Republica S.A.*, 212 F.3d 138, 140 (2d Cir. 2000) (stating Section 1213(c)(1) requires "out-of-state insurers post security or obtain a license in order to be allowed to participate in *court proceedings* in New York") (emphasis added).

The Bermuda Insurers rely on a footnote from the *Levin v. Intercontinental Casualty Insurance Co.* decision, where the court states, "Section 1213's legislative history indicates that defending on the merits requires the posting of a bond." *Levin*, 95 N.Y.2d at 528 n.3. But that statement from *Levin* is dicta. In fact, the actual holding of *Levin* reads the bond requirement broadly. In *Levin*, the court examined whether the bond requirement applied to a pre-answer motion to dismiss the complaint. *See id.* at 525. Upon considering the legislature's word choice and objectives in enacting the statute, the New York Court of Appeals held that the term "pleading" in Section 1213(c) was not limited to the "kinds of pleadings" identified in N.Y. C.P.L.R. 3011. *Id.* at 528 ("Whether any particular motion to dismiss—other than the one carved out [in Section 1213(c)(3)]—falls within the category of a 'pleading' must be determined in accordance with the Legislature's objectives in enacting the statute."); *see* N.Y. C.P.L.R. 3011. Thus, the foreign insurance carrier was required to post a bond prior to filing its pre-answer motion to dismiss. *See Levin*, 95 N.Y.2d at 528 (noting "[S]ection 1213(c)'s goal of assuring that funds are available in New York to satisfy any judgment in plaintiff's favor"). To hold otherwise would permit a foreign carrier to "wage extensive, costly motion practice, and yet avoid the bond requirement by simply advancing a host of defenses before interposing a formal answer." *Id.*

The Bermuda Insurers also mistakenly rely on *Ghose v. CNA Reinsurance Co.*, 841 N.Y.S.2d 519 (App. Div. 1st Dep't 2007). In *Ghose*, the defendant underwriters moved to dismiss the case on the grounds that New York was an inconvenient forum and the plaintiff cross-moved for an order requiring the defendants to post security pursuant to Section 1213(c). *Id.* at 522. Upon granting the motion to dismiss on forum non conveniens grounds, the court found that the plaintiff's appeal of the order denying his request to have a bond posted was "rendered academic." *Id.* at 524. The Bermuda Insurers argue that similar to the motion to dismiss in *Ghose*, the Arbitration Motions and motions to dismiss for lack of subject matter jurisdiction "only go to issues of forum and jurisdiction" and thus, do not trigger the bond requirement of Section 1213. *See* Opp'n to Bond Motion at 22. But this argument is not persuasive. The court in *Ghose* did not address the types of pleadings that are covered by Section 1213, but rather, it concluded that because of the posture of the case on appeal, it did not need to reach the issue of security. *See Ghose*, 841 N.Y.S.2d at 524.

Based upon the weight of the case law and the plain language of the statute, the Court adopts the more expansive interpretation of Section 1213 and concludes that that the Arbitration Motions and the motions to dismiss for lack of subject matter jurisdiction are pleadings under Section 1213. *See Levin*, 95 N.Y.2d at 527–28; *Marsh & McLennan Cos.*, 2013 WL 4007555, at *5 (imposing Section 1213's security requirement on foreign insurer who filed a motion to dismiss based on arbitration provisions in parties' agreement); *see also Kansa Gen. Ins.*, 1992 WL 367085, at *3 (requiring Finnish insurance company to post a bond pursuant to Section 1213(c)(1) in case that involved a motion to compel arbitration). Furthermore, Section 1213's objective is directly implicated here as the Bermuda Insurers have filed several motions, thereby

engaging in extensive and costly motion practice, the precise concern raised by the court in

*Levin*.  *See Levin*, 95 N.Y.S.2d at 528.[20]

Having resolved the scope of Section 1213, the Court turns to whether a bond is required

here.  On the one hand, the Bermuda Insurers argue that they are not subject to the bond

requirement because they did not commit any of the enumerated acts *within* New York for these

insurance transactions.  *See* Opp'n to Bond Motion at 7–17. Rather, they maintain that all the

enumerated acts under Section 1213 took place in Bermuda.  *See id.* at 14–15.  On the other

hand, the Plaintiffs argue that the Bermuda Insurers satisfy Section 1213(b)(1) because: (1) they

each issued a contract of insurance to GM, a corporation authorized to do business in New York;

and (2) the GM Policies covered GMAC Commercial Credit, LLC, a subsidiary of GM and a

New York corporation based in New York, as well as RFC, which was also authorized to do

business in New York.  *See* Bond Motion at 12–13.  The Plaintiffs argue that the Bermuda

Insurers transacted business in New York under Section 1213(b)(1)(D) because they delivered

contracts of insurance to businesses authorized to do business in New York, insured the related

business activities that took place in New York, and performed claims handling acts in New

York.  *See id.* at 13; Bond Motion Reply at 4.  The Plaintiffs argue that the Bermuda Insurers'

choice to insure New York risks, residents, and certain New York-based subsidiaries of GM is

the clearest example that they conducted business in New York.  *See* Hr'g Tr. at 281:15–20.

Based on the record before the Court and applicable case law, the Court agrees with the

Bermuda Insurers on this issue.  Section 1213(b) is triggered when "by mail or otherwise" an

unauthorized foreign or alien insurer issues or delivers "contracts of insurance to residents of this

---

[20]     Alternatively, the Bermuda Insurers argue that Section 1213(c)'s bond requirement does not apply because
the insured agreed to litigate in a foreign forum.  *See* Opp'n to Bond Motion at 24–25.  Given the Court's
determination on the Bond Motion, it is unnecessary to address this argument.

state or to corporations authorized to do business therein." N.Y. Ins. L. § 1213(b)(1)(A). Courts have found that "it is the act of issuing or delivering a policy *into* New York, that constitutes the grounds by which a New York court may assert personal jurisdiction over an unauthorized alien insurer under subsection (b)(1)(A)." *Associated Aviation Underwriters*, 2003 WL 1888731, at *3; *see, e.g.*, *Blau*, 124 F. Supp. 3d at 175–76; *Ghose*, 841 N.Y.S.2d at 524 (stating "inasmuch as the policy was not issued or delivered in New York, [Section 1213] is not applicable"). It is undisputed that the Bermuda Insurers did not issue or deliver a policy in New York. *See* Bond Motion Reply at 9 (stating "[e]ven though [the Third Excess Policies] were delivered to General Motors in Michigan . . . .").[21] Thus, the Bermuda Insurers do not appear to trigger the requirements of Section 1213.

Nevertheless, the Plaintiffs argue that the Bermuda Insurers satisfy Section 1213(b)(1)(A) because they issued the GM Policies to GM in Michigan when GM was authorized to do business in New York. *See* Bond Motion at 12. To support this argument, the Plaintiffs rely on *Danaher Corp. v. Travelers Indemnity Co.*, 2014 WL 7008938 (S.D.N.Y. Dec. 12, 2014), which addressed whether personal jurisdiction existed over a foreign unauthorized insurer under either N.Y. C.P.L.R. 302 or N.Y. Insurance Law § 1213. *See id.* at *3. The *Danaher* court held that because the complaint arose out of a foreign insurer's "issuance of insurance to corporations authorized to do business in New York, the exercise of jurisdiction over [the foreign insurer] is proper under New York statutory law." *Id.* at *5. The *Danaher* court acknowledged that "[t]he precise relationship between these statutory bases for jurisdiction [Section 1213 and N.Y.

---

[21]    The Plaintiffs argue that *initial* delivery of the policy into New York is not required by Section 1213, and thus, even though the policies were initially delivered to GM in Michigan, "it defies common sense that General Motors did not also alert or otherwise make known to its subsidiaries located and doing business in New York that those subsidiaries were also covered under the Third Excess Policies." Bond Motion Reply at 8–9. But despite the Plaintiffs' suggestion, there is no evidence in this case that the policies were ever issued or delivered in New York.

C.P.L.R. 302] over insurers is not well defined in the New York case law." *Id.* at *3.

Nevertheless, the court stated, "it is clear that insurers that issue policies to corporations

authorized to do business in New York are subject to jurisdiction in this state." *Id.*  But the

*Danaher* court cited numerous cases that provide further guidance on the enumerated acts

contemplated by Section 1213.  These cases suggest a more narrow reading.  In *Armada Supply

Inc. v. Wright*, 858 F.2d 842 (2d Cir. 1988), for example, the Second Circuit found personal

jurisdiction under Section 1213(b)(1)(A) and (b)(1)(D) where a foreign underwriter, at the

request of a company doing business in New York, issued a certificate of insurance on "property

located in New York, appointed a New York firm to receive notice of the claim, engaged a New

York surveyor to attend the vessel, and designated two representatives in New York to

investigate and adjust the claim." *Id.* at 848–49 (noting facts that certificate of insurance was

delivered in New York and that it indicated the cargo's destination was New York were

sufficient under Section 1213); *see also Twin City Fire Ins. v. Harel Ins.*, 2011 WL 3480948, at

*1–2 (S.D.N.Y. Aug. 5, 2011) (finding personal jurisdiction under N.Y. C.P.L.R. 302(a)(1) over

foreign insurer where New York corporation was policy holder); *Ins. of N. Am. v. Pyramid Ins.

of Bermuda*, 1994 WL 88754, at *2 (S.D.N.Y. Mar. 16, 1994) (holding foreign insurer subjected

itself to jurisdiction under N.Y. C.P.L.R. 302(a)(1) by issuing an insurance policy in Bermuda

"with the expectation that it could be claimed upon for events occurring within New York" and

noting jurisdiction under Section 1213 also existed if service of process procedures had been

followed).  None of the additional factors from these cases are present in the record here.

Indeed, other courts have construed Section 1213(b)(1) more narrowly than the *Danaher*

court.  *Cf. Am. Indep. Ins. v. Heights Chiropractic Care, P.C.*, 811 N.Y.S.2d 904, 906 (Sup. Ct.

N.Y. Cnty. 2006) (stating Section 1213 "explicitly derogates the common law definition of

'doing business'" and thus, should be "construed narrowly").  Most importantly for the current

dispute, numerous courts have concluded that the "bases of jurisdiction enumerated in [S]ection

1213(b) . . . all require that the relevant policy be issued or delivered in New York."  *Blau*, 124

F. Supp. 3d at 175; *see also Associated Aviation Underwriters*, 2003 WL 1888731, at *3; *Ghose*,

841 N.Y.S.2d at 524; *Chase Manhattan Bank v. AXA Reinsurance UK PLC*, 752 N.Y.S.2d 17, 19

(App. Div. 1st Dep't 2002) (holding no personal jurisdiction under Section 1213(b)(1) because

the reinsurance agreement was not mailed into New York); *Cavaliere v. N.J. Ins. Underwriting

Ass'n*, 653 N.Y.S.2d 692, 693 (App. Div. 2d Dep't 1997) (stating "plaintiff failed to establish

that the insurance policy was issued or delivered in New York or that premiums were mailed

from New York so as to invoke Insurance Law §§ 1213(b)(1)(A) or (C) as a means to confer

personal jurisdiction . . . ."); *see also Ringers' Dutchocs, Inc. v. S.S. S.L. 180*, 494 F.2d 678, 679

(2d Cir. 1974) (discussing Section 1213's predecessor, Section 59-a and finding no jurisdiction

over foreign insurer because the insurance contract was neither issued nor delivered in New

York).

Applying the majority approach here, the Court finds that the bond requirement was not

triggered under Section 1213(b)(1)(A).  It is undisputed that the Bermuda Insurers' policies were

issued in Bermuda and delivered in Bermuda to AON, the insurance broker acting as an

intermediary between GM and the Bermuda Insurers.  *See* Towlson Affirm. ¶ 11; Madden Decl.

¶¶ 12–14; Rosati Aff. ¶¶ 14, 17; Topple Decl. ¶¶ 21–22, 24–25.  In fact, the address of the

insured on each policy lists GM's Detroit, Michigan address.  *See* Exhs. B, C, D, E attached to

Walters Decl. [ECF Nos. 178-2, 178-3, 178-4, 178-5].  No address in New York is listed.

Nor did the Bermuda Insurers trigger the bond requirement by transacting business in New York under Section 1213(b)(1)(D).[22] "The 'transacting business' requirement of subsection (b)(1)(D) is analogous to that found in C.P.L.R. § 302(a)." *Associated Aviation Underwriters*, 2003 WL 1888731, at *5. "The issuance and delivery of an insurance policy outside New York, in and of itself, does not constitute 'transaction of business' under CPLR § 302(a)(1) or Insurance Law § 1213." *Future Ways, Inc. v. Odiorne*, 697 F. Supp. 1339, 1342 (S.D.N.Y. 1988) (citations omitted). The Plaintiffs argue that the Bermuda Insurers transacted business under Section 1213(b)(1)(D) because they undertook claims handling activities in New York and specifically, AIRCO and XLIB retained a New York law firm to handle claims activities. *See* Bond Motion Reply at 6–7. But the vast majority of what has been presented discusses the Bermuda Insurers' ties to the United States generally, as opposed to New York specifically. *See* Personal Jurisdiction Opp'n at 7–8, 10–14, 16–19. And of course, the mere retention of a law firm in New York in and of itself does not satisfy transacting business under Section 1213(b)(1)(D). *See Reich v. Lopez*, 38 F. Supp. 3d 436, 457–58 (S.D.N.Y. 2014) (holding that while retaining New York lawyers "tasked with the advancement of [d]efendants' interests qualifies as transacting business pursuant to § 302(a)(1), the current cause of action does not arise out of such business" and therefore, the defendants did not transact business under N.Y. C.P.L.R. 302(a)(1), the same standard as Section 1213(b)(1)(D)). The remaining allegations and other materials provided by the Plaintiffs do not provide enough to satisfy the transacting business in New York test of Section 1213(b)(1)(D). To support their allegations that XLIB's

---

[22]    The Court notes that the Bermuda Insurers also do not satisfy Section 1213(b)(1)(B)–(C) because there is no evidence in this record that they solicited business from GM regarding the GM Policies or collected premiums on the GM Policies in New York. Instead, AON solicited the Bermuda Insurers on behalf of GM and paid the premiums for the GM Policies to the Bermuda Insurers in Bermuda. *See* Towlson Affirm. ¶ 11; Madden Decl. ¶¶ 10–14; Rosati Aff. ¶¶ 14–16; Topple Decl. ¶¶ 21–23.

New York-based counsel was responsible for "claims-handling," for example, the Plaintiffs present correspondence involving such counsel, that counsel attended a meeting in Washington DC, and allege that "XLIB communicated with and received communications from RFC in the United States, requested information from RFC, reserved rights under the XLIB policy, and refused RFC's requests to settle claims."  Personal Jurisdiction Opp'n at 11.  As to AIRCO, the Plaintiffs' allegations of claims handling similarly focus on correspondence and e-mail communications as well as counsel's attendance at the Washington, DC meeting.  *See id.* at 17–19.[23]  In sum, the Plaintiffs have failed to make allegations of activities in New York sufficient to satisfy New York Insurance Law §§ 1213(b)(1)(A) or (b)(1)(D) as to the Bermuda Insurers.[24]  *Cf. Blau*, 124 F. Supp. 3d at 177 (citing cases discussing whether plaintiff established enumerated acts under Section 1213); *NYC Med. & Neurodiagnostic, P.C. v. Republic W. Ins. Co.*, 798 N.Y.S.2d 309, 312 (Sup. Ct. App. Term 2004) (stating plaintiff has burden of proving jurisdiction exists).

---

[23]    In the Bond Motion Reply, the Plaintiffs do not describe in detail the types of claims handling activities that the Bermuda Insurers allegedly performed in New York.  Instead, they refer the Court to their Omnibus Opposition to Motions to Dismiss for Lack of Personal Jurisdiction ("Personal Jurisdiction Opp'n") [ECF No. 197].  *See* Bond Motion Reply at 6.  Aside from XLIB and AIRCO's retention of New York law firms, the Plaintiffs rely primarily on communications between the Bermuda Insurers and their agents, which the Plaintiffs contend were located in the United States—and in some cases, New York—and the presence of certain individuals at a meeting in Washington, D.C. on June 14, 2013.  *See* Personal Jurisdiction Opp'n at 7–8, 10–14, 16–19.  But these activities are insufficient to satisfy Section 1213(b)(1)(D).  Furthermore, the Plaintiffs provide charts summarizing communications involving the various Bermuda Insurers and their agents.  While they contend that these demonstrate claims handling activity, the import of the cited communications is questionable for the reasons stated above and in any event, insufficient to satisfy Section 1213(b)(1)(D).  *See* Exhs. 13, 33, 50, 60, attached to Vivek Chopra Decl. [ECF Nos. 199-2, 199-6, 199-10, 199-12]; Hr'g Tr. at 153:10–25, 164:14–165:19, 166:11–21, 171:15–172:5, 173:2–11.

[24]    While Chubb Atlantic joined the arguments set forth in the Joint Opposition to the Bond Motion, it filed a supplemental memorandum of law opposing the Bond Motion because the Chubb Atlantic policy contains an express waiver of a bond requirement by the insured.  *See* Chubb Atlantic Suppl. Memo of Law in Opp'n to Bond Motion at 1 [ECF No. 195].  Based on the Court's ruling on the Bond Motion, the Court need not address the enforceability of the waiver in the Chubb Atlantic policy.

## CONCLUSION

Based on the foregoing, the Court grants the Bermuda Insurers' Arbitration Motions but stays the arbitration proceedings pending resolution of the claims relating to the primary, first excess, and second excess layers of insurance coverage.  The parties have the right to seek to lift the stay for good cause based on additional developments in this case or other appropriate considerations that might bear on the rights of the parties.  The Court denies the Plaintiffs' motion to strike the motions of the Bermuda Insurers or in the alternative to require them to post security pursuant to New York Insurance Law § 1213(c).  The Court denies the other pending motions in this case as moot.[25]  The Defendants are to settle an order on five days' notice.  The proposed order must be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Filing docket, with a copy of the proposed order attached as an exhibit to the notice.  A copy of the notice and proposed order shall also be served upon counsel for the Plaintiffs.

Date:    New York, New York
         October 21, 2016

                                         _/s/ Sean H. Lane_____
                                         UNITED STATES BANKRUPTCY JUDGE

---

[25]    *See* ACE Bermuda's Motion to Dismiss for Lack of Subject-Matter Jurisdiction [ECF No. 151]; XLIB's Motion to Dismiss for Lack of Personal Jurisdiction and Subject Matter Jurisdiction [ECF No. 168]; ACE Bermuda's Motion to Dismiss for Lack of Personal Jurisdiction and Improper Service of Process [ECF No. 153]; AIRCO's Motion Dismiss for Lack of Personal Jurisdiction and Improper Service of Process [ECF No. 162]; Chubb Atlantic's Motion to Dismiss the Amended Complaint, or in the Alternative for a Stay Pending Arbitration [ECF No. 170], *in part*; Cross-Motion Pursuant to 11 U.S.C. Section 1142(b) for an Order Necessary for Consummation of the Bankruptcy Plan [ECF No. 187].