**UNITED STATES BANKRUPTCY COURT**                         <u>FOR PUBLICATION</u>
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
In re:                                                     Chapter 11

RESIDENTIAL CAPITAL, LLC                                   Case No. 12-12020 (MG)

                            Debtors.                       Jointly Administered
------------------------------------------------------------------x
ROWENA DRENNEN, individually and as
Representative of the KESSLER
SETTLEMENT CLASS, *et al.*,

                            Plaintiffs,                    Adv. No. 15-01025 (SHL)

               v.

CERTAIN UNDERWRITERS AT
LLOYD'S OF LONDON, *et al.*,

                            Defendants.
------------------------------------------------------------------x

<u>**MEMORANDUM OF DECISION**</u>


**A P P E A R A N C E S :**

**PERKINS COIE, LLP**
*Counsel for ResCap Liquidating Trust*
700 13th St. NW, Suite 600
Washington, DC 20005
By:     Vivek Chopra, Esq.
        Selena J. Linde, Esq.
        Alexis Danneman, Esq.

**WALTERS, BENDER STROHBEHN &**
**VAUGHAN, P.C.**
*Co-Lead Counsel for the Kessler Class* and
*Counsel for the Mitchell Class*
2500 City Center Square
1100 Main
Kansas City, Missouri 64105
By:     R. Frederick Walters, Esq.
        Karen W. Renwick, Esq.
        David M. Skeens, Esq.

Garrett M. Hodes, Esq.
Michael B. Sichter, Esq.

**SEDGWICK LLP**
*Counsel for Underwriters at Lloyd's*
*of London*
225 Liberty Street
28th Floor
New York, New York 10281
By:    J. Gregory Lahr, Esq.
       Timothy D. Kevane, Esq.
       Lawrence Klein, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is Plaintiffs' motion to compel discovery from Defendant Certain

Underwriters at Lloyd's of London ("Underwriters").  In this lawsuit about insurance coverage,

Plaintiffs allege that Underwriters have improperly withheld claims handling documents on the

basis of the attorney-client and work product privileges.  *See* Motion to Compel Discovery

("Motion") at 1 [ECF No. 298].  Specifically, Plaintiffs allege that Underwriters used attorneys

from a law firm—Sedgwick, Detert, Moran & Arnold, LLP ("Sedgwick")—as claims handlers

and, therefore, cannot shield from discovery documents that reflect the claims handling activities

performed by these Sedgwick attorneys.  *See id.* at 1–2.  Underwriters maintain, however, that

these documents are privileged because Underwriters retained Sedgwick to provide legal advice

on coverage issues under the applicable insurance policies.  *See* Underwriters' Opp. to Motion

("Underwriters' Opp.") at 1 [ECF No. 299-16].  The parties also dispute the date when litigation

became likely for purposes of when any attorney work product privilege would apply.

Since the filing of the Motion, the parties' positions have evolved as Underwriters have

produced some of the previously withheld information.  Notwithstanding the narrowing of their

disagreements, however, the parties have been unable to resolve all their discovery disputes, thus requiring the Court's decision today.[1]

## **BACKGROUND**

We start with a brief history.  In May 2012, Residential Funding Company, LLC ("RFC"), along with its parent companies and other affiliated entities, filed for relief under chapter 11 of the Bankruptcy Code.  *See* Second Amended Complaint (the "Complaint") ¶ 1 [ECF No. 206].  Prior to the petition date, the Defendant insurers in this adversary proceeding sold comprehensive insurance policies to RFC's parent company, General Motors ("GM").  *Id.* ¶ 4.  Underwriters provided GM with a Combined Directors and Officers Liability and Company Liability, Errors and Omissions Liability, Pension Trust Liability, and Mortgagees Errors and Omissions policy (the "Policy").  *See id.* ¶ 38; *see also* Policy, attached as Exh. 1 to Decl. of Vivek Chopra ("Chopra Decl.") [ECF No. 298-3]; Decl. of Bernard Levy ("Levy Decl.") ¶ 9 [ECF No. 299-15].[2]  The Policy designated Eugene Elsbree of Sedgwick as the recipient of all claims notices.  *See* Policy, Item G.  The lead underwriter on the Policy was Novae Group ("Novae"), formerly known as SVB Syndicates Limited, with ACE Global Markets ("ACE") as the co-lead.  *See* Decl. of Eugene Elsbree ("Elsbree Decl.") ¶ 11 [ECF No. 299-14].

Beginning in 2001, several class actions were filed against RFC and other parties on behalf of borrowers who had obtained second mortgage loans that were acquired by RFC on the secondary market.  *See* Compl. ¶ 3.  From 2001 to 2013, Sedgwick sent reports to Underwriters

---

[1]    In connection with this Motion, Underwriters provided the Court with documents *in camera*, and the parties submitted pleadings with text redacted on the public docket to protect information that Underwriters' claim is privileged or confidential.  *See, e.g.*, Plaintiffs' Suppl. Brief in Support of the Motion ("Plaintiffs' Suppl. Br.") [ECF No. 312].  The Court does not believe, however, that this Decision contains any privileged or confidential information.

[2]    Underwriters issued the primary policy and an excess follow form policy to GM.  *See* Compl. ¶¶ 25, 38, 41. The other Defendant insurers in this lawsuit provided excess policies.  *See id.* ¶ 40.

3

about these actions, which the parties here have referred to as the *Kessler* class action, the

*Mitchell* class action, and the Related Missouri Actions (collectively, the "Underlying Actions").

*See* Motion at 6–7.  These reports include so-called "Bordereaux Reports" and "Direct Reports,"

which provided information on the second mortgage claims, including the Underlying Actions

and other claims.  *See id.* at 7; *see also* Transcript of Hearing Held on December 21, 2016 ("Hr'g

Tr.") 121:24–25 [ECF No. 304].  Plaintiffs contend that these reports provided Underwriters with

an update on Sedgwick's investigation of the Underlying Actions, and demonstrate that

Underwriters had delegated claims handling functions to Sedgwick for the Underlying Actions.

*See* Motion at 7–8.  Underwriters disagree, maintaining that Sedgwick was providing legal

advice and counseling with respect to the second mortgage claims, specifically whether these

claims implicated coverage under the Policy.  *See* Underwriters' Opp. at 5; Elsbree Decl. ¶¶ 13–

16; Levy Decl. ¶¶ 13–14,17.

A hearing on the Motion was initially held in late December 2016.  Subsequent to the

hearing, the parties continued to work together on discovery issues and further hearings were

held with the Court on January 23, 2017, and February 28, 2017.  During these hearings, the

Court offered some observations and preliminary conclusions about the issues.  Given the release

of additional information by Underwriters, the parties submitted supplemental briefing after the

last hearing.  [*See* ECF Nos. 312, 313, 314, 315].[3]  There are now three primary issues before the

Court: (i) whether Underwriters acted as claims handlers, rather than attorneys; (ii) the date by

which Underwriters anticipated litigation; and (iii) whether information about the reserve level

established by Underwriters for the Underlying Actions is discoverable.

---

[3]    The Court also received a letter from another defendant, Swiss Re International S.E. ("Swiss Re"), dated
March 6, 2017, related to the appropriate date by which Underwriters anticipated litigation.  *See* Letter dated March
6, 2017 [ECF No. 311] (urging the Court to adopt October 13, 2008).

## DISCUSSION

### A. The Attorney-Client Privilege

The purpose of the attorney-client privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). In determining whether the attorney-client privilege applies, the first inquiry is whether to apply state or federal law. In cases under the Bankruptcy Code, the Federal Rules of Evidence apply. *See In re Asia Glob. Crossing, Ltd.*, 322 B.R. 247, 254 (Bankr. S.D.N.Y. 2005) (citing Fed. R. Bankr. P. 9017; Fed. R. Evid. 1101(b)). The "federal common law of privileges applies when federal law determines the substantive rights of the parties." *Id.* "On the other hand, the state privilege law controls if the underlying claim or defense is also governed by state law." *Id.* (citing Fed. R. Evid. 501; *Bower v. Weisman*, 669 F. Supp. 602, 603 (S.D.N.Y. 1987)).

The parties agree that the Court should apply New York law to the dispute over attorney-client privilege.[4] *See AIU Ins. Co. v. TIG Ins. Co.*, 2008 WL 4067437, at *5 (S.D.N.Y. Aug. 28, 2008). In New York, the attorney-client privilege is codified in C.P.L.R. 4503(a). The privilege "protects confidential communications between client and counsel where such communications are made for the purpose of providing or obtaining legal advice." *HSH Nordbank AG N.Y. Branch v. Swerdlow*, 259 F.R.D. 64, 70 (S.D.N.Y. 2009). Under New York law, there are essentially three elements of the attorney-client privilege: "[(1)] the existence of an attorney-

---

[4]     Underwriters contend that an insurance policy covering risks in multiple states is governed by the law of the insured's principal place of business. *See* Underwriters' Opp. at 11 n.3. Accordingly, Underwriters suggests that the law of either Michigan, as the principal place of business of GM, or Minnesota, as the principal place of business of RFC, are potentially applicable. *See id.* Nevertheless, Underwriters note there is no significant difference between New York law and that of Michigan and Minnesota for purposes of the Motion and, therefore, do not object to applying New York law to this discovery dispute. *See id.* But Underwriters reserve their right to later argue that another state's laws apply to the substantive issues in the case. *See id.*

client relationship, [(2)] a communication made within the context of that relationship for the

purpose of obtaining legal advice, and [(3)] the intended and actual confidentiality of that

communication." *Safeco Ins. Co. of Am. v. M.E.S., Inc.*, 289 F.R.D. 41, 46 (E.D.N.Y. 2011)

(citation omitted); *see also People v. Mitchell*, 58 N.Y.2d 368, 373 (1983). To validly claim the

privilege, "the information sought to be protected from disclosure [must be] a 'confidential

communication' made to the attorney for the purpose of obtaining legal advice or services." *Id.*;

*see also Rossi v. Blue Cross & Blue Shield of Greater N.Y.,* 73 N.Y.2d 588, 593 (1989). The

privilege is "limited to communications—not underlying facts," and the communication "must

be primarily or predominantly of a legal character." *Spectrum Sys. Int'l Corp. v. Chem. Bank*, 78

N.Y.2d 371, 377–78 (1991). "So long as the communication is primarily or predominantly of a

legal character, the privilege is not lost merely by reason of the fact that it also refers to certain

nonlegal matters." *Rossi*, 73 N.Y.2d at 594. Communications protected by the attorney-client

privilege are generally "absolutely immune from discovery." *N.Y. Times Newspaper Div. of N.Y.

Times Co. v. Lehrer McGovern Bovis, Inc.*, 752 N.Y.S.2d 642, 644–45 (App. Div. 1st Dep't

2002) (citing N.Y. C.P.L.R. 3101(b); *Spectrum*, 78 N.Y.2d 371).[5]

Under New York law, an insurance company's claim handling activities are generally

subject to discovery even if they were performed by an attorney. *See Stephenson Equity Co. v.

Credit Bancorp., Ltd.*, 2002 WL 59418, at *3 (S.D.N.Y. Jan. 16, 2002) ("Courts have held that

reports prepared by attorneys investigating insurance claims on behalf of an insurance company

are not privileged, because the reports, although prepared by attorneys, are prepared as part of

the 'regular business' of the company.") (internal quotations and citation omitted); *see also*

---

[5]     Courts have recognized that the privilege may "yield in a proper case where strong public policy requires disclosure." *People v. Osorio*, 75 N.Y.2d 80, 84 (1989); *see also Mitchell*, 58 N.Y.2d at 373. However, no party here has made this argument.

*Melworm v. Encompass Indem. Co.*, 977 N.Y.S.2d 321, 323 (App. Div. 2d Dep't 2013)

("Reports prepared by insurance investigators, adjusters, or attorneys before the decision is made

to pay or reject a claim are . . . not privileged and are discoverable[.]").  Indeed, "[d]ocuments

prepared in the ordinary course of an insurance company's investigation to determine whether to

accept or reject coverage and to evaluate the extent of a claimant's loss are not privileged . . . ."

*Brooklyn Union Gas Co. v. Am. Home Assurance Co.*, 803 N.Y.S.2d 532, 534 (App. Div. 1st

Dep't 2005) (concluding attorney-client privilege did not apply where there was "no legal

advice, no legal recommendations or attorney thought processes revealed in [the] documents"

and that the documents were prepared in ordinary course of claims evaluation).  In insurance

litigation, "attorney-client communications have been denied protection when it appears the

attorney is merely investigating a claim on a policy."  *Evanston Ins. Co. v. OEA, Inc.*, 2006 WL

1192737, at *4 (S.D.N.Y. May 4, 2006); *Stephenson Equity*, 2002 WL 59418, at *3 (finding the

attorney-client privilege did not apply to certain documents prepared by the insurers' counsel

because counsel was hired to investigate facts surrounding the claims and to make a

recommendation to the insurers).  Indeed, "a lawyer's communication is not cloaked with

privilege when the lawyer is hired for business . . . or to do the work of a nonlawyer."  *Spectrum*,

78 N.Y.2d at 379.  But "[t]hat nonprivileged information is included in an otherwise privileged

lawyer's communication to its client—while influencing whether the document would be

protected in whole or only in part—does not destroy the immunity."  *Id.* at 378.

The party asserting the attorney-client privilege bears the burden of establishing it.  *See*

*Mitchell*, 58 N.Y.2d at 373.  Such a burden may be met by a showing based on "competent

evidence, usually through affidavits, deposition testimony, or other admissible evidence."

*Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 428 (S.D.N.Y. 2013); *see also Certain Underwriters at*

7

*Lloyd's v. Nat'l R.R. Passenger Corp.*, 162 F. Supp. 3d 145, 151 (E.D.N.Y. 2016) (noting the

burden is not discharged by "mere conclusory or ipse dixit assertions.") (quotation omitted).  The

party asserting the privilege "also bears the burden of demonstrating that it has not been waived."

*See Swerdlow*, 259 F.R.D. at 70.

### B.   The Attorney-Client Privilege As to Sedgwick

Plaintiffs argue that Underwriters delegated their ordinary claims handling activities to

Sedgwick for the Underlying Actions, including claims investigation and claims determination.

*See* Motion at 2, 7–9 (listing activities Sedgwick engaged in that Plaintiffs contend are typical of

claims handlers including, receiving notice, investigating claims, performing coverage analysis,

maintaining the claims file, requesting information, demanding and analyzing claims status

reports, determining whether claims should be paid or rejected, and preparing regular reports for

Underwriters documenting the status of open claims).  Plaintiffs note that an attorney with

Sedgwick, Mr. Elsbree, was designated as the recipient of all claims notices and contend that he

never identified himself as "coverage counsel."  *See id.* at 5–6.  Plaintiffs contend that the Direct

Reports are the types of reports generated by insurers in the regular course of business that are

turned over to policyholders in discovery.  *See id.* at 2, 7–8, 19–20 (noting the Direct Reports

contain section titles like "Further Handling," "Coverage Evaluation," and "Coverage Issues").

In contrast, Sedgwick asserts that it was retained by Underwriters as coverage counsel to

provide legal advice regarding claims submitted under the Policy.  *See* Underwriters' Opp. at 5.

Sedgwick distinguishes its role as coverage counsel from that of a claims handler.  *See id.*

Sedgwick contends that as coverage counsel, it researched applicable case law, analyzed how the

case law applied to the particularities of the claims, and provided opinions on insurance coverage

issues that might be litigated.  *See* Elsbree Decl. ¶¶ 14–16; *see also* Underwriters' Opp. at 5.

Sedgewick contrasts this to the tasks of a claims handler who processes the initial intake of a claim and information concerning the claim, reviews the policy, and makes decisions regarding coverage such as declinations or claim payments.  *See* Elsbree Decl. ¶ 17; Levy Decl. ¶ 6; *see also* Underwriters' Opp. at 5.  Sedgwick asserts that Novae had leading responsibility for how Underwriters adjusted the claims.  *See* Underwriters' Opp. at 8; Levy Decl. ¶¶ 10, 19.  As for designating Mr. Elsbree to receive notice of claims, Sedgwick explains that this was done as a convenience to Underwriters who are based in London.  *See* Underwriters' Opp. at 4; *see also* Levy Decl. ¶ 11; Decl. of Mark Johnson ("Johnson Decl.") ¶¶ 13, 24 [ECF No. 299-12].  Upon receiving notice of a claim, Mr. Elsbree would forward it to the appropriate representative at Underwriters so that Underwriters could handle it directly.  *See* Underwriters' Opp. at 4–5.  Underwriters contends that the Direct Reports do not reflect claims handling but rather include Sedgwick's analysis of factual and legal developments related to coverage issues.  *See id.* at 6.

The Court concludes that both parties are correct, up to a point.  As the Court had previously suggested, the record here reflects that Sedgwick wore two hats: that of claims handler and legal counsel.  *See* Hr'g Tr. 106:13–16 (Court stating "the factual picture is clearly one of Sedgwick playing more than just an attorney role . . . .").  Sedgwick certainly acted as a claims handler in some respects.  For example, Sedgwick received notice of the claims and opened claims files, reviewed the Policy, and requested and gathered information from Aon, GM's insurance broker, and RFC on behalf of Underwriters.  *See* Elsbree Decl. ¶ 15; *see also* Underwriters' Opp. at 4, 6–7; Plaintiffs' Reply in Support of the Motion ("Plaintiffs' Reply") at 8 [ECF No. 301].  The Direct Reports generally begin with a factual summary of the policies and claims and an update of the status of filed lawsuits, along with newly filed suits.[6]  Specifically,

---

[6]    The Direct Reports were submitted to the Court for *in camera* review.  A "sample binder" of twenty-one other documents was also submitted to the Court for *in camera* review.  However, after the sample binder was

the Direct Reports summarize the litigation status of various suits against RFC, including

motions that were filed, appellate history, and settlement activity and discussions.  This

information provides a factual summary of the status of claims against RFC and, in fact, has been

largely unredacted by Underwriters.  Of course, the attorney-client privilege is limited to

communications and does not protect such underlying facts.  *See Spectrum*, 78 N.Y.2d at 377.  It

is telling that virtually no Novae or ACE documents were produced to demonstrate claims

analysis or investigation being conducted by anyone other than Sedgwick.  *See* Motion at 2 n.6,

10–11; *see also* Hr'g Tr. 97:12–14 ("[T]he record before [the Court] doesn't really show that

[there is] robust claims processing that's going on outside of Sedgwick.").[7]  Thus, the Court

rejects Underwriters' characterization of Sedgwick as a mere "conduit of information."  *See* Hr'g

Tr. 86:8–20; 88:5–18, 105:8–9, 110:18–25 (Court asking Underwriters to provide list of

documents that reflect claims handling process and ultimate coverage decision); *see also id.*

19:2–22 (Court identifying two documents in sample binder reflecting Sedgwick work in claims

processing).

But while Sedgwick did perform some claims handling functions, the record does not

support Plaintiffs' allegation that Sedgwick made the ultimate coverage determinations on the

Underlying Claims.  Rather, the record instead supports that Sedgwick performed analysis and

made recommendations on potential coverage issues.  The Direct Reports generally conclude

with a section titled "Further Handling," which typically states that Sedgwick will continue to

---

submitted, Underwriters produced additional documents and previously redacted material.  At the status conference held on February 28, 2017, Underwriters' counsel explained that all the documents in the sample binder have been produced although they may contain redactions based solely on the attorney-client privilege.  Thus, for the Court's review, Underwriters suggested that the Direct Reports provided the best examples of redactions based on attorney-client privilege.

[7]      The Court is not persuaded by Underwriters' argument that this was a unique claims handling situation and that there "really wasn't work to be done."  *See* Hr'g Tr. 91:16–92:5; *see also id.* 106:17–25.

report in due course or that Sedgwick requests Underwriters to advise whether they agree with

Sedgwick's proposals. *See, e.g.*, Direct Report 12 at 16; Direct Report 18 at 15. This approach

is consistent with the guidelines set forth in an appendix to the Novae claims manual titled, "US

Lawyer Terms of Engagement (Coverage / Representative Counsel)." *See* US Lawyer Terms of

Engagement, attached as Exh. B to Suppl. Lahr Decl. [ECF No. 313-2]. That document states

that preliminary reports should include a summary of the underlying claim with details of loss

and factual background, an initial assessment of liability of the insured, and details on applicable

law and jurisdiction and forum. *See id.* § 5. Where there is litigation against underwriters or

where litigation is likely or threatened, the guidelines further instruct that the report should also

include a detailed discussion on coverage defenses and mitigation strategy. *See id.* § 7.1. The

Direct Reports contain the kind of information described in the Novae document, none of which

establishes that Sedgwick made the ultimate coverage decisions.

But as the Novae document and the Direct Reports suggest, Sedgwick did act as legal

counsel in addition to its claim handling services. The Direct Reports provide legal analyses of

provisions of the relevant policies, including a discussion of case law. Thus, the Direct Reports

include text that reflects Sedgwick's "assessment of [Underwriters'] legal position, and

evidences [Sedgwick's] motivation to convey legal advice." *See Spectrum*, 78 N.Y.2d at 380.

Sedgwick provided a "refined analysis of the facts of the loss, policy coverage and the parties

involved and an evaluation of any legal issues manifesting . . . ." US Lawyer Terms of

Engagement at § 6.1; *see also id.* § 16 (guidelines regarding legal research).

Sedgwick's role as counsel is also supported by other contemporaneous evidence and

sworn statements. For example, there was a specific request for legal advice. Sedgwick attorney

Mr. Elsbree testified that in 2001, Sedgwick was asked by Underwriters "to provide legal advice

11

and counseling regarding lawsuits filed by residential borrowers against . . . [RFC] and others
alleging that their second-mortgage loans involved improper fees." Elsbree Decl. ¶ 13; *see also
id.* ¶¶ 14–17 (describing nature of Sedgwick's retention and activities it undertook in that
capacity); Suppl. Decl. of Bernard Levy ("Suppl. Levy Decl.") ¶¶ 3, 7 [ECF No. 314] (describing
Sedgwick's role as coverage counsel); *105 St. Assocs., LLC v. Greenwich Ins. Co.*, 2006 WL
3230292, at *4 (S.D.N.Y. Nov. 7, 2006) (finding documents protected by attorney-client
privilege where they requested legal advice). Additionally, in a letter from Mr. Elsbree to Aon,
Mr. Elsbree states that Sedgwick has been instructed to "represent [Underwriters'] interests in
connection with the putative class action lawsuits filed against . . . [RFC] in various states."
Letter dated May 2, 2003 at 1, attached as Exh. 7 to Chopra Decl. [ECF No. 298-9]. The Court
has not been given sufficient reason to reject these sworn statements and contemporaneous
evidence. As Underwriters retained Sedgwick to provide legal advice regarding coverage issues
and lawsuits regarding second-mortgage loans and the communications between Sedgwick and
Underwriters were intended to be and actually kept confidential, the attorney-client privilege
applies to documents that reflect Sedgwick's legal opinions and conclusions. *See, e.g.*, *Reliance
Ins. Co. v. Am. Lintex Corp.*, 2001 WL 604080, at *2 (S.D.N.Y. June 1, 2001) (finding attorney-
client privilege applied to documents between insurer and its counsel that consisted of (i) legal
advice regarding extent claim covered by relevant insurance policy; (ii) advice respecting
correspondence from insurer to its adjuster; (iii) legal opinions regarding claims asserted by
client; and (iv) invoices for legal services).

  Plaintiffs maintain that Underwriters cannot avail themselves of the attorney-client
privilege if Sedgwick acted as a claims adjuster. But the Court is unpersuaded by the cases cited
by Plaintiffs. For example, in *Brooklyn Union Gas Co. v. Am. Home Assurance Co.*, the court

found that documents prepared by the insurers' attorneys were discoverable because there was "no legal advice, no legal recommendations or attorney thought processes revealed in the[] documents, nor do they appear to have been 'solely' prepared for settlement purposes . . . ." *Brooklyn Union*, 803 N.Y.S.2d at 534. Rather, the court stated that upon its review of the documents in question, the insurers' attorneys "were acting as claims investigators, not attorneys, and were investigating the issue of whether coverage should be provided and the costs of such coverage." *Id.* By contrast here, these documents reflect Sedgwick's legal advice, legal recommendations, and attorney thought processes related to potential coverage litigation. Unlike in *Brooklyn Union*, therefore, Sedgwick was not merely acting as a claims investigator, but rather as coverage counsel. Plaintiff's also mistakenly rely on *AIU Ins. Co. v. TIG Ins. Co.* The plaintiff in *AIU* argued the attorney-client privilege did not apply because defendant insurer's counsel was acting solely in an investigatory function. *AIU*, 2008 WL 4067437, at *9. The court found that the defendant insurer failed to satisfy its burden that the documents were of a legal and not merely business nature. *See id.* at *10–11 (concluding based on an *in camera* review of documents that *inter alia* many documents merely copied counsel on communications that did not seek legal advice, while others contained updates of insurer's investigation of the claim and reflected business communications).

Plaintiffs also cite cases where the court found attorneys acted as claims handlers and their communications were not protected by the attorney-client privilege. *See, e.g., Stephenson Equity*, 2002 WL 59418, at *3; *Brooklyn Union*, 803 N.Y.S.2d at 534; *Bertalo's Rest. Inc. v. Exch. Ins. Co.*, 658 N.Y.S.2d 656, 658 (App. Div. 2d Dep't 1997). However, Plaintiffs do not cite any cases—and the Court is aware of none—holding that the attorney-client privilege is waived where the attorney serves as both legal counselor and claims handler. Such a position is

13

inconsistent with the well-established principle that a legal communication does not lose its

protection if it also refers to "nonlegal matters." *Rossi*, 73 N.Y.2d at 594. Rather, the Court

finds it is appropriate to distinguish between communications reflecting non-privileged matters

where Sedgwick was merely a claims handler and communications where it was providing legal

advice. *See 105 St. Assocs., LLC*, 2006 WL 3230292, at *3 ("Although '[i]n the context of

insurance litigation, attorney-client communications have been denied protection when it appears

the attorney is merely *investigating* a claim on a policy,' when such communications relate to

*legal advice*, they do not lose the protection of the attorney-client privilege simply because they

involve an insurance claim.") (citation omitted); *see also 34-06 73, LLC v. Seneca Ins. Co.*, 2013

NY Misc. LEXIS 5633, at *4 (Sup. Ct. N.Y. Cty. Dec. 4, 2013) (stating where insurance

companies use attorneys to investigate claims, documents "may be protected by attorney-client

privilege, even if made before the insurance company decides to deny coverage, if they are

primarily of a legal, as opposed to investigatory, character and not related to an insurance

company's routine business activities."); *Reliance*, 2001 WL 604080, at *2 (distinguishing

between attorneys' reports that are result of work that is part of the regular course of insurance

business as "not primarily of a legal character" and communications consisting of legal advice

and opinion that "are primarily of a legal character" and thus protected by attorney-client

privilege); *cf. Stenovich v. Wachtell, Lipton, Rosen & Katz*, 756 N.Y.S.2d 367, 376 (Sup. Ct.

N.Y. Cty. 2003) ("The fact that business advice is sought or even given does not automatically

waive the [attorney-client] privilege, where the advice given is predominantly legal, as opposed

to business, in nature[.]") (internal quotations and citation omitted).

   In arguing that Sedgwick was not acting as counsel, Plaintiffs also cite to Underwriters'

hiring of other lawyers at Smith Haughey Rice & Roegge ("Smith Haughey"). *See* Plaintiffs'

Suppl. Br. at 5–6.  Based on Smith Haughey's retention, Plaintiffs maintain that Sedgwick was

retained only to act as a claims handler while Smith Haughey was subsequently retained for

anticipated litigation.  *See id.* at 5.  But this argument is contradicted by the extensive legal

analysis provided by Sedgwick in the Direct Reports.  Moreover, the mere existence of more

than one set of counsel in a complex commercial dispute is not, in and of itself, dispositive of the

role played by each counsel.  Clients often have different counsel for different tasks, particularly

in complex cases.[8]  Nor have Plaintiffs established that Underwriters' retention of Smith

Haughey as litigation counsel would somehow destroy any attorney-client privilege that

Underwriters had with previously-retained Sedgwick.

 Given the Court's conclusion that these documents contain both privileged and non-

privileged text, it is helpful to identify some examples of text that is properly withheld as

privileged and other text that should be released.  These examples fall into four categories.  This

is not an exhaustive list but rather a guide for the parties to apply to all the documents at issue.

 First, the Direct Reports cite various clauses of the Policy.  The cited Policy provisions

and definitions are often followed by Sedgwick's analysis and interpretation, which are protected

by the attorney-client privilege.  Examples include Policy definitions and clauses, alongside legal

analysis.  *See, e.g.*, Direct Report 1 at 8–11; Direct Report 3 at 16–29; Direct Report 7 at 11–25;

Direct Report 15 at 20–31.  Interspersed with the Policy provisions and analysis are some factual

statements but these are difficult to separate from the legal analysis.  Given this context,

releasing them could reveal privileged information.  *See 105 St. Assocs., LLC*, 2006 WL

---

[8] Indeed, Underwriters have proffered a possible explanation for having two sets of counsel.  They point out that Smith Haughey is based in Michigan, the same state that the parent insured, GM, is based.  *See* Underwriters' Response to Plaintiffs' Suppl. Br. ("Underwriters' Suppl. Br.") at 3 [ECF No. 315].  It would be reasonable for Smith Haughey to be retained as local counsel for coverage litigation in Michigan, with Sedgwick also continuing to provide legal advice.  *See* Suppl. Levy Decl. ¶ 5.

3230292, at *3 (stating where facts are presented as the foundation for legal advice in a communication primarily and predominantly of a legal character, the entire communication may retain its privileged status) (citing *Spectrum*, 78 N.Y.2d at 379–80); *see also 34-06 73, LLC*, 2013 NY Misc. LEXIS 5633, at *6 (finding redactions appropriate in communication between property adjuster and insurer's counsel that was an "amalgam of both investigation and legal strategy, but . . . predominantly of a legal character."). Accordingly, the Court will not require Underwriters to release this type of information.

Second, the Direct Reports include factual or historical information that appears to reflect claims processing rather than legal advice and should, therefore, be released. This would include discussions about correspondence that was sent and received, claim settlements, and summaries of allegations in court filings. *See, e.g.*, Direct Report 2 at 11 (bottom half); Direct Report 4 at 2–7; Direct Report 10 at 11 (first three paragraphs); Direct Report 21 at 8–9; Direct Report 25 at 15–22 (providing historical back and forth of the parties);[9] Direct Report 27 at 7–8 (sections A.1 through first paragraph in A.2).

Third, portions of the Direct Reports fall squarely within the protection of the attorney-client privilege, including the framing of legal issues, discussion of case law, and applicable statutes. *See, e.g.*, Direct Report 1 at 2, 7 (framing of legal issues), *id.* at 11–16 (legal analysis); Direct Report 8 at 14 (framing of legal issues); Direct Report 9 at 5–6 (legal analysis); Direct Report 19 at 13–14 (same); Direct Report 22 at 5–6 (same); Direct Report 25 at 23–26 (same). This bucket also includes discussions of potential exclusions and defenses, and text comparing and analyzing issues in RFC lawsuits. *See, e.g.*, Direct Report 6 at 8–9 (attorney

---

[9]    The majority of the discussion in pages 15 through 22, including sections A.1.a through A.1.c. in Direct Report 25 is historical, however there is some legal analysis that is properly redacted. *See, e.g.*, Direct Report 25 at 21 n.16.

recommendations); Direct Report 19 at 11 (same); Direct Report 3 at 18–19, 27–28 (analyzing RFC lawsuits); Direct Report 7 at 16–22 (same).

Fourth and finally, there were some inconsistencies in redactions among the Direct Reports. Such inconsistencies should be rectified so that material produced in one report should also be released in others. For example, Direct Report 10 at page 11 redacts certain information that is released in Direct Report 6 at page 8. This same information is found in subsequent reports and should be released in those as well. *See, e.g.*, Direct Report 11 at 10. This information is of a historical nature. Similarly, Direct Report 19 and Direct Report 20 redacts material that is released in Direct Report 18 at pages 9–11, relating to the *Mitchell* reservation of rights letter ("*Mitchell* ROR") and GM's response. *See* Direct Report 19 at 8–9; Direct Report 20 at 7. This information is also of a historical nature.

## C. The Work Product Doctrine

Federal law governs the work product doctrine in actions in federal court. *See Grinnell Corp. v. ITT Corp.,* 222 F.R.D. 74, 77 (S.D.N.Y. 2003). The work product doctrine is a "qualified privilege" codified in Federal Rule of Civil Procedure 26(b)(3). *See In re Asia Glob. Crossing*, 322 B.R. at 262. Its purpose is to allow an attorney to "assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference." *Hickman v. Taylor*, 329 U.S. 495, 511 (1947); *see also Salomon Bros. Treasury Litig. v. Steinhardt Partners, L.P.* (*In re Steinhardt Partners, L.P.*), 9 F.3d 230, 234 (2d Cir. 1993) (explaining the doctrine as protecting an attorney's thought processes, which includes "preparing legal theories, [and] planning litigation strategies and trial tactics"). The doctrine protects "the integrity of the adversary process by preventing an adversary from obtaining a free ride in preparing his client's case." *In re Circle K*

17

*Corp.*, 199 B.R. 92, 98 (Bankr. S.D.N.Y. 1996).  The law distinguishes "between non-opinion

work product (work product containing non-privileged, relevant facts) and opinion work product

(work product that contains the attorney's opinions, judgments and thought processes)." *Id.*

Crucial to the present dispute, a document "must have been prepared 'in anticipation of

litigation'" for the work product doctrine to apply.  *In re Suprema Specialties, Inc.*, 2007 WL

1964852, at *3 (Bankr. S.D.N.Y. July 2, 2007).  Courts in the Second Circuit have found that

documents fall under this definition if "in light of the nature of the document and the factual

situation in the particular case, the document can fairly be said to have been prepared or obtained

*because of* the prospect of litigation."  *United States v. Adlman*, 134 F.3d 1194, 1202 (2d Cir.

1998) (citations omitted).  The "because of" formulation does not protect those documents that

"are prepared in the ordinary course of business or that would have been created in essentially

similar form irrespective of the litigation."  *Id.*; *see also Stephenson Equity*, 2002 WL 59418, at

*2.  But a document prepared in anticipation of litigation that also serves an ordinary business

purpose is not deprived of work-product doctrine protection.  *See In re Prof'ls Direct Ins. Co.*,

578 F.3d 432, 439 (6th Cir. 2009); *see also Adlman*, 134 F.3d at 1200 ("The fact that a

document's purpose is business-related appears irrelevant to the question whether it should be

protected under Rule 26(b)(3).").  Furthermore, the "mere possibility of litigation is insufficient

to obtain work-product protection."  *Gucci Am., Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 74

(S.D.N.Y. 2010) (internal quotations and citation omitted).

In the insurance context, courts have noted the difficulty in determining "whether

documents prepared by an insurance company or its representatives are entitled to work-product

protection because insurers are in the business of investigating and adjusting claims."

*Stephenson Equity*, 2002 WL 59418, at *2 (citing cases).  Because "[t]he payment or rejection of

18

claims is a part of the regular business of an insurance company. . . . reports which aid it in the process of deciding which of the two indicated actions to pursue are made in the regular course of its business." *Bertalo's Rest.*, 658 N.Y.S.2d at 659 (internal quotations and citation omitted); *see also OneBeacon Ins. Co. v. Forman Int'l, Ltd.*, 2006 WL 3771010, at *5 (S.D.N.Y. Dec. 15, 2006) ("[D]ocuments prepared in the ordinary course of [an] insurer's business (which by its nature, involves claim investigation and analysis) are not protected from discovery.") (internal quotations and citation omitted). In the insurance context, some "courts frequently presume that investigative reports prepared by or for an insurer prior to a coverage decision are prepared in the ordinary course of the insurer's business and are not afforded work-product protection." *Stephenson Equity*, 2002 WL 59418, at *2 (quoting *Mount Vernon Fire Ins. Co. v. Try 3 Building Servs., Inc.*, 1998 WL 729735, at *6 (S.D.N.Y. Oct. 16, 1998) (citing cases)); *see also Bertalo's Rest.*, 658 N.Y.S.2d at 659 (concluding "those communications which occurred before the date that the defendant [insurer] had reasonable grounds to reject the claim" are discoverable). "This presumption may be rebutted by the insurer if it demonstrates with specific competent proof that it possessed a 'resolve to litigate' when the documents were created." *AIU*, 2008 WL 4067437, at *12. The hiring of a law firm is a "significant factor in determining when the insurer anticipates litigation but it is not determinative." *Id.* at *13 (internal quotations and citation omitted). "Because of the fact-specific nature of this inquiry, documents created after the retention of counsel are not necessarily afforded work-product protection where the insurance company continues to investigate the claim without denying coverage." *Id.* Rather than utilizing a presumption, other courts "have adopted a more flexible case-by-case approach." *Mount Vernon*, 1998 WL 729735, at *7 (citing cases). Such courts frequently engage in a fact-specific analysis to determine the date when an insurer had reasonable grounds to reject the claim. *See,*

19

*e.g., Weber v. Paduano*, 2003 WL 161340, at *4 (S.D.N.Y. Jan. 22, 2003); *see also Evanston*, 2006 WL 1192737, at *4 ("When an investigation conducted by counsel crosses the line from business-centered (and unprotected) to litigation-centered is a question of fact that must be determined on a case-by-case basis.").

The issuance of a reservation of rights letter is relevant but not dispositive of the date when litigation is anticipated. In *AIU Ins. Co. v. TIG Ins. Co.*, for example, the court found that the insurer did not have the resolve to litigate as of the date of its reservation of rights letter, because the letter was sent only eight days after the insurer received notice of the claim and the insurer continued to request additional information, yet never denied the claim. *See AIU*, 2008 WL 4067437, at *13–14. The court concluded that the insurer failed to provide "specific facts that each withheld or redacted document was prepared in anticipation of litigation and not as part of [the insurer's] ordinary investigation . . . ." *Id.* at *13; *see also Evanston*, 2006 WL 1192737, at *4 (engaging in a fact-specific inquiry and ultimately finding that "factual materials generated by . . . 'coverage counsel' and related to the investigation of [the insured's] claim [were] not work product. However, materials generated *after* the claim was denied . . . or in response to [insured's] complaint . . . in the coverage action" were protected work product.). The court in *Mount Vernon Fire*, by contrast, concluded that litigation was anticipated when an insurance company issued a reservation of rights letter that reflected that the insurer "had clearly taken a position regarding coverage." *Mount Vernon*, 1998 WL 729735, at *8; *see also St. Paul Fire & Marine Ins. Co. v. ConAgra Foods, Inc.*, 2008 WL 222518, at *3 (S.D. Ohio Jan. 25, 2008) (finding that at date of reservation of rights letter, it was reasonable for the parties to anticipate that if the insured were forced to expend money to resolve litigation, it would subsequently become involved in a coverage dispute with its insurer); *Royal Surplus Lines Ins. v. Sofamor*

20

*Danek Grp.*, 190 F.R.D. 463, 473 (W.D. Tenn. 1999) (concluding formal reservation of rights

letter "most clearly indicate[d] the strong possibility of future litigation" and "once the ROR

Letter was sent . . . it became reasonable to anticipate litigation.").

   The party asserting the work product privilege bears the burden of establishing it applies.

*See In re Circle K Corp.*, 199 B.R. at 98; *see also Weber*, 2003 WL 161340, at *4.  That party

must "demonstrate by specific and competent evidence that the documents were created in

anticipation of litigation."  *Weber*, 2003 WL 161340, at *4.  If the party asserting the privilege

satisfies its burden, "the party seeking discovery must . . . demonstrate a ground for piercing the

privilege[,]" which may include the existence of an exception or waiver or upon an adequate

showing of need.  *In re Circle K Corp.*, 199 B.R. at 98.

### D.   The Work Product Doctrine As to Sedgwick

   Underwriters here maintain that litigation was anticipated on October 17, 2008, the date

of the *Mitchell* ROR.  *See* Letter dated February 14, 2017, at 2 [ECF No. 309]; Underwriters'

Suppl. Br. at 8–9.  Underwriters contend that it was apparent by this date that Underwriters

would not provide coverage for damages awarded on the claims.  *See* Underwriters' Suppl. Br. at

8–9; *see also* Underwriters' Opp. at 24–25.  But Plaintiffs argue that the October 2008 date is too

early.  Plaintiffs point out that, even after that date, Underwriters continued to request and

receive information from RFC and conduct meetings with RFC, make partial defense cost

payments in *Mitchell*, and that the *Mitchell* ROR itself states that the claims were subject to a

"continuing investigation" and requested additional information.  *See* Plaintiffs' Suppl. Br. at 6.

Instead, Plaintiffs urge the Court to adopt February 29, 2012, the date that Underwriters denied

RFC's demand for payment for the *Mitchell* compensatory damages judgment. *See id.* at 3, 6–7.[10]

Looking at all the facts and circumstances here, the Court finds that the anticipated litigation date is October 17, 2008, the date of the *Mitchell* ROR. *See, e.g., ConAgra Foods*, 2008 WL 222518, at *3 (noting "[i]n several insurance-related cases, courts have concluded that the issuance of a reservation of rights letter triggers a reasonable expectation of future litigation between the parties."). We begin with the language of the *Mitchell* ROR itself. The document characterizes the *Mitchell* action as a "mortgage fee claim," and advises that coverage for the *Mitchell* claim is potentially available only for defense costs. *See Mitchell* ROR at 8–10, attached as Exh. B to Lahr Decl. [ECF No. 299-2]; *cf.* Elsbree Decl. ¶ 26 (describing the same in context of the *Kessler* reservation of rights letter). Such a statement is tantamount to Underwriters refusing to provide coverage to RFC for damages awarded on the *Mitchell* claim. *See* Letter from GMAC Financial Services dated February 19, 2009, at 6, attached as Exh. C to Lahr Decl. [ECF No. 299-3] (disputing Underwriters' characterization of *Mitchell* claim and asserting that Underwriters is responsible for all categories of loss); Letter dated February 29, 2012, at 2, attached as Exh. 26 to Declaration of Selena Linde ("Linde Decl.") [ECF No. 312-29] (stating RFC's points regarding request for reimbursement for settlement payment made on behalf of RFC do not "warrant[] a change in the reservations previously advised."); *see also Mount Vernon*, 1998 WL 729735, at *8 (finding insurer took a position regarding coverage in its reservation of rights letter).

---

[10]    Both parties initially took far more extreme positions. Underwriters previously argued that the date that litigation as anticipated was May 2003, when Underwriters issued their initial reservation of rights letter on the *Kessler* claim. *See* Underwriters' Opp. at 24. Plaintiffs originally argued that Underwriters anticipated litigation on August 20, 2015, the date Underwriters answered the amended complaint in this case. *See* Motion at 30. Neither of these dates is supportable on this record.

This conclusion is confirmed by the context for the issuance of the *Mitchell* ROR.

Shortly before the *Mitchell* ROR—in September 2008—a judgment of approximately $99

million was entered against RFC in the *Mitchell* claim. *See Mitchell* ROR at 6; *see also* Compl.

¶ 135. On October 14, 2008, RFC told Underwriters that it expected Underwriters to fulfill its

obligations regarding the *Mitchell* claim and the next day said it was "imperative" that

Underwriters consent to and fund a settlement. *See* E-mail dated October 14, 2008, attached as

Exh. C to Suppl. Lahr Decl. [ECF No. 313-3]; E-mail dated October 15, 2008, attached as Exh.

D to Suppl. Lahr Decl. [ECF No. 313-4]. These e-mail exchanges reflect that Underwriters

requested RFC explain why the claim was covered and in response RFC said it would seek to

hold Underwriters liable for bad faith based on Underwriters' unwillingness to consent to fund a

settlement. *See* Exhs. C, D attached to Suppl. Lahr Decl.; *see also* E-mail dated October 17,

2008, attached as Exh. E to Suppl. Lahr Decl. [ECF No. 313-5] (RFC asking for Underwriters'

consent to settle up to $57 million and that Underwriters commit to funding such a settlement).

All these communications reflect an adversarial stance between the parties. *See Lloyd's*

*Acceptance Corp. v. Affiliated FM Ins. Co.*, 2012 WL 1389708, at *4–5 (E.D. Mo. Apr. 23,

2012) (finding e-mails were created in anticipation of litigation where parties' communications

reflected an adversarial relationship, even before official claim denial); *cf. AIU*, 2008 WL

4067437, at *14 (finding it appropriate to "engage in a fact-specific inquiry to determine whether

each document was created in anticipation of litigation.").

Additionally, while dated several months later, Direct Report 18, with respect to the

request for reimbursement of defense costs, states: "*In anticipation of a dispute* with the

Assureds, we have undertaken a detailed and comprehensive review of the invoices . . . ." Direct

Report 18 at 13 (April 2009) (emphasis added); *see id.* at 14, 15 (noting possibility of arbitration

23

or litigation); *see also* Direct Report 16 at 13 (referring to October 17, 2008 letter as "coverage position letter"); E-mail dated July 22, 2011, attached as Exh. 5 to Linde Decl. (e-mail from Novae to Aon, stating that Underwriters set out their coverage position in the *Mitchell* ROR). This strongly undermines the Plaintiffs' proposed date of February 2012.

The fact that Underwriters continued to request additional information from RFC after the *Mitchell* ROR does not alter this conclusion.  While the "investigation and evaluation of claims is part of the . . . ordinary and principal business of insurance companies[,] . . . [a]t a certain point an insurance company's activity shifts from the ordinary course of business to anticipation of litigation.  There is no hard and fast rule as to when this occurs."  *Fine v. Bellefonte Underwriters Ins. Co.*, 91 F.R.D. 420, 422 (S.D.N.Y. 1981) (internal quotations and citations omitted).  In *Fine*, the insurer argued that certain expert reports, which were completed approximately four months after a fire, were entitled to work product protection.  *See id.* at 421–22.  The court held that the reports were not entitled to protection, concluding that the insurer failed to demonstrate that it took steps "in that short period prior to the generation of the reports . . . in furtherance of a sufficiently identifiable resolve to litigate," rather than a routine investigation of a claim.  *See id.* at 422–23.  In contrast here, there is a significant length of time—several years—between when Underwriters received notice of the claims and the *Mitchell* ROR.  During this time, moreover, Underwriters contend that they requested information from RFC in response to RFC's requests for settlement commitments.  As Underwriters had agreed to pay defense costs in *Mitchell* subject to a reservation of rights, information on claim developments was necessary.  *See* Underwriters' Suppl. Br. at 9 n.9.  The Court finds this to be a reasonable explanation for Underwriters' requests for additional information after the *Mitchell*

24

ROR and not necessarily inconsistent with a finding that litigation was anticipated in October 2008.

Given the factual record here, therefore, the Court concludes that Underwriters has established by specific competent proof that the anticipated date of litigation was October 17, 2008.[11]

## E.  Reserve Information

In insurance litigation, insureds frequently seek access to information about an insurer's reserve amounts for a given claim.  *See, e.g.*, *Stonewall Ins. Co. v. Nat'l Gypsum Co.*, 1988 WL 96159, at *6 (S.D.N.Y. Sept. 6, 1988); *see also* 17A Couch on Ins. § 251:29 (discussing the discoverability of loss reserves).  Whether reserve information is discoverable preliminarily rests on whether it is relevant.  *See* Timothy M. Sukel & Mike F. Pipkin, Discovery and Admissibility of Reserves, 34 Tort & Ins. L.J. 191, 196 (1998); *see also Musicland Holding Corp. v. Best Buy Co.* (*In re Musicland Holding Corp.*), 424 B.R. 95, 100 (Bankr. S.D.N.Y. 2010) (the party seeking discovery bears the burden of demonstrating relevance).  Under the Federal Rules of Civil Procedure:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant
> to any party's claim or defense and proportional to the needs of the case,

---

[11]      In a footnote, Plaintiffs argue in a conclusory fashion that if the work product doctrine applies, they are entitled to documents in Sedgwick's possession based on substantial need.  *See* Motion at 30 n.160.  Fact work product may be disclosed upon a showing of substantial need and the party's inability to obtain the equivalent of the materials without undue hardship.  *See Upjohn*, 449 U.S. at 400; *see also* Fed. R. Civ. P. 26(b)(3)(A).  Plaintiffs contend that the information is essential to Underwriters' affirmative defenses, such as late notice.  *See* Motion at 30 n.160.  The Court disagrees.  Substantial need has been found "where the information sought is 'essential' to the party's defense, is 'crucial' to the determination of whether the defendant could be held liable for the acts alleged, or carries great probative value on contested issues."  *Amtrust N. Am., Inc. v. Safebuilt Ins. Servs., Inc.*, 2016 WL 3260370, at *4 (S.D.N.Y. June 10, 2016) (citation omitted).  But attorney opinions, judgments and thought processes are entitled to greater protection and the "party seeking to discover it must show 'extraordinary justification.'"  *In re Circle K Corp.*, 199 B.R. at 98 (citation omitted).  Plaintiffs have not sufficiently demonstrated a need for the material under either standard.  *See Costabile v. Westchester*, 254 F.R.D. 160, 167 (S.D.N.Y. 2008) ("'Substantial need' cannot be shown where persons with equivalent information are available for interrogation and/or for deposition.");  *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, 2002 WL 31385824, at *7 (S.D.N.Y. Oct. 21, 2002) (finding no substantial need where party offered no evidence establishing that information was not available from other sources).

> considering the importance of the issues at stake in the action, the amount in
> controversy, the parties' relative access to relevant information, the parties'
> resources, the importance of the discovery in resolving the issues, and whether the
> burden or expense of the proposed discovery outweighs its likely benefit.
> Information within this scope of discovery need not be admissible in evidence to
> be discoverable.

Fed. R. Civ. P. 26(b)(1). "Information is relevant if: '(a) it has any tendency to make a fact more

or less probable than it would be without the evidence; and (b) the fact is of consequence in

determining the action.'" *Vaigasi v. Solow Mgmt. Corp.*, 2016 WL 616386, at *11 (S.D.N.Y.

Feb. 16, 2016) (quoting Fed. R. Evid. 401); *see also State Farm Mut. Auto. Ins. Co. v. Fayda*,

2015 WL 7871037, at *2 (S.D.N.Y. Dec. 3, 2015) (stating relevance is "construed broadly to

encompass any matter that bears on, or that reasonably could lead to other matter that could bear

on any party's claim or defense.") (internal quotations and citation omitted).

Courts in the Second Circuit "have both permitted and denied discovery regarding

reserve information." *Champion Int'l Corp. v. Liberty Mut. Ins. Co.*, 128 F.R.D. 608, 612

(S.D.N.Y. 1989); *see also* Sukel & Pipkin, supra, at 194–95 (discussing split about whether

reserves are discoverable). For example, in *Champion Int'l Corp. v. Liberty Mut. Ins. Co.*, the

plaintiff requested reserve information from the defendant insurers for the purpose of

determining defendants' conduct or claims evaluations. *See Champion*, 128 F.R.D. at 612. The

defendant insurers argued that reserve information was irrelevant to the issue of coverage and

that disclosure would be unfairly prejudicial. *See id.* The court ordered that the reserve

information be produced, stating that courts in the Second Circuit "have recognized the sufficient

relevance [of reserve information] in coverage cases to justify its production absent the existence

of an attorney-client privilege, the applicability of the work-product exemption, or the greater

burden posed by production." *Id.*; *see also Stonewall Ins. Co.*, 1988 WL 96159, at *6–7 (finding

it consistent with case law and Rule 26 to allow defendant insured to explore issue of reserve

26

information in deposition, noting the limited burden it would impose on the insurer).  By

contrast, the court in *Sundance Cruises Corp. v. Am. Bureau of Shipping*, 1992 WL 75097

(S.D.N.Y. Mar. 31, 1992), held that reserve information was not discoverable.  *See id.* at *1.  The

plaintiff in *Sundance* appeared to argue that reserve amounts were relevant as an "indication of

potential liability" to show that the defendant insurer considered its conduct grossly negligent.

*Id.*  The court found that the reserves were not relevant, stating the insurer's "assessment or its

underwriter's assessment or its counsel's assessment of exposure to liability in this or prior cases

has nothing to do with whether here there is liability."  *Id.*  Other courts have reached the same

conclusion.  *See, e.g., U.S. Fire Ins. Co. v. City of Warren*, 2012 WL 1454008, at *10 (E.D.

Mich. Apr. 26, 2012) (stating that a reserve is "merely a business judgment made by an

insurance company to guard against future loss" and does not "reflect a legal determination of

the validity of an insured's claim" and thus, neither its existence nor amount "has any bearing on

the legal question of coverage"); *see also Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 139

F.R.D. 609, 613–14 (E.D. Pa. 1991) (finding reserve information was tenuously relevant, and in

any event, constituted work product material, noting the information goes to "the essence of the

lawyers expertise—establishing the value of a legal claim and the fees and expenses that may be

incurred in its defense.").

A subset of cases on the discoverability of reserve information involve bad faith claims.

Such claims involve instances where a plaintiff has alleged the insurer breached its duty of good

faith by, for example, failing to settle a claim within policy limits or mishandling a claim.  *See,*

*e.g., Scottsdale Ins. Co. v. Indian Harbor Ins. Co.*, 994 F. Supp. 2d 438, 450–51 (S.D.N.Y. 2014)

(explaining insurers' duty of good faith under New York law); *Groben v. Travelers Indem. Co.*,

266 N.Y.S.2d 616, 618 (Sup. Ct. Oneida Cty. 1965) (suit brought against insurer for bad faith

and gross negligence in claims handling).  In such instances, the request for discovery of reserve

information is related to the bad faith claims.  *See, e.g., Nat'l Union Fire Ins. Co. of Pittsburgh v.

H & R Block, Inc.*, 2014 WL 4377845, at *4 (S.D.N.Y. Sept. 4, 2014) (noting that establishing a

reserve is probative especially where a bad faith refusal to pay is alleged and citing cases);

*Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 284 F.R.D. 132, 138–39 (S.D.N.Y. 2012)

(stating "the proposition that reserve information is generally irrelevant in insurance coverage

actions . . . is belied by several . . . recent decisions" and citing cases involving bad faith claims)

(quotations omitted); *Granite State Ins. Co. v. Clearwater Ins. Co.*, 2012 WL 1520851, at *3

(S.D.N.Y. Apr. 30, 2012) (finding reserve documents relevant to affirmative defense of

plaintiff's bad faith in failing to implement adequate and reasonable reserve procedures); *U.S.

Fire Ins. Co. v. Bunge N. Am., Inc.*, 244 F.R.D. 638, 644–45 (D. Kan. 2007) (stating that

determining whether reserve information should be disclosed should be on a case-by-case basis

and finding insurers' reserve amounts could lead to "admissible evidence relating to the

[i]nsurers' own beliefs about coverage and their liability, as well as their good or bad faith in

handling and investigating [the insured's] claims"); *Bernstein v. Travelers Ins. Co.*, 447 F. Supp.

2d 1100, 1107 (N.D. Cal. 2006) (stating courts in California "will be open to arguments in bad

faith cases about the relevance of evidence about reserves—and that in some circumstances those

courts will conclude that such evidence is discoverable."); *Groben*, 266 N.Y.S.2d at 619

(permitting discovery of reserve information, which could develop evidence on issue of

defendant's bad faith, noting that it "could be material and necessary to the action as an

admission against interest as to defendant's knowledge and evaluation of the case."); *cf.* Sukel &

Pipkin, <u>supra</u>, at 219 (observing in cases outside of the bad faith context, the trend appears to be

toward excluding evidence of reserves based on lack of relevance).  Nonetheless, there is a "split

of authority on the relevancy of . . . reserve documents [even] in the context of bad faith claims[.]" *Hartford Roman Catholic Diocesan Corp. v. Interstate Fire & Cas. Co.*, 297 F.R.D. 22, 31 (D. Conn. 2014); *see Fid. & Deposit Co. of Md. v. McCulloch*, 168 F.R.D. 516, 525 (E.D. Pa. 1996) (concluding reserve information not relevant to bad faith counterclaim, though conceding it was a close question).

Even if relevant, reserve information may be protected by the attorney-client and work product privileges. *See Lava Trading, Inc. v. Hartford Fire Ins. Co.*, 2005 WL 66892, at *2 (S.D.N.Y. Jan. 11, 2005) (noting court's ruling precluding discovery of "reserves . . . was based on the notion that such specific figures represent work product, since they are normally created because of the anticipation of litigation."); *In re Pfizer Inc. Sec. Litig.*, 1994 WL 263610, at *1–2 (S.D.N.Y. June 6, 1994) (finding "if a document sets forth the methodology for calculating the case reserve for an individual claimant, it is privileged as work product (and perhaps also as an attorney-client communication)."); *Sundance Cruises*, 1992 WL 75097, at *1 (stating to the extent reserves "are an indication of potential liability," they might be based on opinions of counsel and therefore be protected from disclosure).

Plaintiffs contend that reserve information here is relevant to Underwriters' knowledge of the underlying claims and its coverage position, the reasonableness of the underlying settlement, and Underwriters' alleged bad faith conduct and delay in adjusting the claims. *See* Plaintiffs' Reply at 18; *see also* Hr'g Tr. 33:10–34:8, 35:6–8 (Plaintiffs arguing reserve amounts are relevant to whether Underwriters' refusal to pay defense costs was improper, the issue of consent to settle, and Underwriters' notice defenses). In contrast, Underwriters argues that reserve information is not relevant here and is nonetheless protected by the attorney-client and work product privileges. *See* Underwriters' Opp. at 32–33; *see also* Elsbree Decl. ¶¶ 54–55.

29

Underwriters note that Plaintiffs do not assert a bad faith claim here. *See* Hr'g Tr. 101:18–24.

As to relevancy to their defenses, Underwriters asserts that there has been no allegation of

ambiguity or suggestion that it would be necessary for the Court to review extraneous evidence

like this reserve information to interpret the Policy. *See id.* 102:12–22.

      The Court finds that Plaintiffs have not established that the reserve information here is

relevant. Plaintiffs contend that "documents produced to date *may give rise* to a potential bad

faith claim against Lloyd's . . . ." *See* Plaintiffs' Suppl. Br. at 9 (emphasis added); *see also* Hr'g

Tr. 49:18–22 (stating Plaintiffs allege bad faith conduct but not an actual claim for bad faith).[12]

But the Complaint does not allege a bad faith claim.[13] *Cf. Bovis Lend Lease, LMB, Inc. v.*

*Seasons Contracting Corp.*, 2002 WL 31729693, at *17 (S.D.N.Y. Dec. 5, 2002) (finding party

did not waive privilege by raising issue of good faith noting, "[g]enerally, where a party does not

itself place in issue the matter as to which the privileged communications are relevant, the

privilege is not waived."). Rather, the Complaint asserts claims for declaratory judgment and

breach of contract under the terms of the policies. *See* Compl. ¶¶ 208–233, 255–288, 297–312.

As a coverage dispute, the Court concludes "neither the existence nor amount of a reserve fund

has any bearing on the legal question of coverage, which is determined by the language of the

insurance contract." *City of Warren*, 2012 WL 1454008, at *10. Moreover, the Court rejects

Plaintiffs' contention that reserve information is relevant to their claims for coverage,

---

[12]    *See* Compl. ¶¶ 195–207 (alleging defendant insurers *inter alia* were informed of and aware in at least 2003 that RFC faced potential liability and that damages could exceed $1 billion, that they declined to participate in settlement meetings regarding the *Kessler* claim, and that they refused to consent to a reasonable settlement).

[13]    Plaintiffs alleged a bad faith claim in a prior version of the complaint. *See* Amended Compl. ¶¶ 234–247 [ECF No. 122]. But Plaintiffs withdrew that bad faith claim pursuant to a stipulation entered into between the parties. *See* So-Ordered Stipulation to File Second Amended Adversary Compl. ¶¶ 2, 5 [ECF No. 205]. No bad faith claim is alleged in the current Complaint. *See Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 352 (1978) (stating discovery is improper if only relevant to a stricken claim).

particularly regarding fees-related exclusions.  *See* Plaintiffs' Reply at 18–19; Plaintiffs' Suppl.

Br. at 8–9.  Plaintiffs argue that under the doctrine *contra proferentum*, the claims files,

including reserve information, are crucial to resolving any ambiguities in the policy language

since Sedgwick helped draft the Policy.  *See* Plaintiffs' Reply at 19; Hr'g Tr. 49:4–14 (Plaintiffs

arguing legal analysis is discoverable if it relates to the initial coverage determination because it

goes to whether Underwriters thought its own policy was ambiguous and issues of timing for

purposes of a possible bad faith claim).  But Plaintiffs have not pointed to any specific policy

language that they claim is ambiguous or any evidence of ambiguity.  *Cf. Ins. Co. of N. Am. v.*

*UNR Indus., Inc.*, 1994 WL 683423, at *1 (S.D.N.Y. Dec. 6, 1994) (stating movant identified

two insurance policy provisions that could be ambiguous and ordering insurer to turn over

drafting documents).  While the relevance standard is a liberal one, "it is not so liberal as to

allow a party 'to roam in shadow zones of relevancy and to explore matter which does not

presently appear germane on the theory that it might conceivably become so.'"  *In re Fontaine*,

402 F. Supp. 1219, 1221 (E.D.N.Y. 1975) (quoting *Broadway & Ninety Sixth St. Realty Co. v.*

*Loew's Inc.*, 21 F.R.D. 347, 352 (S.D.N.Y. 1958)).  Accordingly, the Court denies Plaintiffs'

request for reserve information.[14]

## **CONCLUSION**

        Consistent with the foregoing, the Court grants Plaintiffs' Motion in part and denies it in

part.  Accordingly, Underwriters shall produce without redactions, those documents withheld on

the basis of work product privilege that are dated prior to October 17, 2008, and shall review all

---

[14]        The parties also disagree whether the reserve information is protected by the attorney-client and work product privileges.  *See* Underwriters' Opp. at 32–33; Plaintiffs' Reply 18–19.  Based on the Court's *in camera* review of the Direct Reports, the reserve information appears to reflect Sedgwick's "thoughts, conclusions, and mental impressions as to the value" of the Underlying Claims and seems based on legal analysis.  *See Pfizer*, 1994 WL 263610, at *1; *Sundance Cruises*, 1992 WL 75097, at *1 (noting "to the extent reserves are an indication of potential liability by insurers, as argued by plaintiffs, they might be based in large part upon the opinions of counsel and would, therefore, be protected from disclosure.") (internal quotations and citation omitted).

documents consistent with this ruling to determine whether any additional information should be

produced.


Dated: New York, New York
      July 14, 2017

                                */s/ Sean H. Lane*
                                **UNITED STATES BANKRUPTCY JUDGE**