**UNITED STATES BANKRUPTCY COURT**   <u>**FOR PUBLICATION**</u>
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
In re:              Chapter 11

RESIDENTIAL CAPITAL, *et al.*,     Case No. 12-12020 (MG)

       Debtors.    (Jointly Administered)
-----------------------------------------------------------------x
ROWENA DRENNEN, FLORA GASKIN,
ROGER TURNER, CHRISTIE TURNER, JOHN
PICARD and REBECCA PICARD, individually
and as the representatives of the KESSLER
SETTLEMENT CLASS,

STEVEN and RUTH MITCHELL, individually
and as the representatives of the MITCHELL
SETTLEMENT CLASS,

and            Adv. No. 15-01025 (SHL)

RESCAP LIQUIDATING TRUST,

     Plaintiffs,

    v.

CERTAIN UNDERWRITERS AT LLOYD'S
OF LONDON, *et al.*,

     Defendants.
-----------------------------------------------------------------x

<u>**MEMORANDUM OF DECISION**</u>

**A P P E A R A N C E S :**

**WALTERS, RENWICK, RICHARDS, SKEENS & VAUGHN, P.C.**
*Counsel for the Kessler Class and the Mitchell Class*
2500 City Center Square
1100 Main
Kansas City, Missouri 64105
By: R. Fredrick Walters, Esq.
   Karen W. Renwick, Esq.
   David M. Skeens, Esq.

Garrett M. Hodes, Esq.
Michael B. Sichter, Esq.

**CARLSON LYNCH SWEET & KILPELA, LLP**
*Counsel for the Kessler Class*
115 Federal Street, Suite 210
Pittsburgh, Pennsylvania 15212
By:    R. Bruce Carlson, Esq.
        Gary Lynch, Esq.
        Edwin J. Kilpela, Jr., Esq.

**PERKINS COIE, LLP**
*Counsel for the ResCap Liquidating Trust*
700 13th Street NW, Suite 600
Washington, DC 20005
By:    Selena J. Linde, Esq.
        Vivek Chopra, Esq.
        Alexis Danneman, Esq.

**TROUTMAN SANDERS LLP**
*Counsel for Clarendon National Insurance Company*
401 9th Street NW
Washington, DC 20004
By:    John W. Duchelle, Esq.
        Thomas S. Hay, Esq.

**KAUFMAN DOLOWICH & VOLUCK, LLP**
*Counsel for Continental Casualty Company*
60 Broad Street, 36th Floor
New York, New York 10038
By:    Patrick M. Kennell, Esq.
        Kevin M. Mattessich, Esq.

**ROBINSON & COLE LLP**
*Counsel to Certain Interested Underwriters and Lloyd's, London*
Chrysler East Building
666 Third Avenue, 20th Floor
New York, New York 10017
By:    Lawrence Klein, Esq.
        J. Gregory Lahr, Esq.
        Soo Y Kim, Esq.

**FORAN GLENNON PALANDECH PONZI & RUDLOFF P.C.**
*Counsel to Those Certain Underwriting Members at Lloyd's, London*
*and Those Companies Whose Names are Severally Subscribed to Policy No.*
*FD0001142 and Those Certain Underwriting Members at Lloyd's, London*
*and Those Companies Whose Names are Severally Subscribed to Policy No.*
*FD0001144, Twin City Fire Insurance Company, Continental Casualty Company,*
*Clarendon National Insurance Company, Swiss Re International S.E. (formerly know*
*as SR International Business Insurance Company Ltd., Steadfast Insurance Company,*
*St. Paul Mercury Insurance Company, and North American Specialty Insurance Company*
222 N. La Salle Street, Suite 1400
Chicago, Illinois 60601
By:     Susan N.K. Gummow, Esq.
        John Eggum, Esq.

**ARNOLD & PORTER KAYE SCHOLER LLP**
*Counsel to North American Specialty Insurance Company*
250 West 55th Street
New York, New York 10019
By:     Daniel Bernstein, Esq.

**CAHILL GORDON & REINDEL LLP**
*Counsel for Swiss Re International S.E. (formerly known as*
*SR International Business Insurance Company Ltd.)*
80 Pine Street
New York, New York 10005
By:     Thorn Rosenthal, Esq.
        Samuel G. Mann, Esq.
        Tamara M. O'Flaherty, Esq.

**KAUFMAN BORGEEST & RYAN LLP**
*Counsel for St. Paul Mercury Insurance Company*
200 Summit Lake Drive, 1st Floor
Valhalla, New York 10595
By:     Scott A. Schechter, Esq.
        Patrick Stoltz, Esq.
        Matthew E. Mawby, Esq.

**HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER**
*Counsel for Steadfast Insurance Company*
One Logan Square, 27th Floor
Philadelphia, Pennsylvania 19103-6933
By:     Ronald P. Schiller, Esq.
        Sharon F. McKee, Esq.

**WILEY REIN LLP**
*Counsel for Twin City Fire Insurance Company*
1776 K Street NW
Washington, DC 20006
By:    Daniel J. Standish, Esq.
       Cara Tseng Duffield, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are cross-motions for partial summary judgment filed by the

plaintiffs[1]—including the Liquidating Trust in the underlying bankruptcy case and certain class

action plaintiffs with claims against one of the debtors—and eight of the defendants[2]—including

various tiers of insurers—in the above-captioned adversary proceeding.[3]  The Plaintiffs assert

that their claims against Residential Funding Company, LLC ("RFC"), one of the debtors, are

covered by insurance policies that were originally issued by the Defendants to General Motors

Corporation.  *See* Joint Concise Statement of Undisputed Material Facts (the "SUF") [ECF No.

336] ¶ 1.  The question at issue in the present cross-motions is whether two exclusions in the

policies preclude coverage of the Plaintiffs' claims.  For the reasons set forth below, the Court

---

[1]     The plaintiffs are: (i) Rowena Drennen, Flora Gaskin, Roger and Christie Turner, John and Rebecca Picard, individually, and as the representatives of the Kessler Settlement Class (the "Kessler Class"); (ii) Steven and Ruth Mitchell, individually, and as the representatives of the Mitchell Settlement Class (the "Mitchell Class," and together with the Kessler Class, the "Class Plaintiffs"); and (iii) the ResCap Liquidating Trust, as successor to Residential Funding Company, LLC (the "Liquidating Trust," and together with the Class Plaintiffs, the "Plaintiffs").  The Class Plaintiffs and Liquidating Trust's motions for partial summary judgment were filed at ECF Nos. 337 and 340, respectively.

[2]     The defendants that filed a cross-motion include Certain Underwriting Members at Lloyd's of London, Twin City Fire Insurance Company, Continental Casualty Company, Clarendon National Insurance Company, Swiss Re International SE (f/k/a SR International Business Insurance Company Ltd.), Steadfast Insurance Company, St. Paul Mercury Insurance Company and North American Specialty Insurance Company (collectively, the "Defendants").  The Defendants' cross-motion was filed at ECF No. 338.  This motion does not include certain other defendants in the adversary proceeding whose motions to compel arbitration were granted by the Court.  *See* ECF Nos. 291, 306.

[3]     Unless otherwise specified, references to the Case Management/Electronic Case Filing ("ECF") docket are to the above-captioned adversary proceeding.

concludes that the two exclusions do not bar coverage.  Accordingly, the Court grants the Plaintiffs' partial motions for summary judgment and denies the Defendants' cross-motions for partial summary judgment as to these two exclusions.

## BACKGROUND

### A. The Mortgage Transactions

The Plaintiffs' claims against RFC are based on origination and closing fees that were paid by the Class Plaintiffs in connection with second mortgages or subordinate loans (the "Loans") they obtained from several lenders (the "Originating Banks").  *See* SUF ¶¶ 14-15, 44-45.  These fees were paid to the Originating Banks and certain other third parties at either the time of closing or during the disbursement of the Loans.  *See id.* ¶¶ 16, 18-19, 20, 22, 24, 26, 28, 45-47, 49-51, 54.  The fees were financed with the proceeds of the Loans and were included in and disbursed from the principal of the Loans.  *See id.* ¶¶ 23, 25, 27, 29-30, 52.  The Class Plaintiffs assert that certain of these fees were unlawful (the "Fees").  *See id.* ¶¶ 19-21, 31, 58.

Formerly known as GMAC-Residential Funding Corporation or Residential Capital Corporation, RFC operated during this period as a financial services company that bought and packaged mortgage loans, which it then securitized or sold directly to investors.  *See id.* ¶¶ 35, 56.  In this capacity, RFC entered into contracts with the Originating Banks pursuant to which RFC agreed to purchase and take assignment of certain high loan-to-value loans.  *See id.* ¶¶ 36, 57.  Under these contracts, the Class Plaintiffs' Loans were acquired by RFC after the closing and funding of the Loans by the Originating Banks.  *See id.* ¶¶ 39, 41, 43, 58, 61.  RFC then packaged the Loans, which were subsequently securitized or sold.  *See id.* ¶¶ 38, 39, 43, 58, 63, 64, 65.

None of the Fees were paid to RFC or its subsidiaries or affiliates during the closing and funding of the Loans. *See id.* ¶¶ 16-20, 22, 24, 26, 28, 32-33, 46-47, 49-51, 53-54. RFC did not originate or close any of the Loans itself, and it did not have any contact or relationship with the Class Plaintiffs prior to its purchase of the Loans. *See id.* ¶¶ 38, 41-42, 58, 62. Rather, the Class Plaintiffs sought to hold RFC derivatively liable for the acts of the Originating Banks pursuant to 15 U.S.C. § 1641(d), and directly liable for acts that RFC itself performed after the loans originated, closed and the Fees were paid. *See id.* ¶¶ 4, 66, 68-70; Kessler Joint Consol. Am. Compl., attached as Ex. B to the SUF [ECF No. 336-2], at ¶¶ 12, 15, 50, 52, 108-109, 251, 488, 502-504, 506, 508 525-526, 528; Mitchell Third Am. Pet., attached as Ex. J to the SUF [ECF No. 336-10], at ¶¶ 1, 7, 77.

## B. <u>Prepetition Litigation</u>

Representatives of both the Mitchell Class and the Kessler Class filed actions against RFC, among others, relating to the Fees (respectively, the "Mitchell Action" and the "Kessler Action"). *See* SUF ¶¶ 4, 66. The Kessler Action, which was filed in October 2011, was still pending at the time that RFC filed for bankruptcy in 2012. *See id.* ¶¶ 4, 5.

The Mitchell Action, filed in July 2003, proceeded to trial and the trial court entered a partial directed verdict against RFC and certain of the other defendants. *See id.* ¶¶ 67, 68. The jury awarded compensatory damages in the amount of $4,329,048 and punitive damages in the amount of $92,000,000. *See id.* ¶ 76. RFC appealed the trial court's ruling and the judgment was subsequently affirmed as to the compensatory damages, but reversed and remanded for retrial as to the punitive damages claim. *See id.* ¶ 78. Ultimately, RFC paid $15,648,868.12 to satisfy the compensatory damages judgment, along with related attorneys' fees. *See id.* ¶ 79. By the time of RFC's bankruptcy filing in 2012, RFC and the Mitchell Class had reached an

agreement to settle the remanded claim for punitive damages for the amount of $14.5 million

(the "Mitchell Settlement"), but no money had been paid under that settlement. *See id.* ¶ 81.

### C. **The Bankruptcy Proceeding**

In May 2012, RFC filed for protection under Chapter 11 of the Bankruptcy Code. *See id.*

¶¶ 5, 82. In December 2013, the Court approved a Chapter 11 plan (the "Plan"), establishing the

Liquidating Trust for the purpose of liquidating and distributing RFC's remaining assets to its

unsecured creditors. *See id.* ¶ 83.

During the bankruptcy proceedings, RFC reached a resolution with both the Kessler

Class and the Mitchell Class regarding their respective remaining claims against RFC. In

November 2013, the Court entered an order approving a settlement agreement between RFC and

the Kessler Class (the "Kessler Settlement"), which provided the Kessler Class with a $300

million allowed claim against RFC's bankruptcy estate. *See id.* ¶¶ 8-10. As part of the Kessler

Settlement, RFC's rights under the applicable insurance policies issued to RFC by the

Defendants were assigned to the Kessler Class and the Liquidating Trust. *See id.*

Similarly, the Plan approved the terms of the Mitchell Settlement that RFC and the

Mitchell Class had reached prepetition with respect to punitive damages, resulting in an allowed

claim against RFC's bankruptcy estate in the amount of $14.5 million. *See id.* ¶ 84. The Plan

also assigned the Mitchell Class the right to pursue the Defendants for any insurance proceeds

under the applicable policies to satisfy the Mitchell Claim. *See id.* Additionally, the Plan

assigned to the Liquidating Trust any rights of RFC to recover $6.1 million from the Defendants

in costs incurred by RFC in defense of the Mitchell Action, as well as RFC's rights to payment

from the Defendants for the $15.6 million in compensatory damages paid by RFC to the Mitchell

Class prior to the bankruptcy filing.  *See id.* ¶ 83.

As assignees of RFC's rights under these insurance policies, the Kessler Class and the

Mitchell Class now seek coverage of their respective allowed claims under the Kessler

Settlement and the Mitchell Settlement as losses under the insurance policies, while the

Liquidating Trust seeks coverage for RFC's payment of the compensatory damages judgment in

the Mitchell Action.  *See id.* ¶¶ 10, 13, 83-85.[4]

**D.    The Policies**

The central document at issue in these motions is the Combined Directors and Officers

Liability and Company Liability (Including Employment Practices Liability), Errors and

Omissions Liability, Pension Trust Liability, and Mortgagees Errors and Omissions Insurance

Policy, No. 823/FD0001142, attached as Exhibit A to the SUF (the "Primary Policy") [ECF No.

336-1], issued to General Motors Corporation by Defendant Insurer Certain Underwriting

Members at Lloyd's of London.  *See* SUF ¶ 1.  The other Defendants also issued excess policies

(together with the Primary Policy, the "Policies") that mirror the Primary Policy in pertinent part,

specifically with respect to the Primary Policy's Insuring Clause I.D, the relevant coverage

exclusions under III.C, and the definitions.  *See id.* ¶ 2.

---

[4]      As the Plaintiffs explain it, this case is about RFC's claim for coverage (and, by assignment, the Plaintiffs')
under the applicable insurance policies for RFC's loss in connection with the Mitchell and Kessler Class claims.  *See
Class Pl.' Mem. in Opp. to Def. Insurers' Mot. for Partial Summ. J.* at 16 (the "Class Plaintiffs' Opposition") [ECF
No. 342]; *Rescap Liquidating Trust's Reply in Supp. of Mot. for Summary Judgment on Fees-Related Exclusions* at
9 (the "Liquidating Trust's Reply") [ECF No. 352] (noting that RFC is "the Assured now seeking coverage under
the Policy. . . .").

The coverage at issue arises out of Insuring Clause I.D.(a) of the Policies (the "Insuring Clause") for errors and omissions liability. *See* Primary Policy at 11. The Insuring Clause states:

> Underwriters shall pay on behalf of the Assureds:
>
> (a) Loss which the Assureds shall become legally obligated to pay by reason of any Claim first made against such Assured during the Policy Period resulting directly from a Wrongful Act committed by a Professional Liability Assured or by any person or entity for whose conduct a Professional Liability Assured is legally responsible in rendering or failing to render Professional Services. . . .

*Id*. It is undisputed that RFC was both an "Assured" and a "Professional Liability Assured" as defined under the Policies and is therefore entitled to coverage if it satisfies the other requirements for coverage. *See* SUF ¶ 3.

The Policies, however, carve out in Clause III.C a number of exclusions to coverage for any loss under the Insuring Clause. *See* Primary Policy at 24-27. Two of these exclusions are the subject of the current dispute. The first of these is the so-called "Return of Fees Exclusion" in Clause II.C.9, which exempts from coverage any claim:

> for premiums, return premiums, fees, commissions, costs, expenses or other charges paid or payable by or to the Assured; provided, however, that this Exclusion shall not apply to Costs, Charges and Expenses in connection with a Mortgage Fee Claim which is otherwise covered under Insuring Clause I.D. . . . .

*Id*. at 24. The second of these is the "Mortgage Fee Claim Exclusion"[5] in Clause III.C.10, which applies to any claim:

> that is a Mortgage Fee Claim, provided that this Exclusion shall not apply to Costs, Charges and Expenses which the Assured shall become legally

---

[5]    The Return of Fees Exclusion and the Mortgage Fee Claim Exclusion are together defined in this decision as the "Fee Exclusions."

> obligated to pay by reason of a Mortgage Fee Claim which is otherwise
> covered under Insuring Clause I.D.

*Id.* at 25.

The term "Assured"—contained in both Fee Exclusions—is defined in the Policies to mean: "1. the Company, 2. the Directors and Officers 3. any Professional Liability Assured 4. any Pension Trust Liability Assured." Primary Policy at 12. But the meaning of "Assured" is also addressed in the so-called "Deemer Clause" in the Policies, which provides:

> As used in the Exclusions set forth in Clause III.C, the term Assured
> includes any person or entity for whose conduct an Assured is legally
> responsible in rendering or failing to render Professional Services. . . .

Primary Policy at 27.

The Defendants contend that "[t]he two [F]ee [E]xclusions at issue are short, simple, unambiguous and straightforward in their application to preclude coverage for judgments or settlements in respect of the underlying claims[.]" *See Def.'s Mem. of Law in Supp. of Mot. for Partial Summ. J.* at 2 (the "Defendants' SJM") [ECF No. 338-1]. As part of their argument, the Defendants assert that the Deemer Clause extends the scope of the Fee Exclusions to the receipt of fees by entities for whose conduct RFC is legally responsible, in this case the Originating Banks. *See Def.' Mem. in Opp. to Pl.' Mot. for Partial Summ. J.* at 3-4 (the "Defendants' Opposition") [ECF No. 341]. By contrast, the Plaintiffs believe that the Fee Exclusions do not apply here because the fees in question were paid to the Originating Banks, not to RFC. *See Reply Memo. in Supp. of Class Plaintiffs' Mot. for Partial Summary Judgment* at 8-10 (the "Class Plaintiffs' Reply") [ECF No. 351]; Liquidating Trust's Reply at 8-13.[6]

---

[6]    The procedural history regarding these motions is tortured. In the first filed motions, the Plaintiffs sought partial summary judgment by arguing that the two Fee Exclusions do not apply because no fees were paid to RFC in connection with the Kessler and Mitchell claims. *See Mem. in Support of Class Plaintiffs' Mot. for Partial Summ. J.* at 1 (the "Class Plaintiffs' SJM") [ECF No. 337-1]; *see also Recap Liquidating Trust's Mem. in Support of Its Mot.*

# DISCUSSION

## A. **Legal Standards**

### 1. Summary Judgment

Federal Rule of Civil Procedure 56 governs the granting of summary judgment and is made applicable to this adversary proceeding under Rule 7056 of the Federal Rules of Bankruptcy Procedure. "[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the [movant] is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [the movant's] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir. 1995). If "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S.

---

*for Summ. J on Fees-Related Exclusions* at 1-2 ("Liquidating Trust's SJM") [ECF No. 340-1] (arguing that exclusions preclude coverage only for claims arising out of fees "paid to" the insured and none of improper fees were paid to—or payable to—RFC).

But the Defendants subsequently conceded that no fees were paid to RFC. *See* Def.'s SJM at 2-3. Instead, the Defendants sought summary judgment by relying on a definition of the "Assured" as modified by the Deemer Clause. *See* Def.'s SJM at 2-3. In response, the Plaintiffs complained bitterly that Defendants have now conceded the issue that they have been disputing for more than 15 years—and that had been articulated as the basis for Defendants' denial of coverage—but the Plaintiffs nonetheless responded to what they saw as the Defendants' "new theory" based on the Deemer Clause. *See* Class Pl.'s Opp. at 1; *see also Liquidating Trust's Resp. to Def.'s Mot. for Partial Summ. J.* at 1-3 (the "Liquidating Trust's Response") [ECF No. 349] (noting that insurers conceded for the first time that the challenged fees where paid to the loan originators and not RFC but that Defendants nevertheless seek summary judgment based on an expanded definition of Assured). But the Plaintiffs' motions have not presented any argument on the coverage dispute or theory for relief based on Defendants' purported change in legal position. Accordingly, this decision addresses only the disputed legal issues identified by the Defendants' motion and fully briefed by the parties. *See* ECF Nos. 338-1, 341, 342, 349, 351, 352, 354 (memorandum submitted by the parties on these issues).

11

253, 288 (1968)).  "A fact is material when it might affect the outcome of the suit under

governing law." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007).  "In

deciding whether material factual issues exist, all ambiguities must be resolved and all

reasonable inferences must be drawn in favor of the nonmoving party." *In re Ampal-Am. Israel*

*Corp.*, 2015 WL 5176395, at *10 (Bankr. S.D.N.Y. Sept. 2, 2015) (citing *Matsushita*, 475 U.S. at

587).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat

an otherwise properly supported motion for summary judgment . . . ." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  "The Court may also grant some but not all of the

relief requested in a summary judgment motion if it finds disputed issues of fact as to some of

the issues presented." *In re Residential Capital, LLC*, 533 B.R. 379, 395 (Bankr. S.D.N.Y. 2015)

(citing Fed. R. Civ. P. 56(g)).

    2.  <u>Choice of Law</u>

Bankruptcy courts generally apply the choice of law principles of the forum state.  *See*

*Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599, 601-02 (2d Cir. 2001) ("[B]ankruptcy

courts confronting state law claims that do not implicate federal policy concerns should apply the

choice of law rules of the forum state."); *see also Statek Corp. v. Dev. Specialists, Inc. (In re*

*Coudert Bros. LLP)*, 673 F.3d 180, 186-87 (2d Cir. 2012).  The Court therefore looks to the

choice of law rules of New York, the forum state in this case, to determine what state law should

apply.

Under New York law, "the first question to resolve in determining whether to undertake a

choice of law analysis is whether there is an actual conflict of laws." *Curley v. AMR Corp.*, 153

F.3d 5, 12 (2d Cir. 1998) (citing *Allstate Ins. Co. v. Stolarz*, 81 N.Y.2d 219, 223 (1993)).  An

actual conflict will be found to exist where "the applicable law from each jurisdiction [that might

apply] provides different substantive rules" that are "relevant to the issue at hand . . . and must have a significant possible effect on the outcome of the trial." *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005) (internal citations and quotations omitted). If no actual conflict exists, then a choice of law analysis is unnecessary. *See IBM v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004) ("Choice of law does not matter, however, unless the laws of the competing jurisdictions are actually in conflict. . . . In the absence of substantive difference, however, a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it."); *Curley*, 153 F.3d at 12; *Excess Ins. Co. v. Factory Mut. Ins. Co.*, 769 N.Y.S.2d 487, 489 (App. Div., 1st Dep't 2003) ("If no conflict exists, then the court should apply the law of the forum state in which the action is being heard."). All parties in this case agree that there is no conflict between the laws of New York and the laws of Michigan, the only other possible jurisdiction whose laws could govern interpretation of the Policies. *See Def.' SJM* at 16-17; Liquidating Trust's *SJM* at 11; Class Pl.'s *SJM* at 8 n.11.[7] Accordingly, the Court will look primarily to New York law—with references to Michigan law where particularly helpful—for this decision.

>      3.   Insurance Contract Interpretation

By and large, insurance policies are interpreted using the same principles applicable to contracts in general. *See Castle Oil Corp. v ACE Am. Ins. Co.*, 26 N.Y.S.3d 783, 786 (App. Div., 2d Dep't 2016) (citing *Universal Am. Corp. v. Nat'l Union Fire Ins. Co.*, 25 N.Y.3d 675, 680

---

[7]    The Primary Policy, which does not contain a choice of law provision, was issued to General Motors Corporation in Michigan. *See* Class Pl.'s SJM at 8 n.11; Def.'s SJM at 16. The excess Policies follow form to the Primary Policy, except for the excess policy issued by Defendant Swiss Re International SE, which contains a New York choice of law provision. *See id.*

(2015)); *see also McGrath v. Allstate Ins. Co.*, 290 Mich. App. 434, 439 (Mich. Ct. App. 2010) ("The rules of contract interpretation apply to the interpretation of insurance contracts."). When interpreting a policy, "[u]nambiguous provisions must be given their plain and ordinary meaning." *Id.* (citing *Universal Am. Corp.*, 25 N.Y.3d at 680); *see also Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyds, London*, 136 F.3d 82, 86 (2d Cir. 1998). A policy "should be 'read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose." *Ins. Co. of N.Y. v. Cent. Mut. Ins. Co.*, 850 N.Y.S.2d 56, 58 (2008) (quoting *Empire Props. Corp. v. Manufacturers Trust Co.*, 288 N.Y. 242, 248 (1942)); *see also McGrath*, 290 Mich. App. at 439 (citing *Klapp v. United Ins. Group Agency, Inc.,* 468 Mich. 459, 467 (2003)) ("The language of insurance contracts should be read as a whole and must be construed to give effect to every word, clause, and phrase."). A "court should not read a contract so as to render any terms, phrase, or provision meaningless or superfluous." *Givati v. Air Techniques, Inc.*, 960 N.Y.S.2d 196, 198 (App. Div., 2d Dep't 2013) (internal citations omitted). Additionally, "the court 'may not write into a contract conditions the parties did not insert by adding or excising terms under the guise of construction, nor may it construe the language in such a way as would distort the contract's apparent meaning.'" *Georgitsi Realty, LLC v. Penn-Star Ins. Co.*, 702 F.3d 152, 155 (2d Cir. 2012) (quoting *In re Matco-Norca, Inc.*, 802 N.Y.S.2d 707, 709 (App. Div., 2d Dep't 2005)); *see also Comerica Bank v. Lexington Ins. Co.*, 3 F.3d 939, 944 (6th Cir. 1993) ("Under Michigan law, the office of interpretation or construction is to ascertain the intention of the parties *from the words which have been used; [t]he court is not at liberty to insert words* which have been omitted, and which are not to be found in the instrument.") (internal citations and quotations omitted) (emphasis in original).

14

The language of the insuring provisions in an insurance policy generally "should be broadly interpreted, with any doubts as to coverage resolved in favor of the insured." *Berman v. Gen. Accident Ins. Co. of Am.*, 671 N.Y.S.2d 619, 623 (Sup. Ct., N.Y. Cty. 1998). Additionally, "[e]xclusions to coverage must be strictly construed and read narrowly, with any ambiguity construed against the insurer." *Lancer Indem. Co. v. JKH Realty Grp.*, LLC, 7 N.Y.S.3d 492, 494 (App. Div., 2d Dep't 2015) (internal citations omitted). Additionally, "[t]o negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case." *Id.* (internal citations and quotations omitted); *see also Indian Harbor Ins. v. Zucker*, 553 B.R. 633, 640 (W.D. Mich. 2016) ("It is the insurer's burden to prove that an exclusion to coverage is applicable") (citing *Heniser v. Frankenmuth Mut. Ins.*, 449 Mich. 155, 161 n.6 (1995)); *Cragg v. Allstate Indem. Corp.*, 17 N.Y.3d 118, 122 (2011).[8] Exclusions or exceptions from coverage "are not to be extended by interpretation or implication, but are to be accorded a strict and narrow construction." *Pioneer Tower Owners Ass'n v. State Farm Fire & Cas. Co.*, 12 N.Y.3d 302, 307 (2009) (internal citations and quotations omitted). When deciding whether to adopt an insurer's interpretation of exclusionary language, courts will also consider whether the insurer could have adopted more precise policy language. *See, e.g., U.S. Fid. & Guar. Co. v. Thomas Solvent Co.*, 683 F. Supp. 1139, 1159 (W.D. Mich. 1988) ("The courts have no patience with attempts by a paid insurer to escape liability by taking advantage of an ambiguity, a hidden meaning, or a forced construction of the language in a policy, *when all*

---

[8]     The Defendants argue that the *contra proferentum* rule of construction—whereby any ambiguity should be construed against the insurer who drafted the contract—should not apply to the Fee Exclusions in this case due to the size and sophistication of General Motors, as well as the drafting history of the Primary Policy. *See* Def. SJM at 18 n.17. As this decision relies on the plain language of the Policies and not on the rule of *contra proferentum*, the Court need not delve into the drafting history of the Primary Policy or the commercial sophistication of the insured.

*question might have been avoided by a more generous or plainer use of words*.") (quoting

*Powers v. Detroit Auto. Inter-Insurance Exchange*, 427 Mich. 602, 624 (1986) (emphasis in

original).

**B.  Return of Fees Exclusion**

The Defendants first argue that the Plaintiffs' claims are barred by the Return of Fees

Exclusion contained in Clause III.C.9 of the Policies.  They point to its exclusion "for premiums,

return premiums, fees, commissions, costs, expenses or other charges paid or payable by or to

the Assured. . . ."  Primary Policy at 24.  The Defendants read this Fee Exclusion in the context

of the expanded definition of "Assured" in the Deemer Clause, which includes "any person or

entity for whose conduct an Assured is legally responsible. . . ."  Primary Policy at 27; *see Def.*

*Reply Mem. of Law in Supp. of Def. Mot for Partial Summ. J.* at 2 (the "Defendants' Reply")

[ECF No. 354] ("Defendants maintain that RFC is the Assured but the Deemer Clause expands

the term 'the Assured' for the purpose of the Fee Exclusions. . . .").

The Defendants argue that the Deemer Clause's expansion of the term "Assured" makes

the Return of Fees Exclusion applicable to any claims based on fees that were paid to entities for

whom RFC was legally responsible, such as the Originating Banks.  The Defendants contend that

the proper way to read this expanded definition of Assured is to essentially tack additional

language to the end of the Return of Fees Exclusion to make it an either/or option.  *See* Def.'s

Opp. at 4.  Thus, under the Defendants' interpretation, the Return of Fees Exclusion (as

expanded by the Deemer Clause) should read: "fees, commissions, costs, expenses or other

charges paid or payable . . . . by or to the Assured. . . . or any person or entity for whose conduct

16

an Assured is legally responsible." *Id.*[9]  As a result, the Defendants argue that even though the

Fees were paid to the Originating Banks and not to RFC, the definition of the term "Assured" in

the Return of Fees Exclusion is expanded by the Deemer Clause to include the Originating

Banks, thereby excluding coverage under the Policies for RFC.  *See* Def.'s Opp. at 2 ("Plaintiffs

concede that the claims against RFC were predicated on fees paid to entities for whose conduct

RFC was legally responsible.  Thus, the Return of Fees Exclusions apply notwithstanding that

the fees in question were paid to the Originating Banks or others, rather than directly to RFC,

because RFC was held 'legally responsible' for the improper fees charged by the originating

banks or others.").

The Plaintiffs disagree.  They assert that even if the Deemer Clause is triggered,[10] it still

would not exclude coverage here.  The Plaintiffs note that the Return of Fees Exclusion would

still only apply to a "Loss . . . in connection with any Claim . . . for . . . fees . . . paid . . . to *the*

---

[9]      *See* Def.'s Opp. at 2 ("Plaintiffs concede that the claims against RFC were predicated on fees paid to entities for whose conduct RFC was legally responsible.  Thus, the Return of Fees Exclusions apply notwithstanding that the fees in question were paid to the Originating Banks or others, rather than directly to RFC, because RFC was held 'legally responsible' for the improper fees charged by the originating banks or others.").

[10]      The Court notes that the Plaintiffs dispute whether the Deemer Clause was even triggered as to either of the Fee Exclusions.  The Plaintiffs assert that the Deemer Clause was not triggered—and therefore cannot deem the Originating Banks to be "Assureds"—because the Originating Banks were not rendering Professional Services, as required under the language of the Deemer Clause.  *See* Class Pl.'s Reply at 3-8; Liquidating Trust's Reply at 13-15.

The Defendants agree with the Plaintiffs that no Professional Services were rendered.  *See* Def.'s Reply at 2-3.  But the Defendants note that the language relating to "Professional Services" in the Deemer Clause is identical to the "Professional Services" language contained in the Insuring Clause.  *See id.*  The Defendants assert that the use of identical language in both clauses means that if there were no Professional Services for purposes of the Deemer Clause then there cannot be any for purposes of the Insuring Clause, and thus no coverage of the claims to begin with.  *See id.*  The Defendants, however, state that for purposes of the summary judgment motions they are willing to assume that there were Professional Services, such that both the Deemer Clause and the Insuring Clause apply.  *See id.*  Indeed, the parties cannot even agree on the issue of which entity is meant to be rendering the Professional Services under the language of the Deemer Clause.  *Compare* Class Pl.'s Reply at 3-8; Liquidating Trust's Reply at 13-15, *with* Hr'g Tr. at 26:4-27:16 (July 18, 2018) [ECF No. 358].  But the Court need not reach the issue of whether Professional Services were being rendered, and by whom, given its conclusion that the two Fee Exclusions do not apply even if the Deemer Clause was triggered.

Assured. . . ."  Primary Policy at 24-25 (emphasis added).[11]  For the Plaintiffs, the use of the

definite article "the" before the word "Assured" is key: it means that the Return of Fees

Exclusion applies only to "the" Assured that engaged in the excluded conduct—the receipt of the

Fees—and is also seeking coverage.  *See* Class Pl.'s Reply at 3, 8-10; Liquidating Trust's Reply

at 7-13.  The Plaintiffs stress that their claims relate to coverage for RFC's Loss, and RFC was

not "*the* Assured" that received the Fees.  *See id.*

The Court agrees with the Plaintiffs' interpretation.  "Every clause or word in an

insurance contract is deemed to have some meaning. . . ." and the Court must consider the

significance of the word "the" in the Return of Fees Exclusion.  *Wirth v. Liberty Mut. Ins. Co.*,

997 N.Y.S.2d 552, 554 (App. Div., 4th Dep't 2014) (internal citations and quotations omitted).

Under the Defendants' argument, the Originating Banks are "the" Assured that engaged in the

excluded conduct—that is, they are the party that received the fees.  The language of the Return

of Fees Exclusion would only exclude coverage for the Originating Banks themselves—"the"

Assured that engaged in the excluded conduct—not for "an" or "any" Assured under the

Policies.[12]  Even if the definition of the word "Assured" were expanded by the Deemer Clause,

---

[11]     The Liquidating Trust argues that the effect of the Deemer Clause is simply to expand the meaning of the word "Assured" to add a fifth type of entity that constitutes an "Assured" for purposes of certain exclusions—that being "any entity" for whose conduct any Assured is legally responsible for rendering or failing to render Professional Services—not to change the exclusion from one that applies only to "the" Assured that engaged in excluded conduct to one that applies to any entity, whether or not they engaged in such conduct.  *See* Liquidating Trust's Reply at 11 (citing to the definition of the term "Assured" in Clause II.C of the Policies as including (1) any Professional Liability Assured; (2) the Company; (3) the Directors and Officers, and (4) any Pension Trust Liability Assured.")

[12]     The Defendants do not argue that the Return of Fees Exclusion is triggered based on fees paid to RFC. With respect to the payment of fees to RFC, the Defendants state:

> Even though the challenged fees were paid to the loan originators or the banks that funded the loans, and not to RFC, the policy expressly extends the above Exclusions to encompass derivative legal liability of RFC in respect of claims based on fees paid to others. . . . Thus, the fee exclusions apply in this case.

Def.'s SJM at 2-3.

the Plaintiffs' claims relating to RFC are not covered by the exclusion because RFC was not

"the" Assured that engaged in the excluded conduct.  The language of the exclusion should be

ascribed its plain and ordinary meaning to distinguish between exclusions in the Policies that

differentiate between conduct by "the" Assured from those that exclude conduct of "an" or "any"

Assured in the context of a policy that involves multiple Assureds.  *See Castle Oil Corp.*, 26

N.Y.S.3d at 786 ("Unambiguous provisions must be given their plain and ordinary meaning.").

To do otherwise would render the parties' decision to use the term "the" in the Return of Fees

Exclusion—as opposed to "any" or "an" Assured—essentially meaningless.  *See Givati*, 960

N.Y.S.2d at 198 (stating the "court should not read a contract so as to render any terms, phrase,

or provision meaningless or superfluous.").

Indeed, numerous courts in New York and Michigan have held that "*the* insured" in a

policy exclusion is limited to only the insured that engaged in the excluded conduct, which in

these circumstances was the Originating Banks and not RFC.  In *Vanguard Insurance Co. v.

McKinney*, 184 Mich. App. 799 (Mich. Ct. App. 1990), for example, the Court of Appeals of

Michigan was confronted with an insurance exclusion in a homeowner's policy which provided

that the policy would not apply "to bodily injury or property damage which is either expected or

intended from the standpoint of *the* Insured."  *Id.* at 802 (emphasis in original).  Similar to the

case at hand, the insurer argued that the language of the exclusionary clause covered any named

insured, while the policy holder asserted that the phrase "the Insured" limited the exclusion to the

specific insured who engaged in the conduct in question and did not affect the status of any other

named insured.  *See id.* at 803-04.  The *McKinney* court sided with the policy holder, noting that

> the distinction between "an insured" and "the insured" is . . . highly relevant. . . .
> [E]xclusionary language referring to the conduct by "an insured" excludes
> coverage to all insureds on the basis of the conduct of any insured.  However,

> where, as in the case at bar, the exclusionary clause refers to the conduct of "the insured," coverage is only precluded as to the particular insured who engaged in the conduct and not as to any other insured covered by the same policy.

*Id.* at 809; *see also Richard Paylor & Orpah Paylor v. First Mt. Mortg. Corp.*, 2008 WL 4605304, at *7 (Mich. Ct. App. Oct. 9, 2008) ("The definite article "the" particularizes the subject spoken to that object. . . . If [the insurance provider] wished to exclude coverage arising out of the violation of a penal statute, regardless of which insured committed the violation, it could have done so by using the phrase "any insured." Because the phrase "the insured" was used, it is plain that the application of the exclusion must be determined by reference to a particular insured."). New York courts have reached the same conclusion. *See Allstate Ins. Co. v. Mugavero*, 79 N.Y.2d 153, 164 (1992) ("[E]xclusionary clauses barring coverage of intentional harm by "*the* insured[,]" rather than by "*an* insured[,]" have been held to exclude coverage only for harm caused by the particular insured committing the act.") (emphasis in original); *Employers Ins. Co. of Wausau v. Harleysville Preferred Ins. Co.*, 726 Fed. App'x 56, 62-63 (2d Cir. 2018) ("It is significant that the exclusion refers to '*the* insured,' rather than 'an insured' or 'the named Insured.' For the latter two wordings, the reference would always include Hellman, who is the named insured and, of course, *an* insured. The phrase 'the insured,' however, is not conducive to the same reading, because it refers to a specific insured while not necessarily referring to the named insured. . . . It is reasonable to read 'the insured' to refer solely to whichever insured is seeking coverage. . . .") (emphasis in original) (internal citations and quotations omitted); *Axis Reinsurance Co. v. Bennett*, 2008 WL 2485388, at *15 (S.D.N.Y. June 19, 2008) ("[U]nlike the phrase 'the insured,' the phrase 'any insured' unambiguously

expresses a contractual intent to create joint obligations and to prohibit recover by an innocent

co-insured.") (internal citations and quotations omitted).[13]

The Defendants counter that the cases cited by the Plaintiffs deal with "naked" exclusions

in insurance policies that do not include language extending legal responsibility in the same

manner as the Deemer Clause.  But the cases cited by the Defendants are distinguishable based

on the language of the exclusions themselves.  The case of *Allstate Ins. Co. v. Stamp*, 134 N.H.

59 (1991), dealt with an exclusion that used the words "an insured."  *Id.* at 61.  The court in

*Stamp* concluded that the insurer's "use of the indefinite article 'an,' rather than the definite

'the,' before 'Insured' is a clear reference to any insured who commits an intentional act

resulting in damages, regardless of whether or not he is the particular insured seeking coverage."

*Id.* at 62.  The Defendants erroneously rely on a stray comment in the case, where the court

---

[13]        Indeed, the majority of jurisdictions distinguish between "the insured" and "any insured" or "an insured" when interpreting insurance policy exclusions.  *See Hanover Ins. Co v. Crocker*, 688 A.2d 928, 931 (Me. 1997) (noting that its "conclusion is consistent with the majority of other jurisdictions that have held that provisions excluding from coverage injuries intentionally cause by 'the insured' refer to a definite, specific insured, who is directly involved in the occurrence that causes the injury.") (citing cases); *Mut. Benefit Ins. Co. v. Politsopoulos*, 631 Pa. 628, 639 (2015) ("[A] majority of jurisdictions recognize potential differences in meaning which may be taken from the selective use of definite and indefinite articles in association with the word 'insured' as employed in insurance policy exclusions.") (citations omitted); *Osbon v. Nat'l Union Fire Ins. Co.*, 632 So.2d 1158, 1159-60 (La. 1994) (finding that "the phrase 'the insured' refers to a specific insured, namely, the insured who (1) is responsible for causing the loss and (2) is seeking to recover under the policy. . . . [T]his interpretation is in line with other jurisdictions that have interpreted similar exclusions and conditions contained in statutes and insurance policies."); *N. Sec. Ins. Co. v. Perron*, 172 Vt. 204, 220 (2001) ("Courts construing similar policy language have concluded that, when a provision uses the article 'the,' the provision applies only to claims brought against the particular insured named in the claim. Conversely, when the exclusionary language refers to intentional acts of 'an insured,' courts have uniformly concluded that the exclusion applies to all claims which arise from the intentional acts of any one insured, even though the claims are stated against another insured."); *Allstate Ins. Co. v. Thuillard*, 2008 WL 2930548, at *4 (Conn. Super. Ct. 2008) ("Thus . . . 'an' means 'any' and therefore, the contract provides, clearly and unambiguously, that the exclusion extends generally to a vehicle of an employer of . . . any insured. . . . We agree that the phrase 'an insured' clearly means 'any insured'. . . ."); *see also* Allan D. Windt, *Insurance Claims & Disputes: Representation of Insurance Companies & Insureds*, § 11:8 (6th ed. 2018) ("Most exclusions are written to apply to actions taken by 'the' insured.  In that event, the exclusion would be inapplicable as to any insured that did not engage in the proscribed actions.") (citing cases); Randy J. Maniloff & Jeffrey W. Stempel, *General Liability Insurance: Key Issues in Every State*, §§ 10.00-10.01 (4th ed. 2018) ("Numerous decisions abound following this pattern [of distinguishing between 'the' insured and 'an' insured or 'any' insured] when addressing the scope of various general liability, homeowners, and auto policy exclusions under a host of circumstances.") (citing cases).

observed that its conclusion was "further bolstered by the policy's general provision that the act of 'an insured person will be binding upon another.'" *Id.*[14]  Two other cases relied upon by the Defendants—*Century Surety Co. v. Charron*, 230 Mich. App. 79 (1998) and *Kabanuk Diversified Invs. v. Credit Gen. Ins. Co.*, 553 N.W.2d 65 (Minn. Ct. App. 1996)—are similarly distinguishable.  The coverage issues there rested upon the exclusions use of the word "or," such that they were phrased in the disjunctive.  *See Century Surety*, 230 Mich. App. at 81-85 (exclusion using the phrase "by the insured or by anyone else for whom the insured is legally responsible . . ."); *Kabanuk*, 553 N.W.2d at 70 (same).  In short, nothing in any of these cases is inconsistent with the Court's conclusion in this case.

The Defendants argue that interpreting the Return of Fees Exclusion in the manner advocated by the Plaintiffs would result in the Deemer Clause becoming mere surplusage because it would not apply to the Return of Fees Exclusion.  But by its terms, the Deemer Clause is applicable to each of the exclusions contained in the Policies, not just the Return of Fees Exclusion.  The exclusions contained in the Policies purposefully differentiate in numerous circumstances between "an Assured," "any Assured" and "the Assured," thereby distinguishing between insureds engaged in specific conduct as opposed to all insureds under the Policies.  Indeed, the distinct language of the exclusions is only made more important by the fact that the Policies provide coverage for multiple insureds.  Adopting the Defendants' interpretation of the Deemer Clause would render these important distinctions meaningless.  The Court cannot simply

---

[14]  The Court is unclear as to whether the Defendants cite to *Allstate* to support their position or merely to distinguish it as a case relied upon by the Plaintiffs.  *Compare* Def.'s Reply at 5 n.6 (noting that Allstate "held that the exclusion in question applied to bar coverage.  This holding was based on the use of 'an insured person' in the exclusion and a deemer clause which provided that the act of 'an insured person will be binding upon another.'"), *with* Hr'g Tr. at 35:7-20 (July 18, 2018) (noting that "there was a deemer clause in that case, the exclusion applied, and they gave effect to the deemer clause.").

read out the word "the" from the Return of Fees Exclusion because "[e]very clause or word in an insurance contract is deemed to have some meaning . . . , and a policy's terms should not be assumed to be superfluous or to have been idly inserted." *Wirth v. Liberty Mut. Ins. Co.*, 997 N.Y.S.2d 552, 554 (App. Div. 4th Dep't 2014); *Platek v. Town of Hamburg*, 24 N.Y.3d 688, 693–94 (2015) (stating that courts will "construe the policy in a way that affords a fair meaning to *all* of the language employed by the parties in the contract and leaves no provision without force and effect.") (emphasis in original) (internal citation omitted); *Michigan Battery Equip., Inc. v. Emcasco Ins. Co*., 317 Mich. App. 282, 284 (2016) ("The language of insurance contracts should be read as a whole and must be construed to give effect to every word, clause, and phrase.") (internal citation omitted); *Givati v. Air Techniques, Inc.*, 104 A.D.3d 644, 645 (N.Y. App. Div., 2d Dep't 2013) ("[A] court should not read a contract so as to render any term, phrase, or provision meaningless or superfluous") (internal citations omitted).

As noted in *McKinney*, "[s]trong public policy [also] supports this decision.  Adherence to a correct usage of the English language in insurance contract construction promotes a uniform, reliable and reasonable foundation upon which policyholders and insurers alike may rely when they enter into a contractual agreement." *McKinney*, 184 Mich. App. at 807.  The case law on this issue was well established prior to the date of the Policies and the parties clearly knew how to differentiate between definite and indefinite articles, as exemplified by the various language of the exclusions.  The parties nonetheless chose to use the word "the" in the Return of Fees Exclusion.  If the Defendants had wished to bar coverage for all Assureds in the Return of Fees Exclusion, they could have done so by instead using the words "an" or "any," as they did with other coverage exclusions.  *See Travelers Indem. Co. v. Bloomington Steel Supply Co.*, 718 N.W.2d 888, 895 (Minn. 2006) ("Instead of excluding coverage for bodily injury expected or

23

intended from the standpoint of '*the*' insured, the Travelers' policies could have excluded

coverage for bodily injury expected or intended from the standpoint of '*an*' or '*any*' insured.")

(emphasis in original).

The Defendants cite to the language used in two other exclusions to assert that the

Plaintiffs' proposed rule of construction regarding "the Assured" does not comport with the

usage of that term in the Policies. *See* Def.'s Reply at 5 n.5; Hr'g Tr. 31:9-32:6 (July 18, 2018).

For instance, the Defendants cite to Exclusion III.C.34, which provides:

> Underwriters shall not be liable for Loss under Insuring Clause I.D. in connection
> with any Claim:
>
> (34) alleging, arising out of, based upon or attributable to the formation,
> operation, administration or management by an Assured, in part or in whole, of
> any entity other than the Assured including, by not limited to, limited or general
> partnerships;

Primary Policy at 27. The Defendants argue with respect to Exclusion III.C.34 that a rule of

construction under which "an" means "any" and "the Assured" means only the Assured upon

whom liability is imposed, would make the carveout in the exclusion "of any entity other than

the Assured. . ." meaningless. *See* Hr'g Tr. 31:13-32:6 (July 18, 2018). This is because the

exclusion applies where "an assured"—any assured— is held liable for operation, formation,

administration of some other entity. *See id.* If "the assured" were interpreted to be only the

assured who was held liable, then it would be a carveout for any entity other than itself, so the

carveout would not make sense. *See id.*[15]

---

[15] The Defendants also cite to Exclusion III.C.5, which provides:

> Underwriters shall not be liable for Loss under Insuring Clause I.D. in connection with any Claim:
>
> (5) for, or arising out of, directly or indirectly, liability of an Assured to a person, corporation,
> partnership or other legal entity (including any subrogee, assignee, contractor, subcontractor,
> subsidiary, affiliate or division):
>
> (a) that wholly or partly owns, operates, manages or otherwise controls, directly or indirectly, any Assured,

As an initial matter, it appears that the Defendants' argument regarding Exclusions III.C.5 and III.C.34 were first raised in a footnote in the Defendants' Reply and thus is not properly before the Court. *See* Def.'s Reply at 5 n.5; *see also Ret. Bd. of the Policemen's Annuity & Benefit Fund of Chi. v. Bank of N.Y. Mellon*, 775 F.3d 154, 168 (2d Cir. 2014) ("Plaintiffs raise this argument in a footnote, so it would be within our discretion to consider it waived."). In any event, the Court disagrees with the Defendants' reading. The first part of this exclusion is written broadly, with the terms "an" or "any" to exclude a number of Assureds. *See* Hr'g Tr. 105:11-106:9 (July 18, 2018). The second half of this exclusion contains an exception to the exclusion, which uses the word "the" to narrowly except only the one Assured that was involved in the specific excluded conduct. *See id.*; *see also* Hr'g Tr. 32:7-12 (July 18, 2018).

Indeed, there are numerous instances of differentiation between "an," any," and "the" Assured throughout the exclusions that support the Plaintiffs' interpretation. For instance, Exclusion III.C.8(a) provides:

> Underwriters shall not be liable for Loss under Insuring Clause I.D. in connection with any Claim:
>
> (8) for, or arising out of, directly or indirectly, any Wrongful Act committed or any Professional Services rendered after:
>
> (a) revocation or surrender (voluntary or involuntary) of *the* Assured's charter or license to do business, or . . .

---

(b) that is, was or in the future becomes wholly or partly owned, operated, managed or otherwise controlled, directly or indirectly, by any Assured, or

(c) in which any Assured has an equity or partnership interest;

provided, however, that the words 'operated, managed or otherwise controlled' in subpart (b) of this Exclusion shall not be deemed to include the Assured's real estate property management services.

This Exclusion shall not apply in the event of a limited partnership interest or solely passive investment by the Assured if such interest or investment represents no more than 10% of the ownership of any such entity;

Primary Policy at 24. The Court finds the argument regarding this exclusion inapplicable for the same reasons.

Primary Policy at 24 (emphasis added).  If this exclusion were to apply when "an" or "any" Assured's charter or license to do business were revoked, then it would become impossibly broad as such an interpretation would exclude claims for completely unrelated and innocent Assureds because one of hundreds of Assureds had its charter or license revoked before the Wrongful Act was committed.  *See* Class Pl.'s Opp. at 16.

Similarly, Exclusion III.C.14 provides:

> Underwriters shall not be liable for Loss under Insuring Clause I.D. in connection with any Claim:
>
> (14) actually or allegedly arising out of or relating to any warranties or guarantees made by *any* Assured as to the future value of any Securities or investment;

Primary Policy at 25 (emphasis added).  As noted by the Class Action Plaintiffs, the language here excludes coverage for claims arising from warranties or guarantees made by the same Assured, but also to create a "joint obligation" by excluding claims against all other Assureds that arise from warranties or guarantees made by any Assured, even when the Assured that made the warranties or guarantees is not the Assured seeking coverage.  *See* Class Pl.'s Opp. at 16.

Another example, Exclusion III.C.3, uses the terms "the" and "any" to distinguish between different parties.  It provides:

> Underwriters shall not be liable for Loss under Insuring Clause I.D. in connection with any Claim:
>
> (3)  for, or arising out of, directly or indirectly, liability assumed by *the* Assured by agreement, or under any contract, whether oral or in writing, including but not limited to any express warranties or guaranties, or arising from cost estimates unless:
>
> (a) such liability would have attached to *the* Assured in the absence of such agreement or contract; or
>
> (b) such liability arises solely and directly out of *the* Assured's failure or alleged failure to perform Professional Services required to be performed by such contract or agreement; or

(c) for Loss which is expected or intended by *any* Assured and which results from
any breach of contract;

Primary Policy at 23 (emphasis added).  There are many other such instances.  *See id.* at 25
(Exclusions III.C.12 and III.C.13); *id.* at 26 (Exclusions III.C.21 and III.C.24); *id.* at 27
(Exclusions III.C.35 and III.C.36).

## C.  Mortgage Fee Claim Exclusion

The Court turns now to the second issue in these motions, the Mortgage Fee Claim
Exclusion.  Contained in Clause III.C.10 of the Policies, it provides that "[u]nderwriters shall not
be liable for Loss under Insuring Clause I.D. in connection with any Claim . . . that is a Mortgage
Fee Claim . . . ."  Primary Policy at 25.  A "Mortgage Fee Claim," in turn, is defined as "a Claim
arising out of fees paid to or by a Professional Liability Assured in connection with loan
origination, loan processing, loan closing, loan marketing or loan servicing . . . ."  *Id.* at 17.
"Professional Liability Assured" is a defined term in the Policies that is specifically limited to
the following four entities: (1) General Motors Acceptance Corporation ("GMAC"); (2) any
Subsidiary of GMAC; (3) General Motors Asset Management Corporation ("GMAMC"); and (4)
any Subsidiary of GMAMC.[16]  *Id.* at 15.

Notwithstanding this fairly straightforward language, the parties offer far different
interpretations of the Mortgage Fee Claim Exclusion.  All parties agree that RFC was a
Professional Liability Assured.  *See* SUF ¶ 3.  But as no fees were paid by or to RFC—they were

---

[16]    The Primary Policy provides the following definition for Professional Liability Assureds:

"Professional Liability Assureds" means:

(a)  General Motors Acceptance Corporation ("GMAC");
(b)  Any Subsidiary of GMAC;
(c)  General Motors Asset Management Corporation ("GMAMC"); and
(d)  Any Subsidiary of GMAMC.

Primary Policy at 15.

27

instead paid to the Originating Banks—the Plaintiffs argue that the Mortgage Fee Claim Exclusion does not apply by its plain terms.

The Defendants' reasoning as to why the Mortgage Fee Claim Exclusion applies is far less straightforward.  Rather than use the definition of the term "Professional Liability Assured" in the Policies, they seek to redefine the term.  They do so in two steps.  First, the Defendants argue that any Professional Liability Assured must also constitute an "Assured."  The Defendants then import the expanded definition of the term "Assured" from the Deemer Clause into the Mortgage Fee Claim Exclusion so as to cover any entity "for whose conduct an Assured is legally responsible in rendering or failing to render Professional Services."[17]  Having thus broadly redefined the term "Professional Liability Assured," the Defendants' interpretation of the Mortgage Fee Claim Exclusion would cover payments made in connection with fees for loan processing by the Originating Banks to customers because such fees were paid by or to an entity for whose conduct RFC is legally responsible.[18]

Faced with these two competing interpretations, the Court concludes that the Plaintiffs' straightforward reading is the correct one.  It gives consistent effect to the plain meaning of the

---

[17]    Defendants state that "[a]ny 'Professional Liability Assured' is an 'Assured' and, thus, for the purpose of the Exclusion includes any 'entity for whose conduct an Assured is legally responsible in rendering or failing to render Professional Services.'"  Def.'s SJM at 24–25; *see also* Def.'s Reply at 7–8 ("To be sure, 'Mortgage Fee Claim' refers to 'a Professional Liability Assured' rather than an 'Assured,' but that does not affect the application of the Deemer Clause.  The term, 'Assured' as used in the Deemer Clause is a defined term that means, as set forth in Definitions Clause II.C, among other things, 'any Professional Liability Assured.'  Thus, the use of the word 'Assured' in the Deemer Clause should be read to encompass the expressly included subcategory of Professional Liability Assureds, which is used in the definition of Mortgage Fee Claim incorporated into Exclusion III.C(10).").

[18]    In invoking the exclusions, the Defendants also rely upon case law concerning the phrase "arising out of." For example, they explain that "[u]nder New York law, the phrase 'arising out of' when used in an insurance exclusion imposes a 'but for' causation test."  Def.'s SJM at 25 (citing *Mount Vernon Fire Ins. Co. v. Creative Hous. Ltd.*, 88 N.Y.2d 347, 352–53 (1996)).  They likewise note that the phrase "has been broadly construed under Michigan law as requiring only a causal connection that is more than incidental[,] fortuitous[,] or remote."  *Id.* at 26. Based on such case law, they conclude that the Mortgage Fee Claim Exclusion applies because, "[i]n the present case, neither the *Kessler* nor the *Mitchell* claims would have existed but for the assertedly improper, excessive and inadequately disclosed fees charge by the loan originators and/or banks."  *Id.*

language and the definitions of the terms contained in the Policy. *See Morgan Stanley Grp., Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000) ("Under New York law, an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract.") (internal citation and quotation omitted); *Comerica Bank*, 3 F.3d at 943 (noting with respect to insurance policy that "[t]he contract language will be given its ordinary and plain meaning, rather than a technical or strained construction.") (citing *Jones v. Farm Bureau Mutual Ins. Co.,* 172 Mich. App. 24 (1988)). By contrast, the Defendants' more tortured interpretation cannot be squared with the language of the Policies because it does not give effect to the distinct defined term, "Professional Liability Assured."

As the Plaintiffs correctly note, "[w]hile a 'Professional Liability Assured' is one of the four different subsets identified in the definition of the term 'Assured,' the converse is not true. That is, every 'Assured' is not also a 'Professional Liability Assured.'" Class Pl.'s SJM at 9. More specifically, the definition of "Assured" contains four distinct and defined groups: "(1) 'any Professional Liability Assured'; (2) 'the Company'; (3) the 'Directors and Officers,' and (4) 'any Pension Trust Liability Assured.'" *See* Liquidating Trust's Reply at 6 (quoting Primary Policy at 12). The Deemer Clause simply adds a fifth type of entity that is an "Assured" for purposes of the exclusions: "any person or entity for whose conduct as Assured is legally responsible in rendering or failing to render Professional Services." *Id*. (quoting Primary Policy at 27). Thus, the separately defined term "Professional Liability Assured" is simply a sub-category of the broader term "Assured." When properly viewed in context then, the Mortgage Fee Claim Exclusion is narrowly tailored to apply only to the more narrow category of a "Professional Liability Assured," and not to all Assureds.

29

As the Class Plaintiffs also correctly observe, "for the Deemer Clause to trigger the application of the III.C.10 Mortgage Fee Claim Exclusion, the Deemer Clause must 'deem' the Originating Banks a 'Professional Liability Assured' as that term is used in the definition of 'Mortgage Fee Claim' found in Clause II.Y.  But the unambiguous terms of the Deemer Clause *only* [deem] a person or entity to be an 'Assured' as that term is used in the Clause III.C. Exclusions and [do] not deem a person or entity to be a 'Professional Liability Assured.'"  Class Pl.'s Opp. at 8; *see also* Liquidating Trust's Resp. at 4 ("[T]he Mortgage Fee Exclusion does not apply because MCR is undisputedly *not* a 'Professional Liability Assured,' and because the expanded definition of 'Assured' does nothing to change the definition of 'Professional Liability Assured.'").  More simply put, the Class Plaintiffs are correct that the term "Professional Liability Assured" is not changed by the Deemer Clause, which only expands the defined term "Assured."  *See* Class Pl.'s Reply at 13.  As the parties agree that fees were only paid to the Originating Banks—not to RFC or another Professional Liability Assured—the claims are not "Mortgage Fee Claims" and the Mortgage Fee Claim Exclusion does not apply.

Once again, the Defendants argue that the Plaintiffs' interpretation would result in the Deemer Clause becoming surplusage, with the Defendants this time casting their argument in terms of the Deemer Clause and the Mortgage Fee Claim Exclusion.  *See* Def.'s Reply at 8 ("If Professional Liability Assured were excluded from the application of the Deemer Clause, it would have no effect and would be surplusage."); *see also id.* at 6 ("[Plaintiffs'] argument would make the Deemer Clause mere surplusage as respects Exclusion III.C(10), contrary to accepted canons of construction.").  But the Defendants willfully ignore the way the Policies are written. There are thirty-eight total exclusions in Clause III.C of the Policies, and the Deemer Clause does not need to apply to every single one for it to be meaningful.  In fact, a number of the

exclusions do not even use the term "Assured," so it would be impossible for the Deemer Clause to affect any of those exclusions. *See* Hr'g Tr. at 104:22–25 (July 18, 2018) ("There is—I think there's eleven of those exclusions that don't even use the term 'assured.' So the [D]eemer [C]lause, even if triggered, couldn't apply to eleven of them."); *see, e.g.*, Primary Policy at 23-27 (Exclusions III.C.2, III.C.15, III.C.17, III.C.18, III.C.20, III.C.22, III.C.23, III.C.26, III.C.29, III.C.30, III.C.32, III.C.33, III.C.37). Moreover, the exclusions sometimes use the term "Assured," other times use the term "Professional Liability Assured," and sometimes use neither term. By using these different defined terms in some places—and not in others—it is clear that the Policies make a conscious distinction between these terms. *See, e.g.,* Exclusions III.C.36 and III.C.38 (two exclusions using the term "Professional Liability Assured"). Indeed, Exclusions 36 and 38 contain both the term "Assured" and "Professional Liability Assured," making it clear that the drafters of the Policies did not consider these terms synonymous, as the Defendants seem to do. So rather than rendering the Deemer Clause "mere surplusage," the Plaintiffs' interpretation gives effect to the purposeful distinctions for when different terms are used—and not used—in the Policies. The Defendants impermissibly seek to erase such distinctions. *See Georgitsi Realty*, 702 F.3d at 155 ("[T]he court may not write into a contract conditions the parties did not insert by adding or excising terms under the guise of construction, nor may it construe the language in such a way as would distort the contract's apparent meaning.") (internal citations and quotations omitted); *see also Comerica*, 3 F.3d at 944 ("Under Michigan law, the office of interpretation or construction is to ascertain the intention of the parties *from the words which have been used; [t]he court is not at liberty to insert words* which have been omitted, and which are not to be found in the instrument.") (internal citations and quotations omitted) (emphasis in original).

The Defendants' interpretation also ignores the scope of the Deemer Clause as contemplated by the Policies. By its terms, the Deemer Clause's expansive definition of "Assured" only applies to the provisions of Clause III.C—the section on exclusions—and nowhere else. The Defendants' interpretation seeks to apply this expansive definition of "Assured" to the Professional Liability Assured definition—which is outside of the exclusions themselves—and thereby impact the definition of a Mortgage Fee Claim, even though the term "Assured" is not present in the operative language of the defined term. *See* Primary Policy at 15 (Clause II.Q). But the Defendants do not explain how one can permissibly export the Deemer Clause's definition of the term "Assured" outside of the exclusions, and in so doing insert it into a clause of the Mortgage Fee Claim Exclusion where the term "Assured" is not actually used.[19] If the drafters of the Policies had wished the Deemer Clause to apply so broadly, as the Defendants urge, they could have easily taken steps to do so. But they did not. Instead, the Defendants seek to shoehorn the Deemer Clause where it does not belong.

The Defendants present a strained analogy equating the various definitions in the Policies with parked cars and street signs. Def.'s Reply at 8 ("Plaintiffs' argument is akin to saying that a prohibition on parking cars in an area does not include green cars because 'green cars' are not 'cars.' Both green cars and other colored cars are cars, and both 'green cars' and 'cars' use the

---

[19]    While the Mortgage Fee Claim Exclusion itself does not use the term "Professional Liability Assured," the term "Mortgage Fee Claim" in that exclusion makes reference to a "Professional Liability Assured." *See* Clause II.Y (defining "Mortgage Fee Claim" as "a Claim arising out of fees paid to or by a Professional Liability Assured in connection with . . . ."). Thus, the coverage of the Mortgage Fee Claim Exclusion looks to the actions of a Professional Liability Assured. But the applicable portion of Exclusion Ten does not actually include the term. To be sure, the later portion of Exclusion Ten does makes reference to the "Assured" but only as to any exception to the exclusion. *See* Exclusion III.C.10. (Underwriters not liable for loss on any Mortgage Fee Claim "provided that this Exclusion shall not apply to Costs, Charges and Expenses which the Assured shall become legally responsible to pay by reason of a Mortgage Fee Claim which is otherwise covered under Insuring Clause I.D.") This exception to Exclusion 10 is not addressed in the parties' summary judgment motions and the reference to "Assured" in the latter half of Exclusion Ten is not relevant to the parties' current dispute.

32

words 'cars.'  A parking prohibition applies to all cars, irrespective of their color, just as the

Deemer Clause applies to all Clause III.C exclusions and all Assureds, including Exclusion

III.C(10) and Professional Liability Assureds.")  While colorful, Defendant's analogy does not

accurately reflect the language here, where the Mortgage Fee Claim Exclusion uses specific

terms to define the scope of its exclusion from coverage.  That language must be given effect.

More specifically, the Mortgage Fee Claim Exclusion only excludes claims that are Mortgage

Fee Claims, which are claims arising out of fees paid to or by a "Professional Liability Assured"

*only*—not an "Assured" more generally.[20]

In sum, the Court concludes that Defendants' interpretation of the Mortgage Fee Claim

Exclusion is unsupported given the plain language of the Policy, the relevant definitions and

common sense.

## CONCLUSION

For the reasons stated above, the Court concludes that the Return of Fees Exclusion and

the Mortgage Fee Claim Exclusion do not bar the Plaintiffs' Claims.  Accordingly, the Courts

grants the Plaintiffs' motions for partial summary judgment and denies the Defendants cross-

motions for partial summary judgment solely as to the two Fee Exclusions.  The Plaintiffs should

settle an order on five days' notice.  The proposed order must be submitted by filing a notice of

the proposed order on the Case Management/Electronic Case Filing docket, with a copy of the

---

[20]      The Plaintiffs' counsel expressed their disagreement with the Defendants' analogy more metaphorically.
*See* Hr'g Tr. at 111:23–112:7 (July 18, 2018) (argument of Class Counsel) ("[T]he reason that [analogy] doesn't
work for them in this case is, is because the No Parking sign in our exclusion doesn't say 'cars.' The No Parking
sign in our case says 'professional-liability assured.'  So the No Parking sign in the analogy would be, well, then, no
green cars can park here. What does that mean? That means every other colored car, black, yellow, red, blue, can all
park there. This analogy actually supports the Plaintiffs' position with respect to the separate definitions and the
subcategory of professional-liability assureds.").

proposed order attached as an exhibit to the notice.  A copy of the notice and proposed order

shall also be served upon counsel to the Defendants.[21]

Dated: New York, New York
           December 27, 2019


                                        /s/ *Sean H. Lane*
                                        UNITED STATES BANKRUPTCY JUDGE

---

[21] While the parties did not provide briefing on the issue, the Defendants have stated that they do not consent to the Court issuing a final judgment for purposes of summary judgment under *Stern v. Marshall*, 564 U.S. 462 (2011).  *See* Hr'g Tr. 126:18-19 (July 18, 2018).  The Court's decision today is not a final disposition of the case and therefore does not implicate *Stern v. Marshall*.  *See id.* at 128:10-18.  But to the extent that it might be construed as implicating the constitutional concerns raised in *Stern*, this decision should be considered proposed findings of fact and conclusions of law pursuant to Local Bankruptcy Rule 9033-1.  *See* General Order M-431, dated January 31, 2012.