**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>RESIDENTIAL CAPITAL, LLC, *et al.*,<br><br>                              Debtors. | Chapter 11<br>Case No. 12-12020 (MG)<br><br>(Jointly Administered) |
| ROWENA DRENNEN, FLORA GASKIN, ROGER TURNER, CHRISTIE TURNER, JOHN PICARD AND REBECCA PICARD, individually and as the representatives of the KESSLER SETTLEMENT CLASS,<br><br>STEVEN AND RUTH MITCHELL, individually and as the representatives of the MITCHELL SETTLEMENT CLASS,<br><br>and<br><br>RESCAP LIQUIDATING TRUST,<br><br>                              Plaintiffs,<br><br>v.<br><br>CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON, *et al.*,<br><br>                              Defendants. | Adv. Case No. 15-01025 (DSJ) |

**DECISION RESOLVING CROSS-MOTIONS
FOR PARTIAL SUMMARY JUDGMENT**

**A P P E A R A N C E S:**

**PERKINS COIE LLP**
*Counsel for ResCap Liquidating Trust*
700 13th Street, NY Suite 800
Washington, DC 20005
By:    Vivek Chopra, Esq.
       Selena Linde, Esq.

**ARNOLD & PORTER KAYE SCHOLER LLP**
*Counsel for North American Specialty Insurance Company*
399 Park Avenue
New York, NY 10022
By:   Kent Yalowitz, Esq.
      Daniel R. Bernstein, Esq.

**WILEY REIN LLP**
*Counsel for Twin City Fire Insurance Company*
2050 K Street NW
Washington, DC 20006
By:   Cara Duffield, Esq.

**HINSHAW CULBERTSON LLP**
*Counsel for Certain Underwriters at Lloyd's of London*
800 Third Avenue, 13th Floor
New York, NY 10022
By:   J. Gregory Lahr, Esq.
      Matthew Ferlazzo, Esq.
      Karen Toto, Esq.

**WALTERS RENWICK RICHARDS SKEENS & VAUGHAN, P.C.**
*Counsel for the Kessler Class and the Mitchell Class*
1100 Main Street, Suite 2500
Kansas City, MO 64105
By:   Roy Frederick Walters, Esq.
      Kip D. Richards, Esq.
      Karen W. Renwick, Esq.
      David M. Skeens, Esq.

**CAHILL GORDON & REINDELL LLP**
*Counsel for Swiss Re International S.E.*
32 Old Slip
New York, NY 10005
By:   Thorn Rosenthal, Esq.
      Taylor Elicegui, Esq.

**HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER**
*Counsel for Steadfast Insurance Company*
One Logan Square, 27th Floor
Philadelphia, PA 19103-6933
By:   Sharon F. McKee, Esq.

**KAUFMAN DOLOWICH & VOLUCK, LLP**
*Counsel for Continental Casualty Company*
40 Exchange Place, 20th Floor
New York, NY 10005
By:    Patrick M. Kennell, Esq.

**STEPTOE JOHNSON LLP**
*Counsel for Clarendon National Insurance Company*
13330 Connecticut Ave, NW
Washington, DC 20036
By:    Harry Lee, Esq.
       John O'Connor, Esq.

**DAVID S. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

This memorandum opinion and order (this "**Decision**") decides eleven separate motions

for partial summary judgment filed at the close of discovery in a multi-party dispute between two

types of claimants[1]—a liquidating trust that has succeeded to the rights of one of the debtors in a

confirmed voluntary Chapter 11 bankruptcy case, and two groups of class-action plaintiffs who

hold substantial allowed claims against the estate—as against multiple insurer defendants[2] who,

among them, provided up to $400 million of liability insurance to the debtor.  The claimants are

proceeding under the authority of the confirmed plan and a related settlement, which together

entitled the Class Plaintiffs and the Liquidating Trust to pursue coverage claims that the debtor

---

[1] The plaintiffs are: (i) Rowena Drennen, Flora Gaskin, Roger and Christie Turner, John and Rebecca Picard, individually, and as the representatives of the Kessler Settlement Class (the "**Kessler Class**"); (ii) Steven and Ruth Mitchell, individually, and as representatives of the Mitchell Settlement Class (the "**Mitchell Class**," and together with the Kessler Class, the "**Class Plaintiffs**"); and (iii) the ResCap Liquidating Trust, as successor to Residential Funding Company, LLC (the "**Liquidating Trust**" or the "**Trust**" and, together with the Class Plaintiffs, the "**Plaintiffs**").

[2] The defendants are: Those Certain Underwriting Members at Lloyd's London and Those Companies Whose Names are Severally Subscribed to Policy No. FD0001142 (the "**Primary Underwriters**"); Those Certain Underwriting Members at Lloyd's London and Those Companies Whose Names are Severally Subscribed to Policy No. FD0001144 (the "**Excess Underwriters**" and together with the Primary Underwriters, the "**Underwriters**"); Twin City Fire Insurance Company ("**Twin City**"), Continental Casualty Company ("**Continental**"); Clarendon National Insurance Company ("**Clarendon**"), Swiss Re International S.E. (formerly known as SR International Business Insurance Company Ltd.) ("**Swiss Re**"), St. Paul Mercury Insurance Company ("**St. Paul**"), Steadfast Insurance Company ("**Steadfast**"), and North American Insurance Company ("**North American**") (collectively and together with the Excess Underwriters the "**Excess Insurers**") (the Excess Insurers and Primary Underwriters together, the "**Insurers**" or "**Defendants**").

3

originally had against its insurers.  As assignees of the debtor's insurance rights, the Kessler Class

and Mitchell Class seek coverage of their respective allowed claims as losses of the debtor under

the insurance policies, while the Trust seeks coverage for the debtor's payment of a compensatory

damages judgment in the Mitchell Class's underlying suit and related costs and expenses.

The motions addressed by this Decision seek rulings related to (i) whether the losses

resulting from the claims of the Mitchell Class and the Kessler Class are covered under the terms

of the  insurance policies' provisions defining the scope of their coverage; (ii) if so, whether those

insurance claims are barred by the policies' "Exclusion 38," which (as detailed and stated more

precisely below) excludes from the policies' coverage certain claims arising from services

rendered by insured people or entities that are not a "Professional Liability Assured"[3] as that term

is defined in the policies; (iii) whether at least portions of the insurance claims at issue are excluded

from the policies' coverage and/or precluded as a matter of law because they arise from awards of

punitive damages and/or statutory penalties; (iv) whether claims against the Excess Insurers (those

responsible for all but the first $50 million of coverage) are barred by so-called "exhaustion"

provisions in the Excess Insurers' policies, which, roughly speaking, state that the Excess Insurers'

obligations do not arise until the primary layer of insurance is paid in full or the Primary

Underwriters are held liable to pay in full; (v) whether claims based on a variety of specific types

of asserted consequential damages are recoverable; (vi) whether certain claims or causes of action

are time-barred; (vii) whether the Insurers are entitled to challenge the reasonableness of the

allowed claim amount giving rise to the Kessler Class's claims notwithstanding this Court's

previous approval of the settlement, in the course of which this Court explicitly determined under

the standards applicable to review of class action settlements and Bankruptcy Rule 9019 motions,

---

[3] Terms capitalized but not defined herein have the meanings stated in the Policy.

among other things, that the settlement was fair and reasonable; (viii) even if the Insurers are not

precluded from contending that their coverage obligations are not triggered because the settlement

for which insurance payment was sought was unreasonable, whether the Court should determine

that the Class Plaintiffs are entitled to summary judgment on the ground that no reasonable juror

could conclude that the settlement was unreasonable; and (ix) whether the full allowed-claim

amount of $300 million of the Kessler Class action claimants constitutes an insured loss, or

whether the amount of that loss is limited to the actual cash payment obligation of the estate, where

under the parties' Court-approved settlement and the Plan the Kessler Class received an allowed

claim of $300 million that by agreement was to be satisfied solely by a cash distribution from the

estate of approximately $27 million, coupled with the right to pursue the Insurers for the debtor's

insurance coverage rights up to the full allowed amount of the claim, *i.e.*, $300 million.

Put succinctly here and in greater and more precise detail below, this Decision holds as

follows:

1. The Plaintiffs are entitled to summary judgment determining that the claims fall within
   the scope of the policies' coverage, and the unambiguous language of Exclusion 38,
   which case law instructs must be construed narrowly against the insurer, does not
   exclude the claims from coverage.  The Court further concludes that the Insurers have
   waived their entitlement to rely on Exclusion 38 through their sustained invocation of
   other defenses and exclusions while never raising Exclusion 38.  Thus, the Insurers'
   summary judgment motion on these issues is denied.

2. The Insurers are not entitled to summary judgment on their contention that the Plaintiffs
   are barred from recovering from the Insurers on the portions of the claims that arise
   from what the Insurers assert are punitive damages and/or statutory penalties, because

the policies specify that their scope of coverage is to be determined applying the most broadly permissive relevant source of state law. Delaware law concededly is among the states whose law applies under that provision, and Delaware law does not bar insurance coverage of punitive damages. The Court does not accept the Insurers' contention that a limited public-policy based aspect of New York's choice of law principles calls for deviating from New York's usual willingness to enforce agreements as to what law applies; among other things, New York lacks a sufficiently strong state interest in the matter for its public-policy choice-of-law override to apply here. Further, claims that were allowed to the Class Plaintiffs based on available compensation-heightening measures such as law authorizing the award of treble damages in some circumstances do not constitute the sort of fines or penalties that the policy excludes.

3. The Excess Insurers' policies' wording varies, but they all unambiguously require that the primary layer of insurance be paid in full or that the Primary Underwriters be held liable to pay in full before the Excess Insurers' obligations to pay are triggered. Accordingly, any claim against the Excess Insurers premised on their failure to make payments prior to such time as the Primary Underwriters either paid in full or were held liable to pay in full fails. Thus, the Excess Insurers' summary judgment motion on that issue is granted.

4. As recognized by this Court's prior order allowing the Plaintiffs to amend their complaint, the amendments do not reflect new claims, but instead reflect new allegations and damages demands pled as part of the breach of contract claims already contained in the prior version of the complaint, which are undisputedly timely. Therefore, none of the Plaintiffs' claims or causes of action are time-barred.

5. The Defendants' various legal arguments against the availability of various types of consequential damages are precluded by the law of the case doctrine because they have already been considered and rejected by this Court, and/or they are otherwise unavailing on the merits. The Plaintiffs have identified evidence demonstrating that the parties reasonably dispute certain material facts, including whether the parties contemplated certain types of consequential damages at the time of contracting, whether the Defendants engaged in bad faith, and whether consequential damages are quantifiable or purely speculative. Therefore, summary judgment on that issue is inappropriate.

6. The Kessler Class's motion for partial summary judgment on the issues of whether the Insurers are barred by reason of waiver and/or are collaterally estopped from challenging the reasonableness of the settlement amount is denied. The Insurers took steps to preserve all defenses to claims at the time the Court approved the claim settlement and confirmed the Plan, including with respect to reasonableness, and the Court's approvals were without prejudice to those Insurer defenses. The mere fact that the then-presiding judge found the settlement to be, among other things, "reasonable," does not support summary judgment on the Insurers' reasonableness defense. The Court's earlier determination was that it was reasonable to settle the Kessler Class's claims for consideration including an allowed claim amount, a limited but guaranteed cash distribution from the estate, and the opportunity to pursue the Insurers for additional amounts with no guarantee that those collection efforts would succeed. That determination cannot appropriately be leveraged into a binding determination rejecting

a defense as to the reasonableness of the resulting overall allowed claim amount for coverage purposes.

7.  The Court also denies the separate motion of the Kessler Class for partial summary judgment seeking a determination that the amount of the Kessler Class settlement was reasonable.  Reasonableness generally is a triable fact question, and here, although the Kessler Class presents strong arguments and evidence, the Insurers present sufficient evidence and arguments based on the Kessler Class's own proffered evidence to present a genuine dispute of material fact that precludes entry of summary judgment.

8.  Finally, the Court denies the Insurers' motion for partial summary judgment seeking a determination that the amount of Loss incurred in connection with the Kessler Settlement—and, therefore, the amount of damages recoverable—is capped at $27 million, rather than the full $300 million allowed claim amount.  It is undisputed that the Insurers are obligated to cover losses which the debtor became "legally obligated to pay," and the controlling documents and applicable caselaw demonstrate that the $300 million allowed claim is such an obligation.

## BACKGROUND

This adversary proceeding was commenced in 2015 and has a long, involved history.  This section briefly explains who the relevant parties are, the conduct from which this adversary proceeding arose, the history of the litigation, and the documents whose meaning determines many of the issues raised in the various motions.  Additional issue-specific background is set forth in applicable discussion sections below.  Further details regarding the case's general background and other matters may be found elsewhere on the docket.[4]

---

[4] This case was transferred to me for administration in February 2021.  [ECF No. 566].  In 2019, Judge Lane decided a previous motion for partial summary judgment filed by the Insurer Defendants, who then asserted that a different

Residential Funding Company, LLC ("**RFC**"), the debtor relevant to this adversary proceeding, was at all relevant times an indirect subsidiary of General Motors Corporation ("**GM**"). [*See, e.g.*, ECF No. 336-1 at 11 of 58, §§ II.C and F; ECF No. 336 ¶ 3].[5] RFC operated as a financial services company that, among other things, purchased second mortgage loans issued by several originating lenders ("**Originating Banks**"), then securitized those loans and sold the resulting mortgage-backed securities ("**MBS**") to investors. [*See, e.g.*, ECF No. 811 at 7; ECF No. 388 at 5]. RFC also functioned as the master servicer for the securitized loans after they were purchased and was compensated for that by the investors out of the loan payments, developed and made available to the Originating Banks mortgage-related software, and made warehouse loans to the Originating Banks. [ECF No. 811 at 7–9].

The Plaintiffs' claims against RFC arise from certain fees paid, and alleged to be unlawful, by the Class Plaintiffs in connection with second mortgages or subordinate loans issued by the Originating Banks. [ECF No. 388 at 5]. Beginning in 2001, borrowers asserted various claims against RFC in numerous lawsuits asserting, among other things, that the loans RFC purchased violated various state and federal laws by including certain unlawful fees. [ECF No. 811 at 9].

policy exclusion rendered the Plaintiffs' claims outside the scope of their coverage obligations. [*See* ECF Nos. 337, 338, 340, 388]. Judge Lane rejected that contention in a well-reasoned Memorandum of Decision dated December 27, 2019, docketed at ECF No. 388. Pages 5 through 16 of that decision detail the case's background and state certain applicable legal standards, including with respect to summary judgment, choice of law, and interpretation of insurance contracts. Those portions of Judge Lane's decision are incorporated herein. At oral argument on May 12, 2022 (the "**Hearing**"), the Court informed the parties it might take this step and asked if any party was aware of any misstatement of law or fact contained in Judge Lane's opinion, or if any party objected to the Court's reliance on the decision. [*See* ECF No. 953 ("**Hearing Tr.**") at 10:9–24]. No party objected or identified any reason not to incorporate these portions of Judge Lane's decision. [*See generally* Hearing Tr.].

[5] Unless otherwise specified, references to the Case Management/Electronic Case Filing ("**ECF**") docket are to the above-captioned adversary proceeding. Citations to the ECF docket in the above-captioned adversary proceeding are referred to as "ECF No. __," and citations to the ECF docket in the main bankruptcy case, 12-12020 (MG), are referred to as "Bk. ECF No. __." Whenever possible, the Court will endeavor to cite to a document's underlying pagination, and such citations will take the form "ECF No. __ at __." When that is not possible—for example, if a single docket entry contains multiple documents, each with its own separate underlying pagination—the Court will cite to the page number in the ECF-stamped banner at the top of the page, and such citations will take the form "ECF No. __ at __ of __." The Court may also cite to other subdivisions of a document, such as a paragraph or section number, as appropriate.

Among these lawsuits were claims by the Kessler Class plaintiffs in the Kessler Action (defined below), and by the Mitchell Class plaintiffs in the Mitchell Action (defined below). [*See, e.g.*, *id.*; ECF No. 336-2].

In 2011, the Kessler Class filed a joint consolidated amended class action complaint against RFC and other defendants in the Kessler Action[6] alleging, *inter alia*, that RFC was liable for violations of the Real Estate Settlement Practices Act ("**RESPA**"), Truth in Lending Act ("**TILA**"), Home Ownership and Equity Protection Act ("**HOEPA**"), and Racketeer Influenced and Corrupt Organizations Act ("**RICO**") based on loans issued to the Kessler Class by Originating Banks. [ECF No. 336 ¶ 4; *see generally* ECF No. 336-2]. The Kessler Action was pending when RFC filed its bankruptcy petition in May 2012. [ECF No. 336 ¶ 5].

The named plaintiffs in the Kessler Action filed proofs of claim against RFC on behalf of the Kessler Class and moved to certify class claims. [*Id.* ¶ 6]. In November 2013, the Court entered an order certifying the Kessler Class and approving a settlement agreement between RFC and the Kessler Class (the "**Kessler Settlement**," docketed at Bk. ECF No. 4793). [ECF No. 336 ¶ 9; Bk. ECF No. 5968]. The Kessler Settlement provided for, *inter alia*, a $300 million allowed claim against RFC (the "**Kessler Claim**") and the assignment of RFC's rights under certain insurance policies (detailed below) to the Kessler Class, in exchange for RFC's release from any other recovery with respect to the Kessler Class's claims. [ECF No. 336 ¶¶ 4–43; Bk. ECF No. 4793].

The Mitchell Class plaintiffs commenced the Mitchell Action[7] in 2003 against RFC and others alleging that second mortgages RFC had purchased from one particular Originating Bank,

---

[6] *In re Comty. Bank of N. Va. Lending Pracs. Litig.*, MDL No. 1674, Case No. 03-cv-0425 (W.D. Pa. 2008) (the "**Kessler Action**").

[7] *Mitchell v. Res. Funding Corp.*, 334 S.W.3d 477, 494–95 (Mo. Ct. App. 2010) (as modified (Feb. 1, 2011) (the "**Mitchell Action**")).

Mortgage Capital Resources Corporation ("**MCR**"), involved certain fees charged to borrowers that violated the Missouri Second Mortgages Loans Act ("**MSMLA**"), HOEPA, and common law. [*See* ECF No. 336 ¶¶ 44–66]. Following trial, the trial court held that, *inter alia*, RFC violated the MSMLA, resulting in $4,329,048 in compensatory damages, and approximately $92 million in punitive damages. [ECF No. 388 at 6]. RFC appealed, and judgment was affirmed as to compensatory damages, and reversed and remanded for retrial on punitive damages. [*Id.*]. RFC ultimately paid $15,648,868.12 to satisfy the compensatory damages judgment and related attorneys' fees. [*Id.*]. When RFC filed for bankruptcy in 2012, RFC and the Mitchell Class had agreed to settle the remanded punitive damages claim for $14.5 million (the "**Mitchell Settlement**"), but none of that money had been paid. [*Id.* at 6–7]. In December 2013, the Court confirmed a Chapter 11 plan (the "**Plan**") which, among other things, approved the Mitchell Settlement, resulting in an allowed claim against the estate for $14.5 million (the "**Mitchell Claim**" and together with the Kessler Claim, the "**Claims**"), and assigned the Mitchell Class the right to pursue the Defendants for any insurance proceeds under the applicable insurance policies to satisfy the Mitchell Claim. [*Id.* at 7].

The Plan also established the ResCap Liquidating Trust (the "**Trust**") to liquidate and distribute RFC's remaining assets to unsecured creditors, and assigned to the Trust any rights RFC had to recover $6.1 million from the Insurers for defense costs in the Mitchell Action, as well as RFC's rights to payment from the Insurers for the $15.6 million in compensatory damages that RFC paid to the Mitchell Class before the bankruptcy filing. [ECF No. 388 at 7–8].

As assignees of RFC's rights under these insurance policies, the Kessler and Mitchell Classes now seek coverage of their respective allowed claims as losses under the policies, and related consequential damages. [*See, e.g.*, ECF No. 388 at 8]. The Trust seeks coverage for RFC's

11

payment of the compensatory damages judgment in the Mitchell Action, and related consequential

damages including defense costs. [*See, e.g.*, ECF No. 388 at 8; ECF No. 811 at 1].

The insurance from which the Plaintiffs now seek coverage for their claims consists of a

"tower" of insurance comprised of a $50 million comprehensive, combined insurance policy issued

to GM and subsidiaries including RFC by the Primary Underwriters (the "**Policy**" or "**Primary**

**Policy**") [ECF No. 336-1],[8] and a total of $350 million in excess policies (the "**Excess Policies**"

and, together with the Primary Policy, the "**Policies**") issued by the Excess Insurers in four layers,

amounting to total coverage, along with the Primary Policy, of $400 million. [*See* ECF No. 796-

1 at 5–6]. The Excess Policies "follow form" to the Primary Policy, and thus mirror the Primary

Policy in relevant part, including as to the Primary Policy's Insuring Clause I.D., the relevant

coverage exclusions under section III.C, and the definitions.[9, 10] [ECF No. 388 at 8].

The coverage sought here arises from Insuring Clause I.D.(a) of the Policies for errors and

omissions (the "**Insuring Clause**"), which provides:

> Underwriters shall pay on behalf of the Assureds:
> (a) Loss which the Assureds shall become legally obligated to pay by reason of any Claim
> first made against such Assured during the Policy Period resulting directly from a
> Wrongful Act committed by a Professional Liability Assured or by any person or entity
> for whose conduct a Professional Liability Assured is legally responsible in rendering
> or failing to render Professional Services. . . ."

[ECF No. 336-1 § I.D(a)]. The parties do not dispute that RFC was both an "Assured" and a

"Professional Liability Assured" as defined in the Policies. [ECF No. 388 at 9; ECF No. 336-1

---

[8] The full name of the Policy is "the Combined Directors and Officer Liability and Company Liability (Including Employment Practices Liability), Errors and Omissions Liability, Pension Trust Liability, and Mortgagees Errors and Omissions Insurance Policy, No. 823/FD0001142. The Primary Policy incorporates an application (the "**Application**") that GM completed and submitted to the Primary Underwriters containing certain representations relevant to the issues presented. [ECF No. 852-7].

[9] In this Decision, unless otherwise stated, (i) references to "the Policy" shall be read to include all relevant Policies, if and as applicable; and (ii) it is assumed that each of the Policies follow form to the Primary Policy.

[10] In addition, as detailed below, each Excess Policy includes an "exhaustion provision" governing if and when coverage under the respective Excess Policies is triggered.

Decl. A(1), §§ II.C, Q, KK].  The following terms defined in section II of the Policy hold particular

relevance:

C.  "Assureds" means: (1) the Company,[11] (2) the Directors and Officers (3) any
Professional Liability Assured[12] [and] any Pension Liability Assured.

* * *

E. "Claim" means:
1. any written or oral demand for damages or other relief against any of the Assureds; or
2. any civil, criminal, administrative or regulatory or arbitration proceeding initiated
against any of the Assureds, including: (a) any appeal therefrom . . .

* * *

V.1. "Loss" means [in relevant part] 1. as used in Insuring Clause . . . I.D., damages,
judgments, settlements and Costs, Charges and Expenses incurred by any of the Assureds,
but shall not include:

(a) amounts deemed uninsurable under the law pursuant to which this Policy shall be
construed; provided, however, that insurability shall be governed by such applicable law
which most favors coverage for such Loss among the following:

(i) where those damages were awarded or imposed;
(ii) where the Wrongful Act occurred;
(iii) where the Company is incorporated;
(iv) where the Company has its principal place of business;

(b) taxes, sanctions or criminal, civil or regulatory fines or penalties imposed by law[.]

* * *

FF. "Professional Services" means only those services to customers or clients which are
rendered, or which ought to have been rendered, by or on behalf of a Professional Liability
Assured, in the ordinary course of the Professional Liability Assured's activities as a
financial services company, as disclosed to Underwriters and as per the Policy terms and
conditions.

For the avoidance of doubt, the term Professional Services shall not include any services
rendered, or which ought to have been rendered, by or on behalf of (i) any Assured other

---

[11] "Company" means 1. the Parent Company; and 2. any Subsidiary." [ECF No. 336-1 § II.F.]. "Parent Company" in
turn means General Motors Corporation.  [See ECF No. 336-1 § II.BB. and Item A(1) of the Policy Declarations].
[12] "Professional Liability Assureds' means (1) General Motors Acceptance Corporation; (2) Any Subsidiary of
GMAC; (3) General Motors Asset Management Corporation; and (4) Any Subsidiary of GMAMC." [ECF No. 336-
1 § II.Q].

than a Professional Liability Assured or (ii) any Professional Liability Assured as: (a) a lawyer; (b) an accountant; (c) an architect; (d) an engineer.

\* \* \*

LL. "<u>Wrongful Act</u>", . . . as used in Insuring Clause I.D., means any actual or alleged:
1. breach of duty, neglect, error, misstatement, misleading statement, omission, or
2. libel, slander, defamation, invasion of privacy, infliction of mental anguish, infliction of emotional distress, wrongful entry or wrongful eviction committed by a Professional Liability Assured solely in rendering or failing to render Professional Services to others.
   . . .

Section III.C. sets forth exclusions which carve out coverage under the Insuring Clause for certain losses.  Relevant here is the exclusion under section III.C.38 ("**Exclusion 38**"):

Underwriters shall not be liable for Loss under Insuring Clause I.D. in connection with any Claim . . . 38. for, or arising out of, directly or indirectly, any services rendered, or which ought to have been rendered, by or on behalf of any Assured which is not a Professional Liability Assured[.]

Finally, the so-called "Deemer Clause" at the end of section III.C. modifies the definition of "Assured" for purposes of the exclusions only:

As used in the Exclusions set forth in Clause III.C., the term Assured includes any person or entity for whose conduct an Assured is legally responsible in rendering, or failing to render Professional Services.

As detailed below, the parties disagree over the meaning of these and other Policy provisions. Resolving the motions at issue hinges in substantial part on the Policy's proper interpretation.

14

## DISCUSSION

### A.  Legal Standards

1.  Summary Judgment

Federal Rule of Bankruptcy Procedure ("**Bankruptcy Rule**") 7056 makes Federal Rule of Civil Procedure 56 applicable in adversary proceedings.[13]  "[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the [movant] is entitled to a judgment as a matter of law.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [the movant's] right to judgment as a matter of law."  *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir. 1995).  "Where the moving party demonstrates 'the absence of a genuine issue of material fact,' the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Celotex*, 477 U.S. at 323).  "To defeat a summary judgment motion, the non-moving party 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and 'may not rely on conclusory allegations or unsubstantiated speculation.'"  *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).

---

[13] It also requires that any motion for summary judgment be made at least 30 days before the initial date set for an evidentiary hearing on any issue for which summary judgment is sought, unless a different time is set by local rule or the court orders otherwise.  Bankruptcy Rule 7056.

If "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).  "A fact is 'material' when it 'might affect the outcome of the suit under governing law.'" *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (quoting *Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir. 2005)).  "In deciding whether material factual issues exist, all ambiguities must be resolved and all reasonable inferences must be drawn in favor of the nonmoving party." *In re Ampal-Am. Israel Corp.*, No. 12-13689, 2015 WL 5176395, at *10 (Bankr. S.D.N.Y. Sept. 2, 2015) (citing *Matsushita*, 475 U.S. at 587).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

The Court may "grant some but not all of the relief requested in a summary judgment motion if it finds disputed issues of fact as to some of the issues presented." *In re: Residential Cap., LLC*, 533 B.R. 379, 395 (Bankr. S.D.N.Y. 2015) (citing Fed. R. Civ. P. 56(g)).  Further, the Court may grant summary judgment to a nonmovant or on grounds not raised by a party, or consider summary judgment on its own.  Fed. R. Civ. P. 56(f).

2.  Choice of Law

Bankruptcy courts generally apply the choice of law principles of the forum state.  *See Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599, 601–02 (2d Cir. 2001) ("[B]ankruptcy courts confronting state law claims that do not implicate federal policy concerns should apply the choice of law rules of the forum state."); *see also Statek Corp. v. Dev. Specialists, Inc. (In re Coudert Bros. LLP)*, 673 F.3d 180, 186–88 (2d Cir. 2012).  The Court therefore looks to the choice

of law rules of New York, the forum state in this case, when it needs to determine what state law should apply.

Under New York law, "the first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws." *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998) (citing *Allstate Ins. Co. v. Stolarz*, 81 N.Y.2d 219, 223 (N.Y. 1993)). An actual conflict will be found to exist where "the applicable law from each jurisdiction [that might apply] provides different substantive rules" that are "relevant to the issue at hand . . . and must have a significant *possible* effect on the outcome of the trial." *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005) (citations and quotations omitted). If no actual conflict exists, then a choice of law analysis is unnecessary. *See IBM v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004) ("Choice of law does not matter, however, unless the laws of the competing jurisdictions are actually in conflict. . . . In the absence of substantive difference, however, a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it."); *Curley*, 153 F.3d at 12 ("It is only when it can be said that there is no actual conflict that New York will dispense with a choice of law analysis."); *Excess Ins. Co. v. Factory Mut. Ins. Co.*, 769 N.Y.S.2d 487, 489 (App. Div., 1st Dep't 2003) ("If no conflict exists, then the court should apply the law of the forum state in which the action is being heard.").

In many respects, but with the exception of some specific issues that are discussed below, there is no meaningful difference between the potentially relevant sources of state law. Thus, except where further analysis is required, this Decision draws primarily from New York law, with occasional references to other states' law that reinforces or is consistent with New York law.

3.   Insurance Contract Interpretation

By and large, insurance policies are interpreted using the same principles that apply to contracts generally.  *See Castle Oil Corp. v ACE Am. Ins. Co.*, 26 N.Y.S.3d 783, 786 (App. Div., 2d Dep't 2016) (citing *Universal Am. Corp. v. Nat'l Union Fire Ins. Co.*, 25 N.Y.3d 675, 680 (2015)); *see also McGrath v. Allstate Ins. Co.*, 802 N.W.2d 619, 621 (Mich. Ct. App. 2010) ("The rules of contract interpretation apply to the interpretation of insurance contracts.").   When interpreting a policy, "[u]nambiguous provisions must be given their 'plain and ordinary meaning.'" *Castle Oil*, 26 N.Y.S.3d at 786 (quoting *Universal Am. Corp.*, 25 N.Y.3d at 680); *see also Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998).  A policy "should be 'read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose.'" *Ins. Co. of N.Y. v. Cent. Mut. Ins. Co.*, 850 N.Y.S.2d 56, 58 (App. Div., 1st Dep't 2008) (quoting *Empire Props. Corp. v. Mfrs. Tr. Co.*, 288 N.Y. 242, 248 (1942)); *see also McGrath*, 802 N.W.2d at 621 ("The language of insurance contracts should be read as a whole and must be construed to give effect to every word, clause, and phrase.") (citing *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 453 (Mich. 2003)).  A "court should not read a contract so as to render any term, phrase, or provision meaningless or superfluous." *Givati v. Air Techniques, Inc.*, 960 N.Y.S.2d 196, 198 (App. Div., 2d Dep't 2013) (citations omitted).  Additionally, "the court 'may not write into a contract conditions the parties did not insert by adding or excising terms under the guise of construction, nor may it construe the language in such a way as would distort the contract's apparent meaning.'" *Georgitsi Realty, LLC v. Penn-Star Ins. Co.*, 702 F.3d 152, 155 (2d Cir. 2012) (quoting *In re Matco-Norca, Inc.*, 802 N.Y.S.2d 707, 709 (App. Div., 2d Dep't 2005)); *see also Comerica Bank v. Lexington Ins. Co.*, 3 F.3d 939, 944 (6th Cir. 1993) ("Under

Michigan law, the office of interpretation or construction is to ascertain the intention of the parties *from the words which have been used; [t]he court is not at liberty to insert words* which have been omitted, and which are not to be found in the instrument.") (citations and quotations omitted).

The language of the insuring provisions in an insurance policy generally "should be broadly interpreted, with any doubts as to coverage resolved in favor of the insured." *Berman v. Gen. Accident Ins. Co. of Am.*, 671 N.Y.S.2d 619, 623 (Sup. Ct., N.Y. Cnty. 1998). Additionally, "[e]xclusions to coverage must be strictly construed and read narrowly, with any ambiguity construed against the insurer." *Lancer Indem. Co. v. JKH Realty Grp., LLC*, 7 N.Y.S.3d 492, 494 (App. Div., 2d Dep't 2015) (citations omitted); *see also MBIA Inc. v. Certain Underwriters at Lloyd's, London*, 33 F. Supp. 3d 344, 358 (S.D.N.Y. 2014) (Under New York law, "[t]he rule that insurance policies are to be construed in favor of the insured is most rigorously applied in construing the meaning of exclusions incorporated into a policy of insurance or provisions seeking to narrow the insurer's liability.") (quoting *Bodewes v. Ulico Cas. Co.*, 336 F. Supp. 2d 263, 272 (W.D.N.Y. 2004)). "To negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case." *Lancer Indem.*, 7 N.Y.S.3d at 494 (citations and quotations omitted); *see also Indian Harbor Ins. v. Zucker*, 553 B.R. 633, 640 (W.D. Mich. 2016) ("It is the insurer's burden to prove that an exclusion to coverage is applicable") (citing *Heniser v. Frankenmuth Mut. Ins.*, 534 N.W.2d 502, 505 n.6 (Mich. 1995)); *Cragg v. Allstate Indem. Corp.*, 17 N.Y.3d 118, 122 (2011).

When deciding whether to adopt an insurer's interpretation of exclusionary language, courts will also consider whether the insurer could have adopted more precise policy language. *See, e.g., Hooper v. State Mut. Life Assur. Co. of Worcester, Mass.*, 28 N.W.2d 331, 334 (Mich.

1947) (Michigan courts have "no patience with attempts by a paid insurer to escape liability by taking advantage of an ambiguity, a hidden meaning, or a forced construction of the language in a policy, when all question might have been avoided by a more generous or plainer use of words."); *Farmington Cas. Co. v. Cyberlogic Techs., Inc.*, 996 F. Supp. 695, 702 (E.D. Mich. 1998) (same).

### B.   <u>The Claims Are Covered by the Policy's Insuring Clause I.D</u>

The Plaintiffs and Insurers filed cross-motions for partial summary judgment on whether the losses resulting from the Mitchell and Kessler claims are covered by the Insuring Clause. [*See, e.g.*, ECF Nos. 802, 811, 861].   More specifically, the primary issue is whether those claims "result[ed] directly from a Wrongful Act" committed by RFC or by an "entity for whose conduct" RFC is "legally responsible." [ECF No. 336-1 § I.D].  A secondary issue is whether that Wrongful Act was committed "in rendering or failing to render Professional Services." [*Id.*].

The Class Plaintiffs contend that the Kessler and Mitchell Claims resulted directly from RFC's Wrongful Acts in the course of performing its Professional Services when it purchased and securitized unlawful mortgage loans. [ECF No. 802 at 1].  The Trust contends that RFC's liability in the Mitchell Action resulted from RFC's Wrongful Acts in failing to review for federal- and state-law compliance loans purchased from Originating Banks, and in RFC's post-purchase collection of unlawful fees in connection with those loans. [*See, e.g.*, ECF No. 811 at 1].  The Trust further contends that the Insuring Clause does not require RFC's Wrongful Acts be committed in the course of rendering Professional Services, but that, regardless, both RFC's failure to conduct proper diligence in purchasing unlawful loans and its collection of unlawful fees constitute Professional Services rendered in the ordinary course of RFC's financial services business. [ECF No. 811 at 23 n. 24, 24–33].  The Insurers argue "no evidence" exists to establish any of the three purported requirements for coverage under the Insuring Clause: "(1) that there was a Customer,

(2) to whom a Professional Service was provided, (3) in a manner that constitutes a Wrongful Act."
[ECF No. 861 at 3].

For the reasons detailed below, the Plaintiffs are entitled to summary judgment on this issue.

1.  Background

GM's Application in support of its request for coverage provided the Insurers information about GM's businesses and thus the risks to be insured. [*See* ECF No. 852-7; ECF No. 811-1 ¶ 39]. The Policy, by its terms, incorporates the Application, and vice versa. [ECF No. 336-1 § VII.A[14]; ECF No. 852-7 at CNIC0014806[15]].

In response to the Application's "Professional Services Supplemental Questions," GM stated that the "Professional Service[s]" rendered by GM, its subsidiaries, affiliates and/or joint ventures "include, but are not limited to" activities summarized in chart form, including with respect to GMAC Mortgage Group, of which RFC is a subsidiary. [ECF No. 852-7 at CNIC0014794, CNIC0014812]. The summary chart lists as GMAC Mortgage Group's "Professional Services," among other things, "Residential and Commercial Mortgage Origination, Securitization and Servicing," "Commercial Asset-Backed Lending," and "Mortgage-Related Software Development," while referencing a "GMAC Profile" that appears later in the Application. [*Id.* at CNIC0014794, CNIC0014807–CNIC0014813]. The Application's "Profile:

---

[14] "It is warranted that the particulars and statements contained in the Application . . . are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy. By acceptance of the Policy the Assureds agree: 1. That the statements in the Application are their representations, that they shall be deemed material to the acceptance of the risk or the hazard assumed by Underwriters under this Policy and that this Policy is issued in reliance upon the truth of such representations. . . ."

[15] "IT IS AGREED THAT THIS APPLICATION SHALL BE THE BASIS OF THE CONTRACT SHOULD A POLICY BE ISSUED, AND THIS APPLICATION WILL BECOME A PART OF SUCH POLICY, IF ISSUED, AND WILL BE ATTACHED THERETO."

GMAC Financial Services" stated that GMAC[16] is in the "mortgage business," that the "growth of the GMAC Mortgage Group has been truly impressive," and that the group's 1999 earnings of $260 million were up 126 percent over 1998 "as the group grew aggressively with acquisitions of residential and commercial servicing portfolios." [*Id.* at CNIC0014807]. The Application further disclosed the nature of GMAC Financial Services' "[m]ortgage [o]perations" as "a wide array of real estate financial services" that "includes the origination, purchase, financing and servicing of residential . . . mortgage loans" and "the issuing, purchasing and selling of mortgage-backed securities." [*Id.* at CNIC0014811]. RFC specifically is described as "the leading issuer of private-label [MBS] and home equity loan asset-backed securities (ABS) with 1999 issuance of $24.5 billion." [*Id.* at CNIC0014812]. Further, the Application explained, RFC "originates and purchases jumbo, high loan-to-value and sub-prime residential mortgages, then securitizes the mortgages into pass-through certificates" which RFC "then sells to investors and functions as a master servicer on behalf of investors." [*Id.*]. The Application further reported that RFC "engaged in a number of related businesses, including warehouse lending," where it had "$6 billion in commitments." [*Id.*].

Shortly after RFC obtained insurance under the Policies, it began notifying the Insurers of various lawsuits, including the Mitchell and Kessler Actions, alleging that the Originating Banks had issued loans violating federal and state law, and that RFC violated those laws when it purchased and securitized those loans. [ECF No. 811 at 2; ECF No. 811-1 ¶ 111]. For the ensuing two decades, the Insurers have denied coverage based on their contention that the Mitchell and Kessler Actions did not result from RFC's Wrongful Acts or Professional Services as required by the Insuring Clause. [*See* ECF No. 811 at 2; ECF No. 811-1 ¶¶ 146–58].

---

[16] The Application states that GMAC is "a wholly-owned subsidiary" of GM that "operates under the brand name of GMAC Financial Services." [ECF No. 852-7 at CNIC0014807].

2. <u>The Claims Fall Within the Scope of the Insuring Clause</u>

a. *The Claims Resulted Directly from RFC's Wrongful Acts*

The Policies' Insuring Clauses define the scope of coverage.  The relevant clause is

numbered I.D(a), and provides:

Underwriters shall pay on behalf of the Assureds:

Loss which the Assureds shall become legally obligated to pay by reason of any Claim first made against such Assured during the Policy Period resulting directly from a Wrongful Act committed by a Professional Liability Assured or by any person or entity for whose conduct a Professional Liability Assured is legally responsible in rendering or failing to render Professional Services . . . ."

[ECF No. 336-1 § I.D.(a)].  As noted above, it is undisputed that RFC is an Assured and a

Professional Liability Assured.  [*See* ECF No. 336-1 Decl. A(1), §§ II.C, II.Q, KK; ECF No. 811

at 16; ECF No. 388 at 9].  Thus, all parties agree that the Plaintiffs can establish coverage if they

can show that the claims against RFC resulted directly from its Wrongful Acts within the Policy's

meaning.

The Policy defines "Wrongful Act," in relevant part, as "any actual or alleged . . . breach

of duty, neglect, error, misstatement, misleading statement, [or] omission[.]"  [ECF No. 336-1 §

II.LL].  Here, the relevant claims against RFC were based on the fact of RFC's ownership of loans

with unlawful characteristics (roughly speaking, excessive fees), and RFC's ownership of the loans

resulted from its acquisition of them from the Originating Banks.  Thus, the premise of the claims

necessarily is that RFC engaged in "neglect," "breach of duty," and/or "omissions" by seeking and

acquiring mortgages from the Originating Banks without conducting proper due diligence to

screen out or decline to own mortgages for which unlawful fees had been charged.  [*See, e.g.*, ECF

No. 811 at 22–23].  Moreover, RFC was alleged and/or found to be in direct violation of various

state and federal statutes, including due to its own conduct.  [*See, e.g.*, ECF No. 802 at 10–15; ECF

No. 811 at 19–22; ECF No. 921 at 1–2]. These state and federal law violations also constitute Wrongful Acts under the Policy, whether as a breach of duty, neglect, error, or otherwise. [*See* ECF No. 811 at 19–21]. Whether one characterizes RFC's Wrongful Acts as these violations or RFC's underlying conduct (*i.e.*, insufficiently vetted loan acquisitions), RFC committed Wrongful Acts that resulted in alleged and/or settled liabilities, damages, and/or obligations to pay—in other words, Losses—for violations of state and federal law.

The Insurers argue that RFC did not commit any Wrongful Acts, and that the Claims instead result from the Originating Banks' wrongful acts and thus were not derived "directly" from RFC's conduct. [*See, e.g.*, ECF No. 861 at 31–34]. This contention disregards RFC's own independent role in choosing to acquire unlawful loans in a manner that made RFC liable. As stated above, the Claims rest not only on conduct of the Originating Banks, but also on RFC's own conduct; even setting aside RFC's post-acquisition conduct, had RFC conducted proper due diligence and chosen not to acquire the loans, it would not have been liable.

The Trust further argues that RFC's Wrongful Acts need not have been in the course of rendering Professional Services to trigger coverage, because the phrase "in rendering or failing to render Professional Services" applies only to Losses from Wrongful Acts committed by persons or entities "for whose conduct RFC is legally responsible[.]" [ECF No. 811 at 23 n. 24]. Under this reading, section I.D.a. sets forth two paths to coverage: one for Wrongful Acts committed by a Professional Liability Assured, and another for Wrongful Acts committed by those for whose conduct a Professional Liability Assured is responsible in rendering or failing to render Professional Services.[17] [*Id.*]. The Insurers did not address this argument at length, if at all. The

---

[17] Again, the full text of subclause (a) of the Insuring Clause provides coverage for "Loss which the Assureds shall become legally obligated to pay by reason of any Claim first made against such Assured during the Policy Period resulting directly from a Wrongful Act committed by a Professional Liability Assured or by any person or entity for

Court need not decide this issue because, as explained below, it concludes that RFC's Wrongful Acts were committed in the course of rendering Professional Services in RFC's capacity as a financial services company that was a Professional Liability Assured.

      b.   *RFC's Wrongful Acts Were Committed in Rendering or Failing to Render Professional Services*

Under the Policy, "'Professional Services' means only those services to customers or clients which are rendered, or which ought to have been rendered, by . . . a Professional Liability Assured in the ordinary course of the Professional Liability Assured's activities as a financial services company, as disclosed to Underwriters. . . ." [ECF No. 336-1 § II.FF]. The Plaintiffs argue, in brief, that both RFC's investors (the purchasers of securitized debt obligations) and the Originating Banks were RFC's customers and/or clients; that RFC rendered services to them in the ordinary course of its activities as a financial services company; and that those services were disclosed to the Underwriters in the Application such that the services constitute Professional Services that trigger coverage under the Policy. [*See* ECF No. 811 at 24–33; ECF No. 802 at 24–38]. The Insurers argue that, in relation to the Mitchell and Kessler loans, no evidence established that there was a customer or client to whom a Professional Service was provided in a manner that constitutes a Wrongful Act. [*See, e.g.*, ECF No. 861 at 3]. In other words, and as more fully explained by Underwriters' counsel at the Hearing, the Insurers contend that no evidence ties any Wrongful Act committed by RFC in the course of providing Professional Services to a particular customer or client to the unlawful loans on which the Kessler and Mitchell Claims are based. [*See* Hearing Tr. at 39:19–49:18, 310:16–313:6]. The Court concludes that the Insurers' reading is overly narrow and without support in the Policy's text.

---

whose conduct a Professional Liability Assured is legally responsible in rendering or failing to render Professional Services[.]" [ECF No. 336-1 § I.D(a)].

RFC, as disclosed to the Insurers in the Application, was a financial services business whose services included, but were not limited to, the origination, purchase, securitization, sale, and master servicing of mortgage loans. [*See* ECF No. 852-7 at CCIC0014794, CCIC0014811, CCIC0014812]. By its terms, the Policy's definition of "Professional Services" requires only that services be provided to "customers or clients"; it contains no further qualification, and does not require that the customers or clients to whom services are rendered be the claimants from whom Losses arise, nor that the services be rendered to a particular client or client involved in the underlying Actions. [*See* ECF No. 336-1 § II.FF]. Here, RFC's customers or clients are both the Originating Banks and RFC's investors.

RFC referred to the Originating Banks explicitly and consistently as its "clients" or customers for almost two decades. [*See* ECF No. 811 at 7–9]. But the Court need not rely on labels. RFC did not just purchase loans from the Originating Banks, but also maintained ongoing relationships in which RFC provided the banks a suite of financial and other services to help them source loans for RFC. [*See* ECF No. 811 at 7–9, 25–26]. These services included customer support, mortgage-related software, warehouse lending, and forward commitments which provided the liquidity necessary to source loans for RFC. [*See, e.g.*, *id.*; Hearing Tr. at 28:23–30:15]. The Insurers have identified no admissible evidence to the contrary.

Investors that purchased mortgage-backed securitized products from RFC also were RFC's customers or clients. After purchasing the loans, RFC packaged them into MBS and sold them to investors, such as hedge funds or pension funds; these investors were RFC's customers. [*See* ECF No. 811 at 26]. RFC provided services to those investors: RFC did not purchase loans from the Originating Banks and sell them, unaltered, to investors. RFC packaged those loans into securitized products, then sold them to investors, and thereafter served as the master servicer for

the loans. [*Id.*]. Again, the Insurers have not shown otherwise. Instead, they object to a supposed failure to correlate any particular Loss with a specific loan or customer. But neither the Policy nor applicable law requires such granularity, especially given the scope of RFC's securitization business as disclosed to the Insurers in the Application and, thus, included in the Policy's scope of coverage.

Indeed, the financial services that RFC provided are best understood as the total process of sourcing and acquiring loans from originators in order to securitize them, packaging the loans into securitized products, selling them, and continuing to act as servicer for them. [*See* Hearing Tr. at 27:9–28:22]. These services were at the core conduct of RFC's business and cannot be understood as completely independent or meaningfully severable. [*E.g.*, ECF No. 852-7 at CNIC0014812 (RFC "originates and purchases . . . sub-prime residential mortgages, then securitizes the mortgages into pass-through certificates" which RFC then "sells to investors and functions as a master servicer on behalf of investors")]. That these services were rendered "in the ordinary course of [RFC]'s activities as a financial services company" would thus seem difficult to dispute. And the Insurers do not try.

It is appropriate, then, that courts often look to activities at the core of an insured's business in interpreting the term "professional services" as used in insurance contracts. In *MBIA Inc. v. Certain Underwriters at Lloyd's, London*, the insured—a writer of financial guarantee policies for securities, including MBS—sought coverage under a professional indemnity policy. 33 F. Supp. 3d 344, 348–49 (S.D.N.Y. 2014). The insurers denied coverage, claiming that the subject acts were not "professional services" under the policy, which defined professional services to include, *inter alia*, "those activities, which are declared in the Application Form or which are commenced during the Policy Period." *Id.* at 357. The court concluded that because the subject

27

conduct involved "core operations of MBIA's business . . . namely, how to invest and allocate its available pool of assets to insure against different classes of claims," that conduct "[went] to the heart of MBIA's business and therefore" satisfied the definition of professional service. *Id.*; *see also EnTitle Ins. Co. v. Darwin Select Ins. Co.*, No. 1:11–CV–01193, 2013 WL 422712 at *5 (N.D. Ohio Feb. 1, 2013) (agreeing with the insured that because the conduct "[was] customary in the industry" it constituted "a Professional Service [the insurer] expected [the insured] to engage in"), *aff'd*, 553 F. App'x 543 (6th Cir. 2014).

Other courts likewise have found that providing financial services such as loan securitization falls within a commonsense understanding of "professional services" as used in insurance contracts. [*See* ECF No. 811 at 27–28 (collecting cases)]. In *David Lerner Assocs., Inc. v. Philadelphia Indem. Ins. Co.* the court, interpreting "professional services" under an insurance policy,[18] held that "the common sense understanding of the term 'professional services'" encompassed the insured's activities in "engag[ing] in the due diligence and sale of financial products." 934 F. Supp. 2d 533, 541 (E.D.N.Y. 2013). The court elaborated that "it is clear under New York law that the allegations in the underlying lawsuits against [the insured]—relating to its purported failure to, *inter alia,* conduct due diligence on the REITs in connection with providing investment advice to its customers in the sale of this financial product—constitute 'professional services' under the common understanding of that term[.]" *Id.* at 542.

In *Impac Mortg. Holdings Inc. v. Houston Cas. Co.*, the insurer argued that coverage should have been denied because the insured was not performing "professional services for others" when it "bought, sold, or securitized loans for its own account." No. SACV 11-1845, 2013 WL 792790 at *8 (C.D. Cal. Feb. 26, 2013) (quotation marks and brackets omitted). The court disagreed,

---

[18] "Professional services" was not defined in the subject policy. 934 F. Supp. 2d at 541.

concluding that the insured's "mortgage securitizations . . . were an integral component of its business" and that "liability arising out of mortgage securitization is a risk inherent in the practice of the profession of mortgage banker/broker." *Id.* Therefore, the Court held that "the underlying claims, which all arise out of [the insured's] mortgage securitization business, arise out of [the insured's] 'performance of or failure to perform professional services for others.'" *Id.* The same logic applies here.

Finally, the Policy specifies that Professional Services include "services to customers or clients" that RFC "ought to have [] rendered" but did not. [ECF No. 336-1 § II.FF]. There is no genuine dispute of material fact that RFC *ought to have* conducted appropriate due diligence on the loans that it acquired to securitize, but it did not, and this failure means that an absence of adequate due diligence also constitutes a covered Professional Service.

For all these reasons, RFC committed its Wrongful Acts in the course of rendering or failing to render Professional Services in the ordinary course of its activities as a financial services company. These Wrongful Acts included neglect and/or omissions in actively acquiring, securitizing, and selling loans from the Originating Banks without conducting proper due diligence, and in directly violating state and federal laws. Therefore, the Court concludes, based on the plain language of the Policy, that the Insuring Clause covers the losses which resulted from the claims of the Mitchell and Kessler Actions; and further that no genuine dispute exists as to any fact material to this issue. The Court thus grants the Plaintiffs' motions for partial summary judgment [ECF Nos. 801, 810] and denies the portions of the Defendants' cross-motion for summary judgment [ECF No. 827][19] as to the scope of coverage under the Insuring Clause.

---

[19] The Insurers filed one motion for summary judgment [ECF No. 827] covering multiple issues—the coverage issue resolved by this portion of this Decision, the "Exclusion 38" issue discussed in the Decision's next section, and issues concerning the insurability of certain consequential damages claims.

**C.  Exclusion C38 Does Not Apply to Preclude Coverage**

Even where, as here, the Insuring Clause by its terms applies to a given Loss, the Policy contains a series of exclusions that, if applicable, would exclude the Loss from coverage.  [*See* ECF No. 336-1 § III].  The Plaintiffs and Insurers filed cross-motions for partial summary judgment on whether one exclusion, Exclusion C38, applies to the Losses resulting from the Mitchell and Kessler Actions.  [*See* ECF Nos. 797, 800, 803, 804, 827, 861].

The C38 Exclusion provides that "Underwriters shall not be liable for Loss under Insuring Clause I.D. in connection with any Claim . . . for, or arising out of, directly or indirectly, any services rendered, or which ought to have been rendered, by or on behalf of any Assured which is not a Professional Liability Assured[.]"  [ECF No. 336-1 § III.C.38].  As stated, RFC is both an Assured and a Professional Liability Assured.  [*See id.* Decl. A(1), §§ II.C, Q, KK; ECF No. 811 at 16].

The Insurers emphasize that the Deemer Clause modifies the definition of "Assured" for purposes of the exclusions, including C38: "As used in the Exclusions set forth in Clause III.C., the term Assured includes any person or entity for whose conduct an Assured is legally responsible in rendering or failing to render Professional Services."  [ECF No. 336-1 § III.C].

The Plaintiffs argue first that Exclusion 38 does not apply, and second that even if it did, the Insurers waived their right to rely on Exclusion 38 based on their past conduct.  [*See, e.g.*, ECF No. 800 at 18–40].  The Defendants disagree on both points.  [*See, e.g.*, ECF No. 884 at 4–26; ECF No. 861 at 35–37].  The Court addresses each argument in turn.

1.  The Unambiguous Language of Exclusion 38 Does Not Preclude Coverage for Losses Resulting from the Mitchell and Kessler Actions

In brief, the parties argue as follows.  The Plaintiffs argue that Exclusion 38 does not apply because the Originating Banks are not "Assureds" under the Deemer Clause as they are not entities

for whose conduct RFC was legally responsible, and because RFC's liabilities resulted from its own Wrongful Acts, not merely those of the Originating Banks. Thus, because RFC *is* a Professional Liability Assured, Exclusion 38 does not apply. [*See, e.g.*, ECF No. 800 at 22–35; ECF No. 804 at 12–39]. The Insurers argue that the Claims against, and related liabilities incurred by, RFC arose out of services rendered *by the Originating Banks* on RFC's behalf; and that the Originating Banks are "Assureds" for purposes of Exclusion 38 by virtue of the Deemer Clause, as entities for whose conduct RFC was legally responsible. Thus, because the Originating Banks are not Professional Liability Assureds [*see* ECF No. 336-1 § II.Q], Exclusion 38 applies, barring coverage. [*See* ECF No. 861 at 35–37; ECF No. 864 at 4–25]. The Court concludes that Exclusion 38 does not apply, for the following reasons.

The Insurers seek to get around RFC's own wrongful conduct by arguing that Exclusion 38 applies because the Claims at issue arose, "directly or indirectly," from the Originating Banks' conduct, *even if* the same Claims also arose from RFC's own conduct to which Exclusion 38 would not apply because RFC is a Professional Liability Assured. [Hearing Tr. 69:13–75:17; *see also* ECF No. 884 at 21–23]. Under the Insurers' proposed interpretation, Exclusion 38 would bar coverage for any Claim which arises—again, directly or indirectly—out of the conduct of the Originating Banks. But if this were the case, Claims based principally or almost entirely on RFC's wrongful conduct would not be covered as long as those Claims could also be causally derived from services rendered by the Originating Banks—or, for that matter, derived however indirectly from any act of any person or entity that is not a Professional Liability Assured. This reading might have the absurd result of defeating any possible claim, and it cannot be squared with the well-settled law that in insurance policies, exclusions in particular are to be construed narrowly and against the insurer. *See, e.g., MBIA*, 33 F. Supp. 3d at 358. The most logical, and possibly

31

the only logical, reading of Exclusion 38 is that where a claim does not arise directly from the conduct of a Professional Liability Assured (such as RFC), but does arise by virtue of conduct of some other actor "for whose conduct" an Assured is "legally responsible," then the limitations of Exclusion 38 apply. Nothing in the Exclusion's language, however, even in conjunction with the "Deemer Clause," explicitly purports to extinguish otherwise applicable insurance for the directly incurred liability of a Professional Liability Assured (again, such as RFC). This is particularly so given the requirement that exclusions from insurance coverage take into account an insurer's failure to use other, less ambiguous wording that could have been employed. *See supra* § A.3 (citing *Farmington*, 996 F. Supp. 695, 702). For example, the Policy could have said, but does not say, that the Policy does not cover the direct conduct of a Professional Liability Assured whenever the Loss at issue was directly or indirectly caused by a person or entity that was not a Professional Liability Assured, but for whom or for which the Professional Liability Assured was legally responsible. It would be contrary to established precepts of insurance policy interpretation, *see id.*, to deem an obliquely stated and ambiguous at best exception to override the Policy's direct, broad statement of the coverage's purpose, and its clear impact. Therefore, the Court rejects the Insurers' proposed contractual interpretation.

Further, because the Claims here arose from RFC's own direct conduct and thus do not fit within the scope of Exclusion 38, the Court need not determine whether RFC is "legally responsible" for the Originating Banks' conduct under the Deemer Clause.

Therefore, the Court concludes, based on the plain language of the Policy and on well established case law governing the construction of insurance contracts, that Exclusion 38 does not apply to preclude coverage, and that no genuine dispute exists as to any fact material to this issue. The Court thus grants the Plaintiffs' motions for partial summary judgment and denies the

Defendants' cross-motion for summary judgment as to the interpretation and application of Exclusion 38 to the Losses RFC incurred from the Mitchell and Kessler Actions.

2. Even if Exclusion 38 Applied According to its Terms, the Insurers Waived Their Right to Rely on Exclusion 38 to Preclude Coverage

The Plaintiffs also argue that the Insurers waived their right to rely on Exclusion 38 by, for approximately 17 years (including during earlier stages of this seven-year-old case), asserting other defenses to coverage while choosing not to raise Exclusion 38 despite possessing sufficient knowledge to do so. [*E.g.*, ECF No. 800 at 18–22; Hearing Tr. 57:17–60:21]. The Insurers argue that the Plaintiffs are improperly attempting to use waiver to create coverage that does not otherwise exist; that the Insurers properly and promptly raised Exclusion 38 in response to an earlier ruling in this case; and that Plaintiffs cite no evidence that Insurers intended to relinquish the defense—in fact, the Insurers consistently reserved their rights to assert it. [ECF No. 884 at 23–25].

For the reasons that follow, the Court concludes that the Insurers waived their right to rely on Exclusion 38 to preclude coverage. This conclusion constitutes an independent basis for the Court's award of summary judgment for Plaintiffs regarding the applicability of Exclusion 38.

a. *Applicable Law*

In the context of insurance, New York law defines waiver as "a voluntary and intentional relinquishment of a known right." *New York v. AMRO Realty Corp.*, 936 F.2d 1420, 1431 (2d Cir. 1991) (quoting *Albert J. Schiff Assocs., Inc. v. Flack*, 51 N.Y.2d 692, 698 (N.Y. 1980)). A court may find an insurer waived its right to assert a defense "where there is proof that the insurer intended to abandon that defense, or where such an intention can clearly be inferred from the circumstances." *Interstate Indem. Co. v. Cont'l Ins. Co.*, No. 94 Civ. 5201, 1998 WL 118165, at *2 (S.D.N.Y. Mar. 16, 1998) (citing *AMRO Realty*, 936 F.2d at 1431); *see also Steadfast Ins. Co.*

*v. Stroock & Stroock & Lavan LLP*, 277 F. Supp. 2d 245, 254 (S.D.N.Y. 2003), *aff'd*, 108 F. App'x 663 (2d Cir. 2004). Under New York law specific to the insurance context, an "insurer is deemed, as a matter of law, to have intended to waive a defense to coverage where other defenses are asserted, and where the insurer possesses sufficient knowledge (actual or constructive) of the circumstances regarding the unasserted defense." *AMRO Realty*, 936 F.2d at 1431; *see also Kirschner v. Process Design Assocs., Inc.*, 592 N.W.2d 707, 709 (Mich. 1999) ("Generally, once an insurance company has denied coverage to an insured and stated its defenses, the insurance company has waived or is estopped from raising new defenses.").

There is "no question that New York law recognizes implied waiver of defenses to insurance coverage." *Weintraub v. Great N. Ins. Co.*, 571 F. Supp. 3d 250, 264 (S.D.N.Y. 2021). That an insurer's intention to relinquish its rights to a defense can be inferred from the circumstances is based on a long-established common law understanding of express and implied waiver. *See Kiernan v. Dutchess Cnty. Mut. Ins. Co.*, 150 N.Y. 190, 195, 44 N.E. 698 (1896) ("While express waiver rests upon intention, and estoppel upon misleading conduct, implied waiver may rest upon either, for it exists when there is an intention to waive unexpressed, but clearly to be inferred from circumstances, or when there is no such intention in fact, but the conduct of the insurer has misled the insured into acting on a reasonable belief that the company has waived some provision of the policy"). Thus, a court may find an "irrevocable waiver" where "the words and acts of the insurer reasonably justify the conclusion that with full knowledge of all the facts it intended to abandon or not to insist upon the particular defense afterward relied upon." *Weintraub*, 571 F. Supp. 3d at 264 (quoting *AMRO Realty*, 936 F.2d at 1431).

An insurer's waiver generally cannot create coverage that does not otherwise exist under a policy. *Waknin v. Liberty Ins. Corp.*, 132 N.Y.S.3d 140, 142–43 (App. Div., 2d Dep't 2020);

*Kirschner*, 592 N.W.2d at 710.  Generally, the waiver doctrine "will not be applied to broaden the coverage of a policy to protect the insured against risks that were not included in the policy or that were expressly excluded from the policy" because an insurer "should not be required to pay for a loss for which it has charged no premium."  *Kirschner* 592 N.W.2d at 710 (citations omitted).

      b.  *Analysis*

Here, there is no genuine, material factual dispute that the Insurers possessed full knowledge of the facts necessary to assert Exclusion 38 as a defense long before they raised it as a defense in this case in early 2020.  [*See, e.g.*, ECF No. 421 at 43 (assertion of Exclusion 38 as a defense by North American); ECF No. 425 at 56 (assertion by Steadfast); ECF No. 428 at 52 (assertion by St. Paul].   In 2003, after a comprehensive review and analysis of extensive information provided regarding the Kessler Action and RFC's role in it, Lloyd's issued a reservation-of-rights letter (the "**Kessler ROR**") denying coverage and asserting, *inter alia*, a lack of professional services and the applicability of certain mortgage fee exclusions while not relying on Exclusion 38.  [ECF No. 919-1 ¶¶ 55, 57–58; ECF No. 800 at 14–16].  The Kessler ROR did not assert that Exclusion 38 applied.  [ECF No. 919-1 ¶ 57].  In 2004, North American and Steadfast adopted the Kessler ROR, and by the end of 2013 each of the Insurers had adopted and incorporated the Kessler ROR after receiving more than 5,000 pages of information related to the Kessler Action.  [ECF No. 919-1 ¶¶ 59–60].

In 2008, Lloyd's issued its reservation-of-rights letter regarding the Mitchell Action (the "**Mitchell ROR**") after receiving extensive documentation and reports regarding the Mitchell Action.  [ECF No. 919-1 ¶¶ 32–38].  Outside counsel for Lloyd's, who had been a primary drafter of the Policy, provided those reports. [ECF No. 919-1 ¶¶ 33–34, 37].   The Mitchell ROR set forth various defenses to coverage, including the exclusions in sections C.3, C.9, and C.13 of the Policy.

[ECF No. 822-2 at 22–37 of 172].  The ROR did not mention Exclusion 38.  [*Id.*].  In a deposition, Lloyd's outside counsel stated that all defenses Lloyd's believed could apply were included in the Mitchell ROR.  [ECF No. 919-1 ¶ 39].  Lloyd's reaffirmed its position in 2009 and in 2012, and thereafter all other Excess Insurers adopted the Mitchell ROR, with none raising Exclusion 38.  [ECF No. 919-1 ¶¶ 45–54].  Nor did the Insurers raise Exclusion 38 in this case until after this Court's ruling on the fee exclusions.

The Court thus concludes that there is no genuine dispute that the Insurers possessed sufficient knowledge as of 2003 to assert Exclusion 38 as to the Kessler Action, and as of at least 2008 to assert Exclusion 38 as to the Mitchell Action, yet the Insurers instead chose to assert other defenses to coverage while failing to raise Exclusion 38.  *See AMRO Realty*, 936 F.2d at 1431.  That the Insurers raised Exclusion 38 "promptly" after the Court's 2020 ruling on the fee exclusions does not cure their failure to raise it for the previous 17 years.  *See Weintraub*, 571 F. Supp. 3d at 264 (a court may find an insurer's waiver "irrevocable" where "the words and acts of the insurer reasonably justify the conclusion that with full knowledge of all the facts it intended to abandon or not to insist upon the particular defense afterward relied upon") (citation omitted).  Nor do the Insurers' general reservations of rights to assert additional defenses [*see, e.g.*, ECF No. 822-2 at 54–55 of 172; ECF No. 884 at 3] allow them to here assert Exclusion 38 upon receiving an adverse ruling from the Court.  *See Olin Corp. v. Lamorak Ins. Co.*, 332 F. Supp. 3d 818, 851 (S.D.N.Y. 2018) (insurer's "reservation of rights to add new defenses as new information became available does not preclude a finding of waiver").

This is not a case where concluding that the Insurers waived Exclusion 38 would broaden coverage under the Policy and protect the insureds against risks they did not pay for.  *Waknin*, 132 N.Y.S.3d at 142–43; *Kirschner*, 592 N.W.2d at 710.  As stated above, the Losses here are covered

under the Insuring Clause, and the only question is whether Exclusion 38 overcomes the Policy's applicability. Thus, GM paid premiums for coverage for itself and its subsidiaries, that coverage on its face protected against the kinds of loss at issue here, and those losses accordingly are risks for which GM and its subsidiaries paid to obtain insurance from the Insurers.

Finally, although intent to waive a contract right is generally a fact issue, the undisputed facts may suffice for the Court to infer that intent as a matter of law, *see In re HBL SNF, LLC*, No. 21-22623, 2022 WL 1612221 at *9–10 (Bankr. S.D.N.Y. May 20, 2022), particularly where the subject right is to an insurance policy exclusion, which must be interpreted narrowly, *see, e.g.*, *MBIA*, 33 F. Supp. 3d at 358. This is such a case. The Court concludes that the Insurers, with knowledge of the facts necessary to assert Exclusion 38 as a defense, manifested an intent to waive that exclusion through their sustained invocation of other defenses and exclusions while failing to raise Exclusion 38. The Court thus concludes the Plaintiffs are entitled to partial summary judgment establishing that the Insurers waived their right to assert Exclusion 38 as a defense to coverage. Accordingly, both based on waiver and on the inapplicability of Exclusion 38, the Court grants the Plaintiffs' motions for partial summary judgment and denies Insurers' motion for partial summary judgment as to the Insurers' defense based on Exclusion 38.

**D. The Plaintiffs Are Not Precluded From Recovering Portions of Their Claims That Arise From What Insurers Characterize as "Punitive Damages" and/or "Statutory Penalties"**

The Insurers moved for partial summary judgment on whether portions of the Losses from the Mitchell and Kessler Actions that Insurers characterize as punitive, rather than compensatory, are uninsurable based on (a) New York's state-law public policy forbidding insurance coverage for punitive damages and (b) the exclusion of "taxes, sanctions or criminal, civil or regulatory fines or penalties imposed by law" from the Policy's definition of "Loss." [ECF No. 857 at 9–33]. The

Class Plaintiffs[20] opposed and, in their opposition but without formally cross-moving, asked the Court to grant summary judgment in their favor on these two issues. [ECF No. 900 at 44]. The Insurers replied. [ECF No. 917]. The two issues operate independently, and this Decision discusses each in turn.

    1.  <u>Coverage of Punitive Damages Is Not Barred by New York State Law Principles</u>

The parties (and the Court) agree that this Court should apply the choice-of-law principles of the forum state, *i.e.*, New York. *See supra* § A.2; *Bianco*, 243 F.3d at 601–02; [ECF No. 857 at 10; *see* ECF No. 900 at 18–21].

New York law calls for enforcing contractual choice-of-law provisions in most situations. *See, e.g.*, *Ministers & Missionaries Benefit Bd. v. Snow*, 26 N.Y.3d 466, 474 (N.Y. 2015) ("New York courts should not engage in any conflicts analysis where the parties include a choice-of-law provision in their contract, even if the contract is one that does not fall within General Obligations Law § 5-1401."). This is so because ignoring such a contractual term and instead applying New York's "conflict-of-laws principles . . . would contravene the primary purpose of including a choice-of-law provision in a contract—namely, to avoid a conflict-of-laws analysis and its associated time and expense. Such an interpretation would also interfere with, and ignore, the parties' intent, contrary to the basic tenets of contract interpretation." *Id.* at 475; *see also Willis Re Inc. v. Herriott*, 550 F. Supp. 3d 68, 91–92 (S.D.N.Y. 2021).[21]

---

[20] The Trust is not a party to this dispute because the Insurers' motion is directed solely at claims of the Class Plaintiffs, not to any claims of the Trust. [Hearing Tr. 95:17–25].

[21] The Class Plaintiffs argue that the Insurers incorrectly frame the issue, and that, based on their view that the Policy lacks an overarching choice-of-law provision and instead includes only a provision regarding which state's law determines the Policy's scope of coverage, the Court's choice-of-law analysis should weigh what state has the greatest contacts with and interest in the parties' dispute. [ECF 900 at 6–7, 18–24]. The Class Plaintiffs argue that New York has insignificant contacts with the parties' disputes (a point that the Insurers dispute), and that the Court instead should look to Michigan (the corporate headquarters and main location of the Policy's negotiation), or Minnesota (assertedly ResCap's center of operations when the Policy was negotiated), or conceivably Delaware (the parent corporation and lead policy-holder's state of incorporation). [*Id*]. All of these jurisdictions, in the Class Plaintiffs' view, would support the insurability of punitive damages claims and awards under a choice-of-law analysis that neither involves reliance on a contractual choice-of-law provision, nor possible application of New York choice-of-law caselaw that bars

Further, the parties appear to agree absent the application of New York's public policy to override the normal choice of law rules, the applicable state law (whether Delaware or Michigan) would allow insurance coverage for punitive damages [ECF No. 857 at 10–11; *see* ECF No. 900 at 24–25; Hearing Tr. at 87:21–99:24]. The Policy does not have an overarching choice-of-law provision, but it specifies that (in substance), to the extent potentially relevant states' laws differ as to whether the Policy covers a certain claim or type of claim, the Policy is to be construed applying the law of the state whose law results in the broadest possible scope of coverage. Specifically, subsection (a) of the Policy's definition of "Loss" (the "**Coverage COL Proviso**") excepts from coverage "amounts deemed uninsurable under the law pursuant to which this Policy shall be construed; provided, however, that insurability shall be governed by such applicable law which most favors coverage for such Loss among the following: (i) where those damages were awarded or imposed; (ii) where the Wrongful Act occurred; (iii) where the Company is incorporated; [and] (iv) where the Company has its principal place of business[.]" [ECF No. 336-1 § II.V.1.a]. Applying this provision to the parties' dispute before this Court, the "applicable law" could be that of Michigan (GM's principal place of business and where the Policies were primarily negotiated); Delaware (GM's state of incorporation); or Minnesota (RFC's principal place of business and where many of the Wrongful Acts occurred). [*Id.*; *see* ECF No. 857 at 11, n. 6; ECF No. 900 at 5–7].

The Insurers readily concede that Delaware law permits insurance of punitive damages and is a state whose law can be applied under the Coverage COL Proviso. [ECF No. 857 at 10–11; Hearing Tr. at 87:25–88:18]. That concession makes immaterial a disagreement as to whether

---

enforcing a contractual choice-of-law provision where the result would be sufficiently contrary to public policy. [*Id.*]. The Court need not and does not evaluate this alternative framing of the issues in light of its ruling that New York's public-policy based limitation on applying other states' laws in New York courts does not apply here.

Michigan law also permits insuring punitive damages, because the Proviso requires applying "applicable law which most favors coverage." Thus, both sides agree that the applicable law under the Policy and New York's choice of law rules would allow coverage for the Losses resulting from the "punitive damage" components of the Mitchell and Kessler Settlements, absent application of New York's public policy exception concerning the insurability of punitive damage awards. [ECF No. 857 at 10–11; *see* ECF No. 900 at 23–25; Hearing Tr. 87:21–88:18, 98:11–99:24].

The Insurers argue, however, that the Court should override the parties' agreement concerning applicable law based on a New York public-policy based doctrine that, in some circumstances, calls for not applying the law of a state that ordinarily would apply pursuant to usual choice of law rules if applying that state's law would be sufficiently contrary to fundamental public policy as recognized in New York.

The Insurers are correct, and the Class Plaintiffs do not dispute, that as a matter of the state's public policy New York's substantive law generally does not permit insurance of punitive damage awards. *See, e.g.*, *Hartford Acc. & Indem. Co. v. Village of Hempstead*, 48 N.Y.2d 218, 227–28 (N.Y. 1979) ("We reach that conclusion primarily because to allow insurance coverage is totally to defeat the purpose of punitive damages," which is effectively punishing intentional wrongdoers and deterring misconduct by insureds or others). This Decision assumes *arguendo* that the Insurers have adequately established that the insured's conduct that led to the award and/or claims for punitive damages in the Mitchell and Kessler class actions was of a nature that would trigger application of this rule were New York law applicable.

That reality alone, however, does not establish that the weighing of public policy considerations in applying New York's choice of law rules precludes enforcing other states' laws permitting such coverage if and when New York's ordinary choice of law principles call for

40

applying another state's law. For reasons explained below, the Court concludes that neither the Policy here nor the nationwide conduct it covers gives rise to a sufficient New York nexus to satisfy the requirements that New York courts have identified for overriding choice of law agreements on public policy grounds. The Court further concludes that the nature of New York's public policy interest here is not so fundamental as to satisfy the New York doctrine's requirements, which recognize that the doctrine should not apply whenever New York's policy differs from another state's, but only where the policy in question is fundamental.

First, the Insurers are correct that New York law includes a public policy-based doctrine that creates "an exception to implementing an otherwise applicable choice of law in which the forum refuses to apply a portion of foreign law because it is contrary or repugnant to its State's own public policy." *Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 202 (N.Y. 1985). "The party seeking to invoke the doctrine has the burden of proving that the foreign law is contrary to New York public policy." *Id.* This burden is a "heavy" one, because "public policy is not measured by individual notions of expediency and fairness or by a showing that the foreign law is unreasonable or unwise." *Id.* (citing *Loucks v. Standard Oil Co.*, 224 N.Y. 99, 110 (N.Y. 1918) (Cardozo, J.)).

For the exception to apply, its proponent has the burden to establish "that to enforce the foreign law 'would violate some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal' expressed in" the State's Constitution, statutes, and judicial decisions. *Id.* (citing *Loucks.*, 224 N.Y. at 110); *see also Brown & Brown, Inc. v. Johnson*, 25 N.Y.3d 364, 368 (N.Y. 2015). "[P]lainly not every difference between foreign and New York law threatens" New York's fundamental public policy. *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 79 (N.Y. 1993). "[I]f New York statutes or court opinions

41

were routinely read to express fundamental policy, choice of law principles would be meaningless," and thus "resort to the public policy exception should be reserved for those foreign laws that are truly obnoxious." *Id.* Where the parties have agreed via contract to apply a non-New York forum, "two conflicting policies [are] at work: one, that parties should be free to chart their own contractual course, the other, that there are certain contracts the State will not allow." *Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 7 N.Y.3d 624, 629 (N.Y. 2006).

Further, the party seeking to invoke the exception must establish that enough important contacts exist between the parties, the occurrence and the New York forum to implicate New York's public policy and thus preclude enforcement of the foreign law. *Schultz*, 65 N.Y.2d at 202. The exception should apply "only when New York's nexus with the case is substantial enough to threaten [New York's] public policy." *See Cooney*, 81 N.Y.2d at 79. Addressing a prior case invoking the exception, the New York Court of Appeals explained that "[New York's] public policy was seriously threatened because it was intimately connected to the parties and the transaction," in part because "the parties were both New York domiciliaries." *Schultz*, 65 N.Y.2d at 203 (analyzing *Mertz v. Mertz*, 271 N.Y. 466, 3 N.E.2d 597 (N.Y. 1936)). On the other hand, in *Schultz* the court held that the contacts alleged in that case were insufficient to implicate New York's public policy in a tort action where, although the tort arose out of acts occurring in New York, the plaintiffs (individuals) and defendants (corporations) were domiciliaries of New Jersey. *Id.* at 192, 202–03. The central thrust of the Class Plaintiffs' opposition is that New York's nexus to the conduct at issue is insufficient to implicate any public policy that might preclude enforcement of another state's otherwise applicable law. [ECF No. 900 at 25–32].

Applying these principals to the dispute now before the Court, first, the Insurers' proffered contacts with New York are not "substantial enough to threaten [New York's] public policy."

42

*Schultz*, 65 N.Y.2d at 203.  The Policy is explicitly global, providing that "[t]his Policy shall apply to any Wrongful Act anywhere in the world, regardless of where the Claim is brought."  [ECF No. 336-1 § XVII; ECF No. 918 at 4].  The Policy and all Excess Policies were issued to GM in Michigan.  [ECF No. 918 at 6].

Nor do the Policy's drafters or other parties to it have particularly important connections to New York. The Policy was jointly drafted and prepared by GM, Aon Risk Services ("**Aon**"), and Lloyd's.  [*Id.*].  GM—the named insured, policyholder, and RFC's parent—was a Delaware corporation with its principal place of business in Michigan.  [ECF No. 900 at 6; ECF No. 918 at 5].  Aon's insurance brokers based in Michigan and Illinois assisted GM with the negotiation and placing of all of the Policies, as Aon's brokers in England assisted Lloyd's with the Policy and Lloyd's Excess Policy.  [ECF No. 918 at 7].  Both of Lloyd's leading underwriters, SVB Syndicates and ACE Underwriting Agencies, were incorporated and held their registered offices in England.  [*Id.* at 15].

At the time of contracting, none of the parties to the Policies—neither insurers nor insureds—was domiciled in New York.  [ECF No. 900 at 6].  The location of the insured is particularly significant; as the New York Court of Appeals has noted, "a question of whether New York's interest precludes indemnification for punitive damages focuses more on the conduct of the insured than on that of the insurer. . . ." *Zurich Ins. Co. v. Shearson Lehman Hutton*, 84 N.Y.2d 309, 319 (N.Y. 1994).  GM, as stated above, was then and remains now a Delaware corporation with its principal place of business in Michigan.  [ECF No. 900 at 6].  Not one of the eight Insurers was incorporated or had its principal place of business in New York.  [ECF No. 918 at 15–17].  And, as stated above, although RFC was headquartered in New York when it filed for bankruptcy in 2012 [ECF No. 917 at 5–6], it was and remains incorporated in Delaware and had its principal

43

place of business in Minnesota when the Policies were entered into and when the underlying wrongful conduct occurred [*see* ECF No. 897 at 4]; Minnesota Secretary of State[22] and Delaware Division of Corporations Entity Information[23]. *See Schultz*, 65 N.Y.2d at 192, 202–03 (refusing to invoke the public policy exception because New York lacked sufficient important contacts where, although the suit arose from conduct in New York, the relevant parties were domiciled in other states).

Meanwhile, RFC's financial services business was nationwide. The Kessler Class loans were secured by homes in 49 states and the District of Columbia, and nearly a third by homes in Pennsylvania, Virginia, Ohio, Florida, and Maryland, compared to New York's approximately five percent. [ECF No. 918 at 19–20]. The Kessler Action was a consolidated MDL proceeding before a United States District Court in Pennsylvania, based on alleged violations of various federal laws. [ECF No. 900 at 9]. The Mitchell Action was filed in Missouri, alleged violations of Missouri law, and was based on loans closed in Missouri and secured by homes in Missouri, all issued by MCR, a California lender. [*Id.*]. The underlying wrongful conduct involved unlawful fees in connection with these loans and their purchase, securitization, servicing, and sale by RFC, at the relevant times a Delaware corporation based in Minnesota.

Given the facts and law outlined above, Insurers have not satisfied their burden to establish a nexus between New York and this case substantial enough to threaten New York's public policy against insurance coverage for punitive damages and thus preclude enforcement of the law of a state which would otherwise apply. *See Cooney*, 81 N.Y.2d at 78. To hold otherwise would be to employ the doctrine so sweepingly as to improperly render "choice of law principles . . .

---

[22] *Available at* https://mblsportal.sos.state.mn.us/Business/SearchDetails?filingGuid=41ff9686-8ed4-e011-a886-001ec94ffe7f.

[23] *Available at* https://icis.corp.delaware.gov/eCorp/EntitySearch/NameSearch.aspx ("Residential Funding Company, LLC").

meaningless." *See id.* at 79. And neither the Insurers nor the Court have identified any New York case that refused to enforce the effect of an insurance contract of global or nationwide application where the insured was not domiciled in New York and the relevant claimants were widely dispersed, with a low percentage located in New York.

These considerations are not overcome by the Insurers' arguments, which center on four primary contentions for their assertion that the contacts with New York here suffice to invoke the public policy exception.

First, the Insurers observe that thousands of Kessler Class Plaintiffs were domiciled in New York, which, the Insurers argue, suffices to trigger New York's "deep interest in protecting its own residents." [ECF No. 917 at 5 (citing, *inter alia*, *Rosenthal v. Warren*, 475 F.2d 438, 442 n.5 (2d Cir. 1973))]. The evidence cited associates 2,247 loans for properties or borrowers with addresses in New York. [ECF No. 900-1 at 2]. This represents five percent of the 44,843 loans identified, which had addresses in 49 of the 50 States and the District of Columbia. [*Id.*]. Further, none of the conduct that generated the complaints or sanctions at issue has been shown to have been conducted in New York—and certainly there has been no showing of corporate misconduct based in New York or disproportionately affecting New York or its residents.

Second, RFC was headquartered in New York as of May 2012, thus, Insurers argue, triggering New York's "strong interest" in regulating a corporation with its principal place of business in the state. [ECF No. 917 at 5 (citing, *inter alia*, *In re Rezulin Prod. Liab. Litig.*, 390 F. Supp. 2d 319, 335 (S.D.N.Y. 2005))]. But during the periods in which the underlying allegedly wrongful conduct occurred, when the Policy was negotiated and effective, and when the Actions were filed, RFC had its principal place of business in Minnesota and was a Delaware corporation, while General Motors was based in Detroit and was a Delaware corporation. [*See* ECF No. 897

at 4]; Minnesota Secretary of State[24] and Delaware Division of Corporations Entity Information[25]. The Insurers do not and cannot explain why a corporation's principal place of business well after the complained-of conduct ended should have any bearing on the choice of law analysis.

Third, the Insurers assert that this case "arises out of" efforts by attorneys practicing in New York to settle with the Class Plaintiffs. [ECF No. 917 at 6]. These attorneys were either licensed in New York or admitted *pro hac vice* to this Court. [*Id.*]. Further, the Plan, Kessler Settlement Agreement, and Borrower Claims Trust Agreement (defined below) are expressly governed by New York law, and subject to this Court's continuing supervision. [*Id.*]. This all, the Insurers argue, triggers New York's "extremely important" interest in regulating attorneys and other professionals practicing and/or licensed in New York and assuring their proper conduct. [*Id.* (citing, *inter alia*, *In re Primus*, 436 U.S. 412, 422 (1978) and *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 434 (1982))]. But the claims and liabilities asserted themselves have nothing to do with the after-the-fact negotiation of the parties' settlement. Rather, the Loss and associated claims arise from insured conduct during the much earlier periods at issue, at which time the eventual legal fallout in this Court could not have been foreseen.

Fourth, the Insurers were licensed to write insurance policies in New York and several of their representatives were present in New York when writing the policies or handling claims, thus, Insurers argue, triggering New York's interest in regulating the insurance industry, protecting consumers, and exercising its police power. [ECF No. 917 at 7]. As the Insurers summarize it: "New York has an interest in ensuring that insurers regulated by the State of New York and covering New York risks comply with its fundamental public policy precluding indemnification

---

[24] *Available at* https://mblsportal.sos.state.mn.us/Business/SearchDetails?filingGuid=41ff9686-8ed4-e011-a886-001ec94ffe7f.

[25] *Available at* https://icis.corp.delaware.gov/eCorp/EntitySearch/NameSearch.aspx ("Residential Funding Company, LLC").

of conduct giving rise to punitive damages." [*Id.*].   This argument has the most potential plausibility of any of the Insurers' contentions, but the Insurers do not show that New York's regulatory authority over insurers' representatives is dominant or dispositive in the face of a global policy that was negotiated with major corporations located elsewhere, with the policies not focused on New York, as to claims that arise from litigation in Missouri and Pennsylvania and that involved thousands of people of whom just roughly five percent were located in New York.   The stated rationale of New York's policy is to avoid incentivizing or rewarding misconduct by insured actors—here, GM and its subsidiaries—and no appreciable conduct by those entities has been shown to have been conducted in New York.   Further, the Court can conceive of a possible countervailing New York policy objective of ensuring that insurers with any ties to New York are not competitively disadvantaged by being precluded from insuring nationwide or international customers who seek comprehensive coverage for risks they face throughout the world, as well as of not discouraging insurers from underwriting conduct with ties to New York for fear they will not be able to effectively deliver coverage desired by their customers in other states.

Finally, the Insurers' contentions also fail because they have not established that the nature of New York's policy preference—to avoid undermining the punitive and deterrent effects of punitive damages—is so "fundamental" as to require an override of insurance terms of global scope negotiated by global actors with so few ties to New York during the relevant periods.   New York courts recognize that "plainly not every difference between foreign and New York law threatens" New York's fundamental public policy, and that "if New York statutes or court opinions were routinely read to express fundamental policy, choice of law principles would be meaningless," and thus "resort to the public policy exception should be reserved for those foreign laws that are truly obnoxious." *Cooney*, 81 N.Y.2d at 79.   The cases the Insurers rely on all involve

far greater ties to and impact on the lives and conduct of New Yorkers, whereas the policy at issue here—whether the scope of insurance will or will not reduce the punitive consequences of misconduct or reduce the deterrent effect of punitive damages—is neither tied to New York on the facts presented, nor comparably grounded in "some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal" as is required for the policy-based override to apply.  *Schultz*, 65 N.Y.2d at 202.  Indeed, the Class Plaintiffs fairly observe that no case relied on by the Insurers finds New York's determination not to permit insurance of punitive damage awards to warrant overriding choice-of-law principles, and no case cited by the Insurers overrides application of another state's otherwise-applicable law where New York has such modest and incidental ties to the parties' dispute as it does here.

The Court therefore denies the Insurers' motion for summary judgment to the extent that the motion is based on a New York public-policy based rule precluding application of the state's usual choice of law rules where doing so would lead to insurance coverage of punitive damage awards.  The Court acknowledges that the Class Plaintiffs' opposition to the motion suggests that the Court affirmatively grant summary judgment in favor of Class Plaintiffs on this question, but, in the absence of a formal motion or cross-motion notwithstanding the Court's prior scheduling orders requiring the filing of such motions, the Court declines to issue a *sua sponte* grant of summary judgment in Class Plaintiffs' favor.  Nor does the Court express a view (which would be advisory) as to the possible binding or law-of-the-case effect of its ruling as the case moves forward.

2. The Policy Does Not Exclude Class Plaintiffs' "Enhanced" Damages from the Definition of Loss

Second, the Court must determine whether such punitive or enhanced damages are excluded from coverage in the Policy's definition of "Loss" itself.  Specifically, the Policy defines

"Loss" in relevant part as "damages, judgments, settlements and Costs, Charges and Expenses incurred by any of the Assureds, but shall not include . . . (b) taxes, sanctions or criminal, civil or regulatory fines or penalties imposed by law[.]"  [ECF No. 336-1 § II.V.1(b)].  The Insurers argue that this provision excludes coverage for statutory penalties in excess of compensatory damages, such as certain "enhanced damages" provided for by HOEPA, which constitute a large proportion of Class Plaintiffs' claims.  [*See, e.g.*, ECF No. 917 at 15–20].  The Class Plaintiffs contend that section II.V.1(b) applies only to damages sought directly by, and/or payable to, a governmental unit or its analog.  [ECF No. 900 at 33–40].

Under the proper reading of the Policy's language, the Class Plaintiffs' damages are not excluded from the definition of Loss by the carveout in section II.V.1(b).  The Insurers argue the carveout's language covers four categories: "two collected by government agencies—taxes and criminal, civil or regulatory fines—and two collected either by government agencies or private actors—sanctions and penalties imposed by law."  [ECF No. 917 at 17 (quotation marks omitted)].  But the words of the carveout must be read in harmony, considering their context within the Policy and underlying legal principles.

As noted, ambiguities regarding the scope of coverage are to be resolved in favor of the insured, and exclusions to coverage "must be strictly construed and read narrowly, with any ambiguity construed against the insurer."  *Lancer Indem.*, 7 N.Y.S. 3d at 494 (citations omitted).  For an exclusion to negate coverage, an insurer "must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case."  *Id.* (citations and quotation marks omitted).  Section II.V.1(b)'s carveout from the definition of Loss may be properly considered an exclusion for purposes of interpretation; the

definition of Loss delineates the scope of coverage. An exclusion from that definition is thus an exclusion from coverage, triggering the same stringent rules of interpretation.

A narrower interpretation of the carveout here also is consistent with the canon of *noscitur a sociis*, which "counsels that that a word is given more precise content by the neighboring words with which it is associated." *Homaidan v. Sallie Mae, Inc.*, 3 F.4th 595, 604 (2d Cir. 2021) (quoting *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 634–35 (2012)). Here, the term "penalties" appears not in isolation but as part of a single exclusion together with "taxes, sanctions or criminal, civil or regulatory fines" all "imposed by law." [ECF No. 336-1 § II.V.1(b)]. None of those terms is defined in the Policy. But those terms are harmonized, and the carveout made clearer, when read together as a list of liabilities relating to assessments by or payments to a governmental entity.

If the parties had wished to convey a broader meaning encompassing statutory, enhanced, multiple, or punitive damages in actions brought by private individuals under state or federal statutes to redress private wrongs, they could have. The carveout does not exclude, for example, "statutory damages," "treble, enhanced, or multiple damages of any kind," or "damages made available to consumers under TILA, HOEPA, RESPA, or similar statutes." Courts should not adopt an insurer's interpretation limiting coverage under a policy without considering that the insurer could have avoided ambiguity by adopting more precise policy language. *See, e.g.*, *U.S. Fid. & Guar. Co. v. Thomas Solvent Co.*, 683 F. Supp. 1139, 1159 (W.D. Mich. 1988) ("[T]he courts have no patience with attempts by a paid insurer to escape liability by taking advantage of an ambiguity, a hidden meaning, or a forced construction of the language in a policy, when all question might have been avoided by a more generous or plainer use of words.") (citations

omitted).  The Insurers could have used more precise language to broaden the exclusion, but they did not.

Other provisions of the definition of Loss[26] further support the narrower reading of the carveout proffered by the Class Plaintiffs by specifying readily distinguishable contexts in which the carveout applies.  Section II.V.2(a) refers to three specific "fines or penalties imposed by law": first, subsection (i) concerns both "the five percent civil penalty imposed upon a Pension Trust Liability Assured as a fiduciary under Section 502(i) of [the Employee Retirement Income Security Act ('**ERISA**')] for inadvertent violations of Section 406 of ERISA," and "the 20 percent penalty imposed upon a Pension Trust Liability Assured as a fiduciary under Section 502(l)(1)(A) of ERISA."  Sections 502(i) and (l) of ERISA both refer to a "civil penalty" assessed by "the Secretary [of Labor]," not via a private right of action.  29 U.S.C. §§ 1132(i), (l).  Policy section II.V.2(a)(ii) similarly refers to "civil penalties assessed" by either of two United Kingdom regulatory authorities.  The Insurers, on the other hand, fail to point to any Policy language using "civil penalty" to refer to damages based on private rights of action.

At the very least, interpreting section II.V.1(b) to apply only to amounts imposed by, and/or payable to, governmental entities is a reasonable reading of the Policy's language.  Nothing more is required.  To obtain a contrary result, the Insurers bear the burden of establishing that the carveout is stated in clear and unmistakable language, subject to no other reasonable interpretation, and applicable in this case.  *See Lancer Indem.*, 7 N.Y.S.3d at 494.  They have not done so.  Section II.V.1(b)'s carveout from the definition of Loss therefore does not exclude the types of statutory or punitive damages for which the Class Plaintiffs seek coverage.

---

[26] This definition of Loss relates to insuring clause I.E., rather than the Insuring Clause I.D at issue in this dispute. [ECF No. 336-1 § II.V.2].

51

Finally, because New York substantive law precluding insurance coverage for punitive damages does not apply, the Court need not and does not analyze whether the damages addressed here are "punitive" such that New York law would bar insurance coverage for them.

The Court thus concludes, as a matter of law, that the damages which Plaintiffs characterize as statutory penalties and/or punitive damages are insurable, both under the Policy and under applicable State law. Accordingly, the Insurers' motion for partial summary judgment as to the insurability of these damages is denied. Additionally, for the reasons discussed above, in the concluding paragraph of § D.1, the Class Plaintiffs' request for summary judgment is also denied.

## E. **The Excess Insurers Have Not Breached Their Policies Because the Policies' Exhaustion Provisions Have Not Been Satisfied**

The Excess Insurers moved for partial summary judgment on the Plaintiffs' claims for breach of contract and consequential damages in the form of prejudgment interest, penalty interest under Michigan law, "lost prejudgment interest," consequential damages for the costs incurred posting appeal bond collateral in the Mitchell Action, and attorneys' fees. [ECF No. 796]. The Excess Insurers' primary argument is that "the Excess Policies each require strict exhaustion of underlying insurance" before coverage will attach, and these exhaustion requirements have not yet been met, so the Excess Insurers are not yet obligated to pay out on their policies and therefore cannot be held liable for breach of contract or for any assertion of consequential damages stemming from any such asserted breach. [*See generally* ECF No. 796-1]. The Trust and Class Plaintiffs opposed the motion [ECF Nos. 899 and 891, respectively], arguing, among other things, that the Excess Policies were triggered simultaneously by the large losses incurred by RFC [*e.g.*, ECF No. 891 at 4–13; ECF No. 899 at 12–29], that what the Plaintiffs characterize as the Excess Insurers' "repudiation" of coverage precluded enforcement of the exhaustion provisions [*e.g.*, ECF No. 891 at 13–21], and that, even if the exhaustion provisions are enforceable and have not yet

been satisfied as to all Excess Insurers, they have been satisfied with respect to the Continental, Clarendon, Excess Underwriters, and Swiss Re Policies, which contain different exhaustion language [*e.g.*, ECF No. 891 at 25–27; ECF No. 899 at 23–24].

The exhaustion issue controls the outcome of this motion, so this decision addresses it first. For the reasons that follow, the Court concludes that none of the Excess Policies' exhaustion provisions have yet been satisfied or triggered, so that the Excess Insurers are not presently in breach of their obligations under the policies. This holding pertains solely to the Excess Insurers, and not to the Primary Underwriters.

1.  Background

    a.  *Relevant Policy Provisions and Factual Background*

The Excess Policies' wording varied, but all of them contain so-called "exhaustion provisions" requiring that the underlying layers of insurance be paid in full (or, in the case of the Excess Underwriters and Swiss Re policies, be held liable to pay in full) before the Excess Insurers' obligations to pay are triggered. The exhaustion provisions of each Policy are as follows:

- The Twin City Policy provides: "It is expressly agreed that liability for any loss shall attach to the Underwriters only after the Primary and Underlying Excess Insurers shall have duly admitted liability and shall have paid the full amount of their respective liability . . . ." [ECF No. 841-3 at 4 of 14].

- The St. Paul Policy provides: "The Insurer shall only be liable to make payment under this policy after the total amount of the Underlying Limit of Liability has been paid in legal currency by the insurers of the Underlying Insurance as covered loss thereunder." [ECF No. 852-3 at 4 of 12].

53

- The Steadfast Policy provides: "[Coverage applies i]n the event and only in the event of the reduction or exhaustion of the Limit(s) of Liability of an Underlying Insurance Program solely as the result of actual payment of loss covered thereunder . . . ." [ECF No. 852-4 at 8 of 12].

- The North American Policy provides: "It is expressly agreed that liability for any loss shall attach to the Underwriters only after the Primary and Underlying Excess Insurers shall have duly admitted liability, and shall have paid the full amount of their respective liability." [ECF No. 852-5 at 5 of 10].

- The Continental Policy provides: "Coverage hereunder shall attach only after all such Underlying Insurance has been exhausted by payments for losses . . . . All of the Underlying Insurance . . . shall be maintained during the Policy Period in full effect, except for any reduction of the aggregate limit(s) of liability available under the Underlying Insurance solely by reason of payment of losses thereunder." [ECF No. 841-4 at 3 of 11].

- The Clarendon Policy provides: "This insurance will apply only after all such Underlying Insurance has been exhausted by the actual payment of claims or losses thereunder . . . ." [ECF No. 852-1 at 2 of 3].

- The Excess Underwriters Policy provides: "Underwriters shall be liable only after the insurers under each of the Underlying Policies have paid or have been held liable to pay the full amount of the Underlying Limit of Liability." [ECF No. 841-2 at 7 of 28].

- The Swiss Re Policy provides: "The Insurer shall be liable only after all insurers subscribing to any applicable Underlying Policy(s) shall have agreed to pay or have

been held liable to pay the full amount of their respective limits of liability . . . ."

[ECF No. 852-2 at 5 of 9].

The policies are structured as a "tower" of insurance with one "Primary Layer" and four "Excess Layers," as follows: the Primary Layer provides $50 million of coverage; the First Excess Layer provides an additional $50 million above the Primary Layer; the Second Excess Layer provides an additional $100 million above the First Excess Layer; the Third Excess Layer provides an additional $100 million above the Second Excess Layer; and the Fourth Excess Layer provides an additional $100 million above the Third Excess Layer.  [*E.g.*, ECF No. 796-1 at 5; ECF No. 799 ¶¶ 10–13].  The Excess Underwriters Policy forms a part of the First Excess Layer, and the Swiss Re Policy constitutes the Second Excess Layer.  [*E.g.*, ECF No. 799 ¶¶ 11–12].  Pursuant to the Chapter 11 Plan approved by the Court on December 11, 2013, the Court approved allowed claims totaling more than $300 million in connection with the Kessler Settlement and Mitchell Settlement.  [*E.g.*, ECF No. 891 at 3; ECF No. 899 at 4–6].  Additionally, ResCap, RFC's parent company, paid $127 million to post the bond collateral in the Mitchell Action [*e.g.*, ECF No. 899 at 2].

      b. *Arguments*

The Excess Insurers argue that "[c]ourts applying New York and Michigan law routinely enforce exhaustion provisions similar to those in the Excess Policies," that the provisions are "unambiguous" and require "actual payment" of the underlying policy limits before an obligation to pay arises, that the "Plaintiffs cannot demonstrate that they have satisfied the exhaustion provisions of any of the Excess Policies," and that, therefore, the "Plaintiffs accordingly cannot show that any of the Excess Carriers has breached its policy."  [*E.g.*, ECF No. 796-1 at 9–12].

In opposition, the Plaintiffs argue that the exhaustion provisions do not bar the Plaintiffs' breach of contract claims (or any consequential damages stemming therefrom) for three reasons.

*First*, the Class Plaintiffs argue that because RFC was legally obligated to pay a single $300 million Loss in December 2013 (the Kessler Settlement and allowed claim) and another $14.5 million Loss in January 2014 (the Mitchell Settlement and allowed claim), "coverage under all of the Policies [was] triggered simultaneously," and the exhaustion clauses, even if enforceable, do "not require actual payment by the underlying insurers before [] Plaintiffs can assert a breach of contract claim against the Excess Insurers for a single loss which in 2013 exhausted all policies simultaneously." [*See, e.g.*, ECF No. 891 at 3–13]. The Trust similarly argues that RFC's payment of the $127 Mitchell bond collateral "simultaneously triggered Lloyd's, the First-Level Excess Insurers', and Swiss Re's Policies," and that "all these Insurers were in breach when they refused to post the bond collateral," notwithstanding the exhaustion provisions. [ECF No. 899 at 1, 14–29]. In reply, the Excess Insurers challenge the caselaw relied on by the Plaintiffs, emphasizing that one of the Plaintiffs' key cases, *J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*, No. 600979/09, 2017 WL 3448370 (N.Y. Sup. Ct., N.Y. Cnty. Aug. 7, 2017) ("***J.P. Morgan I***") was reversed by the First Department in *J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*, 166 N.Y.S.3d 1 (1st Dep't 2022) ("***J.P. Morgan II***"). [*See, e.g.*, ECF No. 925 at 1, 4–7].

*Second*, the Class Plaintiffs and the Trust argue that, even if *most* of the exhaustion clauses are enforceable and require actual payment before the Excess Policy payment obligation is triggered, the exhaustion clauses of the Excess Underwriters and Swiss Re Policies nonetheless have been satisfied because they provide that they can be satisfied if the underlying policies "have paid *or have been held liable to pay*." [*See, e.g.*, ECF No. 891 at 25–27; ECF No. 899 at 23–24 (emphasis added).] Similarly, the Trust (but not the Class Plaintiffs) argues that the exhaustion

conditions in the Continental and Clarendon Policies require only "payment for losses" and "actual payment of claims or losses," respectively, and that this language "has been interpreted as *not* requiring actual payment by the underlying insurer." [ECF No. 899 at 23]. With respect to the Excess Underwriters and Swiss Re Policies, the Excess Insurers reply that the exhaustion provisions "require[] that the underlying *insurers* have paid or been held liable to pay the full amount of their policy limit," that the "Primary Underwriters have not been held liable to pay the full limit of liability of the Primary Policy," and that, therefore, the "held liable to pay" language makes no difference. [ECF No. 925 at 3–4]. As to the Continental and Clarendon Policies, the Excess Insurers argue that "there has not been payment of losses *under* the Primary Policy exhausting that policy," and the exhaustion provisions require actual payment by the underlying insurers. [*Id.* at 2–3].

*Third*, the Class Plaintiffs (but not the Trust) argue that the Excess Insurers repeatedly repudiated coverage under the Policies and therefore "cannot enforce their exhaustion conditions." [*See, e.g.*, ECF No. 891 at 13–25]. In reply, the Excess Insurers argue that the exhaustion provisions "define the scope of coverage" and "are not conditions that can be forfeited by a denial of coverage," that none of the Class Plaintiffs' cases that are still good law address "forfeiture of an exhaustion requirement," and that the applicable caselaw "show[s] that an excess insurer's denial of coverage on other grounds (even if incorrect) is not a 'repudiation' of coverage that causes it to forfeit its exhaustion provision." [ECF No. 925 at 8–10].

2. Analysis

a. *Choice of Law*

The choice of law principles applicable to this motion are laid out in §§ A.2 and D.1 above and need not be repeated.

Here, the Swiss Re Policy contains a New York choice of law provision. [ECF No. 852-2 at 7 of 9]. The Class Plaintiffs argue that this provision applies only to a particular (and unrelated) section of the Policy and not to the Policy as a whole [ECF No. 891 at 1–2, 27 n.69], but this argument is unpersuasive in light of the express and unambiguous language of the provision itself, which says that "the interpretation and validity *of this Policy* shall be subject to New York law" [ECF No. 852-2 at 7 of 9] (emphasis added). The Class Plaintiffs offer no evidence to suggest that the word "Policy" refers to anything other than what it appears to refer to: the entire Swiss Re Policy. Indeed, as the Excess Insurers rightly point out, "[t]he Swiss Re contract consistently uses 'Policy' to refer to the agreement as a whole, not just the follow form coverage from Section Two of the Lloyd's Policy." [ECF No. 925 at 4 n.1; *see generally* ECF No. 852-2]. Thus, considering the plain language of the Swiss Re choice of law provision, and in the absence of any allegation of fraud or public policy compelling the Court to disregard that plain language, the Court will apply New York law to determine the exhaustion issue as it applies to Swiss Re.

The other Excess Policies do not contain choice of law provisions [*e.g.*, ECF No. 796-1 at 8], so the Court must first determine whether an actual conflict exists between the laws of the relevant jurisdictions—here, New York and Michigan [ECF No. 796-1 at 8–9; ECF No. 891 at 1–2; ECF No. 899 at 11]. With regard to the particular issue of exhaustion, it is undisputed that "Michigan law does not conflict with New York law."[27] [ECF No. 899 at 27; ECF No. 796-1 at 8–9; ECF No. 891 at 12–13; Hearing Tr. at 112:11–15]. The Court agrees and will therefore consider the Parties' arguments under New York law, with references to Michigan law as appropriate.

---

[27] During the Hearing, the Class Plaintiffs suggested that, following the recent New York state court decision in *J.P. Morgan II*, "it might be that [the laws of both states are] not exactly the same with respect to these particular issues now." [Hearing Tr. at 116:4–9.] For the reasons discussed below, the Court concludes that New York law, as it exists in the wake of *J.P. Morgan II*, does not conflict with Michigan law.

b. *The Excess Policies' Exhaustion Clauses Have Not Been Satisfied*

As discussed above, the Parties agree that, on the exhaustion issue, there is no conflict between New York law and Michigan law, with the immaterial exception that Class Plaintiffs suggested at oral argument that *J.P. Morgan II* may not fully align with Michigan law. The Parties disagree, however, about what that law actually says about the interpretation of exhaustion clauses. The Excess Insurers have the better of this argument for the reasons explained below.

The Excess Insurers rely primarily on what they refer to as the "magic quintet of cases." [*See* Hearing Tr. at 111:20–23; ECF No. 925 at 1–2]. These cases are (i) *J.P. Morgan II*, 166 N.Y.S. 3d 1; (ii) *Comerica Inc. v. Zurich American Insurance Co.*, 498 F. Supp. 2d 1019 (E.D. Mich. 2007); (iii) *Forest Laboratories v. Arch Insurance Co.*, 953 N.Y.S. 2d 460 (Sup. Ct., N.Y. Cnty. 2012), *aff'd* 984 N.Y.S.2d 361 (App. Div. 1st Dep't 2014), *pet. denied*, 20 N.E.3d 665 (N.Y. 2014); (iv) *Stryker Corp. v. XL Insurance Co.*, No. 1:05-CV-51, 2015 WL 1944599 (W.D. Mich. Apr. 29, 2015); and (v) *In re TIAA-CREF Ins. Appeals*, 192 A.3d 554, 2018 WL 3620873 (Del. 2018), as well as related proceedings in each case.

Plaintiffs' opposition briefs rely heavily on the now-reversed *J.P. Morgan I*, which the Class Plaintiffs describe as "the only New York precedent to directly address the issue" [ECF No. 891 at 12] and which the Trust describes as "the only New York case to address [the Excess Insurers'] argument directly" and "the only dispositive decision in New York and Michigan courts." [ECF No. 899 at 14–16]. As the Trust explains in its opposition brief, *J.P. Morgan I* involved exhaustion provisions nearly identical to those at issue here:

> Critically, the exhaustion provisions considered by the *J.P. Morgan* court were substantially similar to those at issue here. For example, one of the excess policies . . . included the following exhaustion provision:
>
>> Coverage for any loss shall attach only after 1) all Underlying Insurance carriers have paid in cash the full amount of their

> respective liabilities; 2) the full amount of the Underlying Insurance policies have been collected by the plaintiffs . . . .  [SSOF ¶ 33]

Similarly, [another] excess policy at issue in *J.P. Morgan* included the following provision:

> The Underwriter shall provide the Insureds with insurance coverage during the Policy Period excess of the Underlying Insurance. Coverage under this policy shall attach only after the Limits of Liability of Underlying Insurance has been exhausted by the actual payment of losses.  [SSOF ¶ 34]

[ECF No. 899 at 15–16].

In *J.P. Morgan I*, the New York State Supreme Court for New York County rejected exhaustion arguments like those of the Excess Insurers here, explaining that because the insured "suffered a single large loss which exceeded each of the Insurers' limits, on the very date that it was incurred," there was "no question that [the primary insurer's] primary policy would not have covered the first loss, which thereby would trigger coverage under seven of the excess policies simultaneously. . . .  The excess Insurers' proposition that no insured can ever recover damages from an excess insurer despite incurring a covered loss that reaches, and even exceeds that excess insurers' limits until the insured establishes that the primary insurer has paid up to its limits, is without a sound basis."  *J.P. Morgan I*, 2017 WL 3448370, at *2.  Clearly, if this case were still "good law," as the Trust argues in its opposition brief [ECF No. 899 at 16], then it would strongly support the Plaintiffs' position.

Unfortunately for the Plaintiffs, however, *J.P. Morgan I* was reversed by *J.P. Morgan II* just a few days before the Plaintiffs filed their opposition briefs.  *See J.P. Morgan II*, 166 N.Y.S.3d 1.  In *J.P. Morgan II*, the First Department held that the plaintiffs were "not entitled to prejudgment interest from the excess insurers, because the contractual attachment provision permitted those insurers to wait out good-faith coverage disputes between the insured and the underlying insurer

without risk of breaching their performance obligations; under the plain language of the provision, only upon actual payment by the underlying insurer did the excess insurers' performance obligations become due." *Id.* at 3. Thus, according to what is now "the only dispositive decision in New York and Michigan courts," the Excess Insurers' position is the right one: the exhaustion clauses at issue here can only be satisfied by actual payment by the underlying insurers, except that some specific excess policies discussed below require only a holding that lower-layer insurers are liable to pay, which (as is also discussed below) does not change the outcome even as to those policies. This position has also been adopted by other courts applying New York and Michigan law to policies involving substantially similar exhaustion provisions, including other cases in the Excess Insurers' "magic quintet." *See, e.g.*, *Comerica*, 498 F. Supp. 2d at 1021 (applying Michigan law and finding that "the plain language of the excess policy issued by [the excess insurer] requires exhaustion of the primary insurance's liability limits by actual payment of losses by the primary insurer before the excess policy is triggered"); *Forest Laboratories*, 953 N.Y.S. 2d at 465–66 (applying New York law and finding that the exhaustion clause "protects [the excess insurer] in the situation, as here, where the underlying insurers never paid their full policy amounts, due to settlements with plaintiff"); *TIAA-CREF*, 2018 WL 3620873, at *5 (applying New York law and finding that the excess insurers' "performance obligations have not been triggered because the insurance tiers underlying their policies have not yet paid out").

The Plaintiffs' other cases—which, by the Plaintiffs' own admission, do not "directly address the issue" and are not "dispositive decision[s] in New York [or] Michigan"—do not save their opposition to the Excess Insurers' motion. For example, during the Hearing, the Trust relied heavily on *Ali v. Federal Insurance Co.*, 719 F.3d 83 (2d Cir. 2013), for the proposition that "when a[n] 'out-of-pocket loss', *i.e.*, an actual amount has been paid [by the insured, not the insurer]

which reaches the attachment point of the excess insurer, the underlying limits are deemed exhausted." [*E.g.*, Hearing Tr. at 120:25–121:4; *see also* ECF No. 899 at 19–20]. But *Ali* does not so hold. On the contrary, *Ali* holds only that "the plain language of the relevant excess insurance policies requires the 'payment of losses'—not merely the accrual of *liability*—in order to reach the relevant attachment points and trigger the excess coverage." *Ali*, 719 F.3d at 94. In other words, *Ali* holds only that when *no one* has made a payment exceeding the attachment points, excess coverage does *not* attach. It does not follow from that holding that when *the insured* has made a payment exceeding the attachment points of the policies, coverage *does* attach; indeed, the Second Circuit in *Ali* explicitly did *not* reach the question of "whether the underlying insurers, in particular, [as opposed to the insureds,] were required to make payments" for excess coverage to attach. *Id.* at 92. Even assuming, *arguendo*, that *Ali* could be interpreted as having reached that question, it would make no difference because the exhaustion provision in *Ali,* unlike all but two of the exhaustion provisions at issue here, did not specify that payment had to be made *by the underlying insurer*.[28] *Id.* at 87.

The Plaintiffs similarly rely on *Smit v. State Farm Mut. Auto. Ins. Co.*, 525 N.W.2d 528, 533 (1994) for the proposition that an "excess insurer is not required to pay more than the limits of its policy to satisfy the amount of the judgment remaining to be paid after credit is given for the total amount of the primary insurance coverage." [ECF No. 891 at 8]. But *Smit* did not involve excess policies or, more specifically, a requirement of exhaustion of multiple policies in a single tower of insurance coverage issued to and covering the same insured; *Smit* instead involved a "primary policy insuring the owner [of a vehicle]" and "a second policy insuring the driver." *Smit*, 525 N.W.2d at 533. Several of the Plaintiffs' other cases similarly involve separate insurance

---

[28] For the reasons discussed below, the two outliers—the Clarendon Policy and the Continental Policy—can only be read as requiring payment by the underlying insurers, even though they do not explicitly say so.

policies rather than multiple policies comprising a single tower of insurance, and are therefore similarly inapposite. *See, e.g.*, *Allstate Ins. Co. v. Riverside Ins. Co. of Am.*, 509 F. Supp. 43, 44 (E.D. Mich. 1981) (involving one policy issued to the owner of a vehicle that also covered "authorized driver[s]" of the vehicle, and "a separate" policy issued to an individual who happened to be one of the authorized drivers); *URS Corp. v. Travelers Indem. Co.*, 501 F. Supp. 2d 968, 974 (E.D. Mich. 2007) (distinguishing "(1) true excess coverage which occurs where a single insured has two policies covering the same loss, but one policy is written with the expectation that the primary will conduct all of the investigation, negotiation and defense of claims until its limits are exhausted and (2) coincidental excess coverage which would be primary but for the presence of another policy which is primary over itself," and finding the policy at issue to fall into the "coincidental" category) (citations omitted). Moreover, *Smit* did not rely on or assess the language of the exhaustion provision in the relevant policy or even indicate whether such a provision existed, *see generally Smit*, 525 N.W.2d 528, and the Plaintiffs have not asserted that such language was included in the policy or, if it was, that it was similar to the language of the exhaustion provisions in the Excess Policies at issue here [*see generally* ECF Nos. 891, 899; Hearing Tr.].

The Plaintiffs' reliance on *Zeig v. Mass. Bonding & Ins. Co.*, 23 F.2d 665 (2d Cir. 1928), and its progeny is similarly unavailing. As the *Comerica* court explained, "In *Zeig*, an excess insurance contract required that the underlying policy be exhausted but was silent about whether the full amount of the underlying policy needed to be collected or actually paid out before the excess policy was triggered. . . . The cases that follow *Zeig* generally rely on an ambiguity in the definition of 'exhaustion' or lack of specificity in the excess contract as to how the primary insurance is to be discharged. . . . A different result occurs when the policy language is more specific." *Comerica*, 498 F. Supp. 2d at 1029–30. And here, every Excess Policy's exhaustion

provision unambiguously requires payment of the underlying policy limits or a finding of liability against the underlying insurer before excess coverage will attach.  Moreover, as the Second Circuit explained in *Ali*—the case on which the Trust most heavily relies following the reversal of *J.P. Morgan I*—there are several other "important differences between *Zeig* and this case."  *Ali*, 719 F.3d at 93.  For example, "nothing is inherently errant or unusual about interpreting an exhaustion clause in an excess *liability* insurance policy [like the one here] differently than a similarly written clause in a first-party *property* insurance policy [like the one in *Zeig*]," and "*Zeig* . . . principally address[es] situations in which a policy was deemed exhausted as a result of an insured's below-limit settlement of indemnity claims with the underlying carrier," *id.*, but there has been no such settlement here.

The Court also rejects the Class Plaintiffs' contention that the Excess Insurers' position "borders on the absurd [because] it would mean that no insured could recover damages from an excess insurer for a single large loss until after an insured first sues, prevails, and collects in a lawsuit against the primary insurer alone—and then has to repeat the process for each succeeding layer until the entire loss is collected."  [ECF No. 891 at 4].  To the extent there is anything "absurd" about such a result, the insured multinational corporation here, which was a sophisticated party represented by sophisticated counsel, expressly agreed to such "absurdity" in its contracts, which resulted from arm's length negotiations that also presumably agreed to pricing for each successive layer based on the parties' negotiated agreement about when and in what circumstances the excess insurers would be obliged to pay the insured.  The Plaintiffs' argument "cannot supersede unambiguous policy language or impose obligations under the contract which otherwise do not exist," and it "is insufficient to justify voiding or refusing to enforce the clear language of the policy in this case."  *Comerica*, 498 F. Supp. 2d at 1031.  Indeed, the Plaintiffs' own caselaw

acknowledges that "[b]ecause coverage is only triggered after the primary insurance limit has been exhausted, excess insurance is generally available at a lesser cost than the primary policy since the risk of loss is less than for the primary insurer." *Ali*, 719 F.3d at 91 (citations omitted). Because the insured here reaped the benefits of less costly coverage (or whatever other benefits compelled GM to enter into excess insurance contracts containing express exhaustion provisions), "[n]o public policy argument says that [the Plaintiffs] may have [their] cake and eat it too." *Comerica*, 489 F. Supp. 2d at 1031.

Thus, *J.P. Morgan II* and the other cases cited by the Excess Insurers control, and the express and unambiguous language of the exhaustion provisions dictates granting the Excess Insurers' motion for partial summary judgment (subject to further discussion below of specific Excess Policies). Because neither the Primary Layer nor any of the Excess Layers have been paid out to the policy limits, and because at least until the issuance of this decision the Primary Layer has not been held liable to pay, none of the Excess Insurers' exhaustion provisions has been satisfied, and, therefore, none of the Excess Insurers has incurred or breached an obligation to pay.

c.    *The Excess Underwriters and Swiss Re Exhaustion Clauses Have Not Been Satisfied*

The Plaintiffs argue that even if the Court concludes (as it does) that the exhaustion provisions generally have not been satisfied, the wording of the Excess Underwriters and Swiss Re exhaustion provisions differs and has been satisfied. As the Plaintiffs describe them, "[t]hese Policies' exhaustion conditions only require the underlying policies to 'have been held liable to pay.'" [ECF No. 899 at 23–24; ECF No. 891 at 25–26]. The Court disagrees because the Plaintiffs misconstrue these two policies.

First, the Plaintiffs use inaccurate wording to characterize the Policies, which, rather than requiring the "underlying **policies**" to have been held liable to pay (which may or may not be

triggered by a large enough liability finding or allowed claim amount), instead require the underlying **insurers** to have been held liable to pay.  Specifically, the Excess Underwriters Policy provides that "Underwriters shall be liable only after the insurers under each of the Underlying Policies have paid or have been held liable to pay the full amount of the Underlying Limit of Liability" [ECF No. 841-2 at 7 of 28], and the Swiss Re Policy provides that "[t]he insurer shall be liable only after all insurers subscribing to any applicable Underlying Policy(s) shall have agreed to pay or have been held liable to pay the full amount of their respective limits of liability" [ECF No. 852-2 at 5 of 9].  At least until today, none of the Insurers has been held "liable to pay"; as the Excess Insurers rightly observe, "that is what this very lawsuit is about."  [ECF No. 925 at 3].  That reality precludes a finding of exhaustion sufficient to trigger the obligations of either the Excess Underwriters or Swiss Re.

The Excess Underwriters Policy is within the First Excess Layer, so the only underlying insurance is the Primary Policy.  The Excess Underwriters Policy expressly and unambiguously states that the Excess Underwriters "shall be liable only after the insurers under each of the Underlying Policies have paid or have been held liable to pay the full amount of the Underlying Limit of Liability."  [ECF No. 841-2 at 7 of 28].  Thus, if and when the Primary Underwriters were "held liable to pay," the Excess Underwriters' obligation to pay would be triggered on any amounts due beyond the Primary Layer, whether the Primary Underwriters did or did not pay the amount they owed on their policy.  Whether the Primary Underwriters paid or failed to pay the amount due under their policy at that point, then, if the Excess Underwriters did not pay on the policies they issued, then they presumably would be in breach.  But the Excess Underwriters cannot be in breach before that point because no obligation to pay would have arisen.

To emphasize, the critical word in the Excess Underwriters' controlling policy provision is "held." Even if the Primary Underwriters were in breach of their own obligations, such a breach alone would not, under the Policy, trigger the Excess Underwriters' obligations to pay under the Excess Underwriters Policy; rather, the Primary Underwriters' liability for that breach must be "held," which connotes a determination of a court or other authorized tribunal. Until and unless such a holding exists, the coverage obligations under the Excess Underwriters Policy are not triggered. *See Diamond Shamrock Chemicals Co. v. Aetna Casualty & Surety Co.*, 609 A.2d 440, 482 (N.J. Super. Ct. App. Div. 1992) (applying New York law and holding that "the obligation of the excess providers had not been triggered, because the primary policies had not been exhausted and there was no adjudication of the primary insurer's responsibility to pay the policy limits").

The Court need not and does not decide whether, upon the issuance of this Decision, it will have been "held" that the Primary Underwriters are "liable to pay the full amount of the Underlying Limit of Liability," so as to trigger the Excess Underwriters' payment obligations under the Excess Underwriters Policy. It suffices to resolve the motions now before the Court to hold that the Excess Underwriters' obligations were not triggered *before* the issuance of this Decision, and that the Excess Underwriters therefore have not breached their obligations.

A similar analysis establishes that Swiss Re has not breached the payment obligations of the Swiss Re Policy. The Swiss Re Policy constitutes the Second Excess Layer, so the underlying layers are the Primary Layer and the First Excess Layer. In addition to the Excess Underwriters Policy, the First Excess Layer contains the Twin City, Clarendon, and Continental Policies, all of which require actual payment of all underlying insurance before coverage attaches. [ECF No. 799 ¶ 11; 841-3 at 4 of 14; 841-4 at 3 of 11; 852-1 at 2 of 3]. As discussed above, no Insurer in the

First Excess Layer has paid or been held liable to pay, so Swiss Re's payment obligations under the Swiss Re Policy cannot have been triggered.

This conclusion finds direct support in the First Department's recent decision in *J.P. Morgan II*, where the relevant policy similarly required "the insurers of the Underlying Policies paying or being held liable to pay." [ECF No. 925-2 at 31]. As discussed above, *J.P. Morgan II* held that "under the plain language of the provision, only upon actual payment by the underlying insurer did the excess insurers' performance obligations become due," 166 N.Y.S.3d at 3. The Plaintiffs' reliance on New Mexico and Delaware cases [*see* ECF No. 891 at 25–27; ECF No. 899 at 23–24] cannot overcome either the unambiguous language of the Policies at issue here, or the clear statement of New York law that *J.P. Morgan II* provides.

Thus, the Swiss Re and Excess Underwriters exhaustion provisions, like the exhaustion provisions of the other Excess Policies, have not yet been satisfied, and the Court's grant of summary judgment in favor of all Excess Insurers extends to them.

### d. *The Continental and Clarendon Exhaustion Clauses Have Not Been Satisfied*

The Trust similarly argues that the exhaustion conditions in the Continental and Clarendon Policies require "payment for losses" and "actual payment of claims or losses" but do not specify who must make those payments, and, therefore, because RFC's damages reached the attachment points, the Continental and Clarendon exhaustion provisions have been satisfied. [ECF No. 899 at 23]. Once again, *J.P. Morgan II* squarely rejects this argument. As the Trust emphasizes, "[c]ritically, the exhaustion provisions considered by the *J.P. Morgan* court were substantially similar to those at issue here. For example, one of the excess policies . . . included the following provision: [']The Underwriter shall provide the Insureds with insurance coverage during the Policy Period excess of the Underlying Insurance. Coverage under this policy shall attach only

after the Limits of Liability of Underlying Insurance has been exhausted by the actual payment of losses.[']"  [ECF No. 899 at 15–16].  Unfortunately for the Trust, as discussed extensively above, *J.P. Morgan II* reversed the decision the Trust relies on, and held that "under the plain language of the provision, only upon actual payment by the underlying insurer did the excess insurers' performance obligations become due."  166 N.Y.S.3d at 3; *see also Comerica*, 498 F. Supp. 2d at 1022–23; *Forest Labs*, 953 N.Y.S.2d at 465.  The only still-in-force cases cited by the Trust to rebut this position [*see* ECF No. 899 at 23] are a Delaware case applying Delaware law and a Seventh Circuit case applying Indiana law—neither an adequate basis to disturb the authoritative statement of New York law provided by *J.P. Morgan II*, and neither as persuasive as the analysis in *J.P. Morgan II* as well as *Comerica* and *Forest Labs*.  Meanwhile, *Ali*, as discussed above, explicitly did *not* reach the question of "whether the underlying insurers, in particular, [as opposed to the insureds,] were required to make payments" for coverage to attach."  *Ali*, 719 F.3d at 92.

The *J.P. Morgan II* approach also makes the most sense from the perspective of contractual interpretation.  The Continental Policy provides that coverage "shall attach only after all such Underlying Insurance has been exhausted by payments for losses" [ECF No. 841-4 at 3 of 11], and the Clarendon Policy provides that that coverage will apply "only after all such Underlying Insurance has been exhausted by the actual payment of claims or losses" [ECF No. 852-1 at 2 of 3].  The term "exhausted" implies, by definition, that the "Underlying Insurance" must run out or be used up before excess coverage attaches.  It therefore would contradict the express agreement reached by sophisticated parties to deem these exhaustion provisions satisfied merely by a loss of the insured, because such a loss does not use up the amount of insurance available to it until after the insurer has paid out to the policy limits.

Thus, the Court's grant of summary judgment to the Excess Insurers extends to the Continental and Clarendon policies.

### e.    *The Excess Insurers Have Not Repudiated Their Policies*

The Class Plaintiffs spend almost thirteen pages of their Opposition brief—and spent almost all of their time at oral argument—arguing that "through their repeated repudiation of coverage under their respective Policies, the Excess Insurers cannot enforce their exhaustion conditions." [ECF No. 891 at 13–25; Hearing Tr. at 116:4–120:2]. In short, the argument goes that because the Excess Insurers allegedly denied coverage under the Policies, they have forfeited their right to enforce the exhaustion provisions and therefore cannot rely on those provisions to escape liability. [ECF No. 891 at 13]. This argument suffers from a fatal flaw: even assuming, *arguendo*, that the Excess Insurers did deny coverage under the Excess Policies, their doing so would not constitute a "repudiation" sufficient to render the exhaustion provisions unenforceable.

In their brief, the Class Plaintiffs once again rely heavily on *J.P. Morgan I*, which, they argue, is "once again directly on point and provide[s] clear authority for both (1) how and why the Excess Insurers repudiated coverage, and (2) why that repudiation precludes enforcement of the exhaustion conditions in their policies." [ECF No. 891 at 21; *see also id.* at 21–24]. To be sure, in *J.P. Morgan I*, the New York Supreme Court reasoned that "where an insurer repudiates a claim and disclaims coverage, an insured's purported failure to comply with a condition contained in the policy [such as the exhaustion provision] is excused." 2017 WL 3448370, at *2. But as discussed above, *J.P. Morgan I* was overruled by *J.P. Morgan II*, which specifically held that "the contractual attachment provision permitted [the excess] insurers to wait out good-faith coverage disputes between the insured and the underlying insurer without risk of breaching their performance obligations." 166 N.Y.S. 3d at 3. Thus, *J.P. Morgan II* squarely rejects the Class

70

Plaintiffs' argument, as do several of the other cases in the Excess Insurers' "magic quintet." *See, e.g.*, *Comerica*, 498 F. Supp. 2d at 1025–26 (allowing the excess insurer to enforce an exhaustion provision even though the insured had incurred losses exceeding the limits of the primary policy and the primary and excess insurers had raised a coverage defense).

The other cases cited by the Class Plaintiffs do not save their position, because none of those cases supports the proposition that an excess insurer whose policy contains an exhaustion clause that has not yet been satisfied can be held to have "repudiated" the policy and forfeited its right to enforce the exhaustion clause because it previously denied coverage. *See, e.g.*, *QBE Ins. Corp. v. Jinx-Proof Inc.*, 22 N.Y.3d 1105 (N.Y. 2014) (holding that an insurer had effectively disclaimed coverage for—and therefore had no obligation to defend—assault and battery claims by sending letters indicating that the policy excluded such coverage; forfeiture of contractual rights through repudiation was not an issue); *City of New York v. Zurich-Am. Ins. Grp.*, 798 N.Y.S.2d 708, 2004 WL 2403179, at *3 (Sup. Ct., Kings Cnty. Oct. 22, 2004) (addressing forfeiture of insurer's right to enforce the insured's continuing obligation to mitigate its damages and dispose of a claim against it in a way that did not prejudice it after the insurer had denied coverage), *aff'd* 811 N.Y.S.2d 773 (2006); *Alyas v. Gillard*, 180 Mich. App. 154, 160 (1989) (addressing forfeiture of insurer's right to enforce a clause prohibiting the insured from voluntarily settling a claim without the insurer's consent).

Thus, the Excess Insurers did not repudiate their policies, and the exhaustion provisions are therefore enforceable.

### 3. The Exhaustion Provisions Preclude the Breach of Contract and Consequential Damages Claims Against the Excess Insurers

The Excess Insurers' exhaustion defenses alone are a sufficient basis to grant them summary judgment on this motion. Based on the arguments raised by the Plaintiffs in their briefing

and during the Hearing, it is unclear whether the Plaintiffs are taking the position that, even if the

Court sustains the exhaustion defenses, Plaintiffs could still prevail on claims against the Excess

Insurers for breach of contract and consequential damages in the form of prejudgment interest,

penalty interest under Michigan law, "lost prejudgment interest," consequential damages for the

Mitchell bond costs, and attorneys' fees.  For the reasons that follow, the Court concludes that they

cannot.[29]

### a.  *Breach of Contract*

The Excess Insurers argue that "[b]ased on the plain and unambiguous language of the

Excess Policies and the undisputed fact that Primary Underwriters have not paid out the limit of

the Primary Policy, coverage under the Excess Policies has not yet attached.  Accordingly, none

of the Excess Carriers is presently liable to pay any amount under its policy to the Plaintiffs, and

therefore none of the Excess Carriers has breached its contract."  [ECF No. 796-1 at 12].  Aside

from the arguments discussed (and rejected) above, the Plaintiffs do not argue that, if the

exhaustion provisions are enforceable and have not yet been satisfied, the contracts have

nonetheless been breached.  [*See generally* ECF Nos. 891, 899].  Nor could they.

"A contract 'is not breached until the time set for performance has expired.'"  *Liberty*

*Surplus Ins. Corp. v. Segal Co.*, No. 03CV2194BSJ, 2004 WL 2102090, at *3 (S.D.N.Y. Sept. 21,

2004) (quoting *Rachmani Corp. v. 9 E. 96th St. Apartment Corp.*, 629 N.Y.S.2d 382, 384 (1st

Dep't 1995)), *aff'd in part*, 420 F.3d 65 (2d Cir. 2005), *and aff'd in part*, 142 F. App'x 511 (2d

Cir. 2005).  "In this case," as in *Liberty Surplus*, "the time set for [the Excess Insurers']

---

[29] Several of the Plaintiffs' arguments in support of particular claims against the Excess Insurers are exactly the same as their arguments on the issue of exhaustion more generally:  that is, the Plaintiffs argue that the Excess Insurers' arguments fail because the exhaustion provisions have already been satisfied and/or repudiated, and therefore the Plaintiffs' various theories of recovery are not barred.  [*See, e.g.*, ECF No.891 at 28–32, 35; ECF No. 899 at 29–30, 32–33].  Because the Court has already considered and rejected these arguments [*see supra* §§ E.1.b, E.2.b–e], it will not address them again here.

performance occurs upon the exhaustion of the Underlying Policies." *Id.* Thus, because none of the exhaustion provisions at issue here has been satisfied, the time set for the Excess Insurers to perform has not yet occurred, and the Excess Insurers cannot be held liable for breach of contract. Therefore, the Court grants partial summary judgment in favor of the Excess Insurers on the Plaintiffs' breach of contract claims.

> b.  *Consequential Damages – Prejudgment Interest Generally*

The Class Plaintiffs "seek prejudgment interest from the Insurers under the Michigan prejudgment [interest] statute M.C.L. § 500.2006, which provides for statutory interest at the rate of 12% annually." [ECF No. 891 at 27]. The Trust similarly seeks "pre-judgment interest on the covered losses RFC incurred," including (i) 12% penalty interest under § 500.2006; or, in the alternative, (ii) "statutory pre-judgment interest" under M.C.L. § 600.6013 and "pre-filing interest under M.C.L. § 438.77"; or (iii) "common law" prejudgment interest." [ECF No. 899 at 31–33].

Several statements by counsel for the Plaintiffs during the Hearing at least tacitly concede that, if the Court were to hold in the Excess Insurers' favor on the exhaustion provisions, then Plaintiffs are not entitled to payment of prejudgment interest from the Excess Insurers themselves. [*See, e.g.*, Hearing Tr. at 154:18–23 ("[L]ost pre-judgment interest is an alternative form of consequential damages sought. We seek that only—and we seek as an alternative form of relief if the Court should grant the exhaustion motions of the excess insurers. Obviously exhaustion clauses don't apply to the primary carrier."); *id.* at 154:24–155:3 ("If however, the Court grants exhaustion motions of the excess carriers, then we ask for the pre-judgment interest that we would have received from those excess carriers, from the primary carrier [which] is Lloyd's. So it's an alternative request."); *id.* at 155:10–16 (The Court: "So bottom line, this issue is raised by you so that if you lose on the exhaustion piece as to the excess carriers, you nevertheless have an

alternative remedy to get your consequential damages in the form of lost pre-judgment interest from the primaries? That's the deal?" Class Plaintiffs: "You've stated it better than I could. Yes.")]. Even so, for the sake of completeness, and because some of the Plaintiffs' arguments seem to suggest a contrary view, the Court will address the parties' arguments on this issue.

The Excess Insurers contend that the claims against them for prejudgment interest fail because "the underlying insurance has not been exhausted and coverage under the Excess Policies has not attached," and, therefore, "[g]iven that Plaintiffs are not presently entitled to any payments from the Excess Carriers, there is no basis for prejudgment interest to accrue." [ECF No. 796-1 at 12–16]. The Plaintiffs counter that "it is premature to dismiss claims for pre-judgment interest against any Excess Insurer until the Court rules upon all other pending summary judgment motions and the total amount of potentially covered claims remaining in this action held by all Plaintiffs is known." [ECF No. 899 at 32; ECF No. 891 at 27–28]. At bottom, this is a dispute about precisely when prejudgment interest begins to accrue: the Excess Insurers argue that "prejudgment interest begins to accrue upon breach of an insurance contract" [ECF No. 925 at 11]; the Class Plaintiffs argue that "prejudgment interest beg[ins] to run when the insured 'suffer[s] a single large loss which exceed[s] each of the Insurers' limits, on the very date that it [i]s incurred" [ECF No. 891 at 28]; and the Trust argues that prejudgment interest accrues (i) "60 days after satisfactory proof of loss was received by the insurer" under § 500.2006, (ii) "from the date the complaint was filed until the judgment is paid" under § 600.6013, or (iii) "when contract damages are measurable before the complaint" under common law [ECF No. 899 at 32–33].

The Class Plaintiffs' arguments on this point are largely duplicative of their arguments on the enforceability and satisfaction of the exhaustion provisions, including their misplaced reliance on the overruled *J.P. Morgan I* [*see* ECF No. 891 at 28–31], and are rejected for the reasons already

discussed, *see supra* §§ E.2.b, e.  But more fundamentally, the Plaintiffs' arguments are premised

on the faulty assumption that the Excess Insurers ultimately are (or at least may be) held liable for

breach of contract.  Indeed, every case relied on by the Plaintiffs involves an award of prejudgment

interest to a plaintiff who succeeded on the underlying claim.  *See J.P. Morgan I*, 2017 WL

3448370, at *2 ("JP Morgan, *as the prevailing party on its claim for breach of contract*, is entitled

to prejudgment interest . . . .") (emphasis added); *KV Pharm. Co. v. Nat'l Union Fire Ins. Co. of

Pittsburgh, Pa.*, No. 4:05CV270, 2006 WL 1153825, at *1 (E.D. Mo. May 1, 2006) (awarding

prejudgment interest "[a]fter a trial resulting in a jury verdict for plaintiffs"); *Verizon Commc'ns

Inc. v. Illinois Nat'l Ins. Co.*, No. CVN14C06048, 2018 WL 2317821, at *1 (Del. Super. Ct. May

16, 2018) (awarding prejudgment interest to a plaintiff that had been granted summary judgment

on the underlying claim), *rev'd on other grounds sub nom.*, *In re Verizon Ins. Coverage Appeals*,

222 A.3d 566 (Del. 2019).  Even the statutory provisions cited by the Plaintiffs make clear that

interest can accrue only on damages actually suffered or amounts actually owed.  *See* M.C.L. §

500.2006 (requiring insurers to "pay on a timely basis . . . benefits provided under the terms of its

policy," and providing for 12% interest for "claims not paid on a timely basis"); M.C.L. § 600.6013

("Interest is allowed on a money judgment recovered in a civil action . . . .").[30]

Here, the Court has already held that the Excess Insurers have not breached their contracts,

so the Plaintiffs' damages and any interest accruing thereon are nonexistent, or fixed at zero.  It

may well be the case that, somewhere down the line, the exhaustion provisions will be satisfied,

and the Excess Insurers will become obligated to pay; at that point, interest could begin to accrue,

---

[30] The analogous New York statute is even clearer that an underlying breach of contract is required before interest can accrue.  *See* N.Y. CPLR § 5001 ("Interest shall be recovered upon a sum awarded because of a breach of performance of a contract. . . .  Interest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred.").  The Court need not—and does not—resolve the parties' dispute over whether Michigan law or New York law applies to the Swiss Re Policy with respect to this issue [*see, e.g.*, ECF No. 796-1 at 14–16; ECF No. 891 at 27 n.69], because the outcome is the same either way.

a question that today's ruling does not decide. As of now, however, the *existing* breach of contract claims fail because no breach has occurred, no prejudgment interest has accrued, and there is nothing to be gained by forestalling judgment on the issue. Therefore, the Court grants the Excess Insurers' motion for partial summary judgment on Plaintiffs' claims for prejudgment interest.

      c.  *Consequential Damages – Prejudgment Penalty Interest Under Michigan Law*

With regard to the 12% penalty interest sought by the Plaintiffs, the Excess Insurers argue that even if the exhaustion provisions do not preclude the claims for prejudgment interest, penalty interest is unavailable because the Class Plaintiffs, as the assignees of RFC's coverage claims under the Policies, are "third-party tort claimants" for purposes of § 500.2006 and must therefore "show that their claim is 'not reasonably in dispute'" in order to recover penalty interest. [ECF No. 796-1 at 28–29]. The Class Plaintiffs counter that, "[s]tanding in the shoes of RFC as assignees of its insurance rights, Class Plaintiffs are 'the insured' and at the very least 'a person directly entitled to benefits' from the Policies" for purposes of § 500.2006, and therefore they have direct contractual claims rather than third-party tort claims. [ECF No. 891 at 32–34]. Because Plaintiffs are not entitled to *any* prejudgment interest from the Excess Insurers, the Court need not—and does not—decide the issue of whether the Plaintiffs would otherwise be entitled to the 12% penalty interest rate under § 500.2006.

      d.  *Consequential Damages – Lost Prejudgment Interest*

In their opposition brief, the Class Plaintiffs state that "to the extent that the Court decides that the exhaustion clauses do require each underlying layer to pay their respective limits before the next layer is required to pay, thereby preventing prejudgment interest from accruing, Class Plaintiffs alternatively seek as consequential damages lost prejudgment interest from each Insurer that wrongfully denied coverage and thereby prevented the next layer of insurance above them

from attaching." [ECF No. 891 at 35]. In support of their position, the Class Plaintiffs (i) incorporate by reference the arguments made in their *Memorandum In Opposition To Defendants' Motion For Summary Judgment On Professional Services/Wrongful Acts, Exclusion 38 and Consequential Damages* [ECF No. 861]; *see infra* § F, (ii) argue that the Excess Insurers' caselaw is "clearly distinguishable from the present case where Plaintiffs have made numerous allegations in the Third Amended Adversary Complaint [ECF No. 412] regarding the bad faith acts by the Insurers," and (iii) argue that lost prejudgment interest was foreseeable. [ECF No. 891 at 35–37].

As noted above, however, during the Hearing, the Class Plaintiffs explicitly and repeatedly stated that they are seeking lost prejudgment interest only from the Primary Underwriters—not the Excess Insurers—and only as an alternative to recovery from the Excess Insurers.[31]  *See supra* § E.3.b. [*See also* Hearing Tr. at 154:18–23, 154:24–155:3, 155:10–16]. Accordingly, and in light of the Court's holding that the Plaintiffs are not entitled to any prejudgment interest from the Excess Insurers, the Court need not address the Class Plaintiffs' arguments to resolve the Excess Insurers' motion. To the extent that the Class Plaintiffs do seek to recover lost prejudgment interest from the Excess Insurers, the Court grants partial summary judgment in favor of the Excess Insurers on those claims.

### e.  *Consequential Damages – Mitchell Bond Costs*

The Trust seeks "$23.3 [million] in consequential damages" resulting from the "lost [] use of the $127 million [ResCap] paid to collateralize the [Mitchell appeal] bond." [ECF No. 899 at 12]. The Excess Insurers argue that such damages are unrecoverable because the Excess Insurers never breached the contracts in light of the exhaustion provisions, so that there is no basis to award

---

[31] Because this motion was brought exclusively by the Excess Insurers, the Court need not address the claims for consequential damages against the Primary Underwriters here. Those claims are addressed below, in the discussion of the Defendants' separate motion for partial summary judgment on consequential damages, which was filed by all Defendants, including the Primary Underwriters. *See infra* § F.

consequential damages.  The Excess Insurers argue in the alternative that no consequential damages can be awarded because RFC and the Excess Insurers did not "contemplate[] that the Excess Carriers would be liable to pay their policy proceeds when the Primary Policy was not exhausted."  [ECF No. 796-1 at 18–19].  In response to the latter argument, the Trust argues that a breach has occurred and that consequential damages can be awarded because they "were reasonably foreseeable to the parties at the time of contracting . . . . based on the parties' understanding at the time of contracting," including "the state of the law at the time of policy issuance."  [ECF No. 899 at 29–30].

The Trust's claim against the Excess Insurers for consequential damages is defeated by the Court's determination that the Excess Insurers have not breached the Policies due to those Policies' exhaustion provisions; the very premise of consequential damages is the existence of a breach. *See, e.g.*, *Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York*, 10 N.Y.3d 187, 192–93 (N.Y. 2008) ("[I]n order to impose on the defaulting party a further liability than for damages [which] naturally and directly [flow from the breach], . . . arising from a breach of contract, such unusual or extraordinary damages must have been brought within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting.  . . .  [T]he party breaching the contract is liable for those risks foreseen or which should have been foreseen at the time the contract was made.") (citations omitted); *Command Cinema Corp. v. VCA Labs, Inc.*, 464 F. Supp. 2d 191, 200 (S.D.N.Y. 2006) ("The nonbreaching party may also seek additional damages—so called special or consequential damages—that flow from the breach of the contract, but these 'are restricted to those damages which were reasonably foreseen or contemplated by the parties during their negotiations or at the time the contract was executed.'") (quoting *Kenford Co. v. Cnty. of Erie*, 73 N.Y.2d 312, 321, 537 N.E.2d 176, 180 (N.Y. 1989)); *Lotsadough, Inc. v. Comerica Bank*,

No. 12-10121, 2012 WL 5258300, at *9 (E.D. Mich. Oct. 23, 2012) ("Once the plaintiff's breach of contract claim falls, the remaining counts of the amended complaint give way as well. In the second count of its amended complaint, the plaintiff seeks specific performance or consequential damages. That count of the plaintiff's amended complaint is dependent on its breach of contract claim."). The Court therefore grants partial summary judgment in favor of the Excess Insurers on the Trust's claims for consequential damages resulting from the Mitchell bond costs.

       *f.*   *Consequential Damages – Attorneys' Fees*

The Plaintiffs also seek payment from the Excess Insurers on account of the attorneys' fees that they have incurred and will incur in this case. As the Trust succinctly puts it: "Recovery of such fees is permitted under New York, but not Michigan, law. The issue therefore is which state's law governs." [ECF No. 899 at 34]. The Excess Insurers argue that (i) "Michigan, not New York law, governs the award of attorneys' fees to the Excess Carriers other than Swiss Re [who has a New York choice of law clause]," and (ii) even under New York law, attorneys' fees are unavailable because "[t]he Excess Carriers have not acted in gross disregard of their obligations by failing to pay their policy limits." [ECF No. 796-1 at 22]. The Plaintiffs engage in lengthy choice-of-law analyses to reach the conclusion that "because this attorneys' fees issue is procedural rather than substantive, . . . the law of the forum (New York) governs this issue." [ECF No. 899 at 34–43; ECF No. 891 at 41–44]. Applying New York law, the Plaintiffs argue that summary judgment is inappropriate because there is "an issue of fact as to whether the Excess Insurers have acted in such bad faith denying coverage that no reasonable carrier would have denied coverage under similar circumstances." [ECF No. 899 at 43; ECF No. 891 at 45]. Additionally, the Class Plaintiffs (but not the Trust) argue that the "Court previously addressed Plaintiffs' demand for attorneys' fees twice, both times ruling in favor of Plaintiffs over the Insurers' objections," and

therefore the Court should refuse to revisit the question under the law of the case doctrine. [ECF No. 891 at 38–41].

The parties' contentions are resolved by the Court's determination that the Excess Insurers have not breached their obligations in light of their policies' exhaustion provisions, so resolving the choice of law or law of the case questions that the parties briefed is unnecessary. Even assuming, *arguendo*, that New York law applies and that attorneys' fees could theoretically be recoverable here in some circumstances, the Plaintiffs still are not entitled to them. The Excess Insurers did not act in "such bad faith denying coverage that no reasonable carrier would have denied coverage under similar circumstances," and, to the contrary, the Excess Insurers' position based on their policies' exhaustion provisions is legally correct. The Court therefore grants partial summary judgment in favor of the Excess Insurers on the Plaintiffs' claims for attorneys' fees.

4.   Conclusion

For the reasons stated above, the Excess Insurers' motion for partial summary judgment on the Plaintiffs' claims for breach of contract, prejudgment interest, consequential damages, and attorneys' fees is granted.

## F.   **The Plaintiffs Are Not Precluded From Recovering Consequential Damages**

In addition to the Excess Insurers' exhaustion-based motion, all Defendants moved for partial summary judgment on the Plaintiffs' claims for various types of consequential damages. [ECF No. 827]. Though the Defendants' briefing does not draw particularly clear lines between them, the Defendants' arguments appear to be that (i) the Plaintiffs failed adequately to plead their demands for consequential damages, (ii) any damages are limited to the policy limits because consequential damages were not contemplated by the parties at the time they made their contracts, (iii) assignees of rights under an insurance contract cannot recover consequential damages, (iv)

consequential damages are unavailable for breaches of third-party liability policies, (v) the Plaintiffs have identified no policy provisions specifically allowing for recovery of the requested consequential damages, (vi) the damages sought are unquantified and speculative, (vii) prejudgment interest is statutory and "not a form of consequential damages," and (viii) attorneys' fees are not recoverable for various reasons. [ECF No. 861 at 37–45; ECF No. 936 at 18–24].

The Trust and Class Plaintiffs opposed the motion [ECF Nos. 893 and 881, respectively], arguing, among other things, that the Defendants' arguments are duplicative of arguments already made and rejected earlier in this proceeding and are therefore foreclosed by the law of the case doctrine [ECF No. 893 at 31–32; ECF No. 881 at 30–32], that the Plaintiffs' pleadings are sufficient [ECF No. 893 at 32–37; ECF No. 881 at 32–38], that the consequential damages sought were foreseeable and reasonably contemplated by the parties [ECF No. 893 at 34–36, 44–45; ECF No. 881 at 35–38], that assignees can recover consequential damages [ECF No. 893 at 37–38; ECF No. 881 at 40–44], that consequential damages are available for breaches of third-party liability policies [ECF No. 893 at 39–41; ECF No. 881 at 44 n.76], that record evidence gives rise to a genuine dispute of material fact rendering summary judgment inappropriate [ECF No. 893 at 42–45; ECF No. 881 at 37, 38], that prejudgment interest is recoverable [ECF No. 893 at 29 & n.174; ECF No. 881 at 39–40], and that the Defendants' unsupported argument that "attorneys' fees are not recoverable" should be rejected out of hand [ECF No. 881 at 44; ECF No. 893 at 31 n.185, 42 n.236].

For the reasons that follow, the Court denies the Defendants' motion for partial summary judgment on the Plaintiffs' claims for consequential damages.

    1.   Factual Background

        a.   *Procedural History Pertinent to the Consequential Damages Motion*

In October 2019, the Plaintiffs filed a motion for leave to file their third amended (and currently operative) complaint (the "**Third Amended Complaint**" or "**TAC**") seeking to add, *inter alia*, "claims for relief" demanding consequential damages and attorneys' fees. [ECF No. 377]. The Defendants unsuccessfully opposed the motion [ECF No. 384], and the Court allowed the Plaintiffs to add their new proposed damages requests [ECF No. 411]. On February 11, 2020, the Plaintiffs filed the TAC [ECF No. 412], which demands, *inter alia*, the following damages:

- Pre-judgment interest. [*E.g.*, ECF No. 412 ¶¶ 296, 317, 380, 411; *id.* at 107].

- Attorneys' fees and costs. [*E.g.*, ECF No. 412 ¶¶ 296, 317, 380, 411; *id.* at 107].

- Consequential damages in the amount of the prejudgment interest the Class Plaintiffs would have been entitled to collect under applicable law from the Excess Insurers if the Primary Underwriters' alleged bad faith conduct had not prevented the Excess Policies' exhaustion provisions from being triggered ("**Lost Prejudgment Interest**"). [*E.g.*, ECF No. 412 ¶¶ 287, 293–94, 345, 352].

- Consequential damages in the amount of RFC's—and later the Trust's—"pre-bankruptcy losses," which include the lost opportunity cost to ResCap of paying to collateralize the Mitchell appeal bond and the unreimbursed defense costs (including attorneys' fees) in what the Plaintiffs refer to as "the present coverage action" and the "underlying coverage dispute and wrongful denial of coverage" (the "**Trust's Pre-Bankruptcy Losses**"). [*E.g.*, ECF No. 412 ¶¶ 296, 313, 316–17, 354, 376, 379–80, 407, 410–11].

- Consequential damages in the amount of the Class Plaintiffs' attorneys' fees incurred in litigating what they term the "underlying coverage dispute and wrongful denial of coverage by the Excess Insurers." [*E.g.*, ECF No. 412 ¶¶ 295, 346, 353].

The Defendants moved for judgment on the pleadings (the "**Pleadings Motion**") on July 14, 2021. [ECF Nos. 698, 699]. The Court heard oral argument on that motion on August 26, 2021, and rejected the Defendants' arguments under the "law of the case doctrine," concluding that Judge Lane had already decided the issues using the Civil Rule 12 dismissal standard when granting the Plaintiffs leave to amend. [ECF No. 742 at 46–51]. On September 16, 2021, the Court entered an order denying the Pleadings Motion but noting that "[s]uch denial is without prejudice to: (1) Defendants' ability to raise the issues asserted [in the motion] (including solely legal issues) via motion for summary judgment, and (2) Plaintiffs' ability to oppose such motions on all grounds including but not limited to the 'law of the case' doctrine." [ECF No. 734 at 2].

b. *Evidence Relevant to the Defendants' Motion*

The Defendants do not point to any admissible evidence in support of their motion for summary judgment on the Plaintiffs' claims for consequential damages. [*See generally* ECF Nos. 841, 861, 936, 937, 938].

The Class Plaintiffs, in their statement of undisputed material facts, point to the expert report of James Schratz, who, after "review[ing] hundreds of documents and the deposition transcripts of the Insurers' claims handlers and/or 30(b)(6) witnesses," opined that the Defendants' positions were so unreasonable that "no reasonable insurer, under the given facts, would have asserted" them. [ECF No. 881-1 ¶¶ 64–78]. The Plaintiffs also cite eight deposition transcripts which the Plaintiffs contend demonstrate that the Defendants "recognized that excess policies contain" exhaustion provisions and that the Excess Insurers "would contend that they would not be required to pay until" the underlying insurers had satisfied those provisions. [ECF No. 881-1 ¶ 3].

The Trust, in its statement of undisputed material facts, cites the deposition transcripts of "14 insurer claims representatives and 30(b)(6) witnesses" and "[t]he Trust's 30(b)(6) witnesses, a fact witness from GM, and three witnesses from RFC's broker Aon," all of whom "were questioned on the issues of relatedness, inter-related second mortgage claims, and coverage for RFC's defense costs, including the Mitchell bond costs." [ECF No. 893-1 ¶¶ 37–38]. The Trust also points to the deposition transcripts of "nine experts and rebuttal experts who testified regarding the basis for and quantification of the Trust's consequential damages." [ECF No. 893-1 ¶ 39]. Of particular pertinence to the present motion, the Trust also cites Policy provisions covering "reasonable and necessary legal fees and expenses incurred by the Assured in the investigation, adjustment, arbitration, mediation, defense or appeal of any Claim and cost of attachment of similar bonds[]" as well as communications with the Primary Underwriters suggesting that costs of posting an appeal bond were covered. [ECF No. 893-1 ¶¶ 60–64].

2. The Law of the Case Doctrine Precludes Consideration of Some, But Not All, of the Defendants' Arguments

Because the Plaintiffs' law of the case argument would, if accepted, dispose of the Defendants' motion, the Court will address it first. For the reasons discussed below, the Court concludes that the law of the case doctrine does preclude reconsideration of the Defendants' arguments regarding the sufficiency of the Plaintiffs' pleadings, but it does not preclude consideration of the Defendants' other arguments or the motion more generally.

a. *Arguments*

The Plaintiffs argue that the Court has already rejected the Defendants' arguments twice—once in granting the Plaintiffs' motion to file a third amended complaint, and once in denying the Pleadings Motion—and should therefore refuse to consider the arguments again under the law of the case doctrine. [ECF No. 881 at 29–32; ECF No. 893 at 27–28, 31–32]. The Plaintiffs

emphasize that the Defendants have not only failed to identify any "intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice," but have in fact merely copied and pasted their entire argument wholesale from their prior unsuccessful briefing with only a few "minor changes." [ECF No. 881 at 31–32 & n.44]. Among these so-called "minor changes" is the addition of two sentences asserting that the Plaintiffs have failed to produce any supporting evidence sufficient to give rise to a triable issue of fact. [ECF No. 881 at 32 n.44; Hearing Tr. at 147:1–3 (Class Plaintiffs: "[The Defendants] do have two sentences in their document in there where they say, well, they haven't presented sufficient evidence, but they don't back that up.")]. The Plaintiffs also assert that "[t]here is no argument that there are changed circumstance[s] or that a different or divergent standard applies[.]" [ECF No. 881 at 32].

The Defendants reply that "the Court expressly noted at the prior hearing [on the Pleadings Motion] that Insurers could raise this issue via summary judgment" and that "[b]ecause of the divergent standard of review applicable to motions to dismiss and motions for summary judgment, the law of the case doctrine is inapposite to the Court's analysis of whether, after the close of discovery, genuine issues of fact have been raised which survive summary judgment." [ECF No. 936 at 18 (quoting *Bank Leumi USA v. Ehrlich*, 98 F. Supp. 3d 637, 647 (S.D.N.Y. 2015))].

b. *Legal Standard*

The law of the case doctrine provides that "[w]hen a court decides upon a rule of law, that decision should continue to govern the same issue in subsequent stages of the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983); *accord Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009). The doctrine is intended to promote consistency and avoid reconsideration of matters already decided during the course of an ongoing action. *In re HS 45 John LLC*, 585 B.R. 64, 80 (Bankr.

85

S.D.N.Y. 2018). Courts apply the doctrine when a prior decision "in an ongoing case either expressly resolved an issue or necessarily resolved it by implication." *Aramony v. United Way of America*, 254 F.3d, 403, 410 (2d Cir. 2001) (citation omitted). The doctrine is discretionary, however, and courts may revisit prior rulings in the course of a case if "cogent and compelling reasons militate" in favor of doing so. *Johnson*, 564 F.3d at 99 (quoting *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002)).

    c. *Analysis*

    There is some merit to both the Plaintiffs' and the Defendants' arguments. As a general matter, the Plaintiffs are incorrect that "[t]here is no argument that there are changed circumstance[s] or that a different or divergent standard applies" [ECF No. 881 at 32]. As the Defendants rightly argue, "[b]ecause of the divergent standard[s] of review applicable to motions to dismiss and motions for summary judgment, the law of the case doctrine is inapposite to the Court's analysis of whether, after the close of discovery, genuine issues of fact have been raised which survive summary judgment." [ECF No. 936 at 18 (quoting *Bank Leumi USA*, 98 F. Supp. 3d at 647)]. The Defendants are also correct that, in denying the Plaintiffs' motion for judgment on the pleadings, the Court expressly noted that it was "not foreclosing briefing of these issues down the road in connection with summary judgment motions" and that "it could make sense for [the Court] to revisit the rulings, either that summary judgment posture and facts that'll be brought to bear could modify the outcome, or [the Court could be] willing to take another look at the merits of the arguments [the parties have] made, even if they're pure questions of law." [ECF No. 742 at 46:18–47:3]. But at the same time, the Court also expressly noted that it was "not foreclosing any argument that [the] law of the case doctrine should be [followed] in [the summary judgment] context" and that it was not "precluding counterarguments that [the Court] shouldn't even touch

[the issue] and [the] law of the case doctrine really should just govern and be followed right through the case." [ECF No. 742 at 46:20–47:6].

The Court concludes that the law of the case doctrine militates against reconsideration of the Defendants' arguments regarding the sufficiency of the Plaintiffs' pleadings [*see, e.g.*, ECF No. 861 at 38–41]. It is true that a motion for summary judgment is subject to a different standard of review than a motion for judgment on the pleadings, but that is because a court considering a motion for judgment on the pleadings is bound to accept as true the facts alleged in the pleadings, while a court considering a motion for summary judgment may consider the entire evidentiary record before it to determine whether, typically after discovery, there exists sufficient evidence to give rise to a triable issue of material fact. But here the Defendants' arguments about the sufficiency of the Plaintiffs' pleadings are just that: arguments about the pleadings, not the evidence. The Court has already rejected these arguments twice [*see* ECF No. 411 at 2; ECF No. 742 at 46:6–50:15], and the Court sees no reason why the arguments would be any more availing now than they were then. Although the Court may now consider a broader range of evidence (or lack thereof) in determining whether there exists a triable issue of a material fact raised by the pleadings, the sufficiency of the pleadings themselves is unchanged. Thus, the law of the case doctrine applies, and the Court declines to reconsider the Defendants' arguments to the extent that they merely challenge the sufficiency of the pleadings. The Court therefore need not and does not address the Plaintiffs' other arguments regarding the sufficiency of their pleadings, including, without limitation, their argument that federal law rather than New York law applies to issues concerning the form of pleadings [*see, e.g.*, ECF No. 881 at 32–38; ECF No. 893 at 32–36] and their substantive arguments regarding the sufficiency of the pleadings under Rule 9(g) [*see, e.g.*, ECF No. 881 at 33].

The law of the case discussion does not dispose of the Defendants' motion, however, because not all of the Defendants' arguments merely attack the sufficiency of the pleadings. Indeed, as the Class Plaintiffs acknowledged during the Hearing, the Defendants argue more than once that the Plaintiffs "haven't presented sufficient evidence." [Hearing Tr. at 146:23–25]. As discussed above, the existence or non-existence of evidence giving rise to a triable issue of material fact may only be considered on a motion for summary judgment, not a motion for judgment on the pleadings. *See* Fed. R. Civ. P. 56(c)(1)(B); *Wells Fargo Bank, N.A. v. Nasr*, No. 19-CV-47, 2019 WL 2074566, at *3–4 (S.D.N.Y. May 10, 2019) (explaining that a court deciding a motion for summary judgment must consider "all of the submissions taken together" to determine if there is a "dispute as to any material fact," while a court deciding a motion for judgment on the pleadings must "apply the same standard as that applicable to a motion under Rule 12(b)(6)" and consider only "the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case"). Thus, to the extent that the Defendants' arguments are based on the evidence that the Plaintiffs present (or a lack thereof), those arguments are properly before the Court for the first time on the present motion, and it would be inappropriate for the Court to reject them out of hand under the law of the case doctrine. *See, e.g.*, *Bank Leumi*, 98 F. Supp. 3d at 647 (declining to apply the law of the case doctrine because of "the divergent standard[s] of review applicable to motions to dismiss and motions for summary judgment"); *Nobel Ins. Co. v. City of New York*, No. 00-CV-1328, 2006 WL 2848121, at *4 (S.D.N.Y. Sept. 29, 2006) (declining to apply the law of the case doctrine because "a ruling in favor of a plaintiff on a motion to dismiss does not address the merits of a case" and therefore "will not preclude a subsequent ruling in favor of a defendant on the same issue on a motion for summary

judgment following discovery"). Therefore, the Court will address each of those arguments in turn, as well as any accompanying legal arguments.

      3.  <u>The Defendants' Remaining Arguments Are Unavailing</u>

      Some of the Defendants' arguments are difficult to parse, and the Defendants, the Class Plaintiffs, and the Trust have all approached those arguments differently. The waters are further muddied by the fact that, over the course of this case, and even within the briefing on the present motion, the parties at times use the term "consequential damages" differently and leave unclear whether that term is or is not intended to encompass certain forms of damages. [*See, e.g.*, ECF No. 412 ¶¶ 296, 317, 380, 411 (referring to attorneys' fees and prejudgment interest as "consequential damages"); ECF No. 861 at 37 ("[A]ttorneys' fees are not recoverable in this action, whether as 'consequential damages' or otherwise[.]"); ECF No. 861 at 45 ("[P]rejudgment interest is statutory . . . [and] not a form of consequential damages . . . ."); ECF No. 881 at 39 & n.65 ("[The] Class Plaintiffs are seeking, with respect to consequential damages, potentially *lost* prejudgment interest resulting from the Insurers' breach of contract and bad faith, not the award of prejudgment [interest] itself. To be clear, Class Plaintiffs do seek prejudgment interest. However, the prejudgment interest that Class Plaintiffs refer to in connection with their claim for consequential damages is in the form of prejudgment interest that was potentially lost or did not accrue because of the Insurers' refusal to pay amounts owed under the policy."); ECF No. 893 at 27, 28 (repeatedly referring to "consequential damages" and "attorneys' fees" separately); ECF No. 893 at 28 (noting that the "Trust seeks its attorneys' fees in the coverage action" as a "categor[y] of what may be considered consequential damages"); ECF No. 893 at 28–29 & n.174 (noting that the Trust's Defense Costs are "the only consequential damages the Trust seeks," that the "Complaint also seeks consequential damages in the form of pre-judgment interest," and that

the Trust is "still seeking pre-judgment . . . interest" but not "as a form of consequential damages")].

As best the Court can discern, the arguments on this motion may properly be parsed, at the highest level, into three distinct categories: (i) arguments regarding the availability of consequential damages in the form of assertedly Lost Prejudgment Interest[32] and the Trust's Pre-Bankruptcy Losses; (ii) arguments specific to the availability of prejudgment interest; and (iii) arguments specific to the availability of attorneys' fees. The Court will address each category in turn.

    4.   <u>The Plaintiffs Are Not Precluded From Recovering Consequential Damages for Lost Prejudgment Interest and the Trust's Defense Costs</u>

       a.   *Choice of Law*

In their motion—which addresses several issues besides consequential damages—the Defendants conduct a choice of law analysis which concludes that New York law applies "to govern interpretation of the Policies," "with references to Michigan law to the extent particularly helpful," because in the Defendants' view there is no conflict between the two states' laws. [*See* ECF No. 861 at 19–20]. The Defendants acknowledge that "[c]hoice-of-law rules may require application of different jurisdictions' laws to distinct legal questions or contracts within a case" [*id.* at 20], but the Defendants do not conduct a separate choice of law analysis with regard to the availability of consequential damages [*see generally id.*]. Instead, the Defendants appear to assume, without further explanation, that New York law governs the availability of consequential

---

[32] To be clear, "*Lost* Prejudgment Interest" is distinct from ordinary prejudgment interest and refers to the prejudgment interest which the Class Plaintiffs claim they would have been entitled to recover from the Excess Insurers if the Primary Underwriters had not wrongly refused payment and thereby prevented the Excess Insurers' exhaustion provisions from being satisfied, thereby preventing the Excess Insurers from breaching their policies and, therefore, preventing prejudgment interest from accruing on such breaches. [*See, e.g.*, ECF No. 881 at 34, 37–40 & n.65]. Both the Class Plaintiffs and the Trust seek ordinary prejudgment interest in this case, but only the Class Plaintiffs seek *Lost* Prejudgment Interest. [*See, e.g.*, ECF No. 881 at 39 & n.65; ECF No. 893 at 29 & n.174]. This distinction is not always clearly observed in the parties' briefing, but the Court discusses both types of damages separately.

damages in this case.[33]   [*See* ECF No. 861 at 37–45 (citing almost exclusively New York law); ECF No. 936 at 18–24 (citing exclusively New York law)].

The Class Plaintiffs argue that either New York or Michigan law applies [ECF No. 881 at 35], and the Trust argues that Michigan law applies [*e.g.*, ECF No. 893 at 39].   Under both Michigan law and New York law, consequential damages are recoverable only if they were "reasonably contemplated by both parties at the time of the contract's execution."  *Dahlinger v. First Am. Specialty Ins. Co.*, No. 1:19-CV-0020, 2020 WL 1511261, at *3 (N.D.N.Y. Mar. 30, 2020); *No Limit Clothing, Inc. v. Allstate Ins. Co.*, No. 09-13574, 2011 WL 96869, at *5 (E.D. Mich. Jan. 12, 2011) (same).   The primary difference between the two is that New York law, but not Michigan law, imposes the additional requirement that such damages be caused by the insurer's bad faith.  *Compare Dahlinger*, 2020 WL 1511261, at *3 (explaining that consequential damages are available only if they "derive from [the] insurer's bad faith refusal to pay [the] insured's claim"), *with No Limit Clothing*, 2011 WL 96869, at *5 (explaining that the "entitlement to consequential damages" is "not based upon a showing of insurer's good or bad faith").

The Court need not decide the choice of law issue in order to resolve this motion, however, because the Defendants' arguments fail either way.  The Court will first address the bad faith requirement and then address the contemplation requirement.

    b.   *The Defendants' Bad Faith*

The Defendants do not focus their efforts on New York's bad faith requirement, about which there is a triable factual dispute; indeed, the Defendants' opening brief does not appear to

---

[33] The Defendants do provide a string cite to Michigan law with regard to one of their arguments about the sufficiency of the Plaintiffs' pleadings [ECF No. 861 at 39 n.105], but, as discussed, the Court declines to consider such arguments under the law of the case doctrine.  The Defendants also cite two Michigan cases for the proposition that consequential damages are available only if they were contemplated by the parties at the time of contracting [*id.* at 42 n.107], which, as discussed below, is also true under New York law.  The Defendants cite exclusively New York law for their remaining arguments.

address the issue at all [*see generally* ECF No. 861]. The Class Plaintiffs argue that "the record is replete with evidence of the Insurers' bad faith," pointing specifically to the "124-page expert report of Plaintiffs' claims handling expert, Mr. James Schratz" [ECF No. 881 at 38–39; ECF No. 881-1 ¶¶ 64–78; Hearing Tr. at 147:13–18], and the Trust similarly marshals various deposition transcripts and communications ostensibly demonstrating bad faith. [ECF No. 893 at 43–44; ECF No. 893-1 ¶¶ 45–59].

In their reply and during the Hearing, the Defendants effectively conceded that, at least with regard to consequential damages generally,[34] their alleged bad faith is reasonably in dispute, and the pertinent inquiry for purposes of this motion is whether the parties reasonably contemplated the requested damages at the time of contracting. [*See* ECF No. 936 at 20 ("[The Plaintiffs] only offer arguments meant to deflect away from the legal standard; Plaintiffs now offer new factual allegations regarding the Insurers' alleged 'bad faith' conduct purportedly revealed during discovery, in a vain effort to shroud the absence of any facts demonstrating that the specific type of injury allegedly suffered was contemplated *at the time of contracting*."); Hearing Tr. at 150:15–151:12 (The Defendants: "[I]f Your Honor is inclined to look at Mr. Schratz's report, then I absolutely would encourage Your Honor to look at Mr. Willem's rebuttal report. And as you might expect, the experts have different views on the coverage and what was done throughout the course of the life of these cases or these claims. So it's really not going to get the class plaintiffs anywhere by relying on Mr. Schratz because just as forceful, and I would say even more persuasive, is Mr. Willem's report demonstrating a reasonableness of the positions taken by insurers and the reasonableness of their conduct. But that's really a completely separate question.

---

[34] In their reply brief, the Defendants argue that attorneys' fees, specifically, are not recoverable because the Defendants did not act in bad faith, which is also required to recover attorneys' fees. [ECF No. 936 at 23–24]. As discussed below, the Court does not reach this argument because the Defendants waived it by failing to raise it in their opening brief.

We're talking about essentially bad-faith damages, and that's not what is at issue in this consequential damages motion. What is at issue is what was contemplated between GM on one hand and the insurers on the other hand.")].

Because the Defendants' bad faith is in dispute, this motion does not turn on whether the applicable law is New York's (which requires a showing of bad faith) or Michigan's (which does not). Rather, the Defendants' motion turns on the issue of contemplation, not bad faith. New York law and Michigan law appear consistent on this issue.

c.  *Contemplation by the Parties – Overview*

The Defendants argue that the Plaintiffs cannot recover consequential damages due to some combination of (i) the Plaintiffs' status as assignees who purportedly lack privity with the Defendants, (ii) the Plaintiffs' purported failure to identify any policy provisions expressly providing for consequential damages despite the Plaintiffs' asserted status as third-party beneficiaries under the policies, (iii) the Plaintiffs' suing under "third-party liability policies" (*i.e.*, policies providing coverage to the insured for liability arising from damages suffered by someone other than the insured) as opposed to first-party policies, and (iv) the Plaintiffs' failure sufficiently to quantify the damages sought. [*See, e.g.*, ECF No. 861 at 41–45]. The Defendants' briefing tends to blur the lines between these arguments, and with respect to the first three, it is unclear whether each one is intended to be an independent, categorical basis for dismissing the Plaintiffs' claims, or a sub-argument in support of the Defendants' broader argument that consequential damages were unforeseeable and not contemplated by the parties. In the interest of being thorough, the Court has considered each of these arguments in both contexts (except for the fourth, which appears to stand alone). For the reasons discussed below, the Court rejects all four of the Defendants' arguments.

d. *The Plaintiffs' Status as Assignees*

The Defendants assert that the "Plaintiffs are not in contractual privity with the Insurers; rather, Plaintiffs' claims against the Insurers are based on an assignment of rights under the Policies." [ECF No. 861 at 37]. The Defendants go on to argue that "[i]n contracting with GM for the Policies, the Insurers agreed to provide professional liability insurance to GM. Notably, the Kessler Class and Mitchell Class are not parties to the Policies. Thus, it cannot logically follow that either the Kessler Class or Mitchell Class could be entitled to consequential damages because neither entity was in privity of contract with the Insurers at the formation of the Policies."[35] [ECF No. 861 at 42]. The Defendants then cite various New York cases for the proposition that "third parties under an insurance contract" cannot recover consequential damages. [ECF No. 861 at 42–44].

In response, the Plaintiffs argue that, as assignees, they have "step[ped] into [RFC's] shoes and acquire[d] whatever rights [RFC] had." [ECF No. 881 at 42 (quoting *Furlong v. Shalala*, 156 F.3d 384, 392 (2d Cir. 1998); *accord* ECF No. 893 at 37]. Further, the Plaintiffs argue, because the Plaintiffs "were assigned all rights that RFC had under the Policies in regard to the Kessler and Mitchell settlements, including the right to recover any extra contractual damages related to those claims," as well as "all of RFC's rights to seek consequential damages and attorney's fees in this case," they "are entitled to recover the same damages that RFC itself could have recovered from the Insurers if it had retained its rights under the Policies." [ECF No. 881 at 41–42; *accord* ECF No. 893 at 37–38]. The Plaintiffs specifically point to "the expansive language used in the actual

---

[35] By its terms, the Defendants' argument is limited to the Class Plaintiffs, not the Trust. To the extent that the Defendants intended the argument to apply to the Trust as well, the Court rejects the argument for the reasons discussed below.

assignment of rights" to the Plaintiffs, emphasizing that the assigned rights specifically include the

following:

> any and all of the Debtors' rights, titles, privileges, interests, claims, demands, or
> entitles to any proceeds, payments, causes of action, and choses in action under,
> for, or related to the GM Policies with respect to a particular item of loss under the
> GM Policies, including the rights (1) to recover insurance proceeds for an item of
> loss covered under the GM Policies and (2) to recover from the insurers that issued
> the GM Policies for breach of contract or breach of other duty or obligation owed
> by such insurer under the GM Policies, as applicable, including the duty to settle,
> together with any extra contractual or tort claim arising therefrom, including bad
> faith, breach of implied covenant of good faith and fair dealing, fraud, or violation
> of any statutory or common law duty owed by the insurer under the GM Policies,
> as applicable, and all with respect to a particular item of loss under the GM Policies.

[ECF No. 881 at 41–42; ECF No. 893 at 38 & nn.218–19]. The Class Plaintiffs also distinguish

the Defendants' cases on the grounds that the plaintiffs in those cases either were not assignees of

the insured's rights under the contract or, if they were, that they sought "consequential damages to

the assign[ees]' businesses [that] were unique to those businesses and could not have ever been

claimed by the original assign[ors], let alone contemplated at the time the polices were issued,"

which is "decidedly not the case in this litigation, where [the Plaintiffs] are only claiming damages

that RFC itself could have and would have pursued had it retained its rights under the Policies."

[ECF No. 881 at 42–43].

The Plaintiffs have the better of the argument. It is true that the Plaintiffs are not the insured

whose name appears in the Policies, but it is equally true that, as assignees of the insured, the

Plaintiffs have "stepped into the shoes" of the insured and can bring any claims that the insured

could have brought, including, potentially, claims for consequential damages. *E.g.*, *Furlong*, 156

F.3d at 392 ("Under common law, an assignee steps into the assignor's shoes and acquires

whatever rights the latter had."). Indeed, if there was any doubt, the assignment itself explicitly

provides for the assignment of "any and all of the Debtors' rights, titles, privileges, interests,

claims, demands, or entitles to any proceeds, payments, causes of action, and choses in action . . .

to recover from the insurers that issued the GM Policies for breach of contract or breach of other

duty or obligation owed by such insurer under the GM Policies, as applicable, . . . together with

any extra contractual or tort claim arising therefrom."[36]   [Bk. ECF No. 6065-1 at 15, 70].   It is

therefore incorrect to suggest that the Plaintiffs are "third parties" to the Policies or that the

Plaintiffs' consequential damages claims are barred due to a supposed lack of privity with the

Defendants.  *See Ametex Fabrics, Inc. v. Just In Materials, Inc.*, 140 F.3d 101, 110 (2d Cir. 1998)

("[L]ack of privity is 'not a viable defense' because [the assignee], as the assignee of [the

assignor's] 'rights' . . . stepped into [the assignor's] privity with [the assignor's contractual

counterparty] and could pursue directly a breach of contract claim based on those rights.").

The Defendants' cases do not salvage their argument.  Several of the cases do not involve

claim assignees and are therefore inapposite.  *See J. Kokolakis Contracting Corp. v. Evolution

Piping Corp.*, 46 Misc. 3d 544, 545–46 (N.Y. Sup. Ct., Suffolk Cnty. 2014) (dismissing claim by

"an additional insured" under the policy); *Scottsdale Ins. Co. v. McGrath*, 549 F. Supp. 3d 334,

340–41 (S.D.N.Y. 2021) (dealing with a potential insured under the policy).   The cases that do

involve assignees do not stand for the proposition that assignees may never recover consequential

damages under an insurance contract, but instead hold only that, based on the specific facts of

those cases, the consequential damages sought had not been contemplated by the parties and were

---

[36] The Court is aware of Second Circuit precedent explaining that "[a]s a general matter, New York follows the majority rule that [a no-transfer clause preventing the transfer or assignment of rights under an insurance contract] is valid with respect to transfers that were made prior to, but not after, the insured-against loss has occurred," and that "under New York law, a no-transfer clause may, in certain unusual circumstances, remain valid as to some pre-transfer claims even though the loss occurred before the transfer," thus preventing assignment of those claims.  *Globecon Grp., LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170–75 (2d Cir. 2006).  The Policies here appear to contain "no-transfer" clauses [*see, e.g.*, ECF No. 841-1 at 39 ("Assignment of interest under this Policy shall not bind Underwriters unless their consent is endorsed heron.")], but the Defendants have not invoked those provisions or otherwise contended that the assignments to the Plaintiffs were invalid [*see generally* ECF Nos. 861, 936], so the Court does not reach that issue.

therefore unavailable. *See Int'l Rehab. Scis. Inc. v. Gov't Emps. Ins. Co.*, No. 12-CV-1225-A, 2014 WL 6387276, at *3–4 (W.D.N.Y. Nov. 14, 2014) ("The plaintiff's argument that GEICO's no-fault auto insurance policies contemplated consequential damages (including loss of revenue and diminution of business value) flowing to a third-party payee based upon untimely payment of claims is not persuasive."); *State Farm Mut. Ins. Co. v. Anikeyeva*, 950 N.Y.S.2d 726, 2012 WL 1020963, at *6 (Sup. Ct., Nassau Cnty. 2012) ("[T]here could have been no contemplation of defendants' consequential damages at the time the policies were issued.").

The Defendants' cases are therefore readily distinguishable from the facts before the Court. As the Class Plaintiffs rightly point out, the consequential damages sought in those cases were unique to the businesses of the assignees and could not have been claimed—or, consequently, assigned—by the assignors. In *International Rehab*, for example, the plaintiff, a medical services company that had "provided durable medical equipment" to each of 154 individuals who had been injured in automobile accidents and who subsequently assigned their no-fault auto insurance rights to the plaintiff, sought "consequential damages . . . related to the reduction of revenue and the increase in cost of doing business based upon [the insurer's] alleged failure to make timely payments of the plaintiff's claims." 2014 WL 6387276, at *1–2. Similarly, in *State Farm*, the defendants—several "professional acupuncture corporations" that had provided acupuncture treatments to "numerous [] insureds who had been involved in motor vehicle collisions" and who had subsequently assigned their no-fault auto insurance rights to the corporations—filed counterclaims seeking consequential damages "for the loss of [the corporations' owner's] business, allegedly caused by the [insurer's] failure to pay no-fault benefits under its policies." *State Farm*, 2012 WL 1020963, at *4; Affirmation in Supp. ¶ 5, *State Farm Mut. Ins. Co. v.*

*Anikeyeva*, 950 N.Y.S.2d 726 (Sup. Ct., Nassau Cnty. Oct. 9, 2012) (No. 004399/10), 2012 WL 12326043.

In both cases, the insureds never could have possessed claims for consequential damages arising from an unrelated company's loss of business, so the insureds never could have assigned such claims to anyone, because an "assignee acquires no greater rights . . . than [its] assignor. *Rojas v. Cigna Health & Life Ins. Co.*, 793 F.3d 253, 259 (2d Cir. 2015) (quotations omitted). Thus, it is only logical that the insurers had not contemplated such claims, whether they be brought by the insureds themselves or by an assignee thereof.  In other words, the claims were not held to be unforeseeable because they were brought by assignees of the insureds, but because the insureds themselves had never possessed such claims in the first place.  Here, by contrast, the Plaintiffs are seeking only consequential damages that RFC—at least theoretically—could have pursued itself; even if RFC had not assigned its rights, RFC theoretically could have brought claims for Lost Prejudgment Interest and the Trust's Pre-Bankruptcy Losses, because those losses either were or could have been incurred by RFC directly.

If anything, the Defendants' cited cases suggest that an assignee of rights under an insurance contract may recover consequential damages in appropriate circumstances.  In *Int'l Rehab*, for example, after concluding that the medical service provider could not recover consequential damages for its lost business, the court noted, in a footnote, that the provider also sought to recover consequential damages suffered by each of the individual assignors, who were apparently "affected in their ability to get treatment, to get their lost wages paid, and the health cost in not getting treatment and the worry and strain of having the no fault bills outstanding and their ability to prove the serious injury threshold due to the inability to get treatment, and the decreased value in their personal injury cases due to the inability to get treatment, as well as the

compromise of the patient-provider relationship."  2014 WL 6387276, at *3 n.2.  Tellingly, the

court did not dismiss this damages demand on the grounds that a claim assignee cannot recover

consequential damages.  *Id.*

Instead, the *Int'l Rehab* court dismissed the demand on the grounds that (i) the allegations

related to the demand were "not contained in the complaint," (ii) "the plaintiff ha[d] not

demonstrated that the assignors assigned anything more to [the assignee] than the right to seek

payment for the durable medical equipment," and (iii) "the plaintiff cite[d] to no authority

supporting the proposition that the[] far-reaching consequential damages were within the

contemplation of the parties as the probable result of a breach at the time of, or prior to, contracting

for the no-fault insurance at issue."  *Id.*  The logical implication is that if the plaintiffs *had* included

sufficient allegations in the complaint, *had* demonstrated an assignment of claims for

consequential damages, and *had* cited authority or evidence demonstrating that the requested

damages had been contemplated by the parties, then such damages *would* have been available,

even though the plaintiff was an assignee.  Similarly, in *State Farm*, the court stated that "[w]hether

[] an assignment [of rights under the no-fault insurance law] includes additional rights" beyond

the "payment of benefits provided to the assignor" "depends, *inter alia*, on the language of the

assignment instrument,"[37] 35 Misc. 3d 1203(A), at *5, which seemingly implies that an assignment

instrument, depending on its language, may assign additional rights beyond the payment of

benefits—such as claims for consequential damages.

The Court therefore denies the Defendants' motion to the extent it relies on the argument

that consequential damages sought by an assignee of rights under the insurance contract at issue

here are *per se* unforeseeable or otherwise unavailable.

---

[37] This language does not appear in the section of the opinion discussing the consequential damages claim, but the
Court sees no reason why the principle would be any less applicable to such claims.

e. *Specific Policy Provisions Allowing Recovery of Consequential Damages*

The Defendants further argue that "even where consequential damages flow from a breach of contract, such damages may not be recoverable by a third-party beneficiary because 'the contract must evince a discernable intent to allow recovery for the specific damages to the third party that result from a breach thereof before a cause of action is stated.'" [ECF No. 861 at 44 (quoting *Strauss v. Belle Realty Co.*, 98 A.D.2d 424, 426 (2d Dep't 1983), *aff'd* 65 N.Y.2d 399 (N.Y. 1985). Thus, because, in the Defendants' view, the policies "do not contain any language expressly—or implicitly—permitting the recovery of consequential damages by Plaintiffs," the "Plaintiffs' claim for consequential damage must be dismissed as a matter of law." [ECF No. 861 at 44–45]. The Plaintiffs respond that the Defendants' cited cases on this issue predate the New York Court of Appeals' decision in *Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York*, 10 N.Y.3d 187 (N.Y. 2008) and its progeny, which, according to the Plaintiffs, stand for the proposition that consequential damages are recoverable "based upon the foreseeability of those damages, without reference to any need for the terms of the policies to expressly provide for those consequential damages." [ECF No. 881 at 36; ECF No. 893 at 41 & n.231].

The Court is tempted to swiftly dispose of the Defendants' argument because, as they word their argument, it is limited to only those cases involving third-party beneficiaries, which this is not. As just discussed, the Plaintiffs are not suing as third-party beneficiaries under the Policies, but rather as assignees of first-party rights who have stepped into the shoes of their assignor. Indeed, two of the three cases cited by the Defendants are limited to the third-party beneficiary context, *see Strauss v. Belle Realty Co.*, 98 A.D.2d 424, 427 (N.Y. App. Div., 2d Dep't 1983) (discussing recoverability of consequential damages "when the contracting parties specifically

100

intend to confer benefits on a third party"), *aff'd* 65 N.Y.2d 399 (1985); *Alicea v. City of New York*, 145 A.D.2d 315, 317 (N.Y. App. Div., 1st Dep't 1988) (same), and they are therefore inapposite.

The third case, however, does not appear to be so limited. *See Globecon Grp., LLC v. Hartford Fire Ins. Co.*, No. 03 CIV. 0023, 2003 WL 22144316, at *3 (S.D.N.Y. Sept. 17, 2003), *aff'd*, 434 F.3d 165 (2d Cir. 2006). In *Globecon*, the District Court explained that "[g]enerally, in order to demonstrate [contemplation by] the parties, we have followed other New York courts in requiring that a specific contractual provision permit recovery for consequential damages." 2003 WL 22144316, at *3 (collecting federal and New York state court cases). On appeal, however, the Second Circuit, though affirming the Southern District's judgment on consequential damages, explained, "Although some [New York] authority suggests that no specific provision is required, such damages must, at a minimum, comport with the intent of the parties to the contract. Since— as we have held [earlier in] this opinion—[the plaintiff] cannot be treated as a party to the insurance contract which is the basis for this suit . . . the consequential damages sought are not recoverable." 434 F.3d at 176–77 (citing *Sabbeth Indus. Ltd. v. Penn. Lumbermens Mut. Ins. Co.*, 238 A.D.2d 767, 768 (N.Y. App. Div., 3d Dep't 1997)). In other words, the Second Circuit acknowledged that New York law does not necessarily require a specific policy provision allowing for consequential damages, while also clarifying that the case before it, *Globecon*, actually *was* a third-party case. As a third-party beneficiary case, *Globecon* is just as inapplicable here as *Strauss* and *Alicea*. In any event, the Plaintiffs are correct that *Bi-Economy* and its progeny, which post-date the *Globecon* appeal, do not appear to require express policy terms that contemplate the payment of consequential damages. *See, e.g.*, *Bi-Economy*, 10 N.Y.3d at 193 (reversing dismissal of consequential damages claim on summary judgment without requiring a specific policy provision

calling for such damages); *Panasia Ests., Inc. v. Hudson Ins. Co.*, 10 N.Y.3d 200, 203, (N.Y. 2008) (same).

Thus, the Court is unconvinced that consequential damages are available only if the Plaintiffs can identify a specific policy provision allowing for them. Accordingly, the Defendants' argument is rejected.

f. *Third-Party Policies vs. First-Party Policies*

The Defendants emphasize a purported "distinction drawn by New York courts between the availability of consequential damages for first party versus third party insurance claims."[38] [ECF No. 861 at 43 n.109]. According to the Defendants, "Under a first party insurance policy, the potential damages for which the insured may seek *reimbursement* are clearly delineated. In contrast, an insured under a third-party liability policy is not seeking reimbursement for the cost of loss incurred but rather coverage for potential liability owed to a third-party. Because the claims that may be filed by third parties against an insured are not for reimbursement of loss incurred, the idea that any specific form of consequential damages was contemplated by the parties to a third-party liability policy is speculative at best." [*Id.*; *see also* ECF No. 936 at 21; Hearing Tr. at 134:9–15]. The Defendants attempt to distinguish the Court of Appeals' decision in *Bi-Economy*, which involved a first-party policy and in which consequential damages were held to be potentially recoverable, from several cases which involved third-party policies and in which consequential damages were held not to be recoverable. [ECF No. 861 at 43–44 (citing *Int'l Rehab*, 2014 WL 6387276; *Scottsdale*, 549 F. Supp. 3d 334)].

---

[38] The preceding sections of this Decision use the term "third party" to refer to a person or entity who was a third party to a contract—that is, someone who lacked contractual privity with the first parties to the contract. In this section, by contrast, the Court uses the term "third-party policies" or "third-party liability policies" to refer to insurance policies providing coverage to the insured for liability arising from damages suffered by someone other than the insured. At times, the parties' briefing blurs the line between these two concepts.

The Trust responds that New York cases are inapt because Michigan law, not New York law, applies to this issue, and both the Trust and the Class Plaintiffs argue that, in any event, neither Michigan nor New York law draws a distinction between first-party and third-party policies when determining the availability of consequential damages, and, on the contrary, courts applying New York law have rejected attempts to draw such a distinction. [ECF No. 893 at 39–41; ECF No. 881 at 44 n.76]. The Defendants have not addressed the Plaintiffs' choice of law argument [*see generally* ECF No. 936], but the Court need not decide that issue because the Court agrees with the Plaintiffs that, even if New York law applies, there is no outcome-changing distinction between first-party and third-party liability policies.

The primary case on which the Defendants rely is *Scottsdale*, 549 F. Supp. 3d 334, which the Defendants characterize as "distinguishing *Bi-Economy* as a 'first-party insurance case,' in which 'there is no independent claim available for bad faith denial of insurance coverage.'" [ECF No. 861 at 44 (quoting *Scottsdale*, 549 F. Supp. 3d at 350)]. According to the Defendants, *Scottsdale* "noted that, '[H]istorically, both first-party and third-party insureds suing in New York for an insurer's breach of contract in failing to pay a claim were limited to recovering within the policy limits of the policy which they purchased.'" [ECF No. 936 at 18–19 (quoting *Scottsdale*, 549 F. Supp. 3d at 349)]. On this, the Defendants are correct. But the Defendants then go on to say that *Scottsdale* "explained that the New York Court of Appeals' decision in *Bi-Economy* did not change that law, it merely carved out an exception in the first-party insurance context." [ECF No. 936 at 19 (quoting *Scottsdale*, 549 F. Supp. 3d at 350)]. On this, the Defendants are wrong.

To be sure, *Scottsdale* noted that "*Bi-Economy* was a first-party insurance case" and that *Bi-Economy* "carved a limited exception to [the] general rule," *Scottsdale*, 549 F. Supp. 3d at 350, but at no point did *Scottsdale* suggest that the exception was limited to *only* first-party insurance

cases; on the contrary, the court expressly avoided that question. The *Scottsdale* court explained that there "ha[d] been some disagreement among courts and commentators about the analytic moorings of *Bi-Economy*" and then described several of the various interpretations of *Bi-Economy*, including that "[s]ome [commentators] have viewed it as limited to first-party insurance claims." *Scottsdale*, 549 F. Supp. 3d at 353–54. But instead of adopting that view (or any of the other views), the court held that "*[o]n any analysis*, Scottsdale is entitled to summary judgment" because, on the specific facts of the case, the lack of bad faith and contemplation by the parties distinguished the case from *Bi-Economy*. *Scottsdale*, 549 F. Supp. 3d at 353–54 (emphasis added). In other words, the court avoided adopting the Defendants' narrow interpretation of *Bi-Economy*, instead distinguishing the case on the grounds that "[t]he facts [in *Scottsdale*] f[e]ll far outside those alleged and at issue in *Bi-Economy*[.]" *Id.* at 353.

Moreover, *Scottsdale* cited no cases and relied on only a single article as support for its statement that "[s]ome [commentators] have viewed [*Bi-Economy*] as limited to first-party insurance claims." *Id.* (citing Charles Platto, Joseph Grasso, Rachel Lebejko Priester & Alison Weir, *What is the Law of Bad Faith in New York Two Years After* Bi-Economy *and* Panasia – *Have The Questions Been Answered?*, 32 No. 3 Ins. Litig. Rep. 69, 73–74 (2010)). Tellingly, although the cited article does "argue that there is" a "difference between first-party and third-party contexts," it immediately goes on to say that "[t]he courts that have considered *Bi-Economy[]* in the context of third-party claims, however, do not distinguish the decisions' application to third-party claims as compared to first-party claims." Platto et. al, *supra*, at 73–74 (citing *U.S. Fire Ins. Co. v. Bunge N. Am., Inc.*, No. 05-2192, 2008 WL 3077074, at *16 (D. Kan. Aug. 4, 2008); *Handy & Harman v. American Intern. Group, Inc.*, No. 0115666/2007, 2008 WL 3999964, at *9 (N.Y. Sup. Ct., N.Y. Cnty. Aug. 25, 2008)). This is in accord with the cases cited by the Plaintiffs on

this point. *See, e.g.*, *In re AXIS Reinsurance Co. REFCO Related Ins. Litig.*, No. 07-CV-07924, 2010 WL 1375712, at *7 n.9 (S.D.N.Y. Mar. 7, 2010) (rejecting an attempt to "distinguish [] *Bi-Economy* as involving first-party insurance policies, as opposed to the third-party insurance policy at issue" and concluding that "[w]ith respect to the issues before the court, there is no distinction between a third-party and a first-party insurance agreement"), *amended on other grounds* No. 07-CV-07924, 2010 WL 1375070 (S.D.N.Y. Mar. 19, 2010), *and report and recommendation adopted sub nom. In re REFCO Sec. Litig.*, No. 07 CIV. 7924, 2010 WL 1374891 (S.D.N.Y. Apr. 5, 2010); *Gov't Emps. Ins. Co. v. Saco*, No. 12-CV-5633, 2018 WL 6531608, at *6 (E.D.N.Y. Dec. 11, 2018) ("[W]hile *Bi-Economy* involved a bad-faith claim against a first-party insurer, rather than a liability insurer, no court has yet held that *Bi-Economy's* expansion of consequential damages does not apply to third-party claims; indeed, at least one court has applied *Bi-Economy* to permit consequential damages in a third-party case.") (citing *Handy*, 2008 WL 3999964).

Therefore, the Court denies the Defendants' motion to the extent it is predicated on the argument that consequential damages are *per se* unforeseeable or otherwise unavailable for a breach of a third-party liability policy.

g.  *Evidence of Foreseeability*

Having rejected every argument that the requested consequential damages are either *per se* unavailable or *per se* unforeseeable (and therefore *per se* unavailable), the Court next considers whether there exists a triable dispute over whether consequential damages in the form of Lost Prejudgment Interest and the Trust's Pre-Bankruptcy Losses were reasonably contemplated by the parties at the time of, or prior to, contracting. As noted above, and as is unsurprising given the inherent difficulty of proving a negative, the Defendants have cited no evidence to show that such

damages were not contemplated or foreseeable; instead, they argue that there is no evidence to suggest that such damages *were* contemplated or foreseeable. [*See, e.g.*, ECF No. 861 at 45].

In response, with regard to Lost Prejudgment Interest, the Class Plaintiffs argue that the Defendants had "knowledge of the purported 'exhaustion' provision requiring Lloyd's and the underlying carriers to satisfy their respective exhaustion provisions before each respective Excess Policy would be triggered," that "the foreseeable consequence of the underlying carrier's refusal to pay" was that "the Excess Insurers would contend that (wrongly) [sic] no claim could attach until Lloyd's paid out its full policy limits to RFC," and that, therefore, "the Insurers knew and were aware at the time the Policies were issued that their failure to pay their limits would allow the Excess Insurers above them to argue liability had not attached and therefore [they] would not have to pay interest." [ECF No. 881 at 37–38]. The Class Plaintiffs support this argument with citations to "substantial testimony elicited during discovery that Lloyd's and other Insurers recognized that excess policies typically contain exhaustion clauses and that insurers higher up in the tower would contend that they would not be required to pay until Lloyd's and Insurers lower in the tower satisfied those exhaustion clauses," all of which is in the evidentiary record. [ECF No. 881 at 37–38; ECF No. 881-1 ¶ 3].

With regard to the Trust's Pre-Bankruptcy Losses, the Trust argues that "the Insurers knew that GM was purchasing significant coverage to protect itself from the financial damages that defense costs could cause" because the "plain language of the Policy provides coverage for all 'Costs, Charges, and Expenses' the Assureds shall become legally obligated to pay by reason of any Claim," including "reasonable and necessary legal fees and expenses incurred by the Assured in the investigation, adjustment, arbitration, mediation, defense or appeal of any Claim and cost of attachment of similar bonds." [ECF No. 893 at 44–45; ECF No. 893-1 ¶¶ 60–62]. The Trust

further argues—with additional record cites—that "Lloyd's confirmed that costs associated with posting an appeal bond—including the cost of premium *and* 'cost of collateral' were covered Costs, Charges, and Expenses," and that "each of these insurers acknowledged in internal documents and reports that the costs of the bond–premium and collateral—were covered costs." [ECF No. 893 at 45; ECF No. 893-1 ¶ 63].  The Trust supports its argument with citations to evidence, including the Policy itself and documents produced during discovery.  [*See* ECF No. 893-1 ¶¶ 60–63].

Plaintiffs, then, have identified evidence showing that both types of damages had been contemplated by the parties.  This evidence is unrebutted by any evidence identified by the Defendants.  At the very least, then, the Defendants have failed to establish that the issue is not subject to genuine dispute, rendering summary judgment on that issue inappropriate.

### h. *Damages Quantification*

Apart from the issue of contemplation, the Defendants argue that "consequential damages that are unquantified and do not go beyond mere speculation cannot be recovered. . . .  Here, because the claims by the Liquidating Trust in the TAAC for 'pre-bankruptcy losses' are unquantified, undefined, and do not exceed mere speculation, such damages cannot be recovered by Plaintiffs and must be dismissed from the TAAC."  [ECF No. 861 at 41 (citations omitted)].  The Defendants' argument is copied verbatim from the Defendants' Pleadings Motion [ECF No. 699 at 10] and explicitly refers to the TAC twice, so it appears to be an argument about the sufficiency of the Plaintiffs' pleadings, in which case it is rejected pursuant to the law of the case analysis discussed above.

However, because the Defendants cite a parenthetical quote from *Bi-Economy* that "proof of consequential damages cannot be speculative or conjectural" [ECF No. 861 at 41 (quoting *Bi-*

*Economy*, 10 N.Y.3d at 193)], and because *Bi-Economy* was decided at the summary judgment stage rather than the motion to dismiss stage, *see* 10 N.Y.3d at 196, the Court interprets the Defendants' argument as suggesting that the Plaintiffs have not provided any evidence to quantify their consequential damages and that such damages are therefore too speculative to be recovered.

Even under this generous interpretation, the Defendants' argument fails, at least as a basis for partial summary judgment. With respect to the Trust's Pre-Bankruptcy Losses, the Trust argues that "the parties disclosed and deposed nine experts who testified regarding the basis for and quantification of the Trust's consequential damages." [ECF No. 893 at 30; ECF No. 893-1 ¶ 39]. With respect to Lost Prejudgment Interest, the Class Plaintiffs argue that "[a]ll the parties know and have contended since the beginning of this litigation that the applicable law would either be New York or Michigan law, and both states impose prejudgment interest by statute at a specific rate that is easily calculated." [ECF No. 881 at 35]. Indeed, the Defendants tacitly concede this point. [*See* ECF No. 861 at 45 ("In any event, prejudgment interest is statutory.") (citing N.Y. CPLR § 5001; M.C.L. § 600.6013)]. Thus, to the extent a factfinder concludes there is a basis to award Lost Prejudgment Interest, the quantification task may be as simple as multiplying the breach of contract damages which the Class Plaintiffs would have been entitled to recover from the Excess Insurers if the Class Plaintiffs had prevailed by the statutory rate, over the amount of time that has passed since prejudgment interest would have begun to accrue.

Therefore, the Plaintiffs have demonstrated, at the very least, the existence of a genuine factual dispute, rendering summary judgment on the basis of damages quantification inappropriate.

5. <u>The Plaintiffs Are Not Precluded From Recovering Prejudgment Interest</u>

In their opening brief, the Defendants' entire argument on prejudgment interest reads as follows: "In any event, prejudgment interest is statutory, and whether it is owed depends solely on

whether coverage is available under the Policies.  Interest is not a form of consequential damages, and it has no connection at all to Plaintiffs' claim of a lack of good faith and fair dealing."  [ECF No. 861 at 45].  The Class Plaintiffs respond that the "Insurers provide no citation to legal authority for this statement" and that "in any event, the Insurers' conclusory statement distorts the specific consequential damages Class Plaintiffs actually seek in this action," which include only *Lost* Prejudgment Interest (*i.e.*, prejudgment interest that the Excess Insurers would have paid had the Primary Underwriters not wrongfully failed to pay up to the primary coverage limit) [ECF No. 881 at 39], while the Trust does not appear to address this argument directly [*see generally* ECF No. 893].  The Defendants did not revisit the argument in their reply brief or during the Hearing [*see generally* ECF No. 936; Hearing Tr.], and counsel for the Primary Underwriters suggested during the Hearing that the Primary Underwriters' arguments regarding the unavailability of consequential damages may not apply to ordinary prejudgment interest [*see* Hearing Tr. at 132:23–25 ("There is no basis to go outside of [the] policy limits except with respect to the potential of pre-judgment interest."); *id.* at 133:9–11 ("So whether it's covering defense costs or indemnity, [the primary policy cap of $50 million] is the limit of what the primary insurers are exposed to with the possible exception of interest.")].

The Court does not see how the Defendants' argument, even if true, would entitle them to summary judgment.  To the extent the Defendants intend to suggest that the Plaintiffs cannot recover ordinary pre-judgment interest even if they are awarded damages on their breach of contract claims, the argument suggests no such thing; it merely states that such interest is, by definition, statutory in nature.  And to the extent that the Defendants intend to suggest that the Class Plaintiffs cannot recover *Lost* Prejudgment Interest as a consequential damage—*i.e.*, because prejudgment interest is available solely as a statutory remedy on a successful breach of contract

claim and not as a form of consequential damages—the Defendants have cited no authority in support of this motion to suggest that the Class Plaintiffs may not recover, as a form of consequential damages, statutory damages to which the Class Plaintiffs allegedly *would have been entitled* in the absence of the Primary Underwriters' bad faith conduct.[39]

Therefore, the Court denies the Defendants' motion for partial summary judgment on the Plaintiffs' claims for prejudgment interest and Lost Prejudgment Interest.

6. <u>The Plaintiffs Are Not Precluded From Recovering Attorneys' Fees</u>

a. *The Defendants' Opening Brief*

The Defendants' opening brief contains the following cursory argument regarding attorneys' fees: "[A]ttorneys' fees are not recoverable in this action, whether as 'consequential damages' or otherwise." [ECF No. 861 at 37]. The Class Plaintiffs respond that, aside from that "single sentence," the Defendants "make no actual argument concerning this point in the memorandum in support," so the Court should summarily reject the Defendants' position. [ECF No. 881 at 44]. Similarly, the Trust argues that the Defendants make their assertion "without any explanation or analysis" and "provide no support" for it, so "the Trust does not construe the Motion as arguing that there is no evidence of attorney's fees or the requisite bad faith supporting such claims." [ECF No. 893 at 31 n.185, 42 n.236]. The Defendants have not challenged—or even acknowledged—these characterizations of their arguments in their reply brief or during the Hearing [*see generally* ECF No. 936; Hearing Tr.], so the Court would be well justified in rejecting the Defendants' "argument" out of hand.

---

[39] The Excess Insurers' motion for summary judgment on the Plaintiffs' claims for breach of contract, prejudgment interest, consequential damages, and attorneys' fees does make such an argument against the availability of such damages from the Excess Insurers. [*See* ECF No. 796-1 at 19–22]. Because, as discussed below, the Primary Underwriters did not join the Excess Insurers in making that argument, and because the argument is not otherwise incorporated by reference into the present motion, the Court does not reach it. The Court expresses no view regarding the potential viability of the argument or the Primary Underwriters' ability to rely on any authority cited therein going forward.

However, the Defendants' opening brief also contains the following sentence: "[T]he TAAC contains nothing but Plaintiffs' bare assertions that they are entitled to consequential damages in the form of attorney's fees and pre-bankruptcy losses, and Plaintiffs have produced no supporting evidence." [ECF No. 861 at 40; *see also id.* at 37]. The term "attorney's fees" in this sentence seems to refer to the attorneys' fees incurred as part of the Trust's Pre-Bankruptcy Losses, which, as discussed above, the Trust is allowed to pursue. But even interpreting the sentence as suggesting that the Plaintiffs have not produced any evidence supporting their claim for attorneys' fees in the present case, the argument still fails. The Trust argues—and the Defendants, in their reply, appear to concede—that attorneys' fees are available under New York law where the "insured makes 'a showing of such bad faith in denying coverage that no reasonable carrier would, under the given facts, be expected to assert it.'" [ECF No. 893 at 35 n.206 (quoting *Sukup v. State*, 19 N.Y.2d 519, 522 (N.Y. 1967)); ECF No. 936 at 23]. As discussed above, the Defendants' asserted bad faith is clearly a disputed issue for trial, so summary judgment on this issue is inappropriate.

    b.  *The Defendants' Reply Brief*

The Defendants' reply brief includes a section titled "Plaintiffs Are Not Entitled to Attorneys' Fees," which consists entirely of two arguments that are utterly absent from the Defendants' opening brief. [ECF No. 936 at 22–24]. First, the Defendants argue that attorneys' fees are unavailable under the "American Rule" "except where authorized by the parties' agreement, statutory provision, or court rule." [ECF No. 936 at 22–23]. Second, the Defendants cite *Sukup*, 19 N.Y.2d at 519, for the proposition that "it is 'well settled that an insured cannot recover his legal expenses in a controversy with a carrier over coverage,' unless the insurer is in 'such bad faith in denying coverage that no reasonable carrier would, under the given facts, be

expected to assert it' or shows 'gross disregard for its policy obligation by the insurer in asserting noncoverage,'" which, the Defendants argue, is not the case here. [ECF No. 936 at 23 (quoting *Sukup*, 19 N.Y.2d at 522)]. The Defendants conclude that the "claim for attorneys' fees must be dismissed" because "Plaintiffs have failed to submit evidence in opposition to Insurers' motion on this issue." [ECF No. 936 at 24].

During the Hearing, the Plaintiffs argued that the Defendants had waived these reply arguments by failing to raise them in their initial moving papers. [Hearing Tr. at 145:21–146:6]. The Court agrees. Abundant authority holds that arguments raised for the first time in a reply brief are waived and need not be considered. *E.g.*, *City of Almaty, Kazakhstan v. Ablyazov*, No. 15-CV-5345, 2021 WL 5154110, at *5 (S.D.N.Y. Nov. 5, 2021) ("Because this argument is raised for the first time on reply, it is waived."); *see also ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 324 n.11 (2d Cir. 2022) ("The [cross-appellants] first raised this argument on appeal in their reply brief, and thereby waived it."). The Court is especially disinclined to consider such arguments here because the Defendants have made no effort whatsoever to suggest that they could not have raised the arguments in their initial brief. Indeed, all evidence is to the contrary: the Defendants' entire American Rule argument is copied and pasted verbatim from their Pleadings Motion [*see* ECF No. 699 at 14], and the Defendants cited *Sukup* on the very same page of the Pleadings Motion [*id.*]. Therefore, the Court deems the arguments waived and will not consider them.[40]

7. The Court Need Not Address the Arguments in the Excess Insurers' Exhaustion Motion

Finally, although the arguments are not offered in support of the present motion, many of the arguments raised by the Excess Insurers in their motion for partial summary judgment on the

---

[40] If the Court were to reach the issue notwithstanding the Defendants' waiver of it, the Court likely would conclude that a triable issue of fact exists as to the existence and extent of bad faith by the Defendants, for the reasons discussed above.

Plaintiffs' claims for breach of contract, prejudgment interest, consequential damages, and attorneys' fees (*i.e.*, the Excess Insurers' exhaustion motion) are directed at the same types of damages that are addressed by the present motion. [*See* ECF No. 796-1 at 12–28]. To the extent that those arguments are not already addressed by the Court's discussion of the Excess Insurers' exhaustion motion, *supra* § E, the Court does not reach those arguments as they apply to the Excess Insurers because the Court grants the Excess Insurers' motion for partial summary judgment based on their exhaustion arguments.

The Court also need not consider those arguments to the extent they may also apply to the Primary Underwriters, because the Primary Underwriters did not join the Excess Insurers in filing their motion [*see* ECF No. 796 at 1–2] and did not incorporate those arguments into the present motion, whether by reference or otherwise [*see generally* ECF Nos 861, 936]. Indeed, during the Hearing, counsel for the Primary Underwriters explicitly acknowledged that, with one exception, the Excess Insurers' counsel's "presentation [of those arguments] was primarily on behalf of the excess insurers" [Hearing Tr. at 172:7–14], and counsel for the Excess Insurers repeatedly demonstrated that she was speaking only on behalf of the Excess Insurers, not the Primary Underwriters [*see* Hearing Tr. at 153:17–20 ("We would say that if we win the exhaustion motion [which applies only to the Excess Insurers], then that's end of story."); *id.* at 153:24–154:2 ("[I]t can't be the case that the excess carriers are then still responsible for pre-judgment interest that didn't accrue."); *id.* at 159:11–14 ("So if I understood Mr. Walters correctly, it sounds like he's now just seeking foregone pre-judgment interest from the primary carrier, in which case I could sit down . . . ."); *id.* at 160:11–16 ("[E]xcess carriers are absolutely entitled to that delay, right? That's the whole point. We're entitled to wait out good-faith coverage disputes."); *id.* at 161:23–162:3 ("So again, on this one, if you rule on exhaustion for the excess carriers, you don't need to

get to this issue, right?  If you hold that the excess carriers have not breached their contracts, you don't need to reach this motion . . . ."); *id.* at 169:11–14 ("For the excess carriers, we would submit that even if Your Honor holds that New York law applies, there are still no attorney fees as against the excess carriers."); *id.* at 170:6–7 ("There's actually not a reason to get into it with respect to the excess carriers.")].

The one exception, according to the Primary Underwriters' counsel, was that the Primary Underwriters joined in the Excess Insurers' arguments "with respect to the reasonableness of the insurer[s'] positions" for purposes of determining the availability of attorneys' fees, which the Primary Underwriters' counsel suggested was "set forth in our briefs."  [Hearing Tr. at 172:22–173:4].  Because, as just discussed, the briefing on the present motion does not purport to incorporate the Excess Insurers' argument by reference or otherwise join in the Excess Insurers' argument, counsel's comment during the Hearing can only have been a reference to the argument, raised for the first time in the Defendants' reply brief, regarding *Sukup* and the reasonableness of the Defendants' coverage positions [*see* ECF No. 936 at 23].  The Court has already discussed and rejected that argument above and need not discuss it again here.

Therefore, the arguments raised in the Excess Insurers' motion do not change the Court's conclusion that the Primary Underwriters are not entitled to partial summary judgment on the Plaintiffs' claims for consequential damages.

8.  <u>Conclusion</u>

For the reasons stated above, the Defendants' motion for partial summary judgment on the Plaintiffs' claims for consequential damages is denied.

**G.  <u>The Plaintiffs' Claims Are Not Time-Barred</u>**

All the Insurers except for Swiss Re (for purposes of this Section G, the "**Moving Insurers**") moved for partial summary judgment that the Plaintiffs' "claim" that the Insurers breached the implied duty of good faith and fair dealing, allegedly raised for the first time in the Third Amended Complaint is barred by the applicable statute of limitations. [ECF Nos. 794, 794-1]. The Trust and Class Plaintiffs opposed the motion [ECF Nos. 898 and 874, respectively] arguing, among other things, that the TAC did not add any new claims but rather added new "allegations" and "damages demands" which are not independently subject to the statute of limitations and are thus timely under the Original Complaint [*E.g.*, ECF No. 898 at 17]. The Class Plaintiffs, but not the Trust, requested partial summary judgment on this issue [ECF No. 874 at 5] but did not file a formal cross-motion for summary judgment. For the reasons that follow, the Moving Insurers' motion for partial summary judgment is denied, as is the Class Plaintiffs' informal request.

1. Background

    a. *Procedural History Pertinent to the Time-Bar Motion*

The Plaintiffs filed their original complaint in February 2015 [ECF No. 1 (the "**Original Complaint**")], and that complaint included the same ten counts as the TAC with an additional Count V for breach of the implied covenant of good faith and fair dealing as to the Policies for the Insurers' alleged bad faith refusal to consent to the Kessler Settlement [*id.* ¶¶ 190–203; *see also* ECF No. 377 at 2–3]. The Plaintiffs filed the first amended complaint in April 2015 as of right under Fed. R. Civ. P. 15(a)(1).[41]  [ECF No. 122].

As a result of motions to dismiss Count V - Bad Faith filed by seven different Insurers, in July 2015 the Plaintiffs and Insurers agreed to the filing of a second amended complaint wherein

---

[41] Made applicable to this case under Bankruptcy Rule 7015.

the Plaintiffs withdrew Count V without prejudice, and the Insurers' motions to dismiss that count were withdrawn.  [ECF Nos. 205, 206; *see* ECF No. 377 at 2–3].  According to an earlier pleading filed by the Plaintiffs, the second amended complaint deleted the bad faith claim of Count V without prejudice "but otherwise le[ft] the remaining Counts, and general allegations of bad faith, intact."  [ECF No. 377 at 2–3].

As noted above, *supra* § F.1.a, in October 2019, the Plaintiffs filed a motion for leave to file a third amended complaint seeking to add (a) "additional allegations" regarding the Defendants' asserted bad faith; (b) additional counts for breach of the covenant of good faith and fair dealing as a result of those additional allegations; and (c) "claims for relief" seeking consequential damages and attorneys' fees (collectively, the "**Amendments**").  [ECF No. 377]. The motion to amend stated that the "new allegations and counts for breach of the implied covenant of good faith and fair dealing are closely related to, but still distinct from, the claims for breach of contract."  [*Id.* at 8–9].  These proposed additions were premised on "recently discovered information" regarding bad faith conduct, based on documents reviewed during discovery and "admissions" by the Insurers during this case.  [*Id.* at 1].  The Plaintiffs argued that the new bad faith claims were different from those previously asserted in Count V because they were based on the Defendants' bad faith handling of RFC's claims and were not "extra contractual."  [*Id.* at 3, 5]

The Insurers opposed the Amendments as futile and untimely.  [ECF No. 384].  Following a hearing [ECF No. 393], the Court granted the motion to amend in part, allowing the Plaintiffs to add their new proposed factual allegations and requests for consequential damages and attorneys' fees, but denying the Plaintiffs' request to add new, separate counts for breach of the implied covenant of good faith and fair dealing.  [ECF No. 411].  Rather than adding new counts, the new

"[a]llegations in support of Plaintiffs' [bad faith] claims" were pled "as part of the claims for breach of contract." [*Id.*]. The Plaintiffs filed the TAC on February 11, 2020. [ECF No. 412].

b. *Relevant Policy Provisions*

Several Policy provisions are relevant to the time-bar inquiry. As stated above, "Loss" includes "damages, judgments, settlements and Costs, Charges and Expenses." [ECF No. 336-1 § II.V.1]. "Costs, Charges, and Expenses" are defined as "reasonable and necessary legal fees and expenses incurred by the Assureds in the investigation, adjustment, arbitration, mediation, defense or appeal of any Claim and cost of attachment or similar bonds[.]" [Id. § II.I]. The allegations and claims for damages at issue in the time-bar motion involve claims for alleged unpaid defense costs, including costs related to the appeal bond, and related consequential damages and attorneys' fees. [*See, e.g.*, ECF No. 794-1 at 1; ECF No. 929 at 1–2, 9, 18–19, 23, 25].

Further, the new allegations and requests for damages at issue are also related to Insurers' allegedly wrongful refusal to treat various claims as one claim because the underlying "Wrongful Acts" were "Interrelated." [*See, e.g.*, ECF No. 898 at 40–42]. The Policy defines "Interrelated Wrongful Acts" as "Wrongful Acts which have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions." [ECF No. 336-1 § II.T].

Further, the Policy includes the following provision, referred to as the "No Action Clause":

No Action shall lie against Underwriters unless, as a condition precedent thereto, the Assureds shall have fully complied with all of the terms of this Policy, nor until the amount of the Assureds' obligation to pay shall been fully and finally determined either by judgment against them or by written agreement between them, the claimant, and Underwriters.

[ECF No. 336-1 § XIII]. The Plaintiffs argue that the No Action Clause dictates that the claims at issue did not accrue until the underlying Mitchell and Kessler Claims were "fully and finally determined." [*See, e.g.*, ECF No. 898 at 29–40; ECF No. 874 at 22–24].

     c. *Arguments*

The Moving Insurers argue that, under either Michigan law (which they contend is applicable here) or New York law (which they contend is the only other option), the applicable statute of limitations for breach of contract claims is six years from the alleged breach, and that the statute of limitations bars the Amendments. [*See, e.g.*, ECF No. 794-1 at 8–12]. In both jurisdictions, the limitations period begins to run from the time when liability for the wrong has arisen, and not the (often later) time when the injured party discovers the occurrence of the wrong. [ECF No. 794-1 at 9]. According to the Moving Insurers, the Amendments concern "Defendants' claims handling in 2002, 2003, 2006, 2008, 2009, and 2010," with the most recent alleged breach of contract occurring in September 2010. [ECF No. 794-1 at 1, 11–12]. Because the Plaintiffs did not move to file the Third Amended Complaint until October 2019—more than nine years after what the Insurers view as the most recent alleged breach date—the Moving Insurers argue that the Amendments had been time-barred for more than three years before they were filed. [*Id.* at 11–12].

In opposition, the Plaintiffs argue that under either New York law (which the Plaintiffs contend is applicable here) or Minnesota law (which they contend is the only other option), the Amendments are timely for several reasons. [*See, e.g.*, ECF No. 874 at 11–35; ECF No. 898 at 14–42].

*First*, the Plaintiffs argue that the allegations concerning breach of the covenant of good faith and fair dealing are subsumed in the breach of contract causes of action—which the parties

agree are timely—and are therefore timely themselves.  [*See, e.g.*, ECF No. 874 at 16–22; ECF No. 898 at 18–21].  The Moving Insurers reply that even if the existing breach of contract causes of action are timely, the Amendments—which were pled "as part of" those causes of action—are so distinct from the previously asserted contract claims that they constitute separate causes of action that should be considered subject to separate statutes of limitation that have already run. [*See, e.g.*, ECF No. 794-1 at 1, 7, 10–12].

*Second*, as noted above, the Plaintiffs argue that, under the terms of the No Action Clause, the claims did not accrue until the underlying Mitchell and Kessler Claims were "fully and finally determined" in January 2014, so the statute of limitations did not expire until January 2020.  [*See, e.g.*, ECF No. 898 at 29–40; ECF No. 874 at 22–24].  As to the No Action Clause, the Moving Insurers contend that it is merely a condition precedent to liability, not a deadline for bringing suit, and that in any event the clause is limited in scope to claims for indemnification, which, the Moving Insurers contend, the claims at issue are not.  [*See, e.g.*, ECF No. 929 at 9, 14–23].

*Third*, the Plaintiffs argue that although the claims are timely without the need to resort to the relation back doctrine, the claims do nonetheless relate back and are therefore timely on that basis. [ECF No. 874 at 26–34; ECF No. 898 at 21–29].  The Moving Insurers argue that relation back *is* necessary in order to save the Amendments, and that the Amendments do not relate back to the Original Complaint because they are based on a set of factual allegations that are entirely distinct from those in the Original Complaint.  [ECF No. 794-1 at 13–14; ECF No. 929 at 21–23].  The Moving Insurers also argue that, even if the Amendments do relate back, the Original Complaint was filed on February 4, 2015, so any Amendments relating to breaches that occurred more than six years earlier—that is, before February 4, 2009—are time-barred anyway.  [ECF No. 794-1 at 13–14].

119

*Fourth*, the Trust argues that, with respect to its claims for Interrelated Claims Damages, the Defendants' "affirmative misconduct, after initial breach, produce[d] a delay between accrual of the cause of action and filing suit," entitling the Trust to equitable tolling on the statutes of limitations under New York and Michigan law.[42]  [ECF No. 794-1 at 9–14; ECF No. 898 at 42]. The Moving Insurers argue that the relevant jurisdictions do not apply a "discovery rule," so "a plaintiff's ignorance of the relevant facts does not toll the statute of limitations for a breach of contract claim," "even though the result may at times be harsh and manifestly unfair, and creates an obvious injustice."  [*See, e.g.*, ECF No. 929 at 24–25].

The Moving Insurers also argue that neither the "continuing violation doctrine" nor Section 108(a) of the Bankruptcy Code save the Amendments from untimeliness.  [ECF No. ECF No. 794-1 at 15–16].  The Class Plaintiffs agree that these doctrines are inapplicable here [ECF No. 874 at 5, 34–35], and the Trust does not purport to rely on them [*see generally* ECF No. 898], so this Decision does not analyze these arguments.

2.  Analysis

a.  *Choice of Law*

Bankruptcy courts apply the choice of law rules of the state in which they sit.  *See supra* § A.2; *In re Coudert Bros. LLP*, 673 F.3d 180, 188–89 (2d Cir. 2012) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)).  Because statutes of limitations are procedural, New York courts generally apply New York's statutes of limitations even if the substantive law of another state governs the underlying claims. *See Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 627 (2d Cir. 1998); *Architectronics, Inc. v. Control Sys., Inc.*, 935 F. Supp. 425, 431 (S.D.N.Y. 1996), on reargument (Aug. 16, 1996).  There exists, however, a statutory exception to that general rule,

---

[42] The Class Plaintiffs do not argue for equitable tolling and, to the contrary, disclaim any reliance on equitable tolling doctrines or the "discovery rule."  [*See* ECF No. 874 at 5, 14 nn.41 & 45, 34–35].

codified in New York's borrowing statute, N.Y. C.P.L.R. ("**NY CPLR**") § 202 (the "**Borrowing Statute**"). *See Stuart*, 158 F.3d at 627; *Migdal Ins. Co., Ltd. v. Ins. Co. of Pa.*, No. 14-CV-700, 2014 WL 5149128, at *2 (S.D.N.Y. Oct. 14, 2014).

Under the Borrowing Statute,[43] "when a nonresident plaintiff sues upon a cause of action that arose outside of New York, the court must apply the shorter limitations period, including all relevant tolling provisions, of either: (1) New York; or (2) the state where the cause of action accrued." *Stuart*, 158 F.3d at 627. The defendant bears the burden of proving that a particular statute of limitations has expired. *In re Boston Generating, LLC*, 617 B.R. 442, 470 (Bankr. S.D.N.Y. 2020). But the plaintiff bears the burden of proving a particular statute has been tolled. *Id.* (citing *Cucolo v. Lipsky, Goodkin & Co.*, 826 F. Supp. 763, 767 n.3 (S.D.N.Y. 1993)). When comparing statutes of limitation under a borrowing Statute, the entity seeking to benefit therefrom bears the burden of proof. *Boston Generating*, 617 B.R. at 470.

The Moving Insurers contend that the relevant forums under the Borrowing Statute are New York and Michigan, the place of contracting and the residence of GM, the principal Assured and RFC's parent company. [ECF No. 794-1 at 8 (citing *Vincent v. Money Store*, 915 F. Supp. 2d 553, 562 (S.D.N.Y. 2013) ("Absent unusual circumstances, when the injury of a nonresident plaintiff is purely economic, the cause of action accrues where the plaintiff resides and sustains the economic impact of the loss")]. Thus, under the Borrowing Statute, the Plaintiffs' "putative claims" are governed by New York law except where Michigan law results in a shorter period. [*Id.* at 9]. The Plaintiffs contend the other applicable forum is Minnesota, which was RFC's and ResCap's principal place of business while the underlying actions were being litigated and thus

---

[43] The Borrowing Statute states in full: "§ 202 Cause of action accruing without the state - An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply." NY CPLR § 202.

where RFC, into whose shoes the Plaintiffs step as assignees of RFC's rights under the Policies, sustained the impact of the alleged loss. [*E.g.*, ECF No. 898 at 16].

The Court concludes that the Moving Insurers have sustained their burden of establishing that Michigan law should apply under the Borrowing Statute, when and as applicable. Among other things, the Borrowing Statute is meant to "prevent[] forum shopping" and encourage "uniformity," and the plaintiff's residence (RFC's for purposes of this analysis) is often but not always the place of accrual under the Borrowing Statute. *See Deutsche Bank Nat'l Trust Co. v. Barclays Bank PLC*, 34 N.Y.3d 327, 337 (2019); *but see Glob. Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 529, (1999) ("When an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss"). Applying the law of GM's residence (Michigan) as the corporate parent and Policy signatory on behalf of GM and all its subsidiaries rather than that of RFC's residence (Minnesota) better promotes uniformity and certainty regarding governing law. *See Fireman's Fund Ins. Co.* 822 F.3d at 643 ("Moreover, an analysis that would look to a subsidiary of an insured based on the particular loss that triggered coverage would be at odds with New York's choice of law rules"). This action is at root based on interpretation of an insurance contract entered into by a Michigan-based corporation, GM, in Michigan; it thus makes more sense considering, among other things, the purposes of the Borrowing Statute, to refer to the law of GM's residence, even though RFC's successors are among the Plaintiffs. *See also supra* §§ A.2, D.1.c. Thus, in determining whether claims are timely applying the legal rules described above, New York law applies except where Michigan law supplies a shorter period.

In both New York and Michigan, the limitations period for a breach of contract claim is six years. NY CPLR § 213; Mich. Compiled L. Ann. 600.5807(9). The two states' standards for accrual of claims and tolling are discussed below.

> ### b. *The Amendments Are Part of the Original Complaint's Breach of Contract Causes of Action*

Because both parties agree that the Plaintiffs' breach of contract claims in the Original Complaint are timely [*see* ECF No. 898 at 2; ECF No. 794-1 at 4–5; ECF No. 874 at 14], the key question (on which the parties' arguments focus) is whether the new "claims" (as the Moving Insurers put it) or "allegations" and "requests for damages" (as the Plaintiffs do) are, for time-bar purposes, part of, or separate from, the breach of contract claims in the Original Complaint. For the reasons discussed below, the Court concludes that the Amendments are part of the breach of contract claims in the Original Complaint and are therefore not time-barred.

For all the ink that has been spilled on this issue, the Court finds this issue not overly complex, and, further, to have been already settled in this case in 2020. As noted above, and as both parties have, to varying extents, acknowledged [*see* ECF No. 874 at 17–18; ECF No. 898 at 2; ECF No. 929 at 20], when Judge Lane granted the Plaintiffs' motion to amend, he specifically ordered that the motion be:

1. GRANTED in part to allow Plaintiffs to amend their complaint with the new proposed factual allegations set forth in their proposed Third Amended Adversary Complaint;

2. GRANTED in part to allow Plaintiffs to amend their complaint to assert a claim for consequential damages and attorney's fees against Defendants;

3. DENIED in part as to Plaintiffs' request to add their proposed separate new Count XII and Count XII for breach of the implied covenant of good faith and fair dealing. Allegations in support of Plaintiffs' claims for breach of the implied covenant of good faith and fair dealing shall therefore be pled by Plaintiffs as part of the claims for breach of contract.

[ECF No. 411 at 2].  By the very terms of Judge Lane's order, the Amendments were approved only as (i) "factual allegations" pled "as part of the claims for breach of contract," or (ii) "claim[s] for consequential damages and attorney's fees against Defendants" pled "as part of the claims for breach of contract."  Either way, the inclusion of the Amendments in the TAC in the wake of Judge Lane's order demonstrates that, by definition, they are "part of the claims for breach of contract."  Put differently, if the Amendments stated new, independent claims and were *not* part of the breach of contract claims, then Judge Lane's order would have forbidden their inclusion in the TAC, and the parties would not be arguing about their timeliness today.  Thus, the very existence of the Amendments as part of the TAC proves that they are, indeed, "part of the claims for breach of contract."

The Moving Insurers attempt to sidestep this conclusion by arguing that, even if the Amendments are *technically* pled as part of the breach of contract claims, they are *practically* so distinct from those claims that they should be considered separate causes of action.  [*See, e.g.*, ECF No. 929 at 1–2, 17–21; Hearing Tr. at 189:25–190:12, 191:21–193:17].  This argument is unavailing.  Tellingly, in their briefs, the Moving Insurers do not cite a single case or other authority supporting the proposition that allegations and prayers for relief pled in support of a particular cause of action can be separated from that cause of action and subject to an independent statute of limitations.  [*See generally,* ECF Nos. 794-1, 929].  Indeed, during the Hearing, when the Court specifically asked the Moving Insurers to provide such authority, they were unable to do so.  [Hearing Tr. at 193:20–194:13]. Nor was the Court, after conducting its own inquiry, able to identify any authority supporting the Moving Insurers' position.  Indeed, the Court has located only one case in any of the potentially relevant jurisdictions that bears on the issue at all, and that case states that "the statute of limitations may not be invoked against factual allegations, as such,

124

in a complaint or against particular evidentiary matter, but only against causes of action."
*Warthmann v. Mfrs. Tr. Co.*, 36 N.Y.S.2d 298, 300 (Sup. Ct., N.Y. Cnty. 1942), *aff'd* 36 N.Y.S.2d
421 (App. Div., 1st Dep't 1942).[44]

Further, this principle applies to new prayers for relief as well as new factual allegations,
"because the Federal Rules do not require a plaintiff to specify the relief sought in the complaint.
. . . Although Rule 8(a)(3) of the civil rules requires that a complaint contain 'a demand for
judgment for the relief the pleader seeks,' the demand is not itself a part of the plaintiff's claim,
and so failure to specify relief to which the plaintiff was entitled would not warrant dismissal under
Rule 12(b)(6) (dismissal for failure to state a claim). Any doubt on this score is dispelled by Rule
54(c), which provides that a prevailing party may obtain any relief to which he's entitled even if
he has not demanded such relief in his pleadings." *In re Methyl Tertiary Butyl Ether ("MTBE")
Prod. Liab. Litig.*, 568 F. Supp. 2d 376, 383 (S.D.N.Y. 2008) (citations and quotations omitted).
It would not make sense, therefore, if a statute of limitations could time-bar a prayer for relief that
had already been pled "as part of" a timely-commenced cause of action—with the Court's prior
blessing, no less.

The outcome that the Insurers seek would also be at odds with the plain language of the
New York and Michigan statutes of limitations themselves. The text of the Michigan statute
provides that "[a] person may not *bring or maintain an action* to recover damages or money due

---

[44] *Warthmann* remains instructive 80 years after it was issued. There, the court had previously dismissed certain
causes of action as time-barred, and the plaintiffs served an amended complaint taking the allegations that had been
pled as part of the dismissed causes of action and moving them under the heading of another cause of action that had
not been dismissed. *Id.* at 299. The court noted that, "in view of prior judicial action," the facts presented a "most
unusual situation" in which "to permit plaintiffs in the instant case to reallege matter which has already been declared
to be barred by the Statute of Limitations, would give sanction to a form of pleading which would lead not only to
confusion but would impose an unwarranted burden on the defendants." *Id.* Here, the opposite is true: the Court has
already taken "prior judicial action" that *specifically allowed* the Plaintiffs to file the TAC containing the Amendments
and *specifically instructed* the Plaintiffs to plead the Amendments "as part of the claims for breach of contract." [ECF
No. 411 at 2]. Thus, the present case does not present a "most unusual situation" compelling the Court to rule in favor
of the Moving Insurers; on the contrary, the "prior judicial action" in this case compels the opposite result.

for breach of contract or to enforce the specific performance of a contract unless . . . the person *commences the action* within the applicable period[.]" Mich. Compiled L. Ann. 600.5807(1) (emphasis added). Similarly, the text of the New York statute provides that "[t]he following *actions* must be commenced within six years: . . . an *action* upon a contractual obligation or liability . . . ." NY CPLR § 213(2) (emphasis added). The statutes bar causes of action, not individual factual allegations. The statutes, by their terms, do not limit the pleading of specific allegations or prayers for relief, but the bringing of the cause of action itself.

The Moving Insurers also attempt to get around Judge Lane's order by arguing that it was "based on" (i) "the liberal standard for allowing amendment under Federal Rule of Civil Procedure 15"; (ii) the fact that "Defendants had not raised objections to the addition of new factual allegations apart from disputing the merits of those allegations"; and (iii) the fact that "under a Rule 12(b)(6) standard it was too soon for the Court to address their merits . . . including the statute of limitations issue." [ECF No. 929 at 20–21]. But even if the Moving Insurers are correct that it was "too soon" for them to raise the statute of limitations issue in opposition to the motion to amend,[45] they still fail to escape the Court's conclusion that the specific factual allegations and prayers for relief pled "as part of" the timely breach of contract claims cannot be bifurcated from those claims and subject to a separate statute of limitations for the reasons discussed above. The Moving Insurers' motion is therefore denied on that basis alone.

In view of the Court's conclusion that the amendments merely add factual allegations and demands for relief in support of pre-existing causes of action, the Court does not reach the parties'

---

[45] The Moving Insurers opposed the motion to amend on the grounds that the Amendments were futile and not timely raised under Fed. R. Civ. P. 15 [*see generally* ECF No. 384], but they did not raise the statute of limitations issue [*see generally id.*, ECF No. 929 at 21 & n.17]. Courts, at least in some circumstances, consider time-bar defenses appropriate for resolution on threshold motions based on the pleadings. *See, e.g.*, *Cartwright v. Comm'r of Soc. Sec.*, No. 19-cv-10853, 2021 WL 4249430, at *2 (S.D.N.Y. Sept. 17, 2021) (entertaining motion to dismiss on statute of limitations grounds under Rule 12(b)(6)).

additional contentions regarding, among other things, the "no action clause," the relation back doctrine, and the equitable tolling doctrine. Rather, the Insurers' motion for partial summary judgment on time-bar grounds is denied.

The Class Plaintiffs' request for partial summary judgment in their favor as to their allegations is likewise denied. The position of all Plaintiffs is that the newly alleged facts do not constitute freestanding claims, but rather constitute additional allegations and prayers for relief in support of existing claims. The Court sees no basis to enter summary judgment with respect to a subset of factual allegations and prayers for relief that do not themselves constitute a claim or cause of action, especially considering that the Class Plaintiffs have not filed a formal motion or cross-motion on this issue notwithstanding the Court's prior scheduling orders requiring the filing of such motions.

**H.** **The Defendants Are Not Precluded From Challenging the Reasonableness of the Kessler Settlement, and the Settlement's Reasonableness Is Reasonably in Dispute**

The Kessler Class filed two separate motions for partial summary judgment asking the Court to reject the Insurers' contention that the estate's 2013 settlement of the Kessler Class's claim was unreasonable so as to preclude insurance coverage for the settled amount of that claim. The first such motion seeks summary judgment on the grounds that the Insurers waived and/or are collaterally estopped from denying coverage based on their contention that the 2013 settlement of the Kessler Class's claim was unreasonable as that term is used in insurance coverage caselaw. [ECF Nos. 807, 808]. The second such motion was filed soon after the first and seeks a determination that no reasonable fact-finder could conclude that the estate's settlement of the Kessler Class's claims in 2013 was unreasonable, such that there is no genuine dispute of material fact as to the settlement's reasonableness. [ECF Nos. 809, 812].

This section of this Decision addresses both motions because they involve overlapping background, although they require separate legal analyses. The Court first considers the motion that is based on waiver and collateral estoppel theories, because, if that motion were granted, the Court would not need to reach the motion based on the merits of the Insurers' reasonableness defense. For reasons detailed below, however, the Court denies the motion that is based on principles of waiver and collateral estoppel, in brief because the Insurers in fact asserted and took steps to preserve their reasonableness defense at the time of the settlement and the interrelated confirmation of the Plan, and because the Settlement as approved assigned the Kessler Class and others rights to pursue recoveries from the Insurers, but did not conclusively purport to resolve or preclude contentions as to whether the settlement could be deemed unreasonable and therefore beyond the Insurers' coverage obligations. The Court further denies the Kessler Class's motion for partial summary judgment determining that the 2013 Kessler Settlement was reasonable for insurance coverage purposes, because the Insurers have presented enough facts and argument as to facts relied upon by the Kessler Class to present a genuine issue of material fact that can only be resolved at trial.

## 1.   Selected Background Relevant to the Reasonableness Motions

The main bankruptcy case of Residential Capital, LLC, often referred to as "ResCap," was commenced in 2012. The Kessler Class's statement of material facts filed in support of the motion indicates that the Kessler Class consisted of individuals located throughout the United States who took out a total of 44,535 second-mortgage loans from Originating Banks that subsequently sold the loans to RFC, a subsidiary of ResCap, a Debtor in the main bankruptcy case that gave rise to this adversary proceeding.[46]   [ECF No. 806 ¶¶ 197, 247, 249; ECF No. 808

---

[46]   Uncontested statements of fact in the statement of facts are deemed admitted. *See* Local Bankruptcy Rule 7056-1(d).

at 2].  In November 2012, the Kessler Class filed a Proof of Claim against RFC, asserting an aggregate entitlement to more than $1.87 billion.  [ECF No. 806 ¶ 53].

Early in its bankruptcy case, ResCap proposed a pre-packaged plan, but that plan drew objections, and the Court referred the case to then-Bankruptcy Judge James Peck for mediation. [Bk. ECF No. 56].  The mediation resulted in an agreed-upon plan, as part of which RFC and the Kessler Class agreed to settle the Class's claim.  [ECF No. 806 ¶¶ 107–10].  The proposed settlement was complex, but, in essence, called for the Kessler Class to be granted an allowed proof of claim in the amount of $300 million, of which no more than $27 million was to be paid by the bankruptcy estate through distributions, with the remaining balance to be collectable solely by an assignment to the Kessler Class of the estate's coverage rights against its insurers on account of the Kessler Class's claims.  *See infra* § I.2.b (listing the various provisions providing for the allowed claim and the distribution).  In other words, subject to certain limitations and requirements, the Kessler Class was granted the entitlement to seek payment from ResCap's insurers on account of all portions of its $300 million allowed claim and a guaranteed direct distribution from the estate capped at $27 million, and the estate would have no other payment obligation to the Kessler Class.  *Id.*

The Kessler Settlement required three separate approvals to become effective:  first, by the Bankruptcy Court on a motion by the Debtors pursuant to Federal Rule of Bankruptcy 9019, which governs Bankruptcy Court approval of settlements that compromise claims against and rights of the estate in contested matters; second, by the Bankruptcy Court through confirmation of the Debtors' proposed Plan, which was an integral component and required condition of the Settlement; and third, by the Bankruptcy Court on a "final" settlement approval pursuant to Fed. R. Civ. P. 23, because the settlement resolved a class action and therefore needed to be reviewed

and approved under Rule 23's standards for approvals of class actions. *See* Fed. R. Civ. P.

23(e)(2). These requirements are express requirements of the Settlement Agreement, which is

docketed as an exhibit to the settlement approval motion in the main bankruptcy case at Bk. ECF

No. 4415-5. Specifically, the Settlement Agreement provided that it was to become effective

only "when all of the following conditions have occurred," including entry of a "Preliminary

Approval Order," entry of a "Final Approval Order," and the occurrence of the "Effective Date"

of a confirmed Plan. [Bk. ECF No. 4514-5 at 42–43].

The Kessler Class observes that the Insurers were notified of the Kessler claims in 2001

and assigned attorneys to monitor and evaluate the matter. [ECF No. 806 ¶ 5]. Further, the

Class asserts that, "as early as 2006," RFC updated the Insurers and provided information

suggesting that potential damages could exceed $2 billion. [*Id.* ¶¶ 5–6, 16–19]. The Kessler

Class further observes that counsel for RFC emailed the Insurers on June 20, 2013, advising

them that RFC had reached a settlement in principle that would grant the Kessler Class an

allowed claim for $300 million. [*Id.* ¶ 107]. On June 28, 2013, RFC sent the Insurers a copy of

the settlement agreement, and requested the Insurers' consent, which the Insurers refused. [*Id.*

¶¶ 118–19]. As noted, the Settlement Agreement's key economic terms included the grant of an

allowed claim amount of $300 million, of which all but $27 million could be collected only from

the Insurers and only in the event the Kessler Class successfully obtained a coverage

determination, *see infra* § I.2.b; the settlement was conditioned on confirmation of a Plan that

assigned the estate's relevant insurance coverage rights to the Kessler Class and authorized the

Class to pursue insurance recoveries from the Insurers [Bk. ECF No. 4515-5 at 9, 16–20, 29, 42–

43]. On July 31, 2013, RFC and the Kessler Class filed a motion to approve their settlement.

[ECF No. 806 ¶¶ 120–22]. The motion sought a "preliminary order" approving the settlement as

"fair, adequate and reasonable," with the same proposed order also to set a final hearing date for a subsequent, final approval of the settlement.  [*Id.* ¶¶ 120–26].

The Insurers object that RFC and the Kessler Class negotiated in "secret" and that the proposed allowed claim amount was radically increased from previously-discussed amounts, without consultation or approval by the Insurers despite their Policies' information-disclosure and compromise-approval requirements.  [*See generally* ECF 879 at 7–9 (citing numerous evidentiary bases and describing settlement discussions through May)].  The Insurers further observe that they "repeatedly wrote to RFC in May, June, and July 2013 reserving their rights." [*Id.* at 9 (citing correspondence)].  Further, the Insurers observe that RFC in turn recognized that the Insurers intended to reserve all defenses to coverage, including with respect to "the reasonableness of the settlement."  [*Id.* at 10 (citing Ex. 165 at 3; Ex. 198 at 2)].  During a meeting on June 14, 2013, RFC's insurance counsel represented to Insurers that the forthcoming Plan would include insurance neutral wording and that coverage defenses were preserved, including with respect to the Kessler Settlement.  [*Id.* (citing Ex. 197 at 20–21)].

Ultimately, as noted, RFC and the Kessler Class filed a motion on July 31, 2013, seeking preliminary approval of their settlement.  [ECF No. 806 ¶¶ 120–22].  The Kessler Class emphasizes that the Insurers did not file an opposition to that motion, and that, following a hearing on August 21, 2013, Judge Glenn entered an order preliminarily approving the Settlement as, among other things, fair and reasonable, while scheduling a "final" hearing on the Settlement.  [*Id.* ¶¶ 168–69, 173–75; Bk. ECF No. 4808].  Judge Glenn's order further specifically required that the Insurers be given notice of the Settlement and his preliminary order, and notice of their right to raise any objection and to participate in the "Fairness Hearing," *i.e.*, the final approval hearing.  [ECF No. 806 ¶¶ 173, 176; Bk. ECF No. 4808 ¶ 18].  The same order

stated: "Any objector who does not make his or her objection in the manner provided in this

Order shall be deemed to have waived any such objection and shall forever be barred from

making any objection to the Settlement, including without limitation, the propriety of class

certification, the adequacy of any notice, or the fairness, adequacy or reasonableness of the

Settlement." [ECF No. 806 ¶¶ 173, 179; Bk. ECF No. 4808 ¶ 21]. The "Settlement" referred to

in the August 21, 2013 Order was the "Kessler Settlement Agreement dated June 27, 2013

between Named Plaintiffs, individually and as the proposed representatives of the Kessler

Settlement Class, and the Settling Defendants" [Bk. ECF No. 4808 at 1], a copy of which is an

exhibit to the settlement approval motion docketed at Bk. ECF No. 4451-5.

The Kessler Class emphasizes that, notwithstanding the clear directive in Judge Glenn's

order, the Insurers never filed an objection to the motion seeking approval of the Settlement,

even in anticipation of the Fairness Hearing after Judge Glenn's preliminary order. The Insurers,

however, did file a "Response and Reservation of Rights" regarding insurance coverage issues in

the main bankruptcy case, in which the settlement approval motions were also sought. [Bk. ECF

No. 4015]. There, the Insurers insisted that "[t]he Debtors cannot use the Plan or any aspect of

the bankruptcy process to alter or amend the rights and obligations arising under . . . the

Policies." [Id. ¶ 14]. And on June 24, 2013, RFC filed a response, stating that insurance

neutrality was a plan confirmation issue, and that RFC would "ensure that the as-yet-to-be-filed

Plan complies with all requirements pursuant to the Bankruptcy Code." [Bk. ECF No. 4066-1 at

2; Bk. ECF No. 4066 ¶¶ 21–28]. As noted, the Settlement Agreement itself conditioned the

Settlement's effectiveness on confirmation of a Plan.

Ultimately, RFC filed a proposed plan of reorganization on July 3, 2014, which included

language preserving certain insurer defenses, subject to limitations or exclusions. [Bk. ECF No.

132

4153 at 17–18, 90].  The Insurers timely filed an objection on October 21, 2013, specifically

objecting that the Plan was not "confirmable" based on assertedly "impermissible" attempts to

prejudice the Insurers' rights by excluding defenses based on collateral estoppel or other

doctrines, including with respect to "reasonableness."  [Bk. ECF No. 5413 at 9–11].  The

Insurers proposed what they contended would be broader, more effective, and legally required or

appropriate language to "maintain[] the pre-bankruptcy status quo with regard to the [] Insurers'

substantive and procedural rights."  [*Id.* at 24].  RFC did not ultimately oppose the Insurers'

proposed language, and instead committed to revise the Plan's language to meet the Insurers'

concern and objection.  [Bk. ECF No. 5718 Annex A at 7].  The Insurers then withdrew their

Plan objection while "expressly reserv[ing] all of their rights under their Policies and under

applicable law and at equity."  [Bk. ECF No. 5876 at 3].

The final hearing on the Kessler Settlement was held on November 26, 2013 [Bk. ECF

No. 6012], after the parties had agreed to remove the limited insurer defense language and add

the broader language discussed above, and after RFC had represented to the Court that the

Insurers' confirmation objection was resolved through the addition of insurance-neutrality

language.  The Court entered a final order approving the settlement on November 27, 2013,

finding that the Settlement was "fair, reasonable and adequate as to, and in the best interests of,

the Parties and the Kessler Settlement Class Members," while also stating that the order "shall in

no way stay, bar, preclude, abate or otherwise operate as [an . . .] adjudication of any claims

other than the Released Claims or the Released Persons by the Releasors."  [Bk. ECF No. 5968

¶¶ 6, 14].

Finally, the Plan as confirmed in 2014 states that "nothing contained in [the] Plan . . .

shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing,

expanding, decreasing, or modifying the rights under the GM Policies of any of those insurers

that issued the GM Policies," that "all issues of insurance coverage or otherwise" shall be

"unaffected by the Plan" other than non-assignment defenses; and that, on all "issues of

insurance coverage," "non-bankruptcy law[] shall control," and all "rights and defenses shall

remain unaffected" by the Plan.  [Bk. ECF No. 6065-1 Art. VII(K)(2)(b), (e)].

    2.  <u>Relevant Legal Standards</u>

The governing summary judgment standard is stated above and is not repeated here.

Waiver is often a fact-dependent inquiry, *see Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue

Shield of N.J. Inc.*, 448 F.3d 573, 585 (2d Cir. 2006), and relevant case law is discussed below in

this Decision's analysis of the Kessler Class's waiver arguments.  The doctrine of collateral

estoppel, or issue preclusion, bars a party from relitigating in a second proceeding an issue of

fact or law that was litigated and actually decided in a prior proceeding, if that party had a full

and fair opportunity to litigate the issue in the prior proceeding and the decision of the issue was

necessary to support a valid and final judgment on the merits. *See, e.g.*, *Gelb v. Royal Globe

Insurance Co*., 798 F.2d 38, 44 (2d Cir. 1986); *Zdanok v. Glidden Co., Durkee Famous Foods

Division*, 327 F.2d 944, 955 (2d Cir. 1964); *see generally Parklane Hosiery Co. v. Shore*, 439

U.S. 322, 326 n.5 (1979).  Issues of fact may bear the same label without being identical, and

they are not identical if the legal standards governing their resolution are "significantly

different." *See, e.g.*, *Jim Beam Brands Co. v. Beamish & Crawford Ltd*., 937 F.2d 729, 734 (2d

Cir. 1991).

    3.  <u>Discussion</u>

        a.  *The Insurers Did Not Waive Their Right to Contest the Settlement's
Reasonableness for Purposes of Insurance Coverage*

134

The case's record firmly refutes the Kessler Class's contention that the Insurers waived the right to invoke reasonableness defenses to coverage demands arising from the Kessler Settlement. The Kessler Class relies both on the lack of any objection by the Insurers to the settlement approval motions that this Court adjudicated in 2013 notwithstanding the Court's specific order requiring any such objections to be raised before the final settlement approval hearing or be waived, and on more general case law holding that a party waives a right or defense where it effects "the voluntary and intentional abandonment of a known right which, but for the waiver[,] would have been enforceable." [ECF No. 808 at 20 (citing *Sang Lan v. AOL Time Warner, Inc.*, No. 11 Civ. 2870, 2013 WL 1820289, at *3 (S.D.N.Y. April 30, 2013))].

The Kessler Class rightly observes that the Insurers were on notice of the Class's claims from well before the bankruptcy, and that the Insurers had notice of the proposed Kessler Settlement beginning in June 2013. The Class also is correct that the Insurers did not file an objection to either the preliminary or the final settlement approval motion, filed under, respectively, Bankruptcy Rule 9019 and Bankruptcy Rule 7023, and the Class correctly quotes the directive in the preliminary order requiring the Insurers and other interested parties to object to the Settlement in connection with the fairness hearing or be deemed to have waived any such objection to the Settlement. [Bk. ECF No. 4808 ¶ 21]. As the Court provided in its preliminary settlement approval order, any failure by the Insurers or any other party in interest to object to the Settlement before the final approval hearing would constitute a waiver of objections *to the Settlement*. [*Id.*] The Kessler Class also is correct that insurers that are aware of litigation against an insured but fail to participate in the proceeding or challenge a settlement's reasonableness can be held to have waived their right to challenge reasonableness in a subsequent coverage litigation. *See Serio v. Pub. Serv. Mut. Ins. Co.*, 7 A.D.3d 277, 278 (N.Y.

135

App. Div., 1st Dep't 2004); *City of New York v. Zurich-Am. Ins. Grp.*, 27 A.D.3d 609, 611 (N.Y.

App. Div., 2d Dep't 2006).

The Kessler Class's waiver argument nevertheless fails because the Insurers do not seek

here to challenge or disturb or modify the Settlement; rather, they seek to assert coverage

defenses in the face of the Class's ongoing attempt to enforce insurance rights that the Settlement

caused to be assigned to the Class while explicitly preserving Insurer defenses.

The terms of the Settlement make clear that the Class is overstating the Settlement's

sweep and effect, and the case's history shows that the Class is ignoring important steps that the

Insurers took to preserve their rights and defenses, including their right to object to the

reasonableness of the claim amount in defending against claims that the Settlement authorized

the Kessler Class to assert.  The Settlement did not purport to deprive the Insurers of rights and

defenses with respect to coverage claims (other than by assigning collection rights to the Kessler

Class), and the Insurers *did* take timely action in the main bankruptcy case to assert and preserve

their ability to defend against coverage claims for reasons including the asserted

unreasonableness of the Settlement.

The terms of the Settlement make clear that no more was required of the Insurers.  The

Settlement did not purport to require payment by the Insurers to anyone.  Rather, it transferred

the Estate's insurance entitlements with respect to the Class's claim to the Class.  [*See* Bk. ECF

No. 4451-5 at 16–20; *e.g.*, *id.* at 19 (the Kessler Class and Liquidating Trust "take on all risk of

recovery or lack thereof . . . on the Insurance Rights")].  Thus, although the Insurers' lack of

objection to the "Settlement" defeats their ability to later seek to vacate or set aside the

Settlement itself, both pursuant to the Court's preliminary approval order and pursuant to legal

principles advanced by the Kessler Class in their current motion, that waiver does not extend

beyond the meaning of the Settlement to additionally bar the assertion of insurance defenses that the Settlement did not purport to resolve.

This conclusion comports with the Insurers' and RFC's unmistakable understanding of the Kessler Settlement as the settlement approval hearing approached. At the time Debtors and the Kessler Class were seeking approval of the Settlement, the Insurers repeatedly communicated to Debtors their insistence that their reasonableness and other coverage defenses be preserved, and they filed a statement in the bankruptcy case reserving those rights well before the final approval hearing on the Settlement, which did not occur until November 2013. [*See* Bk. ECF No. 4015 ¶ 14 ("The Debtors cannot use the Plan or any aspect of the bankruptcy process to alter or amend the rights and obligations arising under . . . the Policies.")]. On June 24, 2013, RFC filed a response, stating that insurance neutrality was a Plan confirmation issue (implicitly if not explicitly, as opposed to a Settlement approval issue), and that RFC would "ensure that the as-yet-to-be-filed Plan complies with all requirements pursuant to the Bankruptcy Code." [Bk. ECF No. 4066-1 at 2; Bk. ECF No. 4066 ¶¶ 21–28]. Further, the confirmed Plan—which was integrally related to the Kessler Settlement and whose confirmation was a required condition of effectiveness of that settlement—specified that the Insurers reserved all defenses including as to reasonableness. [Bk. ECF No. 6065-1 Art. VII(K)(2)(b), (e) (providing that "nothing contained in [the] Plan . . . shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying the rights under the GM Policies of any of those insurers that issued the GM Policies"; that "all issues of insurance coverage or otherwise" shall be "unaffected by the Plan" other than non-assignment defenses; and that, on all "issues of insurance coverage," "non-bankruptcy law[] shall control," and all "rights and defenses shall remain unaffected" by the Plan)].

This history refutes the Kessler Class's contention that the Insurers failed to timely and effectively preserve their rights to raise reasonableness or other coverage defenses if and when they became confronted with coverage demands.  Rather, the Insurers decided not to object to this arrangement in this Court so long as their right to challenge the reasonableness of the settlement in any eventual insurance collection proceeding was preserved.  They specifically reserved their rights in this regard, RFC confirmed this was the parties' intention and further represented to this Court that that was the parties' understanding and intention, and nothing this Court did or said provided otherwise.

This reality is fatal to the Kessler Class's motion based on waiver principles.  The Kessler Class has not established any "voluntary and intentional abandonment of a known right," *Sang Lan*, 2013 WL 1820289, at *3, nor any relevant aspect of the Settlement that precludes the Insurers from raising coverage defenses now.  Accordingly, this Decision does not detail or resolve the parties' other arguments.  Those arguments include the Insurers' objections, not persuasive to this Court, that they lacked meaningful opportunity to object to the Settlement because it supposedly was negotiated in secret and revealed at a time when the Insurers lacked adequate time to investigate it (they had Rule-compliant notice and did not seek discovery or demand an adjournment to permit investigation).  They also include the Kessler Class's criticism of the Insurers' supposed bad faith and strategic gamesmanship in avoiding submitting their defenses to resolution by this Court, because the nature of the Settlement did not require the Insurers to litigate ultimate coverage defenses.  It suffices for purposes of resolving the waiver-based motion to observe that the Class has failed to show an absence of any genuine issue of material fact sufficient to establish that the Insurers waived all coverage defenses based on their assertion that the Settlement was unreasonable.

138

b. *The Insurers Are Not Collaterally Estopped from Raising Reasonableness Defenses*

The Kessler Class's motion based on the collateral estoppel doctrine fares no better for the fundamental reason that the Court's prior preliminary and final orders of the Settlement did not adjudicate or determine whether the Insurers had valid defenses to the Kessler Class's anticipated insurance coverage collection efforts. Rather, as explained elsewhere in this Decision, the Settlement assigned the Estate's rights to coverage to the Kessler Class and allowed them the opportunity to pursue the Insurers to collect all otherwise unpaid portions of their allowed claim amount of $300 million from the Insurers.

The Class correctly quotes Judge Glenn's order approving the Settlement as determining that the "Settlement" is, among other things, fair and reasonable. And reasonable is the same word that the Insurers contend does not apply to the coverage claim now being advanced by the Class. But the two issues are not the same. *See Jim Beam Brands*, 937 F.2d at 734. Again, the Settlement assigned insurance coverage rights from the Estate to the Class, and fixed an allowed claim amount, while providing that the Class's only recourse beyond a guaranteed payout from the Estate of up to $27 million was to be the right to pursue insurance recoveries of up to $300 million. Nothing in the Settlement or its approval purported to extinguish or adjudicate the Insurers' coverage defenses, including as to the reasonableness of that allowed claim amount, and the Insurers took reasonable and effective steps to preserve that defense. Indeed, the Plan explicitly so provides, and the Debtors and the Insurers made clear to the Court that that was their understanding of how the Settlement worked.

Thus, the Court's approval of the Settlement simply did not adjudicate the reasonableness for insurance coverage purposes of the $300 million allowed claim amount. Rather, the Court previously determined on Rule 9019 and Rule 23 review that it was reasonable for both the estate

and for class members to enter a settlement that gave the Kessler Class a guaranteed $27 million

cash payment from the estate, plus the opportunity to pursue the Insurers, over their expressly

preserved defenses, for payment up to the on-paper allowed claim amount of $300 million.  As a

result, the Class fails to satisfy the requirement for application of collateral estoppel that a prior

adjudication resolved the same issue now before the Court.  *See, e.g.*, *Gelb*, 798 F.2d at 44;

*Zdanok*, 327 F.2d at 955.

> c.  *Factual Disputes Preclude Summary Judgment for the Kessler Class as to Whether the Settlement Was "Reasonable" for Insurance Coverage Purposes*

The Kessler Class's motion seeks summary judgment determining that the Settlement

was "reasonable" and that the Insurers accordingly cannot prevail on their reasonableness

defense to the Kessler Claim, which asserts in essence that their coverage obligations do not

require them to pay the Kessler Class on account of its allowed claim because that claim amount

is unreasonable.

The governing law on this issue is as follows.  First, as an appellate court has concluded,

New York's and Michigan's law on this issue align.  *See Fashion H., Inc. v. K mart Corp*., 892

F.2d 1076, 1094 (1st Cir. 1989) (concluding that the reasonableness test as stated in the

Michigan  case of *Trim v. Clark Equip. Co.,* 274 N.W.2d 33, 36–7 (Mich. App. 1978) "faithfully

mirrors the purport of New York's, as well as Michigan's, law" on reasonableness).

Further, as the parties agree, when an insurer declines coverage, an insured does not

forfeit its claim to coverage if it settles rather than proceeding to trial to determine its legal

liability.  *See, e.g.*, *Luria Bros. & Co., Inc. v. Alliance Assur. Co., Ltd*., 780 F.2d 1082, 1091 (2d

Cir. 1986).

To establish that the insurer is required to pay a claim for the resulting liability, the

insured or claimant must show that a potential liability on the facts known to the insured exists,

and that instead of risking trial, the insured settled in an amount that was reasonable in view of the size of possible recovery and degree of probability of claimant's success against the insured. *See Luria Bros.*, 780 F2d at 1091 (citing *Damanti v. Inger*, 314 F.2d 395, 397 (2d Cir. 1963)); *see also Vigilant Ins. Co. v. Travelers Prop. Cas. Co. of Am.*, 243 F. Supp. 3d 405, 431 (S.D.N.Y. 2017) ("The Court is guided by the Second Circuit's decision in *Luria* . . . .") (citing *Luria Bros.*, 780 F.2d at 1091); *Ostrowski v. Am. Safety Indem. Co.*, 07-CV-3977, 2010 WL 3924679 at *6–7 (E.D.N.Y. Sept. 30, 2010).

As part of the reasonableness assessment, New York courts require that the insured have entered the settlement in question in "good faith." *Deutsche Bank Tr. Co. of Ams. v. Tri-Links Inv. Tr.*, 837 N.Y.S.2d 15, 43 A.D.3d 56, 67 (App. Div., 1st Dept. 2007) ("Insofar as [indemnitor] is making the point that it can be required to indemnify [indemnitee] only for a settlement that was made in good faith, [indemnitor] is clearly correct."); *Ostrowski*, 2010 WL 3924679, at *6; *see also CIGNA Corp. v. Lincoln Nat'l. Corp.*, 775 N.Y.S.2d 303, 6 A.D.3d 298, 299 (App. Div., 1st Dep't 2004) (indemnitor was bound by the settlement made by indemnitee to the extent that it was reasonable and entered into in good faith); *see also Shihab v. Bank of N.Y.*, 211 A.D.2d 430, 431 (N.Y. App. Div., 1st Dep't 1995) (same); *Feuer v. Menkes Feuer, Inc.*, 8 A.D.2d 294, 299 (N.Y. App. Div., 1st Dep't 1959) (same).

Michigan law is similar: "If an indemnitor has notice of an action and declines the opportunity to defend it, the general rule is that the indemnitor will be bound by any reasonable, good faith settlement the indemnitee might thereafter make." *Grand Trunk W. R.R., Inc. v. Auto Warehousing Co.*, 686 N.W.2d 756, 763 (Mich. App. 2004). An earlier articulation of this requirement characterized "reasonableness" as requiring examination of the "amount paid in settlement of the claim in light of the risk of exposure. The risk of exposure is the probable

amount of a judgment if the original plaintiff were to prevail at trial, balanced against the possibility that the original defendant would have prevailed." *Id.* (citing *Ford v. Clark Equipment Co*, 87 Mich. App. 270, 274 N.W.2d 33 (1978)); *Trim*, 274 N.W.2d at 36–7. Risk of exposure is the probable amount of a judgment if the plaintiff were to prevail at trial balanced against the possibility that the defendant would have prevailed. *Trim*, 274 N.W.2d at 37.

Thus, under the law of both Michigan and New York, to successfully assert an insurance claim after an insurer has declined to indemnify or defend the claim, the insured or other claimant must show that the risk of liability is greater than the total settlement amount, and that the overall settlement was obtained in good faith.

The Insurers correctly cite cases recognizing that the reasonableness of a settlement often or generally is an issue of fact for the jury or other factfinder. *See, e.g.*, *Vigilant Ins.*, 243 F. Supp. 3d at 433 (S.D.N.Y. 2017) (denying summary judgment where reasonableness was at issue); *Hendershot v. Consol. Rail Co. & Nepera, Inc.*, No. 95 Civ. 7899, 1998 WL 240495, at *5 (S.D.N.Y. May 12, 1998) ("Whether or not a settlement is reasonable is generally a question of fact for the jury."). The reasonableness of a settlement can, however, appropriately be determined on a summary judgment motion where no material fact dispute exists, and the Kessler Class relies on at least one example of a grant of summary judgment for an insured against an insurer where reasonableness of a settlement reached by the insured was at issue. *See Bristol W. Ins. Co. v. Whitt*, 406 F. Supp. 2d 771, 783–85 (W.D. Mich. 2005). There, however, the insurer raised procedural challenges to the insured's conduct of the litigation including an assertion that the insurer "did not receive prompt notice of and a reasonable opportunity to appear in and defend" the litigation, *id.* at 784, not that the terms of the resulting settlement were objectively unreasonable. The *Bristol* court further noted that the insured "presented evidence

showing that the settlement was both the product of good faith negotiations and reasonable," *id.*
at 783, and the opinion does not describe any contrary evidence or argument advanced by the
insurer.  Thus, the holding in *Bristol* is consistent with the generally applicable summary
judgment standard of review, which instructs that a grant of summary judgment requires a
determination that no reasonable finder of fact could find a settlement unreasonable.  The lack of
a reasonableness-related evidentiary response by the insurers in *Bristol* explains the grant of
summary judgment for the insured.

Here, by contrast, genuine disputes of material fact preclude granting the Kessler Class's
summary judgment motion seeking a determination that the Insurers may not decline coverage
for the Kessler Class Claim based on the Insurers' contention that the allowed claim amount was
unreasonable.  The Kessler Class advances powerful arguments that the Settlement was
"reasonable" as is required to compel insurers to pay claims where they declined to participate in
their insured's defense of an eventually-settled claim.  These arguments include that the $300
million claim amount resulted from a hotly contested mediation process; that the stated claim
amount exceeded $1.8 billion and that various metrics suggest that $300 million is a reasonable,
litigation-risk adjusted resolution of the underlying dispute; that an RFC representative
acknowledged in May 2013 that a potential exposure of $2.1 billion existed; that the Kessler
Class's retained experts persuasively explain the reasonable basis for the Settlement amount; and
that the Insurers had ample opportunity to object to the Settlement's prior approval by this Court
yet failed to do so, and the Court's Settlement approval confirms the Settlement's
reasonableness.

The Insurers respond with evidence and arguments of their own:  that the Insurers'
experts opine that the Settlement amount was unreasonable and not in keeping with the insured's

litigation exposure on the underlying claim; that the same claims earlier were settled for less than $30 million which is consistent with the claims' true value, notwithstanding that that amount was disapproved by the then-presiding court; that the Kessler Class's experts' opinions rely on unreliable methods including projecting off of a too-small claim sample whose selection criteria and typicality is unknown; that the Settlement is functionally an agreement by the estate to pay no more than $27 million coupled with effectively a lottery ticket to pursue up to $300 million from the estate's insurance tower coverage, which arguably means that the estate lacked economic incentive to push back against facial claim allowance in amounts that greatly exceeded the relatively modest amount of cash that the Settlement required the estate to pay; that a mediator in 2006 opined that RFC was not unreasonable in viewing a possible $250 million to $300 million settlement as unacceptable; that the Settlement resulted from a flawed process that did not involve the Insurers at a time when they could reasonably influence the Settlement's terms, and instead was sprung on the Insurers as a fait accompli; and that the process leading to the Settlement bespeaks a lack of good faith that precludes a finding that the Settlement was reasonable.

The Court has carefully considered the parties' voluminous factual submissions and arguments and concludes that a genuine issue of material fact is present and precludes granting the Kessler Class's motion for partial summary judgment on the reasonableness of the Settlement.  Each side objects to the admissibility of evidence relied on by the other, but the Court observes that, even without relying on objected-to proposed evidence, factual issues remain that require trial.

The Kessler Class is not aided by the determination of Minnesota courts that settlements by RFC were "reasonable" and therefore binding on primary lending banks from whom RFC

sought indemnification for damages flowing from loans that RFC obtained from those banks.
[*See* ECF No. 812 at 29–35 (citing *In re RFC & RESCAP Liquidating Trust Action*, 399 F. Supp.
3d 804, 819 (D. Minn. 2019) and other cases)].  One such case stated the Minnesota court's
findings of fact and conclusions of law following trial, taking a multitude of evidence into
account and resolving factual disputes based on the totality of the evidence, *In re RFC and
ResCap Liquidating Trust*, 399 F. Supp. 3d at 809–11; that obviously cannot be done on
summary judgment.  .  Moreover, the settlement giving rise to the indemnification claims did not
involve the feature, hotly contested by the Insurers here, that RFC would only be liable to a
limited amount while an assignee could pursue the full amount of RFC's insurance coverage,
without limitation.  Further, the Minnesota court's post-trial ruling was preceded by a pre-trial
decision denying a summary judgment motion on the basis that "the Court is unable to rule that
the [MBS] Settlements were reasonable as a matter of law."  *In re RFC & RESCAP Liquidating
Tr. Action*, 332 F. Supp. 3d 1101, 1157 (D. Minn. 2018).  Another Minnesota RFC
indemnification case was resolved on summary judgment, *see Residential Funding Co. v.
Universal Am. Mortg. Co.*, No. 13-cv-3519, 2018 WL 4955237, at *5–8 (D. Minn. Sept. 12,
2018), and later decisions likewise held that the RFC settlement was not unreasonable, *see
Residential Funding Co. v. First Mortgage Co.*, No. 13-cv-3490 (SRN/HB), 2018 WL 6727065,
at *6 (D. Minn. Dec. 21, 2018); *In re ResCap Liquidating Trust Litig.*, 428 F. Supp. 3d 53, 81, 84
(D. Minn. 2019).

     The overall impression left by these Minnesota indemnification cases is that, when a prior
settlement's reasonableness is at issue, just as on any other issue, the reviewing court must assess
the body of evidence advanced in support of and in opposition to a summary judgment motion.
Such motions are neither presumptively appropriate, nor presumptively inappropriate.  Here, as

noted, the parties advance abundant evidence and advance plausible competing contentions that demonstrate the existence of factual disputes requiring trial. The Court therefore denies the Kessler Class's motion for partial summary judgment seeking a determination that their settlement was reasonable.

## I.    The Amount of Loss Incurred in Connection With the Kessler Settlement Is Not Limited to the $27 Million Actually Distributed From the Estate

The Defendants moved for partial summary judgment on the Plaintiffs' claims for breach of contract against the Excess Insurers and on the Plaintiffs' claims for declaratory judgment against all the Defendants. [ECF No. 836]. Specifically, the Defendants seek a ruling that (i) the amount of loss incurred as a result of the Kessler Settlement is limited to the amount of the cash distribution from the estate (approximately $27 million), not the full amount of the allowed claim ($300 million); and (ii) consequently, the Excess Insurers' exhaustion provisions will never be satisfied, so the breach of contract claims against them should be dismissed in whole or in part. [*See generally* ECF No. 843]. The Defendants' primary argument is that the Defendants are required to indemnify RFC only for those losses which RFC was "legally obligated to pay," which, pursuant to the terms of the Policy, the Kessler Settlement, the Plan, the Plan confirmation order, and the Borrower Claims Trust Agreement (collectively, the "**Controlling Documents**"), include only the $27 million cash disbursement, and not the full $300 million allowed claim amount. [*E.g.*, ECF No. 843 at 9–22]. The Class Plaintiffs opposed the motion,[47, 48] arguing, among other things,

---

[47] The opposition brief is technically titled "*The Kessler Class's* Memorandum of Law" [ECF No. 889 at 1 of 53], but the brief is signed by both "Counsel for the Kessler Class" and "Counsel for the Mitchell Class" [*id.* at 45], and the accompanying response to the Defendants' statement of undisputed material facts was filed by both the Kessler Class and the Mitchell Class [ECF No. 890 at 1], so the Court will proceed as though the Class Plaintiffs collectively opposed the motion. Analytically, this distinction makes no difference.

[48] The Trust also opposed the motion, but it did so only "[t]o the extent any Excess Insurer seeks 'dismissal' of the Trust's claims against them based on their [exhaustion] argument," and the Trust's sole argument was to incorporate by reference the arguments raised in its opposition to the Excess Insurers' motion for partial summary judgment based on their exhaustion arguments. [ECF No. 896 at 1]. As discussed below, the Court need not reconsider the exhaustion issue here and therefore need not give further consideration to the Trust's opposition to the present motion.

that the express terms of the Controlling Documents preserve the Class Plaintiffs' right to pursue

the Defendants for the full $300 million allowed claim amount, and that the $300 million allowed

claim *is* a legal obligation to pay.  [ECF No. 891 at 16–41].

For the reasons that follow, the Court denies the Defendants' motion for partial summary

judgment on the amount of loss incurred in connection with the Kessler Settlement.

1.  The Breach of Contract Claims Against the Excess Insurers Are Already Dismissed

As an initial matter, the Court denies the motion as moot to the extent that it seeks dismissal

of the breach of contract claims against the Excess Insurers, because those claims are already

dismissed pursuant to the Court's decision on the Excess Insurers' motion for partial summary

judgment based on their exhaustion arguments.  *Supra* § E.  Indeed, the Defendants' arguments on

this issue are largely duplicative of the arguments made in support of the Excess Insurers'

exhaustion motion [*see* ECF No. 843 at 7–9; ECF No. 915 at 2–8], and the Class Plaintiffs' and

Trust's arguments in opposition to the present motion merely incorporate by reference their

respective oppositions to the exhaustion motion [*see* ECF No. 889 at 45; ECF No. 896 at 1], so the

Court need not discuss those arguments again here.

2.  Summary Judgment on the Declaratory Judgment Claims Against All Defendants Is
     Inappropriate

The Defendants also seek summary judgment dismissing, in whole or in part, the Plaintiffs'

claims for a declaratory judgment that the Plaintiffs are entitled to $356.4 million ($300 million of

which they attribute to the Kessler Settlement), because "[t]he most that plaintiffs can recover for

the Kessler Settlement is $27 million."  [*E.g.*, ECF No. 843 at 9].  Many of the facts relevant to

this motion are already laid out in the Court's discussion of the Plaintiff's reasonableness and

waiver/estoppel motions, *see supra* § H, so the Court's factual recitation here focuses primarily on

those facts that are not discussed above.

a.  *Selected Background Concerning RFC's Settlement of the Kessler Claim*

As set forth in the Class Plaintiffs' statement of undisputed facts and brief in opposition to the present motion, RFC negotiated with the Kessler Plaintiffs in mediation before Judge Peck from April to June of 2012. [ECF No. 889-1 ¶¶ 9–10]. During that time, RFC sought to involve the Defendants in the negotiations and also sought the Defendants' consent, but the Defendants refused both. [*Id.* ¶¶ 11–35]. During a May 7, 2013 phone call, RFC's counsel informed the Defendants that RFC expected to settle the Kessler Claim in exchange for an allowed claim of $250–$350 million and possibly an assignment of insurance rights under the Policies, and that the Defendants would be responsible for paying "100%" of any allowed claim in favor of the Kessler Plaintiffs as part of any settlement. [*Id.* ¶¶ 36–39]. During a June 14, 2013 in-person meeting, RFC informed the Defendants that the proposed Plan included distributions to the Kessler Plaintiffs through a "Borrower Claims Trust," that the "Borrowers Claims Trust Agreement" would allow borrowers to recover insurance proceeds "on account of [their] allowed claim against the Debtors," that borrowers receiving insurance recoveries would return a proportionate amount of previously received distributions to the Borrower Claims Trust, and that any insurance recoveries under the Policies would be for 100% of the Kessler Plaintiffs' allowed claim, not the amount the Debtor actually paid in partial satisfaction of the claim. [ECF No. 899 at 5–6].

On June 27, 2013, RFC entered into the finalized Kessler Settlement and provided the same to the Insurers for their consent the following day. [ECF No. 889-1 ¶¶ 43–44]. During the approval process, RFC's general counsel testified to this Court that the settlement provided for "the potential for enhanced recoveries from available insurance," and Class counsel testified that "under the terms of the Agreement and Plan, certain Insurance Rights in and to the Policies will be assigned

to the Kessler Settlement Class thereby providing the Class the potential for a very significant recovery." [*Id.* ¶¶ 45–46].

    b.  *Relevant Provisions of the Controlling Documents*

  Evaluating the Defendants' contention that the amount that RFC is (or was) legally obligated to pay is no more than $27 million requires an understanding of the Kessler Settlement and Plan terms that gave the Kessler Class an allowed claim for $300 million, subject to certain provisions or limitations as to the sources of funding from which the Kessler Class could be paid under the Plan.  Those terms are extensive, but their overall import is simple: the Kessler Class was granted an allowed claim of $300 million as against the debtor's estate, and they could collect up to that amount only from one specific estate asset, namely estate insurance entitlements, with the limited exception that the Kessler Class also was entitled to a cash distribution of up to $27 million from other sources.  That preview aside, because this Decision turns on much of the specific language of the Controlling Documents, the Court will quote extensively from those documents rather than attempting to summarize or characterize them further.

  The Policy provides that "Underwriters shall pay on behalf of the Assureds: (a) Loss which the Assureds shall become legally obligated to pay by reason of any Claim first made against such Assured during the Policy Period resulting directly from a Wrongful Act committed by a Professional Liability Assured or by any person or entity for whose conduct a Professional Liability Assured is legally responsible in rendering or failing to render Professional Services." [ECF No. 336-1 § I.D(a); ECF No. 823 at 20 of 577].

  The Kessler Settlement Agreement provides, in relevant part:

> WHEREAS, the Parties acknowledge and agree that this Agreement constitutes a compromise in settlement of the claims (including the Proofs of Claim) and causes of action that have been or could be raised by any Kessler Class Claimant against the Settling Defendants and the other Released Persons (as defined herein) as to the

CBNV/GNBT Loans (as defined herein) but shall in no way release or affect (except as set forth herein) the existing or future claims, causes of action, remedies, and/or rights to relief of any Kessler Class Claimant against any person, association, or entity other than a Released Person with respect to the CBNV/GNBT Loans.

\* \* \*

2.25 Released Claims.  . . .  It is the intention of the Releasors to provide a general release of the Released Claims against the Released Persons; provided, however, that anything in this Agreement to the contrary notwithstanding, the term Released Claims does not include: (A) the claims of the Kessler Class Claimants, whether or not currently asserted in the Litigation, against . . . (2) the insurers that issued the Policies listed in Exhibit E [including the Defendants here],

2.26 Released Persons. "Released Persons" means the Settling Defendants and the Debtors, and each of their past and present officers, directors, shareholders, employees, attorneys (including any consultants hired by counsel), accountants, heirs, executors, and administrators, and each of their respective predecessors, successors, and assigns. Notwithstanding anything in this Agreement to the contrary, the term Released Persons expressly does not include any of the following: . . . (c) insurers or successors to insurers that issued the Policies as listed in Exhibit E;

\* \* \*

[5. Policies.] a. The sole source of recovery of the Kessler Settlement Class shall be distributions from the Borrower Claims Trust and Insurance Rights under the Policies and not from any other assets or property of the Settling Defendants, Released Persons or any other Debtor, or, as established under the Plan, the Liquidating Trust (as defined in the PSA) or the Private Securities Claims Trust (as defined in the PSA)."

b.  On the Effective Date [which is defined as "the date when all of the conditions set forth in Section 14 have occurred and the Settlement thereby becomes effective in all respects"], the Debtors shall convey, transfer, and assign their rights to the Insurance Rights to (i) the Kessler Settlement Class with respect to indemnity for the Kessler Settlement Amount . . . .

\* \* \*

e.  To the extent the Kessler Settlement Class recovers under Insurance Rights on account of all or some of their claims, the Kessler Settlement Class shall return a proportionate amount (such proportionate amount determined by dividing the recovery amount under the Insurance Rights by the Allowed Claim) of any prior distributions from the Borrower Claims Trust Assets made on account of any recoveries of the Kessler Settlement Class from the Borrower Claims Trust (the

"Giveback").  The Kessler Settlement Class shall be entitled to its proportionate share of any distributions from the Borrower Trust resulting from the Giveback. No Kessler Net Recovery Distribution shall be made from proceeds recovered from the Insurance Rights unless and until a Giveback, if any, owed to the Borrower Claims Trust has actually been made.

* * *

[8. Releases.] a. On the Effective Date, in exchange for the agreement by the Settling Defendants to make available and fund the Borrower Claims Trust, to assign the Insurance Rights as set forth herein and for other good and valuable consideration, Releasors, by operation of this Release and the judgment set forth in the Final Order, shall be deemed without further action by any person or the Court (i) to have fully, finally and forever released, settled, compromised, relinquished, and discharged any and all of the Released Persons of and from any and all Released Claims; (ii) to have consented to dismiss with prejudice the Released Claims of the Releasors against the Released Persons in the Litigation; and (iii) to be forever barred and enjoined from instituting or further prosecuting the Released Persons in any forum whatsoever including any state, federal, or foreign court, or regulatory agency. . . . provided, however, that nothing in the Release under this Agreement shall be deemed to waive or impair the right of the Kessler Settlement Class or any members thereof or the Liquidating Trust to seek and recover for their respective claims under the Policies.

* * *

14.   Effectiveness of Settlement Agreement. a. The "Effective Date" of this Agreement shall be the date when all of the following conditions have occurred, at which point the Settlement shall be deemed effective in all respects: . . . (ii) The insurers who issued the Policies have been given at least 48 hours to review and provide their consent to this Agreement, with such notice to be furnished to the insurers on the day following execution of this Agreement, and either have provided their unanimous consent, or the Debtors, in their sole discretion, have elected to proceed with this Agreement despite not receiving such consent; (iii) A Preliminary Approval Order has been entered by the Court, in a form substantially similar to that attached as Exhibit B, granting preliminary approval of this Agreement, and approving a form of Class Mail Notice, as provided in section [8]; . . . (v) A Final Approval Order has been entered by the Court in a form substantially similar to that attached as Exhibit C, as provided in Section 12; . . . and (vii) The Plan, as described in the Plan Support Agreement, has been confirmed and the Effective Date of the Plan (as defined in the Plan) has occurred.

* * *

[Proposed Final Order § 14.] Claims Reserved. The entry of this Order shall in no way stay, bar, preclude, abate or otherwise operate as a dismissal, release, discharge

or adjudication of any claims other than the Released Claims as to the Released Persons by the Releasors.

[Bk. ECF No. 4451-5 at 5, 12–13, 16–17, 19, 29–30, 42–43, C-9].

The Plan provides: "As provided in the Kessler Settlement Agreement, as one element of, and in consideration for, an overall negotiated settlement of numerous disputed claims and issues embodied in the Plan and subject to the entry of the Kessler Settlement Approval Orders, the Kessler Settlement Class shall receive the Allowed Kessler Claim against the RFC Debtors [*i.e.*, the $300 million allowed claim].  The sole source of recovery of the Allowed Kessler Claim shall be distributions from the Borrower Claims Trust and the GM Insurance Rights, and not from any other assets or property of the Released Parties, the Liquidating Trust, or the Private Securities Claims Trust. . . .   Subject to entry of the Kessler Settlement Approval Orders, on the Effective Date, the Debtors shall, pursuant to section 1123(a)(5) of the Bankruptcy Code, convey, transfer, and assign the GM Insurance Rights under the GM Policies in accordance with the Kessler Settlement Agreement and the Kessler Settlement Approval Orders, to (i) the Kessler Settlement Class with respect to indemnify for the Allowed Kessler Claim . . . ."  [Bk. ECF No. 6065-1 at 70].

According to the Plan, the "Borrower Claims Trust" is a "trust established [by the Plan] for the benefit of the holders of Allowed Borrower Claims"—which include the "Allowed Claims held by the Kessler Class Claimants"—for the purpose of "(i) direct[ing] the processing, liquidation and payment of the Allowed Borrower Claims in accordance with the Plan, and the distribution procedures established under the Borrower Claims Trust Agreement, and (ii) preserv[ing], hold[ing], and manag[ing] the assets of the Borrower Claims Trust for use in satisfying Allowed Borrower Claims."  [*Id.* at 6, 67].  The Plan also provides that "the Debtors shall transfer the Borrower-Related Causes of Action to the Borrower Claims Trust.  On or as soon as practicable after the Effective Date, if the Debtors shall not otherwise have done so, the Liquidating Trust, in

152

its capacity as Disbursing Agent, shall fund the Borrower Claims Trust with $57.6 million in Cash

. . . . Distributions to holders of Borrower Claims will be made in accordance with methodology,

criteria and procedures established in the Borrower Claims Trust Agreement." [*Id.* at 85].

The Borrower Claims Trust Agreement, in turn, provides that "[e]ach holder of an Allowed

Borrower Claim shall be entitled to receive (i) Cash in an amount equal to the Allowed amount of

such Claim multiplied by the applicable Borrower Claims Recovery Percentage [which is 9.0%

for claims against RFC, and 9.0% of $300 million is $27 million] (a 'Borrower Claims Payment')

and (ii) its Borrower Claim[s] Trust Beneficial Interest, as provided in Section 3.1. For the

avoidance of doubt, any insurance proceeds to which a holder of an Allowed Borrower Claim may

be entitled shall be in addition to, and not inclusive of, a Borrower Claims Payment, subject to the

right of the Borrower Claims Trust to any Return Amounts pursuant to Section 2.5, and any Cash

distributions from the Return Amount Reserve shall be made in accordance with Section 6.5(b). .

. . The Borrower Claims Payment is intended to be comparable to the recovery that the holder of

an Allowed Claim in the same amount against the same Debtor Group would realize from

distributions made by the Liquidating Trust on Units issued to Unitholders with respect to such

Allowed Claim, based on the estimated value of the Liquidating Trust Assets available for

distribution to Unitholders as of the Effective Date (without, in each case, giving effect to any

insurance proceeds, including proceeds from the GM Policies that may be received in respect of

certain Allowed Borrower Claims . . . )." [Bk. ECF No. 6136-3 at 2, 14–15].

Section 2.5 of the Borrower Claims Trust Agreement provides: "Subject to the Kessler

Settlement Agreement and the Mitchell Settlement Agreement, to the extent a Trust Beneficiary

recovers insurance proceeds on account of all or some of an Allowed Borrower Claim, and

payments on account of such Allowed Borrower Claim have been made pursuant to this Borrower

Claims Trust Agreement, the Trust Beneficiary shall be required to return a portion of such

payments received by such Trust Beneficiary to the Borrower Claims Trust, in accordance with

Article IV.F.6 of the Plan (such returned amount, a 'Returned amount').  Any Returned Amounts

received by the Borrower Claims Trust shall be added to the Return Amount Reserve," which is

defined as "the reserve of Cash maintained by the Borrower Claims Trust for distribution to certain

Trust Beneficiaries as provided in Section 6.5." [*Id.* at 6, 9–10].

Returning to the Plan, Article IV.F.6 provides as follows:

It is the intention that distributions made from the Borrower Claims Trust on account of an Allowed Borrower Claim will be comparable to the recovery that the holder of an Allowed Claim in the same amount against the same Debtor Group would realize from distributions made by the Liquidating Trust on Units issued in respect of such Allowed Claim, based on the value of the assets in the Liquidating Trust available for distribution to holders of Units as of the Effective Date (without in each case giving effect to any insurance proceeds, including proceeds from the GM Policies, that may be received in respect of certain of the Allowed Borrower Claims or to the time delay in receipt of distributions in respect of the Units issued by the Liquidating Trust).  For the avoidance of doubt, the comparable recovery percentages that the holder of an Allowed Claim in the same amount against the same Debtor Group would realize from distributions made by the Liquidating Trust on Units issued in respect of such Allowed Claim shall be established once and finally and for all purposes, including for all future distributions by the Borrower Claims Trust, at the time of and in connection with the Borrower Trust True-Up and confirmation of the Plan, and neither the amount to be transferred to the Borrower Claims Trust nor the percentage distributions from the Borrower Claims Trust shall be adjusted following the Effective Date based on actual experience with respect to recoveries from the Liquidating Trust following the Effective Date of the Plan.

Except as otherwise provided herein or in the Kessler Settlement Agreement, to the extent a Borrower recovers insurance proceeds on account of all or some of an Allowed Borrower Claim, (i) if distributions on account of such Allowed Borrower Claim have not been made, the amount of such Allowed Borrower Claim shall be reduced to the extent paid by insurance proceeds, or (ii) if distributions on account of such Allowed Borrower Claim have been made, the Borrower shall be required to return an amount equal to all distributions received by the Borrower from the Borrower Claims Trust on account of such Allowed Borrower Claim multiplied by a fraction, the numerator of which is the amount of the insurance proceeds received and the denominator of which is the amount of its Allowed Borrower Claim.  Such Borrower shall thereafter continue to be entitled to its proportionate share of any

154

future distribution from the Borrower Claims Trust.  For the avoidance of doubt, the Kessler Settlement Class shall continue to be entitled to its proportionate share of any such future distribution.  Any Borrower who recovers insurance proceeds on account of all or some of an Allowed Borrower Claim shall be required to notify the Borrower Claims Trustee of such recovery within ten (10) Business Days of receipt.

[Bk. ECF No. 6065-1 at 67–68].

Of particular relevance to the Class Plaintiffs' arguments, the Plan also provides that "nothing herein or in the Confirmation Order shall impair any of the Debtors' or any Borrower or former Borrower's rights or remedies (including the GM Insurance Rights) under or with respect to insurance policies other than the Settlement Insurance Policies (as assigned in the Plan), including but not limited to the GM Policies," [*id.* at 57], and that "[n]othing contained in this Plan, in the Disclosure Statement, in the Liquidating Trust Agreement, or in the Borrower Claims Trust Agreement (including addendums, exhibits, schedules, or supplements to the Plan, Disclosure Statement, Liquidating Trust Agreement, or Borrower Claims Trust Agreement, and including any provision that purports to be preemptory or supervening), shall in any way operate to, or have the effect of, impairing, reducing, decreasing, or impeding any Cause of Action that the Debtors, the Liquidating Trust, or any Entity may hold against any insurers under any policies of insurance" [*id.* at 94].

c. *Arguments*

The Defendants argue that the amount of Loss incurred in connection with the Kessler Settlement is capped at $27 million "because that is the amount that RFC was 'legally obligated to pay.'"  [ECF No. 843 at 9].  At a high level, the Defendants' argument proceeds in three basic steps.  *First*, pursuant to both caselaw and the Policy itself, the Defendants are obligated to indemnify RFC only for those damages which RFC is "legally obligated to pay," and therefore "a release discharging [RFC] from all liability relieves the [I]nsurer from the duty of indemnification

because it effectively eliminates any factual or legal grounds on which the duty to indemnify may be based." [*Id.* at 10–11 (citations omitted)]. *Second*, pursuant to the various provisions of the Controlling Documents discussed above, (i) RFC gave the Kessler Class an allowed unsecured claim against RFC in the amount of $300 million so that the Kessler Class could pursue any claims that RFC had against the Insurers, (ii) RFC made a $27 million cash distribution to the Kessler Class through the Borrower Claims Trust (9.0% of $300 million is $27 million), and (iii) RFC was fully released from any obligation other than the cash distribution and the assignment of insurance rights. [*Id.* at 11–17]. *Third*, once the Court confirmed the Plan and the Plan became effective, "RFC had a legal obligation to disburse cash for the benefit of the Kessler plaintiffs," but that legal obligation was limited to the $27 million cash disbursement, not the full $300 million allowed claim amount, pursuant to *In re Prudential Lines Inc.*, 158 F.3d 65 (2d Cir. 1998) and *Fuller-Austin Insulation Co. v. Highlands Ins. Co.*, 135 Cal. App. 4th 958 (Cal. Ct. App. 2006). [ECF No. 843 at 16–19]. Thus, the argument goes, the Defendants' indemnification obligations are capped at $27 million, not $300 million.

The Class Plaintiffs argue, among other things, that the provisions of the Controlling Documents excerpted above preserve the claims against the Defendants in the full $300 million allowed claim amount, that the Controlling Documents did not effect a release of RFC's or the Insurers' liability and obligations, and that the Allowed Claim is a legal obligation to pay. [*See generally* ECF No. 889].

      d.  *Discussion*

To be clear—and as the Defendants have been careful to note—the Defendants do *not* argue that they are obligated to indemnify RFC for only those amounts *actually paid* by RFC, though that appears to be the argument's practical effect; instead, the Defendants argue that they

are obligated to indemnify RFC for only those amounts which RFC is (or was) *legally obligated to pay*, which they say the $300 million allowed claim amount is not. The following exchange during the Hearing makes this point abundantly clear:

> [The Court:] As I understand it, you're reading all of the applicable policies to say that no, no—that payment obligations apply on the part of insurers solely as to amounts actually paid [by RFC]. And that's essentially the twenty-seven million or that's your computation of it, right? . . . That was a negotiated cash distribution. And then the other part is . . . on top of that rests a large, agreed claim amount. We're talking in the ballpark of 300 million that was never paid. And the only— the only satisfaction beyond the cash payment of twenty-seven million is the ability to essentially chase after insurers standing in the shoes of RFC for a coverage amount. But you will say there's no coverage entitlement because there's been no payment, I think. How am I doing?

> [The Defendants:] [Y]eah, I would say it a little differently, which is, the question is what was RFC legally obligated to pay. What they actually paid, they actually paid more than twenty-seven million. But what were they legally obligated to pay by the documents that they signed and that were approved by the court. And that's the language in the insurance policy, legally obligated to pay.

[Hearing Tr. at 217:14–218:15].

The Class Plaintiffs agree that the Policies oblige the Defendants to cover only those losses which RFC is "legally obligated to pay" and that the Plan, once confirmed by the Court, imposed such an obligation on RFC, but the Plaintiffs disagree about the amount of that obligation and argue, among other things, that the $300 million allowed claim *is* a legal obligation to pay, so the Defendants are obligated to indemnify RFC for the full $300 million allowed claim amount. [ECF No. 889 at 16–22, 34–41].

Because the parties do not dispute that the Court's confirmation of the Plan was capable of imposing on RFC—and *did* impose on RFC—a legal obligation to pay *something*, the critical question is whether or not the $300 million allowed claim approved by the Court constitutes such an obligation. Both parties rely on various cases in support of their respective positions, but neither

157

party cites any binding, on-point authority on the issue, and the Court is aware of none. Even so, the Court finds the cited cases instructive and will discuss them in turn.

### e. *The Class Plaintiffs' Cases*

The Class Plaintiffs cite various cases for the proposition that "an allowed claim is a judicial determination of a debtor's liability without qualification" and "fixes a debtor's legal liability even though, as is the case in nearly every bankruptcy, the debtor is incapable of satisfying the full amount of its liability and the debtor's ability to pay only a portion of an allowed claim does not alter or otherwise diminish the full amount of liability the debtor is judicially determined to owe." [ECF No. 889 at 19–20].

The Class Plaintiffs first cite *In re RFC & RESCAP Liquidating Tr. Action*, in which the District Court for the District of Minnesota, analyzing the same Plan and confirmation order that are at issue in this case, held that "the Confirmation Order approving the Second Amended Plan constitutes a final judgment. And, significantly, this final judgment set forth the Allowed Claims, which are, by definition, liabilities. Accordingly, the plain language of the Client Guide requires Defendants [MBS loan originators] to indemnify Plaintiffs for the Allowed Claims set out in the Plan." 332 F. Supp. 3d 1101, 1158–59 (D. Minn. 2018). Of course, a case in the District of Minnesota is not binding on this Court, and even if it were, the case is not on all fours with the present case—for one thing, it involves indemnification by the originating lender of MBS, not by an insurer, and the indemnification provision at issue does not use the precise term "legal obligation to pay"—but the Court nonetheless considers *RFC & RESCAP* to be strong support for the Class Plaintiffs' position that the $300 million allowed claim amount is a legal obligation to pay.

The Defendants respond that the court in *RFC & RESCAP* "acknowledged the general rule that an extinguished claim does not give rise to an indemnity obligation, but pointed out that the 'language of confirmation orders and bankruptcy plans will obviously differ from case to case." [ECF No. 915 at 15–16 (quoting *RFC & RESCAP*, 332 F. Supp. 3d at 1144–45)]. This is true, of course, but it does little to help the Defendants here, because *RFC & RESCAP* dealt with the very same confirmation order and Plan at issue in the present case, so by definition the language is *identical* between that case and this one. The Defendants also attempt to distinguish *RFC & RESCAP* on the grounds that the court there decided that "'the applicable language in [that] case did not extinguish the Allowed Claims' of the MBS creditors because those creditors 'received "Units" [of the Liquidating Trust] in exchange for the allowed claims, which entitle them to receive a pro rata share of recoveries that the Liquidating Trust obtains on their claims,'" whereas the "applicable language of the Plan [here] is different for the Kessler Plaintiffs" because "[t]hey did not receive 'Units,'" but "a guaranteed cash distribution" of the coverage claim. [*Id.* (quoting *RFC & RESCAP*, 332 F. Supp. 3d at 1144–45)]. This distinction is arguably relevant to the Defendants' release arguments, but it has nothing to do with the Minnesota court's decision that the Allowed Claims were liabilities, that the Plan was a final judgment setting forth said liabilities, and that the defendants were therefore required to indemnify the plaintiffs for the full Allowed Claim amounts; indeed, the issue of "Units" is discussed only briefly in an entirely separate section of the decision. *Compare RFC & RESCAP*, 332 F. Supp. 3d at 1158–59 (discussing the defendants' obligation to indemnify for the entire Allowed Claim amount), *with id.* at 1144–45 & n.22 (discussing the "Units" issue as one reason why the claims against the defendants were not actually released). Therefore, the Defendants' arguments do not change the Court's view that *RFC & RESCAP*, though not binding, is nonetheless persuasive authority.

The Class Plaintiffs also cite *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Porter Hayden Co.*, which involved facts similar to the present case. No. CIV. CCB-03-3408, 2012 WL 734176 (D. Md. Mar. 6, 2012). In *Porter Hayden*, the plaintiff's insurers "argue[d] that they [we]re obligated to indemnify the [Trust] only for the actual sums which the Trust pays out to claimants" because "the amount of their indemnification obligation should be substantially reduced from the full value of the claims to the specific sums which the [Trust] [was] able to distribute to claimants." *Id.* at *1. The relevant policy language was similar to the Policy language here, and required the insurers to "pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay." *Id.* The District of Maryland ultimately denied the insurers' motion for summary judgment and "f[ound] that the measure of the Insurers' indemnification liability is not limited to the percentage paid out to the claimants." *Id.*

The *Porter Hayden* court provided several reasons for its conclusion, some of which bear special mention here. *See id.* at *1–4. First, the court explained that, under Maryland law, "an insured is 'legally obligated to pay' a sum if it 'ultimately face[s] the task' of paying that amount," and that "there [was] no question that the Trust 'ultimately face[d] the task' of paying the full amount of the [allowed] claims to the extent of the assets that [we]re or bec[a]me available to do so." *Id.* at *2. The court also explained that "dramatically reducing the Insurers' obligation by correlating it with the Trust's payment percentage would be a form of releasing the insurer from liability on account of the insolvency of the insured," which is contrary to Maryland law. *Id.* at *4. Finally, the court emphasized that the confirmed plan "which was confirmed by the Bankruptcy Court and approved by [the District Court], specifically states that it is not intended to release Porter Hayden's insurers from liability. The Bankruptcy Code is not intended to enable insurers to evade their indemnity obligations. The notion that bankruptcy of the insured should

160

not accrue to the benefit of the insurers is well-established. [A] party who is derivatively liable

for the indebtedness of the debtor, such as its insurer, remains so after confirmation and the

debtor's discharge." *Id.* (quotations omitted).

The Defendants argue that *Porter Hayden* "is irrelevant because it did not adjudicate the

question at hand: whether [the insurers'] indemnity obligation was for the face amount of the

allowed claims or for the out-of-pocket amount actually paid." [ECF No. 915 at 21]. The

Defendants do not expand on this argument at all,[49] so the Court rejects it out of hand because it

is, quite simply, wrong; as just discussed, *Porter Hayden* addressed *precisely* that question. *See*

*generally Porter Hayden*, 2012 WL 734176, at *1 ("[T]he Insurers seek a declaration from this

court that the amount of their indemnification obligation should be substantially reduced from the

full value of the claims to the specific sums which the PHBIT is able to distribute to claimants. .

. . Porter Hayden, by contrast, contends it is entitled to indemnification in the gross amount of

allowed value of claims to the Trust. For the reasons that follow, this court will deny the Insurers'

motion for partial summary judgment and find that the measure of the Insurers' indemnification

liability is not limited to the percentage paid out to the claimants."). Of course, *Porter Hayden*,

like the parties' other cases, is not binding on this Court, especially considering certain of the

court's reasons were expressly based on an application of Maryland state law, which is not

applicable here. Even so, the Court finds *Porter Hayden* to be well-reasoned and considers much

of its rationale to be applicable here, and therefore considers it persuasive authority.

The Class Plaintiffs also point to *UNR Indus., Inc. v. Cont'l Cas. Co.*, 942 F.2d 1101 (7th

Cir. 1991) as "similarly reject[ing] an insurer's attempt to limit coverage for a 'loss' to the amounts

---

[49] To the extent the Defendants intend their observation that *Porter Hayden* involved "an indemnity obligation in an asbestos bankruptcy" [ECF No. 915 at 21] as an additional distinguishing factor, the Defendants would be well-advised not to throw stones, because the primary case on which they rely, *Fuller-Austin Insulation Co. v. Highlands Ins. Co.*, also involves an asbestos bankruptcy. *See generally*, 135 Cal. App. 4th 958 (Cal. Ct. App. 2006).

actually distributed to claimants from the estate." [ECF No. 889 at 38]. The insurance policy at issue in *UNR* provided indemnification for "loss," which was defined as "the sums paid as damages in settlement of a claim or in satisfaction of a judgment." 942 F.2d at 1104. The Seventh Circuit's decision, later cited with approval by *Porter Hayden*, explained that limiting the amount of loss based on "how much money the Trust actually pa[id] to asbestos victims with valid claims" would "threaten[] to confer a windfall on [the insurer] at the asbestos victims' expense. The reason for the potential windfall is that [the insurer] paid the Trust only a portion of the asbestos victims' actual damages in the bankruptcy proceedings. This discounting of the asbestos victims' damages had nothing to do with the merits of their claims. The discounting merely reflected the amount of [the insured's] assets that the asbestos victims could reach. [The insurer] may profit greatly from [the insured's] bankruptcy if its obligations are based on the arbitrarily discounted amount that the asbestos victims actually receive from the Trust." *UNR*, 942 F.2d at 1105. The court found that such a profit would "be contrary to both" the insurance policy, which provided that the insured's bankruptcy "shall not relieve [the insurer] of any of its obligations," and Illinois law. *Id.* Thus, the court concluded that the insurer was "bound by the [] valuation of the asbestos victims' claims in the reorganization." *Id.* at 1106.

The Defendants argue in both their opening and reply briefs that *UNR* is "inapplicable as a matter of law and distinguishable on its facts." [ECF No. 843 at 19–22; ECF No. 915 at 18–20]. The Defendants first argue that *UNR* is distinguishable because the policy provision in *UNR* stating that the insured's bankruptcy "shall not relieve [the insurer] of any of its obligations," which was required by Illinois state law, is not present in the Policy here, and although Michigan law "has an 'anti-diminishment' statute," it "does not apply to surplus lines policies written by surplus lines insurers, as the Primary Policy was here." [ECF No. 843 at 20; ECF No. 915 at 18–19]. "In other

162

words," the Defendants conclude, "General Motors bargained for—and paid for—insurance *without* the clause that animated the *UNR* decision." [ECF No. 843 at 21]. The Court agrees with the Defendants that the Seventh Circuit's reliance on Illinois law in *UNR* is a distinguishing factor, but the Court finds it a stretch to suggest that the absence of an "anti-diminishment" clause demonstrates that the parties specifically bargained for that absence, especially in the absence of any citations to evidence supporting such a proposition. The Court further disagrees with the Defendants that the clause they emphasize "animated" the outcome of *UNR*; as the Class Plaintiffs rightly point out, *UNR* was also based on concerns of fundamental unfairness that would arise from granting a windfall to the insurer [ECF No. 889 at 42 (citing *UNR*, 942 F.2d at 1105)], and *Porter Hayden*, which applied Maryland law, not Illinois law, adopted *UNR* anyway and focused on the language in the plan [*id.* (citing *Porter Hayden*, 2012 WL 734176, at *4)]. In any event, in light of the Class Plaintiffs' other cases on this point which the Court finds persuasive, the Court finds it unnecessary to delve any deeper into the Defendants' attempts to distinguish *UNR* or the parties' arguments concerning the Defendants' status as surplus lines insurers [*see* ECF No. 843 at 20–21; ECF No. 889 at 41–44; ECF No. 915 at 18–20].

      f.   *The Defendants' Cases*

The Defendants primarily rely on two cases. The Defendants first rely on *Prudential Lines*, which they characterize as an "instructive" decision in which the Second Circuit "declined the Trustee's invitation to [apply] 'New York's general policy of preventing an insurer from taking advantage of an insured's bankruptcy' [because] 'the obstacle faced by Claimants [was] a bargained for contract clause that protect[ed] an insurer unwilling to waive it.'" [ECF No. 843 at 17–18 (quoting *Prudential Lines*, 158 F.3d at 76)]. The Court agrees with the Class Plaintiffs, however, that *Prudential Lines* is "exceedingly distinguishable" and "simply not applicable here."

163

[ECF No. 889 at 39–40]. The "bargained for contract clause" in *Prudential Lines* was "a pay first provision requiring that [the insured] pay any claims prior to seeking indemnification from [the insurer]." 158 F.3d at 67–68. Thus, unlike here, the issue in *Prudential Lines* was whether the insured had *actually paid*, *not* whether the insured was *legally obligated to pay*, so *Prudential Lines* is inapposite for that reason alone.

Indeed, the decision in *Prudential Lines* turned on the fact that the insured was engaging in a "sham transaction" preventing it from actually paying and satisfying the pay-first provision: "[The] bankrupt [insured] lack[ed] the funds to pay the claims. In an effort to satisfy the Claimants and the pay first provision, the reorganization plan set aside $300,000 for use in a recycling arrangement: seriatim, the Trustee disbursed a damages payment to each Claimant, who then returned the money to the Trustee as a non-recourse loan so that it would be on hand to pay the next Claimant, and so on. . . . The underlying claims were satisfied with non-recourse notes that entail for [the insured] no actual loss incurred in good faith. . . . [The insured] issues boomerang payments from the $300,000 account. But as these funds immediately came home, the [] Claimants received nothing of value from the insured, and the insured sustained no true loss. We do not think that this sham transaction triggered an indemnification obligation under New York law." *Id.* at 67–68, 74. No such sham transaction exists in this case—nor could it, because such a transaction is premised on the satisfaction of a pay first clause, which also does not exist here—which further underscores that *Prudential Lines* is not applicable here.

In reply, the Defendants suggest that the "Kessler Plaintiffs protest that this case is distinguishable from *Prudential Lines* because they received a 'judgment' that RFC was 'legally obligated to pay'" [ECF No. 915 at 15], but the Defendants simply mischaracterize the Class Plaintiffs' argument; the Class Plaintiffs distinguish *Prudential Lines* on the grounds discussed in

the preceding paragraphs of this Decision [*see* ECF No. 889 at 39–40]. Thus, the Court finds that *Prudential Lines* is inapplicable here.

The Defendants also rely on *Fuller-Austin*, 135 Cal. App. 4th 958, which they describe as "[a]lso instructive." [ECF No. 843 at 19; ECF No. 915 at 14–15]. In that case, according to the Defendants, "the relevant Chapter 11 plan established a settlement trust to which claims could be submitted and assigned a predetermined allowed liquidation value. A claimant who accepted the trust's allowed liquidation value, however, 'would receive only a periodically adjusted "Payment Sum Percentage" . . . based on the Trust's assets, that would amount to only a fraction of the [allowed liquidation value].' The claimants filed an action against the debtor's insurers seeking coverage for the aggregate amount of allowed liquidation values. The *Fuller-Austin* court held that the insurers' indemnification obligation extended only to 'the payment sum percentage that [the debtor would] *actually pay* each claimant,' because that amount—not the allowed liquidated value—was 'the only amount that [the debtor was] obligated to pay . . . .' As the appellate court explained, holding the insurers liability [sic] for allowed liquidation values 'would impermissibly grant [the debtor] greater rights under its insurance policies than it had prior to bankruptcy.'" [ECF No. 843 at 19 (quoting *Fuller-Austin*, 135 Cal. App. 4th at 969–70, 996–97) (alterations in original)].

*Fuller-Austin* is less far afield than *Prudential Lines*, but it is still distinguishable. As the Class Plaintiffs rightly point out, part of "the reason that [the *Fuller-Austin*] court limited the insurers' obligation to the amount actually paid was because 'each asbestos claimant will receive the same amount regardless of whether appellants are obligated to indemnify [the insured] in the [allowed liquidated value] amount or the payment sum percentage amount.' . . . Unlike the settlement and plan in *Fuller-Austin*, the Kessler Settlement, Plan and BCTA all provide that any

165

recovery of the Insurance Rights will directly benefit the borrower claimants both by directly receiving proceeds from the Policies as well as providing for further distributions to RFC claimants from those same proceeds." [ECF No. 889 at 40–41 (quoting *Fuller-Austin*, 135 Cal. App. 4th at 998)]. Indeed, *Fuller-Austin* itself distinguished *UNR* on the same grounds, *see* 135 Cal. App. 4th at 999 ("Implicit in the *UNR Industries* court's reasoning is the notion that there is a direct relationship between the amount that [the insurer] pays into the trust and the amount that each asbestos victim will receive. As discussed earlier, however, the Plan here makes no provision for such a relationship. In other words, nothing in the Plan states that the payment sum percentage received by each asbestos claimant is directly affected by the level at which insurance proceeds are recovered. While certainly there may be some indirect effect to the extent that the payment sum percentage can change on the basis of total Trust assets, such a tenuous relationship affords no basis for imposing an indemnification obligation on appellants in the [allowed claim] amount."), as did *Porter Hayden*, *see* 2012 WL 734176, at *2 ("[*Fuller-Austin*] is distinguishable on the facts. In reaching its conclusion, the *Fuller–Austin* court emphasized that 'an asbestos claimant would not receive any greater protection by an order requiring appellants to indemnify Fuller–Austin in the ALV [allowed liquidation value] amount of each claim, as payment would not alter the Plan's payment provisions dictating that each claimant receives only a payment sum percentage . . . .' Indeed, *Fuller–Austin* cited and distinguished case law suggesting that 'an insurer should not be permitted to limit its liability on the basis of an insolvent insured's inability to pay' on the grounds that Fuller–Austin claimants 'w[ould] receive the same amount regardless of whether appellants are obliged to indemnify Fuller–Austin in the ALV amount or the payment sum percentage amount.'").

The Defendants reply that "[t]hat argument does not help the Kessler Plaintiffs because RFC's obligations to the Borrower Claims Trust were long ago fixed and discharged; and because there will be no payments from the insurers into the trust.  To be sure, the Kessler Plaintiffs will recycle all but 3% of any recoveries through the trust, but that recycling arrangement will not substantially affect any claimant's rights.  As in *Fuller-Austin*, imposing an indemnification in the allowed-claim amount will affect the trust only in an indirect and attenuated manner."  [ECF No. 915 at 14–15].  But the projected Insurer infusion to the trust of 3% of $300 million is still $9 million, which is not insignificant, and the Defendants fail to explain why such benefits would be too "indirect and attenuated" to create a "direct relationship between the amount that [the Insurer] pays into the trust and the amount that each [] victim will receive" sufficient to distinguish this case from *Fuller-Austin*, *see* 135 Cal. App. 4th at 999–1000.

In any event, *Fuller-Austin* is materially and even fundamentally distinguishable for the further reason that the decision does not suggest that the plan or any of the controlling documents there, like the Controlling Documents here, were replete with clear expressions of the parties' and the court's intention that the settlement and plan would *not* serve to limit the insurers' indemnification obligations in any way.  *See generally Fuller-Austin*, 135 Cal. App. 4th 958.  The Defendants have not suggested that they did.  Indeed, if anything, the *Fuller-Austin* decision suggests that the parties understood, prior to plan confirmation, that the controlling documents in that case need *not* be interpreted as imposing a "legal obligation to pay" the full allowed claim amount.  For example, in *Fuller-Austin*, the proposed plan originally provided that "the Plan's confirmation would constitute 'an adjudication of liability on the part of [the insured] and the Trust for the [Allowed Claim] and to holders of Asbestos Claims, and shall be a determination of a sum that [the insured] and the Trust shall be legally obligated to pay.'"  *Id.* at 970.  The insurers

objected, and the insured "unilaterally deleted the challenged language concerning any aggregate amount it would be legally obligated to pay." *Id.* The *Fuller-Austin* plan, therefore, is a far cry from the Plan here, which, as reflected in the recitation of facts above, contains innumerable reservations of the Kessler Class's ability to pursue the Insurers for the full allowed claim amount—an authorization that the insurers in *Fuller-Austin* succeeded in eliminating. And, of course, as with the Class Plaintiffs' cases, *Fuller-Austin* is a state court case applying state law not applicable here, and it is therefore not binding on this Court. To the extent *Fuller-Austin* is viewed as supporting the Defendants' position notwithstanding the Court-approved Kessler Settlement's and Confirmed Plan's contemplation that the Kessler Class was receiving a $300 million claim against the estate and the right to pursue recovery of the estate's insurance coverage for that allowed claim, the Court disagrees with such an application of *Fuller-Austin*, primarily because *Fuller-Austin* does not support such a result, but also because, if it does, it is contrary to abundant case law referenced above, and to this Court's and the parties' explicit intention as expressed in the Controlling Documents in this case.

Thus, on balance, the Court concludes that the Class Plaintiffs have the better of the caselaw argument, and that the approach taken by the Class Plaintiffs' cases is the right one. Therefore, and particularly in light of the Controlling Documents' clear, repeated expressions of the parties' and the Court's intentions that the Kessler Class should be allowed to pursue the Defendants for the full Allowed Claim amount, the Court concludes that, in this case, the $300 million allowed claim amount is a "legal obligation to pay" for which the Defendants are obligated to indemnify RFC.

Finally, although applicable law does not support the Insurers' arguments on this motion, even if it did, the Court would decline to rule in the Insurers' favor on this motion given the

Controlling Documents' contents. As this Decision's detailed factual recitation makes clear, the parties' agreement that the Kessler Class would have an allowed claim in a sum certain of at least $300 million against the estate, and would be entitled to pursue the estate's coverage entitlements as against the Insurers on account of that allowed claim amount, was made abundantly clear at all stages of the Settlement and Plan proceedings, with express reservations understood and specifically approved by this Court, and with not a peep from the Insurers (who were active case participants) that the parties' manner of wording their agreement would defeat its implementation. The Court does not agree that the agreement's form carries the prejudicial impact that the Insurers urge, but, even if it might, the Court need not and does not exalt form over substance to excuse the Insurers' obligations over the parties' clearly intended substantive agreement, which this Court approved as fair and legally appropriate in its approvals of the Kessler Settlement and its confirmation of the Plan. *See Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 404 (2d Cir. 2000) ("The principal purpose of the obligee is given great weight if it can be ascertained. . . . If a literal interpretation of a writing that purports to be a release would frustrate that purpose, the writing may be interpreted as a contract not to sue.") (citing Restatement (Second) of Contracts § 284 cmt. c. (1981)).

    3.  <u>Conclusion</u>

    Therefore, the Court denies the Defendants' motion for partial summary judgment on the amount of loss incurred in connection with the Kessler Settlement.

**CONCLUSION**

    For the reasons stated above, the Court grants the Plaintiffs' motions for partial summary judgment and denies the Insurers' motions for partial summary judgment as to the scope of coverage under the Policy; grants the Plaintiffs' motions for partial summary judgment and

denies the Insurers' motion for partial summary judgment as to the applicability of Exclusion 38; denies both the Insurers' motion for partial summary judgment and the Class Plaintiffs' informal request for partial summary judgment as to whether the Policy by its terms covers Losses that result from enhanced damages; grants the Excess Insurers' motion for partial summary judgment on the Plaintiffs' breach of contract and consequential damages claims based on the Excess Insurers' exhaustion provisions; denies the Insurers' motion for partial summary judgment and the Class Plaintiffs' informal request for partial summary judgment as to whether certain claims or causes of action are time-barred; denies the Insurers' motion for summary judgment on the Plaintiffs' claims for consequential damages; denies the Kessler Class's motion for partial summary judgment as to whether the Insurers have waived, or are collaterally estopped from raising, any challenges to the reasonableness of the Kessler Settlement amount; denies the Kessler Class's motion for partial summary judgment finding said amount reasonable; and denies the Insurers' motion for partial summary judgment as to the amount of Loss incurred in connection with the Kessler Settlement.

As discussed during oral argument on the motions (Hearing. Tr. at 295–97), the parties are to attempt to reach agreement on a form of proposed order consistent with the rulings set forth in this Memorandum of Decision, and submit it on consent. Failing that, interested parties may submit competing proposed orders for the Court's consideration. The parties also are to contact chambers to schedule a conference at which the Court will discuss appropriate next steps in the litigation. That conference will not occur before January. In view of the impending holidays, although prompt entry of an order would be desirable, the parties may submit their

proposed order or orders on or before January 6, 2023.

Dated: New York, New York                              *s/ David S. Jones*
      December 21, 2022                    Honorable David S. Jones
                                      United States Bankruptcy Judge